1  Paul Mezan (NY Bar No. 5357124)
   Stephanie Liebner (VA Bar No. 90647)
2  James Doty (NY Bar No. 4552550)
   Federal Trade Commission
3  600 Pennsylvania Ave., NW
   Washington, DC 20580
4  Phone: (202) 758-4177 (Mezan)
   Email: pmezan@ftc.gov (Mezan)
5  Fax: (202) 326-3395

6  *Attorneys for Plaintiff*
   *Federal Trade Commission*

7  *Additional Counsel Listed on Signature Page*

8

9            UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA

11                 OAKLAND DIVISION

12

| | |
|---|---|
| 13  FEDERAL TRADE COMMISSION; THE ATTORNEYS GENERAL OF THE STATES OF ALABAMA, ARIZONA, CONNECTICUT, MARYLAND, MINNESOTA, MISSOURI, MONTANA, NEBRASKA, NEW HAMPSHIRE, NEW JERSEY, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, PENNSYLVANIA, VIRGINIA, WEST VIRGINIA, WISCONSIN, AND THE DISTRICT OF COLUMBIA; THE PEOPLE OF THE STATE OF CALIFORNIA, THE PEOPLE OF THE STATE OF ILLINOIS, AND THE PEOPLE OF THE STATE OF MICHIGAN,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., a corporation; and<br><br>UBER USA, LLC, a limited liability company,<br><br>Defendants. | Case No. 4:25-cv-03477-JST<br><br>**FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

1        Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"); the Attorneys

2    General of the States of Alabama, Arizona, Connecticut, Maryland,  Minnesota, Missouri,

3    Montana, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma,

4    Pennsylvania, Virginia, West Virginia, Wisconsin, and the District of Columbia (collectively,

5    "Attorneys General")*; the People of the State of California, by and through the District Attorney

6    for Alameda County, the People of the State of Illinois, and the People of the State of Michigan

7    (together with the Attorneys General, "Plaintiff States") (together with the FTC, "Plaintiffs"), for

8    their Complaint allege:

9        1.     The FTC brings this action for Defendants' violations of Section 5(a) of the FTC

10   Act, 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act

11   ("ROSCA"), 15 U.S.C. § 8403, in connection with Defendants' false or misleading claims

12   regarding their subscription services, their failure to provide simple mechanisms for customers to

13   cancel their subscription services, and their charging of customers without their consent.  For

14   these violations, the FTC seeks relief, including a permanent injunction, monetary relief, civil

15   penalties, and other relief, pursuant to Sections 5(m)(1)(A), 13(b), and 19 of the FTC Act, 15

16   U.S.C. §§ 45(m)(1)(A), 53(b), 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

17       2.     The Plaintiff States bring this action with the FTC pursuant to ROSCA, which

18   provides "the attorney general of a State . . . alleging a violation of this chapter . . . that affects or

19   may affect such State or its residents may bring an action on behalf of the residents of the State

20   in any United States district court for the district in which the defendant is found . . . or wherever

21   venue is proper . . . to obtain appropriate injunctive relief."  15 U.S.C. § 8405(a).  Additionally,

22

---

23     * The Attorneys General bring this action pursuant to their own law enforcement authority to seek statutory remedies and to obtain relief for their citizens and remediate all harm arising out

24   of—and provide full relief for—violations of ROSCA and the state consumer law claims enumerated in this Complaint.  The Attorneys General bring their claims set forth in this

25   Complaint in that capacity and not on behalf of any other state agency or state body.  However, references to the Attorney General of Connecticut with respect to its state law claims shall mean

26   the Connecticut Attorney General acting at the request of the Commissioner of Consumer Protection.  References to the Attorney General of Maryland with respect to its state law claims

27   shall mean the Consumer Protection Division, Office of the Attorney General of Maryland. References to the Attorney General of New Jersey with respect to its state law claims shall mean

28   the New Jersey Attorney General and the Acting Director of the New Jersey Division of Consumer Affairs.

First Amended Complaint
Case No. 4:25-cv-03477-JST

1   the Plaintiff States allege that Defendants' false or misleading claims discussed below, and their

2   charging of customers without their consent, constitute unfair and/or deceptive acts and practices

3   that are prohibited by the below enumerated state consumer protection laws.  These laws

4   authorize the Plaintiff States to seek injunctive relief, rescission or reformation of contracts,

5   restitution, damages, the refund of monies paid, disgorgement of ill-gotten monies, or other

6   equitable relief to stop ongoing fraud, deception, or unfair practices caused by Defendants' state

7   law violations.  These laws also authorize the Plaintiff States to obtain civil penalties, attorneys'

8   fees, expenses, and/or costs.

9   **SUMMARY OF THE CASE**

10  3.      Defendants Uber Technologies, Inc. and Uber USA, LLC (collectively, "Uber")

11  provide ride-hailing and food delivery services that consumers can book and pay for through an

12  app on their smartphone.  Defendants also charge consumers $9.99 a month or $96 a year for a

13  subscription service called Uber One in connection with these services.  In numerous instances,

14  Uber claims that consumers in an Uber One membership will save certain amounts off ride

15  bookings or food deliveries compared to those without an Uber One membership, and that Uber

16  One consumers can "cancel anytime" without additional fees.  Uber One renews automatically

17  and charges consumers' credit cards or debits their bank accounts directly on a recurring basis.

18  4.      Consumers have complained that they have been enrolled in an Uber One

19  subscription without their consent, reporting that they never signed up and have no idea why they

20  were charged.  And internal Uber One testing shows that 85% of consumers who were being

21  charged for Uber One and wanted to cancel it would not keep it even if it only cost $1.

22  5.      Defendants have failed to provide a simple method to cancel Uber One,

23  employing a series of obstacles that compound to deter and prevent consumers from stopping

24  recurring charges.  For any consumer wishing to cancel Uber One, Defendants require them to

25  take at least 12 different actions and navigate a maze of at least 7 screens, if they guess the right

26  paths to use, despite there being no mention of cancellation until the fourth screen.  Cancellation

27  is even more difficult for consumers within 48 hours of their billing date.  During this period,

28  Defendants have removed the option to cancel their subscription service from their applications,

1    forcing consumers to take as many as 32 actions and navigate as many as 23 screens, if they

2    guess the right paths to use and only go through the loop described below once.  Even after that,

3    they have had to contact customer service.  In numerous instances, even when consumers are

4    able to reach Uber's customer service, the representatives have taken so long to respond to and

5    effectuate consumers' cancellation requests that consumers end up being charged again without

6    their consent.

7                          **JURISDICTION AND VENUE**

8            6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

9    1345, and 1355.  This Court also has subject matter jurisdiction over the supplemental state law

10   claims asserted by the Plaintiff States under 28 U.S.C. § 1367.

11           7.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), and

12   (d), 1395(a), and 15 U.S.C. § 53(b).

13                        **INTRADISTRICT ASSIGNMENT**

14           8.    Assignment to the Oakland Division is proper because at all relevant times

15   Defendants have conducted business, marketed, and sold their services throughout the United

16   States, including throughout the County of Alameda.

17                                **PLAINTIFFS**

18           9.    The FTC is an agency of the United States Government created by the FTC Act,

19   which authorizes the FTC to commence this district court civil action by its own attorneys.  15

20   U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which

21   prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces

22   ROSCA, 15 U.S.C. §§ 8401-05, which, *inter alia*, prohibits the sale of goods or services on the

23   Internet through negative option marketing without meeting certain requirements to protect

24   consumers.  A negative option is an offer in which the seller treats a consumer's silence – their

25   failure to reject an offer or cancel an agreement – as consent to be charged for goods or services.

26   16 C.F.R. § 310.2(w).

27           10.   The Attorneys General are the chief legal officers of their respective jurisdictions.

28   The District Attorney for Alameda County is authorized to enforce state consumer protection

laws on behalf of the People of the State of California.  The Attorney General for the State of Illinois is authorized to bring an action in the name of the People of the State of Illinois to enforce the Illinois Consumer Fraud Act.  The Plaintiff States bring this action pursuant to consumer protection and/or business regulation authority conferred on them by the following state laws and/or pursuant to *parens patriae* and/or common law authority:

| STATE | STATUTORY AUTHORITY |
|---|---|
| Alabama | ALA. CODE § 8-19-1 *et seq.* |
| Arizona | ARIZ. REV. STAT. §§ 44-1521 to 44-1534 |
| California | CAL. BUS. & PROF. CODE § 17200 *et seq.* and § 17500 *et seq.* |
| Connecticut | CONN. GEN. STAT. § 42-110a *et seq.*, and more particularly, 42-110m |
| District of Columbia | D.C. CODE §§ 28-3901 *et seq.* |
| Illinois | 815 ILL. COMP. STAT. § 505/7(a) |
| Maryland | MD. CODE ANN., COM. LAW § 13-101 *et seq.* |
| Michigan | MICH. COMP. LAWS § 445.905 and § 445.910 |
| Minnesota | MINN. STAT. §§ 8.01, 8.31 |
| Missouri | MO. REV. STAT. § 407.020 *et seq.* |
| Montana | MONT. CODE ANN. §§ 30-14-101 through 30-14-160 |
| Nebraska | NEB. REV. STAT. §§ 87-303.05, 303.11 |
| New Hampshire | N.H. REV. STAT. ANN. § 358-A:1 *et seq.* |
| New Jersey | N.J. STAT. ANN. §§ 56:8-1 to -232, and N.J. STAT. ANN. §§ 52:17B-120, 52:17B-124 |
| New York | N.Y. EXEC. LAW § 63(12) and N.Y. GEN. BUS. LAW §§ 349 and 350 |
| North Carolina | N.C. GEN. STAT. § 75-1.1 *et seq.* |
| Ohio | OHIO REV. CODE ANN. § 1345.01 *et seq.* |
| Oklahoma | OKLA. STAT. tit. 15, § 756.1 |
| Pennsylvania | 73 PA. STAT. §§ 201-1 through 201-9.2 |
| West Virginia | W. VA. CODE § 46A-1-101 *et seq.* |
| Wisconsin | WIS. STAT. § 100.18(11)(d) |

11.   The Plaintiff States also bring this action to enforce the consumer protections contained in ROSCA, which are described below.

## **DEFENDANTS**

12.   Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  Defendant Uber Technologies, Inc. provides ride-hailing and food delivery services and transacts or has transacted business in this District and throughout the United States.

13.   Defendant Uber USA, LLC is a Delaware limited liability company with its

1   principal place of business in San Francisco, California.  Together with Defendant Uber

2   Technologies, Inc., Defendant Uber USA, LLC offers subscription services, such as Uber One,

3   and transacts or has transacted business in this District and throughout the United States.

**COMMON ENTERPRISE**

4

5       14.     Defendants Uber Technologies, Inc. and Uber USA, LLC have operated as a

6   common enterprise while engaging in the deceptive acts and practices and other violations of law

7   alleged below.  Uber has conducted the business practices described below through interrelated

8   companies that have common ownership, office locations, advertising, and lack any real

9   distinction.  Because Uber Technologies, Inc. and Uber USA, LLC have operated as a common

10  enterprise, each of them is liable for the acts and practices alleged below.

**COMMERCE**

11

12      15.     At all times relevant to this Complaint, Defendants have maintained a substantial

13  course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

14  15 U.S.C. § 44.

**DEFENDANTS' BUSINESS ACTIVITIES**

15

16      16.     Founded in 2009, Uber distributes mobile software applications that can be

17  downloaded to a smartphone (the "Uber App" and the "Uber Eats App") (collectively, the "Uber

18  Apps").  The Uber Apps connect transportation providers or couriers with consumers seeking

19  transportation or food delivery services.  Consumers book a ride or a food delivery from an Uber

20  driver using the Uber App or the Uber Eats App.  Following completion of the ride or food

21  delivery, Uber bills the cost to the consumer, deducts fees, and remits a portion of that amount to

22  the provider or courier.

23      17.     Uber has charged consumers for various subscription plans over the years,

24  including Uber Pass, and since November 2021, Uber One.  Consumers enrolled in Uber One

25  typically pay $9.99 per month for a monthly subscription or $96 per year for an annual

26  subscription.  Uber One subscriptions renew automatically, charging consumers on a recurring

27  basis unless they take affirmative action to cancel by a certain date.  Month-to-month plans are

28  renewed and charged monthly, and annual plans are renewed and charged on a yearly basis,

unless consumers are able to cancel.

18.     As of September 2024, Uber has enrolled more than 28.7 million consumers into Uber One subscriptions, including consumers who reside in each of the Plaintiff States' jurisdictions.  These subscriptions account for about $935 million of Uber's gross revenues during just a 2-year period.

**<u>Uber Misrepresents the Purported Benefits of Subscription Plans, including that Consumers Can Cancel Uber One Subscriptions "Anytime"</u>**

19.     Uber markets subscription plans.  For example, it advertises Uber One on its website, the Uber Apps, and various other media as a way for customers to qualify for certain discounts or promotions on eligible rides or deliveries by paying a monthly or annual membership fee.  As part of this marketing, Uber promises consumers certain savings and that they will be able to cancel their subscriptions at "anytime."  For example, during the enrollment flow for Uber One in the Uber apps, Uber states that consumers "[s]ave $25 every month" and can "cancel anytime" with no additional fees.[†]

---

[†] Some of the screenshots that appear in this complaint represent the customer experience for users who have had their mobile devices set to "dark mode."  In that experience, screenshots have appeared in light mode at times and dark mode at other times.

First Amended Complaint
Case No. 4:25-cv-03477-JST



**Ex. 1**

20.     Similarly, the sign-up page on Uber's website markets six benefits of Uber One, including that Uber One consumers can "cancel anytime without fees or penalties."  Another purported benefit is "$0 delivery fees" on eligible orders.

**Ex. 2**

21.     Further, Uber One's customer service representatives are encouraged to make the "cancel anytime" representation to consumers who contact Uber to inquire about enrolling in Uber One. For example, internal talking points documents encourage representatives to tell consumers, "You can cancel your membership in the app at any time."

22.     In fact, these claims are false. Many consumers do not actually save $25 a month by using Uber One. In fact, Uber internal testing documents from January 2023 noted that, "Overall, ███ of users who tried to cancel had ██ savings. ███ of users had lifetime savings between ██ and ███ where ███ are free trial users among them with less than ██ lifetime savings." Further, Uber's savings claim assumes that the subscription is free; the purported savings does not subtract any costs.

23.     Additionally, consumers, including Uber One subscribers, have reported that they have had to pay delivery fees.

24.     Likewise, consumers cannot cancel Uber One "anytime" without paying additional fees. As discussed below, it is difficult to cancel an Uber One subscription, and

consumers have not been able to cancel anytime.

<u>**Uber Enrolls Consumers in Subscriptions in a Number of Ways,**</u>
<u>**Including Without Consent**</u>

25.     Consumers are enrolled in subscriptions in a variety of ways.  For example, they are enrolled in Uber One through push notifications, pop-ups in the Uber App or Uber Eats App, on the checkout screen when booking a ride or delivery, on Uber's website, and through Uber's partnerships with credit card companies.  Regardless of the method, the enrollment process does not require any interaction with Uber customer service representatives and is processed immediately.

26.     Uber sends push notifications to consumers' phone lock screens and displays in-app pop-ups advertising savings, such as on the consumer's next ride or delivery.  For example, Defendants often present consumers using the Uber Apps with pop-up advertisements inviting them to "Claim offer," and promising savings such as, "Get 50% off 1 year."



**Ex. 3**

27.     Consumers that "Claim [the] offer" through a pop-up advertisement proceed directly to a checkout screen that says, "Try Uber One," crosses out the price of $9.99, and has a

1   big button labeled, "Try for free."



15  **Ex. 4**

16          28.     Once consumers click the "Try for free" button, they are immediately enrolled in

17  Uber One and will be charged within 4 weeks (in the example above), and on a recurring basis

18  thereafter.

19          29.     Other consumers who are using the Uber Apps to book a ride or food delivery are

20  presented with an advertisement to enroll in Uber One on their checkout screen.  For example, a

21  consumer attempting to book a ride in the Uber App would see a checkbox above the "Next"

22  button on their checkout screen which tells them that if they check that box they can save a

23  certain dollar amount off their ride with a free trial of Uber One.



**Ex. 5**

30.     If the consumer clicks to "check" the box, a pop-up appears prominently telling them that they will get Uber One "Free for 4 weeks" and can "cancel without fees or penalties," above a bold button labeled "Start Saving":

1

2

3

4

5

6

7

8

9

10

11

12

13



14 **Ex. 6**

15      31.      Once consumers click "Start saving," they are immediately enrolled in Uber One

16 and will be charged every month or year for a subscription.  The only other choice is to

17 "Cancel."  It is unclear what tapping that button would cancel at this point – it could be the

18 delivery or ride they are trying to book; they have not signed up for Uber One and thus could not

19 cancel it.

20      32.      If a consumer were to notice smaller text above the button, they would see

21 language that states that, "You'll be charged $9.99 on [billing date] and every month until you

22 cancel in the app."  However, as discussed more below, consumers are actually charged *before*

23 that date.

24      33.      The consumers in the examples above never click a button labeled "Join Uber

25 One" and do not need to affirmatively enter any billing information; Uber already has it stored if

26 the consumer has ever taken a ride with Uber.  Nevertheless, Uber charges these consumers a

27 recurring subscription fee before the stated billing date – and on a recurring basis thereafter, at

28 least until the consumer notices the charges and tries to cancel them, and in many instances, even

First Amended Complaint
Case No. 4:25-cv-03477-JST

after that.

34.     Consumers are also enrolled in Uber One if they do the following: first, tap "Account" on their home screen, then tap the "Uber One" button on their account screen.



**Exs. 7 & 8**

35.     This directs them to the screen that advertises the "benefits" of Uber One, including that consumers can "cancel anytime" with no additional fees (excerpted in Paragraph 19, above).  Consumers then tap on the "Continue" button, which directs them to a checkout screen where they can complete their enrollment by tapping the "Join Uber One" button.

First Amended Complaint
Case No. 4:25-cv-03477-JST



**Ex. 9**

36.     Consumers can also enroll using Uber's website.  Consumers simply click on the "Sign up now" button on the Uber One page and are directed to the checkout page where they can click the "Join Uber One" button to complete their enrollment.

37.     Further, in some instances, consumers are enrolled into Uber One memberships through Uber's partnerships with credit card companies.  Consumers with certain credit cards may be signed up for Uber One memberships for free for a set number of months, then are charged automatically on a recurring basis.

38.     Consumers report finding Uber One charges on their credit card bill despite *never* knowingly signing up for an Uber One subscription *at all*.  For example, one consumer said, "Uber is charging me for Uber [O]ne and I did not sign up nor gave them credit card info," while another consumer related that, "Uber One has been charging my bank account for $9.99 a month without my consent or me subscribing."  Consumers often complain about this:

- "I'm not sure how it happened but I did an Uber to my job and now Uber one has been taking $9.99 out of my account for the last 15 or 16 months."

First Amended Complaint
Case No. 4:25-cv-03477-JST

- "I looked at a credit card bill and I realized that Uber Eats had been charging $9.99 for an Uber One account for the past 8 months. I have never signed up for this service."

- "I never signed up for Uber One subscription, but they automatically enrolled me and charged me for it. I have not used Uber at all in months."

- "I don[']t have an UBER account and NEVER have but I am being charged a monthly recurring fee of $9.99 for UBER ONE . I don[']t even know how they got my debit card info."

- "Uber unknowingly enrolled me in their Uber One membership and then charged me $9.99 for a monthly subscription. I was not notified that I had subscribed to the Uber One subscription and only became aware that I was enrolled in the Uber One membership after my credit card was charged $9.99."

- "When I created my account I had all those annoying Uber One popups. I clicked exit, reject, deny on all of them. Fast forward to today, Sept 16th 2024, I check my bank account and see that Uber has pulled $9.99 from my debit card both months that I've had it downloaded."

- Uber "makes you think you could try it for free for a day or for an order so this kind of feels like a scam."

- "They offered me Uber One for free for 3 months and instead charged me $96."

- "Uber One took my money for an allegedly complementary account connected to my Capital One card and then would not let me cancel it for a same day full refund!"

### **Uber One's Free Trial Period**

39.     As referenced above, in numerous instances, Uber offers a free trial period.  The length of the free trial period varies but can range between one week and three months.  Since 2021, more than ▇▇▇▇▇ consumers have been enrolled in an Uber One free trial.  Before the conclusion of the free trial period, consumers are automatically enrolled in and charged for an Uber One subscription.

40.     When consumers are enrolled in a free trial, Uber claims they will be charged on a

1    specific date unless they cancel beforehand (*see*, for example, the screen excerpted in Paragraph

2    35, above).  Uber further promises consumers that they will "Save $25 every month" and may

3    "cancel anytime."

4        41.    However, Uber actually bills consumers *before* the stated billing date, during the

5    free trial period.

6        42.    Further, if a consumer successfully cancels his or her free trial before the free trial

7    ends, then the consumer will lose access to Uber One immediately, on the date of his or her

8    cancellation, as opposed to the end of the free trial.  Uber instituted this policy of immediately

9    ending access to Uber One upon cancellation in 2022 to "minimize the number of early quitters"

10   and "reduce such likelihoods of users going through with early cancellations in the trial period."

11   Consumers are therefore incentivized to wait until the last day of their trial before initiating

12   cancellation, by which point Uber has already billed them.

13                    **Uber Makes It Difficult For Customers To Cancel**

14       43.    Whether a consumer is in a free trial or a paid subscription, Uber has instituted a

15   cancellation process that is difficult, time-consuming, and far from simple.  Despite advertising

16   that consumers can cancel "anytime," Uber One cancellation is actually time-restricted, time-

17   intensive, and often ineffective.  As detailed below, Uber utilizes various tactics that prevent or

18   make it hard for consumers to cancel, especially when they attempt to do so within 48 hours of

19   their billing date, often snaring consumers into additional months or even years of a service they

20   no longer want or need.

21       44.    For consumers attempting to cancel Uber One, they begin by navigating a series

22   of screens within one of the Uber Apps.  First, consumers must open the Uber Apps' home

23   screen.

24

25

26

27

28

First Amended Complaint
Case No. 4:25-cv-03477-JST



**Ex. 10**

45.     Because there is no mention of Uber One or "subscription" on the home screen, consumers who wish to cancel might try a few different tabs and buttons such as "Services" or "Activity," which will be futile.  Instead, consumers must find and click on the "Account Tab" at the bottom righthand corner of the screen to be directed to the "Account" screen, where they will begin the cancellation process.

1
2
3
4
5
6
7
8
9
10
11



12  **Ex. 11**

13      46.     On the Account screen, consumers encounter many buttons, none of which

14  mention cancellation.  If they clicked on "Payment," for example, they would encounter other

15  information, but not be able to cancel.  Instead, they must scroll further, to view more choices.

16
17
18
19
20
21
22
23
24
25
26
27



28  **Ex. 12**

47.    While scrolling, if a consumer clicks on "Settings" or "Manage Uber Account," they would be diverted from cancellation. Instead, once they've reached this point, they must scroll down and tap the "Uber One" button.



**Ex. 13**

48.    After a consumer taps the "Uber One" button, they are directed to the "Uber One" screen, where still nothing about cancellation appears. Instead, consumers must again scroll to the bottom of the screen.



**Ex. 14**

49.     Next, near the bottom of the "Uber One" screen consumers must tap the "Manage membership" button.  Once they tap "Manage Membership," they are directed to a new screen, which notes a purported renewal date and how much the consumer will be charged.  (In fact, as discussed elsewhere, consumers are charged before the stated renewal date.)

1
2
3
4
5
6
7
8
9
10
11
12
13



14    **Ex. 15**

15          50.     Scrolling to the bottom of this screen reveals another button in smaller text titled,

16    "End membership."  This is the first time in the process that consumers would see anything

17    related to cancellation, indicating they are on the right track.

18          51.     For a significant part of the relevant time period, this End Membership button was

19    not visible to any consumers in the final 48 hours of their billing cycle.  In fact, consumers

20    attempting to cancel within 48 hours of their billing cycle would get to this page and have no

21    way of knowing where to go next to proceed with cancellation.  For those consumers lucky

22    enough to have the button available to them, after a consumer taps the "End membership"

23    button, the following screen has appeared:

24
25
26
27
28

First Amended Complaint
Case No. 4:25-cv-03477-JST

1
2
3
4
5
6
7
8
9
10
11
12
13



14  **Ex. 16**

15      52.     Here, the consumer must answer a survey question about why they want to cancel

16  their membership.  While the consumer considers one of six preset answers to the survey

17  question, a button at the bottom of the screen labeled "Keep Uber One" is prominently displayed

18  in a bright gray textbox, while a second button labeled "Continue" is presented in a black textbox

19  with dark gray text, faded into the black background.  Consumers must go through different

20  subsequent screens, depending on their answers to the survey.  Consumers cannot proceed with

21  cancellation unless they select an answer.

22      53.     If the consumer picks an answer and taps the "Continue" button, then the

23  following screen has appeared:

24
25
26
27
28

First Amended Complaint
Case No. 4:25-cv-03477-JST



**Ex. 17**

54.    On this screen, Uber presents the consumer with the option to "pause" his or her membership for one month instead of cancelling.  At the bottom of the screen, a button labeled "Pause Uber One" appears prominently in a bright gray textbox, while beneath it is a button labeled "No thanks" in a subdued black textbox with white font.  Neither option mentions cancellation, making it unclear which button to choose to proceed with cancellation.  Further, these buttons are flipped from their placement on the previous screen: On the previous screen the button to click to proceed with cancellation is on the top, whereas, on this screen, the button to click to proceed with cancellation is now on the bottom.  This design interface steers the consumer who wishes to cancel away from the action they are trying to take: If a consumer intuitively clicks in the same place on both screens to move through the cancellation process, they will inadvertently abandon cancellation and merely pause their membership instead.  Indeed, if the consumer taps the "Pause Uber One" button, either because of its placement or because there is no clear cancellation option, then his or her subscription is paused for one month but not cancelled.  At the end of that month, consumers will be billed again in perpetuity unless

1    they attempt the cancellation process again.  Only by tapping the "No thanks" button may

2    consumers continue with cancellation.

3        55.    If the consumer correctly taps the "No thanks" button, the following screen has

4    appeared:



18   **Ex. 18**

19       56.    Here, Uber presents the consumer with yet another offer to continue their

20   subscription at a lower rate for a limited time, usually one month.  At the bottom of this screen, a

21   button labeled "Claim Offer" appears in a bright gray textbox, while a button labeled "End Uber

22   One" appears beneath it in a black textbox with red font.  If the consumer taps the "Claim Offer"

23   button, his or her subscription continues.  After navigating at least 7 screens that require at least

24   12 different actions (assuming the consumer never clicked through any wrong paths), only then,

25   by selecting the red "End Uber One" button, may a consumer actually cancel his or her

26   subscription.

27

28

1

**Uber Has Made It Even More Difficult to Cancel Near the End of a Subscription**

2    57.    Consumers who attempt to cancel within 48 hours of their billing date, however,

3    have been directed to a different screen.

4

5

6

7

8

9

10

11

12

13

14

15

16



17    **Ex. 19**

18    58.    This screen has stated that consumers can keep their memberships active in

19    exchange for savings of "$25 each month."  Consumers who wish to decline this purported

20    "savings" proposition have had to exit out of the cancellation flow or click a button labeled

21    "Close."  In many instances, however, consumers who have clicked the "Close" button have

22    been bounced back to the survey question (excerpted in Paragraph 51, above), where their only

23    options have been to (1) click "Continue" again, sending them back in a loop through the same

24    steps described above; (2) click to "Keep Uber One," contrary to their intentions; or (3) manually

25    navigate back to their home screen by closing out the cancellation flow.  No matter which of

26    these three options they pick, these consumers have not cancelled, are still enrolled, and, most

27    importantly, will be charged again.

28    59.    Consumers who have clicked the "Close" button then choose a survey response

First Amended Complaint
Case No. 4:25-cv-03477-JST

again, click "Continue" again, proceed back through the pause offer screen and the savings offer screen again without being diverted, just to land on the same ending screen that tells them they "could save $25 each month." If they click "Close" again, they have been sent back in the same loop again. If they exit out to their home screen, they have been back at square one and continued to be charged.



**Ex. 20**

60.    Consumers have complained about getting stuck in this circuitous process, describing cancellation as a "loop" they can't get out of. For example, one consumer described Uber One cancellation as "a circular loop" that was "impossibly difficult to navigate." Another consumer recounted a similar experience: "When I tried to cancel the membership on my Uber app I encountered nothing but frustration because even after following all the steps to cancel, I could only get so far… It seems like they have created a loop that you cannot cancel an Uber One membership within 48 hours."

61.    If consumers on the final screen notice the small print language under the bold savings claim (*see* Paragraph 57, above), they have seen a warning that their next scheduled

First Amended Complaint
Case No. 4:25-cv-03477-JST

payment "may" already be in process and that they should "contact support."  In fact, Uber *always* charged consumers before the supposed billing date and *never* processed cancellations concluded via the in-app cancellation flow in the final 48-hour window, and consumers have had to pay in perpetuity.

62.     If consumers do realize their plan wasn't cancelled, they may not realize why. For example, one consumer complained: "I tried to cancel the subscription before the end of the free trial but the option of Ending Subscription on their app just goes on a loop.  After you click on it, it redirects you back to the membership page where it still shows that you are still subscribed."

63.     Consumers who do realize they have not successfully cancelled must figure out where to go next.  Uber did not provide any contact information for "support" or give any guidance on where to navigate within the app to find "support" for the vast majority of the relevant time period, and only offered the information after receiving notice of the FTC's investigation.  As one consumer explained, "Uber is making it impossible to cancel your Uber One subscription without contacting support outside an app, but there's no mechanism to find out how to contact support.  When I go to cancel my membership, it consistently says I am within 48 hours of renewal and will not let me cancel even for the following month.  They're making it deliberately hard to cancel."  And even if consumers do contact support after seeing this screen, they have been charged for another month anyway, as described further below.  Uber employees have even raised concerns about this, with one stating in August 2023: "My concern about this is regarding the message shown in the screen that says 'contact support to cancel' and we might not be able to do so if the payment is pending."

64.     Another consumer described having to navigate the various screens within the in-app cancellation flow before hitting a confusing roadblock: "After confirming my intent to cancel, I was redirected to a screen stating that I was within 48 hours of the renewal date and that I needed to contact support to cancel.  However, there was no contact information provided on this screen.  I attempted to find and use the support options available in the app but was unsure if my cancellation request was successfully submitted or received, leaving the status of my

membership unclear."

65.     After already navigating a battery of screens to reach a dead end, consumers who wished to contact customer support to cancel have then had to navigate a *second* maze of screens.  Here is the process Uber has required consumers to navigate:  First, they must start over by navigating back to the Uber Apps' home screen (excerpted in Paragraph 44, above).  Second, the consumer must tap on the "Account" button, which reveals the following screen again.



**Ex. 21**

66.     Next, the consumer must tap on the "Help" button, which directs them to a new screen.

First Amended Complaint
Case No. 4:25-cv-03477-JST

1
2
3
4
5
6
7
8
9
10
11
12



13  **Ex. 22**

14      67.    On this screen, which mentions nothing about cancellation or Uber One, the

15  consumer must tap the "Membership and loyalty" button, which opens another screen.

16
17
18
19
20
21
22
23
24
25
26
27
28



**Ex. 23**

68. On the "Membership and loyalty" screen, the consumer must tap the "Uber One" button. If the consumer taps the "Uber One" button, the following screen appears.



**Ex. 24**

69. Here, the consumer must tap the "Uber One Membership Cancellation" button, which directs them to yet another screen.

First Amended Complaint
Case No. 4:25-cv-03477-JST

**Ex. 25**

70.     Here, at the top of the screen, consumers see instructions for how to cancel their membership in the app.  If they have attempted to follow these instructions, they have ended up in the same loop described in Paragraphs 58-60 above.  If instead, they read down the page, they have seen a note that says, "If you are less than 48 hours before your next renewal, please contact Support."  There are no instructions on how to contact support, causing at least some consumers to click out of the flow to attempt to find a "Support" tab.  If, instead, the consumer stays on this page and scrolls to the very bottom of the screen, an empty text input field appears under the heading "Share details."

1

2

3

4

5

6

7

8

9

10

11

12



13  **Ex. 26**

14      71.      Consumers must then manually type their cancellation request into the empty box

15  and click the "Submit" button.

16

17

18

19

20

21

22

23

24

25

26

27



28  **Ex. 27**

First Amended Complaint
Case No. 4:25-cv-03477-JST

72.     After consumers submit their cancellation request via the text input field, they have been presented with a new screen that does not indicate whether their request has been granted or where to follow-up next.



**Ex. 28**

73.     If consumers click the button labeled "OK," they have been directed back to the Account screen, excerpted above in Paragraph 65.  From there, if they click the "Help" button again, then scroll all the way to the bottom of the "Help" page, they have seen a button that was not there before titled, "Uber One Membership Cancellation," beneath text that reads, "Support messages."

1
2
3
4
5
6
7
8
9
10
11
12



13 **Ex. 29**

14      74.     If the consumer clicks "Uber One Membership Cancellation," a new screen has

15 opened showing that they have entered a chat with Uber support.

16
17
18
19
20
21
22
23
24
25
26
27



28 **Ex. 30**

First Amended Complaint
Case No. 4:25-cv-03477-JST

75.     By this point consumers have gone through as many as 23 screens and have taken at least 32 actions (including scrolling, clicking, and typing) if they follow the correct steps and only go back through the loop described above once.[‡]  Consumers then must wait for an Uber customer service representative to respond to their request and process their cancellation.  But even consumers who have found their way to the cancellation support queue have often been unable to promptly cancel or avoid being charged due to excessively long hold times: consumers often report waiting *hours or up to a full day* to receive a response from Uber, and that they were already billed for the next payment in the interim.

76.     Uber's restriction on cancelling within 48 hours has come as a surprise to consumers.  An internal Uber document from November 2023 explains that this policy, "[r]esults in customer frustration due to lack of transparency and high contact rate," and notes that, "Users are confused and reach out to Support."  The only place where Uber One mentions anything about a 48-hour period is on the initial checkout page (excerpted in Paragraph 35, above), where it appears in small, light gray fine print at the very bottom of the screen.

77.     Even if consumers notice this fine print when they enroll, it only tells them to "cancel up to 48 hours before [the billing date] in the app."  There is no information at all on where or how to cancel and avoid charges once you are in the 48-hour window during which consumers are likely to think about cancelling a subscription.  This small and confusingly worded disclosure lacks a date certain, only gives a time frame in reference to a different date, *and* fails to warn consumers how long cancellation can take outside the app or that Uber bills consumers before the promised billing date.

78.     And, as noted in Paragraph 42, above, Uber's internal documents show that Uber intentionally incentivizes enrollees to wait until the last possible day to cancel their free trials so they don't prematurely lose their benefits, making it more likely they will slip into this 48-hour

---

[‡] Alternatively, consumers in the final 48 hours of their billing cycle who happen to tap the "Help" button instead of the "Account" button discussed in Paragraph 45, above, could potentially start customer support cancellation directly.  In that case, they would still need to proceed through 10 screens with at least 14 actions, then wait for a response from customer service representatives.  This is a less likely path, however, because the only cancellation instructions that Uber makes available (*see* Paragraph 70, above) direct consumers to the in-app cancellation path first, which would require them to proceed through customer service cancellation second, totaling as many as 23 screens with at least 32 actions.

cancellation black hole without realizing how hard it will be to come out the other side.

79.     Consumers regularly express their surprise, confusion, and frustration over Uber One's tiresome and complicated cancellation process.  In fact, the process is so challenging that it has spawned online tutorials attempting to explain how consumers can cancel Uber One, which have been viewed tens of thousands of times and include dozens of comments from fed up Uber One users.  Other consumers have also complained:

- "I signed up for an uber one account within the uber eats app. I have been trying to cancel but when I go to the membership management tab it tells me to contact customer support and no number is listed. After fully exploring the app to find customer support number which is not anywhere in the uber eats app, I googled the number only to find it is no longer in service. When you call the provided number it tells you to go thru the app!"

- "I have an Uber One account, I try and cancel it and there's no direct way to do it through either the website or the app. Instructions given in the app is either outdated or does not work! There's no button to end the subscription! There's no phone number to contact Uber directly! There's no email service! The only way to communicate with the company as a rider is to go through their in-app help service- which simply opens a claim through which they may or may not contact you. I'm not an old or confused person, I work in tech. This is clearly a means to deceive customers or intentionally make it difficult to stop monthly payments."

- "[A] courtesy trial period is offered but the credit card is charged 24-48 hours before the end of the trial period. When the customer goes to cancel the membership before the end of the trial period there is no way to cancel the membership except to contact customer service. Customer service then informs that the charge is not refundable even though it was made before the end of the trial period and the membership has been cancelled. … Customers are also discouraged from making the cancellation themselves through the app by saying that all membership benefits will suddenly end which does not seem true. Then you are forced into this period where customer

service can only cancel your membership and goes ahead and charges you anyway for an additional month."

**Uber One's Enrollment and Cancellation Processes Result in Unauthorized Charges for Customers**

80.    Uber One's enrollment and cancellation practices are not only frustrating to consumers; they are also costly.  In numerous instances, consumers are unexpectedly charged significant sums of money for Uber One.  For example, many consumers report finding charges for Uber One on their credit card statements despite never authorizing enrollment in a paid Uber One membership.

81.    Additionally, many consumers in Uber One memberships are charged unexpectedly due to Uber's misleading policy of charging consumers for a new subscription 24 to 48 hours before their stated billing date.  Consumers who have tried to cancel their Uber One subscriptions within the last 48 hours of their free trial often find out they have already been enrolled in and prematurely charged for a paid subscription before their free trial has even ended.  Similarly, consumers trying to cancel within the last 48 hours of a paid subscription often discover they have been charged for another unwanted month *or even year* of Uber One prior to the expiration of their current subscription period, or that Uber has not processed any cancellation for them at all.

82.    Some consumers who didn't know they were ever enrolled in Uber One in the first place, or who thought they had already cancelled, are surprised to see Uber One charges appear on their bills and then have trouble canceling.  To recoup their losses, they must then expend significant time and effort requesting refunds, which, as described below, are not always granted:

- "I was signed up for an Uber One Membership. The due date for my next charge is supposed to be 12192023 [*sic*] and I was charged 48 hours in advance for the membership fee of 9.99, I spoke to customer support about it and while they cancelled the membership they would not refund the monthly charge."

First Amended Complaint
Case No. 4:25-cv-03477-JST

- "UBER ONE will charge you for the monthly subscription one day before your current subscription expires....My current subscription ends on March 22 but I was charged on March 21st and I tried to get refunded but they won't allow it."

- "I signed up for a student account of Uber one free trial. The trial was supposed to last thirty days, however today on the twenty ninth day I was charged $48 dollars to my account. The payment is still processing, so I cannot dispute the claim to my bank and must wait for it to be processed which can take about a week. Uber does not have an active or easily accessible customer support phone number. Instead, they have an in-app support guide which does little to help with any situation and makes it harder to contact anyone in customer support. It even says in the app for my account that I am supposed to be charged tomorrow, yet I was charged today."

- "On their terms, it says that if a user tries to cancel within 48 hours of their trial ending - they need to contact uber support. They basically hide the End my membership or manage my membership call to action button and I had to click through buttons to get support through chat. Cancellation only takes effect until the next billing cycle so even if you have 24 hours left of the trial -- they will still charge your credit card for this month's. What a scam."

- "I was attempting to cancel a membership to Uber One through their app. After going through a few pages in the process, I landed on a roadblock page that stated You are within 48 hours of your renewal window and must contact support to cancel. This never existed before and is not only a deceptive business practice but may be illegal. Rather than making it easy, or even possible to cancel in the app they tried to make it much more difficult and time consuming, despite there being no need to do so from a technical or accounting perspective. They also charged my debit card a day before the renewal date, taking my money before they were owed it, which is certainly illegal."

1    83.    Consumers are also hit with unwanted additional charges for Uber One due to

2    unreasonably long wait times in the Uber customer support chat queue.  Many times, when

3    consumers finally hear back from Uber's customer service representatives, they have already

4    been charged for the next billing cycle, even when they initiated their cancellation request well

5    before the end of their free trial or within the current billing cycle of their paid subscription.

6    84.    For example, one consumer complained, "I tried to cancel the subscription

7    through the Uber application on my phone.  The app did not let me cancel the subscription and

8    displayed this message: You are within 48 hours of your renewal date and your next scheduled

9    payment may be in process.  Please contact support to cancel.  Uber does not have a phone

10    number for support and only uses the email support feature on the app to provide support.  I

11    submitted a request to cancel on June 22 at approximately 11:45 AM over the email support

12    feature.  There were no customer service agents available and the app said I will receive a reply

13    when a customer service agent is available.  I received a reply on June 23 at 9:59 AM saying that

14    my membership auto renewal was cancelled and it will not renew after July 23.  So I was

15    charged for a month of Uber one due to lack of proper way for a user to cancel Uber one

16    subscription."

17    85.    If consumers are finally able to reach an Uber customer service representative and

18    cancel, Uber confirms cancellation and states the consumer will not be charged after cancelling.

19    In the example below, Uber confirms cancellation and states "Moving forward, you will not be

20    charged for Uber One":

21

22

23

24

25

26

27

28

First Amended Complaint
Case No. 4:25-cv-03477-JST

1
2
3
4
5
6
7
8
9
10
11
12
13



14 **Ex. 31**

15    86.    But, in fact, Uber always charges consumers, including the one in this example

16 who was enrolled in a four-week free trial, for one additional month.

17    87.    As a result, many consumers have complained that they were charged for Uber

18 One subscription services that they believed were cancelled.  Some of these consumers

19 completed the in-app cancellation flow, and clicked "Close," with the reasonable belief that they

20 had cancelled their subscription, while others connected with customer support and were

21 specifically told their subscriptions were cancelled and they wouldn't be charged again.  In some

22 instances, consumers have been charged for months without their consent for subscriptions that

23 were already cancelled and have even been forced to cancel their credit or debit cards to finally

24 stop the charges.  Even after the primary payment method has been cancelled, Uber sometimes

25 charges other cards it happens to have access to in the app if they have ever been used to book a

26 ride or delivery in the past.  Below are some examples of related consumer complaints:

27    •   "I signed up for Uber Eats (Uber One) via their application. I cancelled their app

28       when given the opportunity to cancel. Uber One still charged my checking account

the monthly fee in the amount of $9.99 three times after cancelling. I reached out via chat, and I was refunded. A couple of months later, Uber One restarted charging my checking account for $9.99. As a result, I cancelled my bankcard, and was issued a new one so that the unauthorized charges would stop. Uber One then attempted numerous times to charge my account. but was unsuccessful. Then Uber one charged my wife's bank card (she used her bankcard once to make a purchase prior to me cancelling my account)."

- "I had signed up for a free trial of Uber One sometime last year. I attempted to cancel this subscription, and I was told by Uber that it had, in fact, cancelled. This week, I was suddenly charged $96 for the subscription that I had cancelled. I spoke with them and recieved [sic] a refund, but that same day I was charged AGAIN for the subscription. They are now refusing to help me or actually issue any refund and are instead putting me through a loop talking to representatives."

- "I also contacted the customer service at Uber one, they promised to pay me back for the reasnt [sic] charging and unsubscribe me, they said Yes, but they still talking [sic] money form [sic] my account even when I tried to delete my debit card from the Uber app. Please help, I did contact Uber 3 times. They still stealing me."

88.    The harm from unwanted recurring charges is not reasonably avoidable, as consumers who did not consent to enroll in Uber subscriptions would not know they needed to cancel to avoid charges, and those who did know do not expect that they will continue to be charged when they request cancellation before their billing dates.  In addition, there is no countervailing benefit to consumers or competition from this conduct because there is no benefit to consumers or competition from being enrolled into unwanted subscriptions or from being trapped by Uber One's circuitous cancellation flow.  In fact, there is significant injury.

89.    Uber's internal documents suggest consumers attempting to cancel find little value in continuing to use the Uber One service, further reinforcing the lack of consumer benefits or salutary effect on competition.  In fact, as of September 2024, ▇▇▇▇ consumers cancelled Uber One without using their membership benefits during their last month – or, for

annual subscribers, last year – of service; and ██████ consumers cancelled without ever having used their Uber One memberships *at all*.  And Uber internal testing revealed that only 15% of cancelling consumers were willing to retain their Uber One membership even when their price was dropped to $1, indicating that 85% of cancelling consumers wouldn't even be willing to pay $1 to keep their Uber One membership benefits.

90.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

*** 

91.    Uber began or continued charging for its subscription programs after the FTC brought more than a dozen actions against other companies under the FTC Act and ROSCA, including for failing to have simple cancellation mechanisms and charging consumers without authorization.  For example, the FTC recently concluded litigation against Amazon, alleging Amazon made consumers navigate "a four-page, six-click, fifteen-option cancellation process," and which the court found stated a claim under the FTC Act and ROSCA.  As another example, the Department of Justice is currently litigating against Adobe on the FTC's behalf for similar practices.

92.    Uber persisted in the practices described above despite a public outpouring of complaints about unauthorized charges and difficulty cancelling Uber's subscription services; online tutorials attempting to explain how consumers can cancel Uber One, which have been viewed tens of thousands of times; internal testing reflecting significant customer confusion; employee discussions of the problems with Uber's disclosures; and receipt of a letter from the FTC in September 2024 probing about Uber's subscription programs, including enrollment and cancellation mechanisms and compliance with ROSCA.

93.    Uber also has experience with the FTC and is currently subject to two prior consent orders related to its advertising and data security practices.  The data security consent order was expanded to include additional requirements after the company failed to disclose a significant data breach.  As one of the world's largest technology companies, Uber has extensive

legal resources, including in-house and outside counsel who are responsible for ensuring Uber complies with all applicable consumer protection laws and regulations.

## **VIOLATIONS OF THE FTC ACT**

94.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

95.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

96.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## **VIOLATIONS OF STATE LAW**

97.    The state statutes listed below generally prohibit deceptive trade practices and, with certain exceptions, practices that are unfair in connection with the offer and sale of goods and services to consumers.

| STATE | STATUTORY AUTHORITY |
|---|---|
| Alabama | ALA. CODE § 8-19-1, *et seq.* |
| Arizona | ARIZ. REV. STAT. §§ 44-1521 to 44-1534 |
| California | CAL. BUS. & PROF. CODE § 17200 *et seq.* and § 17500 *et seq.* |
| Connecticut | CONN. GEN. STAT. § 42-110a *et seq.* |
| District of Columbia | D.C. CODE § 28-3901 *et seq.* |
| Illinois | 815 ILL. COMP. STAT. § 505/1 *et seq.* and 815 ILL. COMP. STAT. § 510/1 *et seq.* |
| Maryland | MD. CODE ANN., COM. LAW § 13-101 *et seq.* |
| Michigan | MICH. COMP. LAWS § 445.901 *et seq.* |
| Minnesota | MINN. STAT. §§ 325D.43 to 325D.48, 325F.68 to 325F.70 |
| Missouri | MO. REV. STAT. § 407.020 *et seq.* |
| Montana | MONT. CODE ANN. § 30-14-103 |
| Nebraska | NEB. REV. STAT. § 87-301 *et seq.* |
| New Hampshire | N.H. REV. STAT. ANN. 358-A:1 *et seq.* |
| New Jersey | N.J. STAT. ANN. § 56:8-2 and § 56:8-4(b) |
| New York | N.Y. EXEC. LAW § 63(12) and N.Y. GEN. BUS. LAW §§ 349 and 350 |
| North Carolina | N.C. GEN. STAT. § 75-1.1 |
| Ohio | OHIO REV. CODE ANN. § 1345.02 |
| Oklahoma | OKLA. STAT. tit. 15, §§ 751–764.1 |
| Pennsylvania | 73 PA. STAT. § 201-1 *et seq.* |

| West Virginia | W. VA. CODE § 46A-6-104 |
| Wisconsin | WIS. STAT. § 100.18(1) |

### Count I

**Misrepresentations**
**(By All Plaintiffs except Virginia)**

98.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its subscription service, including through the means described in Paragraphs 19 to 42 above, Defendants represent, directly or indirectly, expressly or by implication:

   a. that consumers may cancel their subscription services at any time with no additional fees;

   b. a specific date on which consumers will be billed or charged;

   c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month";

   d. specific benefits of their subscription services, such as $0 delivery fees; and

   e. that consumers have authorized Defendants' charges.

99.    In fact, the representations set forth in Paragraph 98 are false, misleading, or not substantiated at the time the representations were made.

100.    Therefore, the making of the representations as set forth in Paragraph 98 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a).

101.    The foregoing practices also violate the laws of the Plaintiff States as follows:

| STATE | STATUTORY AUTHORITY |
|---|---|
| Alabama | ALA. CODE § 8-19-5(27) |
| Arizona | ARIZ. REV. STAT. §§ 44-1521 to 44-1534 |
| California | CA BUS. & PROF. CODE §§ 17200 *et. seq.* and 17500 *et. seq.* |
| Connecticut | CONN. GEN. STAT. § 42-110b(a) and CONN. AGENCIES REG. § 42-110b-18(e)) |
| District of Columbia | D.C. CODE § 28-3904(a), (e), (e-1), (f) (f-1) |
| Illinois | 815 ILL. COMP. STAT. § 505/2 and 815 ILL. COMP. STAT. § 510/2(a)(5), 2(a)(9), and 2(a)(12) |
| Maryland | MD. CODE ANN., COM. LAW §§ 13-303 and 13-301(1) |

| Michigan | MICH. COMP. LAWS § 445.903(1)(c), (i), (k), (n), (r), (s), (bb), and (cc) |
| Minnesota | MINN. STAT. §§ 325F.69, subd. 1, 325D.44, subd. 1(5), (7), (9), (14) |
| Missouri | MO. REV. STAT. § 407.020 |
| Montana | MONT. CODE ANN. § 30-14-103 |
| Nebraska | NEB. REV. STAT. § 87-302(a)(5) and (6) |
| New Hampshire | N.H. REV. STAT. ANN. § 358-A:2, V, IX, XI |
| New Jersey | N.J. STAT. ANN. §§ 56:8-2 and 56:8-4(b) |
| New York | N.Y. EXEC. LAW § 63(12) and N.Y. GEN. BUS. LAW §§ 349 and 350 |
| North Carolina | N.C. GEN STAT. § 75-1.1 |
| Ohio | OHIO REV. CODE ANN. § 1345.02(A) and (B)(1) |
| Oklahoma | OKLA. STAT. tit. 15, §§ 753(5), (12), and (21) |
| Pennsylvania | 73 PA. STAT. §§ 201-2(4)(v), (ix), and (xxi) |
| West Virginia | W. VA. CODE § 46A-6-102(7)(L), (M) and W. VA. CODE § 46A-6-104 |
| Wisconsin | WIS. STAT. § 100.18(1) |

## <u>Count II</u>

### Unfairly Charging Consumers Without Consent
### (By All Plaintiffs except Alabama, Michigan, Nebraska,
### New Hampshire, Ohio, Virginia, and Wisconsin)

102.  In numerous instances, as described in Paragraphs 38 and 80 to 89 above, Defendants charge consumers without obtaining consumers' express informed consent.

103.  Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

104.  Therefore, Defendants' acts or practices as described in Paragraph 102 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

105.  The foregoing practices also violate the laws of the Plaintiff States as follows:

| STATE | STATUTORY AUTHORITY |
| --- | --- |
| Arizona | ARIZ. REV. STAT. §§ 44-1521 to 44-1534 |
| California | CA BUS. & PROF. CODE § 17200 *et. seq.* |
| Connecticut | CONN. GEN. STAT. § 42-110b(a) |
| District of Columbia | D.C. CODE § 28-3904 |
| Illinois | 815 ILL. COMP. STAT. § 505/2 |
| Maryland | MD. CODE ANN., COM. LAW §§ 13-303 and 13-301(1) |

| Minnesota | Minn. Stat. §§ 325F.69, subds. 1, 8; 325D.44, subd. 1(13) |
| Missouri | Mo. Rev. Stat. § 407.020 |
| Montana | Mont. Code Ann. § 30-14-103 |
| New Jersey | N.J. Stat. Ann. § 56:8-4(b) |
| New York | N.Y. Exec. Law § 63(12) |
| North Carolina | N.C. Gen. Stat. § 75-1.1 |
| Oklahoma | Okla. Stat. tit. 15, §§ 752(13)-(14), and 753(21) |
| Pennsylvania | 73 Pa. Stat. § 201-2(4)(xxi) |
| West Virginia | W. Va. Code § 46A-6-104 |

### **VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

106.    In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 et seq., which became effective on December 29, 2010.  In passing ROSCA, Congress declared that "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  Section 2 of ROSCA, 15 U.S.C. § 8401.

107.    Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller, among other things, provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, obtains the consumer's express informed consent for the charges, and provides simple mechanisms for a consumer to stop recurring charges.  *See* 15 U.S.C. § 8403.

108.    The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

109.    As described in Paragraphs 16 to 42 above, Defendants have advertised and sold subscription services through a negative option feature as defined by the TSR.  16 C.F.R. § 310.2(w).

110.    Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

111.    Pursuant to Section 6 of ROSCA, 15 U.S.C. § 8405, the attorney general of a State, or other authorized State officer, may bring an action alleging a violation of this Act that affects or may affect such State or its residents, to obtain appropriate injunctive relief.

### Count III

**Failure to Provide Required Disclosures**
**(By All Plaintiffs)**

112.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 19 to 89 above, Defendants have failed to clearly and conspicuously disclose before obtaining consumers' billing information all material transaction terms, including the following terms:

    a.    That they are being enrolled in a recurring paid subscription;

    b.    The true benefits and savings of an Uber subscription;

    c.    When they will be billed or charged; and

    d.    The method of cancellation.

113.    Defendants' acts or practices, as described in Paragraph 112 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

### Count IV

**Failure to Obtain Express Informed Consent Before Charges**
**(By All Plaintiffs)**

114.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 19 to 89 above, Defendants have failed to obtain a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction.

115.    Defendants' acts or practices, as described in Paragraph 114 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

**Count V**

**Failure to Provide Simple Mechanisms for Stopping Recurring Charges**
**(By All Plaintiffs)**

116.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 19 to 89 above, Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

117.    Defendants' acts or practices, as described in Paragraph 116 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

**CONSUMER INJURY**

118.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and ROSCA.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**THE COURT'S POWER TO GRANT RELIEF**

119.    Sections 5(m)(1)(A), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404 authorize this Court to enter a permanent injunction and award monetary relief, civil penalties, and other relief.

120.    Defendants violated ROSCA with actual knowledge or knowledge fairly implied by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

121.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow the Plaintiff States to enforce their state laws against Defendants in this Court and to grant such relief as provided under the following state laws including injunctive relief, rescission or reformation of contracts, restitution, damages, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, attorneys' fees, expenses, costs, and such other relief to which the Plaintiff States may be entitled:

First Amended Complaint
Case No. 4:25-cv-03477-JST

| STATE | STATUTORY AUTHORITY |
|---|---|
| Alabama | ALA. CODE §§ 8-19-8, 8-19-10(g), and 8-19-11(b) |
| Arizona | ARIZ. REV. STAT. §§ 44-1528, 44-1531, and 44-1534 |
| California | CA BUS. & PROF. CODE §§ 17203, 17206, 17535, and 17536 |
| Connecticut | CONN. GEN. STAT. §§ 42-110m and 42-110o(b) |
| District of Columbia | D.C. CODE § 28-3909 |
| Illinois | 815 ILL. COMP. STAT. § 505/7 |
| Maryland | MD. CODE ANN., COM. LAW §§ 13-406, 13-409, and 13-410 |
| Michigan | MICH. COMP. LAWS § 445.905 and § 445.910 |
| Minnesota | Minn. Stat. §§ 8.31, subds. 3, 3a; 325D.45; 325F.70 |
| Missouri | MO. REV. STAT. § 407.020 *et seq.* |
| Montana | MONT. CODE ANN. §§ 30-14-111, 30-14-133, and 30-14-142 |
| Nebraska | NEB. REV. STAT. §§ 87-303, 303.05, and 303.11 |
| New Hampshire | N.H. REV. STAT. ANN. § 358-A:4, :6–:10, :12 |
| New Jersey | N.J. STAT. ANN. §§ 56:8-8, 56:8-11, 56:8-13, and 56:8-19 |
| New York | N.Y. EXEC. LAW § 63(12) and N.Y. GEN. BUS. LAW §§ 349 and 350 |
| North Carolina | N.C. GEN. STAT. §§ 75-14, 75-15.1, 75-15.2, and 75.16.1 |
| Ohio | OHIO REV. CODE ANN. § 1345.07 |
| Oklahoma | OKLA. STAT. tit. 15, §§ 756.1, 761.1, and 762-763 |
| Pennsylvania | 73 PA. STAT. § 1602-U, 73 P.S. § 201-4.1, and 201-8(b) |
| West Virginia | W. VA. CODE §§ 46A-7-108 and 46A-7-111(2) |
| Wisconsin | WIS. STAT. §§ 93.20, 100.18(d), 100.26(4), 100.261, 100.263, 100.264, 165.755, 302.46(1), 757.05, 814.04, 814.63(1)(b), 814.85(1)(a), and 814.86(1) |

## **PRAYER FOR RELIEF**

Wherefore, the FTC and Plaintiff States request that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, the above-enumerated state consumer protection laws, and ROSCA;

B.    Award monetary and other relief within the Court's power to grant;

C.    Award any additional relief as the Court determines to be just and proper;

D.    Impose civil penalties for each violation of ROSCA; and

E.    Award Plaintiff States civil penalties, damages, restitution and/or forfeitures for each violation of their respective state laws, as well as attorneys' fees, costs, and expenses as provided under state law.

First Amended Complaint
Case No. 4:25-cv-03477-JST

| | |
|---|---|
| 1 | Dated: December 15, 2025 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

Respectfully submitted,

FEDERAL TRADE COMMISSION

*/s/ Paul Mezan*

Paul Mezan (NY Bar No. 5357124)
Stephanie Liebner (VA Bar No. 90647)
James Doty (NY Bar No. 4552550)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Stop CC-10232
Washington, DC 20580
Phone: (202) 758-4177 (Mezan)
Email: pmezan@ftc.gov (Mezan)
Fax: (202) 326-3395

*Attorneys for Plaintiff*
*Federal Trade Commission*

OFFICE OF THE ATTORNEY GENERAL
OF MARYLAND, CONSUMER
PROTECTION DIVISION

*/s/ Philip Ziperman*

Philip Ziperman (MD Bar No.: 9012190379)*
Deputy Chief
Consumer Protection Division
Office of the Attorney General of Maryland
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
pziperman@oag.maryland.gov
(410) 576-6417

Luke Riley (MD Bar No.: 2502271005)*
Assistant Attorney General
Consumer Protection Division
Office of the Attorney General of Maryland
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
lriley@oag.maryland.gov
(410) 576-6568

*Attorneys for Plaintiff*
*Office of the Maryland Attorney General,*
*Consumer Protection Division*

STEVE MARSHALL
*ATTORNEY GENERAL*

By:

*/s/ Michael G. Dean*

Michael G. Dean*
*Assistant Attorney General*

*/s/ Lindsay D. Barton*

Lindsay D. Barton*
*Assistant Attorney General*

Office of the Attorney General
Consumer Interest Division
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7300
Michael.Dean@AlabamaAG.gov
Lindsay.Barton@AlabamaAG.gov

*Attorneys for Plaintiff*
*Attorney General of Alabama*

**KRISTIN K. MAYES**
**Attorney General of Arizona**

*/s/ Alyse Meislik*

Alyse Meislik, AZ Bar No. 024052*
Assistant Attorney General
Office of the Arizona Attorney General
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3702
Fax: (602) 542-4377
Email: consumer@azag.gov
Alyse.Meislik@azag.gov

*Attorney for Plaintiff*
*Arizona Attorney General*

URSULA JONES DICKSON
District Attorney of Alameda County

*/s/ Andres H. Perez*

ANDRES H. PEREZ (SBN 186219)
Assistant District Attorney
HUY T. LUONG (SBN 251507)
Deputy District Attorney
Consumer, Environmental & Worker
Protection Division
7677 Oakport Street, Suite 650
Oakland, CA 94621
Telephone (510) 383-8600
Email: andres.perez@acgov.org
        huy.luong@acgov.org

*Attorneys for Plaintiff*
*People of the State of California*

STATE OF CONNECTICUT

WILLIAM TONG

ATTORNEY GENERAL OF THE STATE
OF CONNECTICUT

*/s/ Brendan T. Flynn*

Brendan T. Flynn*
Fed. Bar No. ct04545
Assistant Attorney General
Office of the Attorney General of the
State of Connecticut
165 Capitol Ave.
Hartford, CT  06106
Tel: 860-808-5400
Fax: 860-808-5593
Brendan.Flynn@ct.gov

*Attorney for Plaintiff*
*Attorney General of the State of Connecticut*

1

2

BRIAN L. SCHWALB
Attorney General for the District of Columbia

3

*/s/ Coty Montag*

4

COTY MONTAG [CA BAR #255703]
Deputy Attorney General, Public Advocacy
Division

5

Coty.Montag@dc.gov

6

BETH MELLEN

7

WILLIAM STEPHENS
Assistant Deputy Attorneys General, Public

8

Advocacy Division

9

KEVIN VERMILLION

10

Director, Office of Consumer Protection

11

EMILY HOLNESS

12

Deputy Director, Office of Consumer
Protection

13

BRITTANY NYOVANIE

14

Assistant Attorney General, Office of
Consumer Protection

15

16

Office of the Attorney General
for the District of Columbia

17

400 6th Street NW, 10th Floor
Washington, DC 20001

18

Tel: (202) 702-5686
Email: Brittany.Nyovanie@dc.gov

19

20

*Attorneys for Plaintiff*
*District of Columbia*

21

22

23

24

25

26

27

28

PEOPLE OF THE STATE OF ILLINOIS

*/s/ Hal B. Dworkin*

HAL B. DWORKIN, IL Bar No. 6318213*
Senior Assistant Attorney General
Office of the Illinois Attorney General
Consumer Protection Division
Consumer Fraud Bureau
115 South LaSalle Street
Chicago, IL 60603
(312) 814-5159
Hal.Dworkin@ilag.gov

*Attorney for Plaintiff*
*The People of the State of Illinois*


FOR PLAINTIFF THE PEOPLE OF THE
STATE OF MICHIGAN:

*/s/ Aaron W. Levin*

AARON W. LEVIN*
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
525 W. Ottawa Street
P.O. Box 30736
Lansing, MI 48909
Tel: (517) 335-7632
Fax: (517) 335-6755
levina@michigan.gov

*Attorney for Plaintiff*
*The People of the State of Michigan*

First Amended Complaint
Case No. 4:25-cv-03477-JST

KEITH ELLISON
Attorney General of Minnesota

*/s/ Jacob Harris*

JACOB HARRIS*
SARAH DOKTORI*
Assistant Attorneys General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2130
jacob.harris@ag.state.mn.us
Telephone: (651) 300-7591
Sarah.doktori@ag.state.mn.us
Telephone: (651) 583-6694

*Attorneys for Plaintiff*
*State of Minnesota by its Attorney General*
*Keith Ellison*

Catherine Hanaway
Missouri Attorney General

*/s/ Alison Esbeck*

Alison Esbeck (MO Bar # 58501)*
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street, Ste 200
St. Louis, MO 63101
(314) 340-4977
Alison.Esbeck@ago.mo.gov

Connor McNeall (MO Bar # 76836)*
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street, Ste 200
St. Louis, MO 63101
(314) 340-7888
connor.mcneall@ago.mo.gov

*Attorneys for Plaintiff*
*Missouri Attorney General's Office*

STATE OF MONTANA

*/s/ Brent Mead*
_____
Brent Mead (MT #68035000)*
Deputy Solicitor General
Office of Consumer Protection
Montana Department of Justice
P.O. Box 200151
Helena, MT 59620-0151
(406) 444-4500
Brent.mead2@mt.gov

*Attorney for Plaintiff*
*State of Montana*

STATE OF NEBRASKA

*/s/ Benjamin J. Swanson*
_____
Benjamin J. Swanson (NE #27675)*
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68508
(402) 471-7759
benjamin.swanson@nebraska.gov

*Attorney for Plaintiff*
*State of Nebraska*

First Amended Complaint
Case No. 4:25-cv-03477-JST

1    FOR PLAINTIFF STATE OF NEW
     HAMPSHIRE:
2

3    JOHN M. FORMELLA
     Attorney General
4
     */s/ Amanda N. Purcell*
5    _____
     Amanda N. Purcell, NH Bar #278532*
6    Assistant Attorney General
     Consumer Protection and Antitrust Bureau
7    New Hampshire Department of Justice
     One Granite Place South
8    Concord, NH 03301
     Telephone: (603) 271-1215
9    Email: Amanda.N.Purcell@doj.nh.gov

10
     *Attorney for Plaintiff*
11   *State of New Hampshire*

12

13
     MATTHEW J. PLATKIN
14   ATTORNEY GENERAL OF NEW JERSEY

15   */s/ Zeyad A. Assaf*
     _____
16   Zeyad A. Assaf *
     Deputy Attorney General
17   New Jersey Office of the Attorney General
     Division of Law
18   124 Halsey St., 5th Fl.
     Newark, NJ 07102
19   Phone: (609) 696-5363
     Email: Zeyad.Assaf@law.njoag.gov
20
     *Attorney for Plaintiff*
21   *Attorney General of the State of New Jersey*

22

23

24

25

26

27

28

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of the State of New York

By:  */s/ Patrick Gibson*

Patrick Gibson (NY Bar No. 5267489)*
Assistant Attorney General
Bureau of Consumer Frauds and Protection
28 Liberty Street
New York, NY 10005
Tel: (212) 416-6067
Email: patrick.gibson@ag.ny.gov

*Attorney for Plaintiff*
*The State of New York*


FOR PLAINTIFF THE STATE OF NORTH CAROLINA:

JEFF JACKSON
North Carolina Attorney General

*/s/ Jesse Ramos*

JESSE RAMOS (NC Bar No. 51663)*
Special Deputy Attorney General

KUNAL CHOKSI (NC Bar No. 55666)
Senior Deputy Attorney General

BRIAN RABINOVITZ (NC Bar No. 41538)*
Special Deputy Attorney General

Consumer Protection Division
North Carolina Department of Justice
Post Office Box 629
Raleigh, NC 27602
Tel: (919) 716-6000
Fax: (919) 716-6050
Email: jramos@ncdoj.gov

*Attorneys for Plaintiff*
*The State of North Carolina*

| | |
|---|---|
| 1 | DAVE YOST<br>OHIO ATTORNEY GENERAL |
| 2 | |
| 3 | */s/ Kevin R. Walsh* |
| 4 | Kevin R. Walsh (0073999)*<br>Senior Assistant Attorney General |
| 5 | Consumer Protection Section<br>615 W. Superior Avenue, 11th Floor |
| 6 | Cleveland, Ohio 44113<br>Telephone: (216) 787-3447 |
| 7 | Facsimile: (866) 947-3223<br>Email: Kevin.Walsh@ohioago.gov |
| 8 | |
| 9 | *Attorneys for Plaintiff*<br>*Ohio Attorney General* |
| 10 | |
| 11 | |
| 12 | GENTNER DRUMMOND,<br>ATTORNEY GENERAL OF OKLAHOMA |
| 13 | |
| 14 | */s/ Christopher J. Campbell* |
| 15 | Cameron R. Capps, OBA No. 32742*<br>Christopher. J. Campbell, OBA No. 33649* |
| 16 | 313 N.E. 21st St.<br>Oklahoma City, OK 73105 |
| 17 | Tel: (405) 522-1260<br>Fax: (405) 521-3921 |
| 18 | Cameron.Capps@oag.ok.gov<br>Chris.Campbell@oag.ok.gov |
| 19 | |
| 20 | *Attorneys for Plaintiff*<br>*Attorney General of Oklahoma* |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

First Amended Complaint
Case No. 4:25-cv-03477-JST

1   DAVID W. SUNDAY, Jr.
    PENNSYLVANIA ATTORNEY GENERAL
2

3   By:

4   */s/ Merna T. Hoffman*
5   MERNA T. HOFFMAN*
    Senior Deputy Attorney General
6   PA Attorney I.D. No. 312897
    15th Floor, Strawberry Square
7   Harrisburg, PA 17120
    Email: mhoffman@attorneygeneral.gov
8

9   JOHN M. ABEL*
    Chief Deputy Attorney General
10  Bureau of Consumer Protection
    PA Attorney I.D. No. 47313
11  15th Floor, Strawberry Square
    Harrisburg, PA 17120
12  Email: jabel@attorneygeneral.gov

13
    *Attorneys for Plaintiff*
14  *Attorney General of Pennsylvania*

15

16
    **JASON S. MIYARES,**
17  **ATTORNEY GENERAL OF THE**
    **COMMONWEALTH OF VIRGINIA**
18

19  */s/ Mark S. Kubiak*
    Mark S. Kubiak (VSB No. 73119)*
20  Senior Assistant Attorney General
    Timothy S. Allison (VSB No. 98083)*
21  Assistant Attorney General
    Office of the Attorney General of Virginia
22  202 North Ninth Street
    Richmond, Virginia 23219
23  Telephone: (804) 786-7364 (Kubiak)
              (804) 786-0594 (Allison)
24  E-mail: mkubiak@oag.state.va.us
              tallison@oag.state.va.us
25

26
    *Attorneys for Plaintiff*
27  *Jason S. Miyares, Attorney General of the*
    *Commonwealth of Virginia*
28

First Amended Complaint
Case No. 4:25-cv-03477-JST

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JOHN B. MCCUSKEY,**
**ATTORNEY GENERAL OF WEST**
**VIRGINIA**

*/s/ Tanya L. Godfrey*

Ann L. Haight (WVSB# 1527)*
Deputy Attorney General, Consumer Director
Tanya L. Godfrey (WVSB# 7448)*
Assistant Attorney General
Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Ann.L.Haight@wvago.gov
Tanya.L.Godfrey@wvago.gov

*Attorneys for Plaintiff*
*Attorney General of West Virginia*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Laura E. McFarlane*

LAURA E. MCFARLANE*
Assistant Attorney General
State Bar #1089358
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-8911
(608) 294-2907 (Fax)
laura.mcfarlane@wisdoj.gov

*Attorney for Plaintiff*
*State of Wisconsin*

First Amended Complaint
Case No. 4:25-cv-03477-JST

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Pro hac vice* application pending or forthcoming

Co-counsel for attorneys appearing *pro hac vice*:

Kerry O'Brien (CABN 149264)
Federal Trade Commission
Western Region San Francisco
90 Seventh St., Suite 14-300
San Francisco, CA 94103
Phone: (415) 848-5100
Email: kobrien@ftc.gov

**ECF ATTESTATION**

I, Paul Mezan, hereby attest that concurrence in the filing of this document has been obtained from the other signatories, and that this document was served by electronic filing or email on December 15, 2025, on all counsel of record.

*/s/ Paul Mezan*

Paul Mezan (NY Bar No. 5357124)
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Phone: (202) 758-4177
Email: pmezan@ftc.gov
Fax: (202) 326-3395

First Amended Complaint
Case No. 4:25-cv-03477-JST