

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Division of Financial Practices
Bureau of Consumer Protection

March 25, 2026

**By ECF**

Honorable Thomas S. Hixson
United States District Court, Northern District of California
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

      Re:    *FTC et al. v. Uber Technologies, Inc. et al.*, Case No. 4:25-cv-03477-JST

      Dear Judge Hixson:

      Plaintiff Federal Trade Commission ("FTC") and Defendants Uber Technologies, Inc. and Uber USA, LLC ("Uber" or "Defendants") submit this joint statement pursuant to the Court's Discovery Standing Order and the March 11, 2026 Discovery Order (Dkt No. 145).

      The parties hereby attest that they have met and conferred in good faith to resolve their disputes prior to filing this letter.

                       Respectfully submitted,

                       */s/ Sarah Abutaleb*

                       Federal Trade Commission

                       *Attorney for Plaintiff FTC*

                       */s/ Ben Mundel*

                       Ben Mundel
                       Sidley Austin LLP

                       *Attorney for Uber Technologies, Inc. and Uber USA, LLC*

## I.  FTC's Statement

Pursuant to the Court's March 11, 2026 Discovery Order, the parties met and conferred on March 19, 2026. The parties  respectfully seek the Court's assistance in resolving the disputes outlined below, regarding (A) the applicable time period for responsive materials; and productions related to (B) enrollment and cancellation processes (RFPs 8 and 10); (C) law enforcement inquiries and private lawsuits (RFPs 16 and 17); (D) issue codes and corresponding consumer complaints (RFPs 19, 25, and 26); and (E) dissemination schedules for Uber One advertisements (RFP 28).[1] *See* Ex. A (July 22, 2025 FTC RFPs to Defendants).

### A.  Defendants Should Not be Permitted to Improperly Narrow the Applicable Time Period

The FTC requested that Defendants produce responsive materials from November 8, 2019 through December 15, 2025, a window tailored to capture materials relevant to the development and operation of Defendants' subscription practices, as well as materials relevant to the allegations that unlawful conduct is ongoing. In an effort to compromise after Defendants' refusal to produce materials for the complete relevant period, the FTC proposed request-specific periods, which the parties have discussed. The parties have agreed to an applicable period for RFPs 1-5, 9, 11, 14, 21-28, 30, 33-37, and 39; a dispute remains for RFPs 6-9, 10, 12-13, 15, 18-20, 29, 31, 32, 38, and 40. *See* Exhibit B. Generally, for the RFPs in dispute, the FTC requests a period of November 8, 2019 through December 15, 2025.[2] Defendants have stated that it will generally not produce documents outside of October 2021 through April 2025.[3] This narrow period is inadequate for two reasons.

First, Defendants' proposal would exclude documents relating directly to the development, design, and implementation of Uber One. Specifically, it would exclude, for example, evidence of testing, building on prior subscription models (Uber Pass), and coordination and decision-making among teams related to Defendants' subscription practices. These materials are essential to understanding not only how the program worked, but Defendants' knowledge and scienter in creating, advertising, and disseminating the program. *See, e.g., FTC v. Precision Patient Outcomes, Inc.*, 2023 WL 4475604, at \*2 (N.D. Cal. July 10, 2023) (Rejecting defendants' proposed time period and ordering defendants to produce documents from before the product was sold because "the requested discovery seeks information about the development of the products at issue, communications about the products at issue, advertisements, marketing, and other actions that Defendants took before they sold the products at issue. Plaintiff is entitled to discovery about those acts even before Defendants actually sold

---

[1] On the evening of March 24, Defendants produced a new set of documents that allegedly includes materials responsive or related to RFPs 19, 25, 26, and 28. The FTC has not had the opportunity to upload or review these materials prior to the submission of this joint statement. To the extent these materials have resolved an outstanding dispute, the FTC will promptly inform Defendants and the Court.

[2] For RFP 19, the FTC's proposed time period is October 1, 2021 to December 15, 2025. *See* Exhibit B.

[3] Uber has agreed to extend the time period until December 15, 2025 for the following requests: RFPs 6, 8, 10, 18, and 40. *See* Exhibit B.

the products at issue."); *Hatamian v. Advanced Micro Devices*, 2015 WL 7180662, at *2 (N.D. Cal. Nov. 16, 2015) (collecting cases) ("In general, courts allow discovery to extend to events before and after the period of actual liability so as to provide context.").

Second, Defendants' proposal would exclude relevant documents from after April 2025. Specifically, it would deny the FTC facts related to Defendants' ongoing conduct, which are at issue in this case. *See Precision Patient Outcomes*, 2023 WL 4475604, at *2 ("The longer time period going forward to the present is also relevant so that Plaintiff can determine if Defendants are continuing to research, market, advertise, or sell the products at issue."). Beyond proving ongoing violations of law, materials up to the present are highly probative of any shifts in Defendants' practices and bear on knowledge of wrongdoing. Accordingly, courts routinely allow discovery through the present where, as here, ongoing misconduct is alleged and the post-complaint information sought is relevant to the claims. *See, e.g., Gutierrez v. Converse Inc.*, 2024 WL 2106952, at *10 (C.D. Cal. May 2, 2024) (allowing discovery through present where plaintiff alleged ongoing misconduct and noting "courts regularly allow discovery up and through 'the present'" in rejecting burden argument); *Franklin Fueling Sys., Inc. v. Veeder-Root Co.,* 2009 WL 10691372, at *1 (E.D. Cal. Nov. 13, 2009) (rejecting complaint date cut-off and granting discovery through the present); *US v. City of Torrance*, 164 F.R.D. 493, 495 (C.D. Cal. 1995) (granting discovery of post-complaint documents related to alleged ongoing misconduct and defenses, noting it is "[t]he only way plaintiff can learn of recent, or proposed changes…").

The FTC therefore respectfully requests the Court order Uber to search for and produce responsive materials to Requests 6-10, 12-13, 15, 18, 20, 29, 31, 32, 38, and 40 from November 8, 2019 to December 15, 2025, to Request 19 from October 1, 2021 to December 15, 2025, and comply with its ongoing obligation to supplement its responses as necessary.

### B. Defendants Should Be Compelled to Produce All Responsive Materials Pertaining to the Uber One and Uber Pass Enrollment and Cancellation Processes (RFPs 8, 10)

RFPs 8 and 10 seek materials sufficient to show the subscription enrollment and cancellation processes used in any jurisdiction, including foreign jurisdictions. During a meet-and-confer between the parties on March 19, 2026, Defendants committed to completing their production in response to RFPs 8(a-f) and 10(a-g), but said they would not produce responsive materials (1) from foreign jurisdictions, or (2) pertaining to the Uber Pass program. Defendants must be compelled to respond to RFPs 8 and 10 in full because, as discussed below, (1) materials from foreign jurisdictions are relevant to issues of knowledge and alternative design, and (2) materials pertaining to Uber Pass are directly relevant to the development and operation of Defendants' subscription services.

First, responsive materials from foreign jurisdictions are highly probative of Defendants' domestic enrollment and cancellation flow operationality, the availability of alternative designs, and Uber's knowledge thereof. As it stands, Defendants refuse to produce responsive materials from *any* foreign jurisdiction. Courts have consistently found that documents from foreign jurisdictions are potentially relevant to the design and implementation of a product, as well as a defendant's knowledge. *See, e.g., FTC v. Amazon.com, Inc. et al.*, 2025 WL 821890 (W.D. Wash. March 14, 2025) (ordering production of materials relating to potential design changes to

Defendants' cancellation flows and information concerning flows used in the global market); *In re Soc. Media Adolescent Addiction*, 2024 WL 3488659, *2-4 (N.D. Cal. June 20, 2024) (ordering production because foreign versions of the defendants' platform were probative of the availability of alternative designs to the U.S. platform and defendants' knowledge of how design differences impacted user engagement); *Crisp v. Nissan Motor*, 2020 WL 6163143, at *2 (W.D. Tex. 2020) (allowing discovery of foreign designs: "The point of seeking documentation of alternative cabin designs is to show that a safer alternative design was feasible."); *In re Tylenol*, 181 F. Supp. 3d 278, 307 (E.D. Pa. 2016) ("[F]oreign labels on the defendants' products, warning of the risk of '"severe or possibly fatal liver damage' … are evidence of the defendants' knowledge of potential risks").

The relevance of materials from foreign jurisdictions is evident from even the small sample of documents that Defendants have produced, which show Defendants operates their customer engagement flows differently in places like Germany. *See, e.g.,* Ex. C, UBER-SEPT24-00000748 at 48-49 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████). The FTC requests the Court order Defendants to produce documents responsive to RFPs 8 and 10 from foreign jurisdictions sufficient to show the complete enrollment and cancellation flows in those jurisdictions, subject to limits agreed upon by the parties.[4]

Second, Defendants must produce materials related to Uber Pass because they are directly relevant to the development, implementation, and operation of their subscription practices. The Uber Pass program was a subscription program that immediately preceded and evolved into the Uber One program, such that there appears to be little distinction between the Uber Pass and Uber One programs (as even the limited number of documents produced to date can attest). *See, e.g.*, Ex. D, UBER-SEPT24-00000001 at 08-09 (████████████████████████████████████████████████████████████████); Ex. E, UBER-SEPT24-00000950 (█████████████████████████████████████████████████████████████████████████). Indeed, Uber One was even at times explicitly referred to as Uber Pass within the application interface. *See* Ex. F, UBER-SEPT24-00000067 at 71 (████████████████████████████████████████████████████████████████). Uber must not be permitted to create an artificial demarcation between Uber Pass and Uber One to avoid producing responsive materials. Further, the fact that Uber One was being developed while Uber Pass was simultaneously in operation demonstrates the relevance of Uber Pass materials to Uber One's design and operation; it is highly likely that Uber One's enrollment and cancellation flows were significantly influenced by the design and functionality of Uber Pass's flows. Materials relating to Uber Pass's enrollment and cancellation flows also bear directly on the

---

[4] In an effort to reach a resolution, the FTC has told Defendants it would be willing to accept responsive documents detailing subscription cancellation and enrollment flows from between 5 and 10 foreign jurisdictions. Defendants have indicated that each jurisdiction has approximately 30 enrollment and cancellation flows and that relevant documents from 5 to 10 jurisdictions would be only 150 to 300 documents in total. Nonetheless, Uber has not agreed.

Defendants' knowledge at the time Uber One was being designed. The FTC is not (as Defendants argue) attempting to improperly expand the complaint; rather, it requests that responsive materials relating to Uber Pass be produced because Uber Pass is demonstrably connected to the Defendants' subscription practices.

For the above reasons, the Court respectfully requests that Defendants be compelled to produce in full materials responsive to RFPs 8 and 10 within fourteen days.

**C. Other Law Enforcement Inquiries and Private Lawsuits Are Relevant and Discoverable (RPFs 16, 17)**

RFPs 16 and 17 request materials pertaining to inquiries or investigations by relevant consumer protection agencies, the Better Business Bureau (BBB), or civil or criminal law enforcement agencies, as well as private lawsuits. Defendants have tried to unilaterally narrow the scope of RFP 16[5] and refused to produce any responsive materials for RFP 17. Defendants should be compelled to fully respond to RFPs 16 and 17 because their receipt of such materials may demonstrate their knowledge of unlawful practices.

For RFP 16, Defendants has said it will produce BBB and Attorney General consumer complaints, but no documents related to investigations by civil or criminal law enforcement or consumer protection agencies (including Civil Investigation Demands and other investigative letters sent to Uber and corresponding responses by Uber) that concern the practices alleged in the FAC. Defendants should be compelled to fully respond to RFP 16 because such documents have been held by courts to be relevant and discoverable. *Rumble, Inc. v. Google, LLC*, 2023 WL 3751797, at *7-9 (N.D. Cal. May 31, 2023) (ordering production of other investigations and enforcement actions that had significant factual and legal overlap and were proportional to the needs of the case).

Specifically, investigations and private lawsuits related to the same or similar conduct alleged in the FAC, are squarely relevant to Defendants' knowledge or notice of unlawful practices needed to award civil penalties. *See, e.g., Schneider v. Chipotle Mexican Grill, Inc.*, 2017 WL 1101799, at *3–4 (N.D. Cal. Mar. 24, 2017) (ordering production of documents from prior private consumer protection lawsuit where pending case involved "significant factual and legal overlap"); *United States v. Stratics*, 721 F. Supp. 3d 1080, 1101 (S.D. Cal. Mar. 6, 2024) (holding knowledge of a similar prior enforcement action provided notice that the statute applied to their conduct). These requests are proportional to the needs of the case and Uber does not allege that producing materials responsive to these requests would impose an undue burden.

The FTC asks the Court to order Defendants to produce all documents responsive to these requests within ten days.

---

[5] Defendants state that for RFP 16 they will only produce BBB and Attorney General consumer complaints, neither of which has been produced, despite these requests being served nearly eight months ago. (Ex. G, Jan. 7, 2026 Letter re Discovery)

**D. Defendants Should Not Be Permitted to Unilaterally Limit Discovery (RFPs 19, 25, 26)**

RFPs 19, 25 and 26 are interrelated: RFP 19 seeks customer correspondence related to the issues in the FAC; RFP 25 requests all codes used by Uber's teams to label or sort Uber One customer correspondence; and RFP 26 seeks data showing, for each month, the volume and percentage of customer service contacts related to each code.[6]

In response to RFP 25, Defendants provided only a list of handpicked "potentially relevant issue codes associated with Uber One" from one of their databases and has not produced a single document in response to RFP 19. Ex. H, Feb. 23, 2026 Production Letter. Defendants must not be permitted to unilaterally decide which issue codes are relevant, especially when they have not expressed or identified any undue burden with producing a comprehensive list of Uber One codes and databases. In an effort to reach agreement, the FTC asked Defendants for the number of outstanding issue codes and complaints associated with Uber One, but Defendants have not responded.

The coding of complaints with issue codes is necessary to quantify consumer harm, identify patterns, and evaluate the prevalence of the challenged practices. Defendants are "required to use reasonable diligence to look for" responsive documents and cannot unilaterally limit search locations, as the FTC "is in a poor position to identify data sources that may have responsive documents." *Davis v. Pinterest, Inc.*, No. 19-cv-07650-HSG (TSH), 2021 WL 3045878, at *3 (N.D. Cal. July 20, 2021); *see also Centerline Housing Partnership I, L.P. – Series 2 v. Palm Communities*, 2021 WL 4895746, *7 (C.D. Cal. Sept. 2, 2021) (holding that parties discovery responses were insufficient "to the extent they unilaterally purport to limit production to responsive documents that 'relate to the claims and defenses in this action' without further specificity about what documents are being produced and what documents are being withheld."). To reasonably search for and identify responsive documents, Defendants must provide a list of *all* codes used to sort customer correspondence, across all databases and repositories that may include responsive materials, and then produce corresponding customer complaints associated with all the codes the FTC deems relevant.

The FTC requests that the Court order Defendants to (i) within ten days, provide the FTC with a complete list of all issue codes that relate to Uber One so the FTC can tailor its request accordingly; and (ii) upon agreement among the parties on other relevant issue codes, produce additional materials responsive to RFPs 19 and 26 within fourteen days.

Further, Defendants should be required to produce customer correspondence responsive to RFP 19 that is already identifiable through the limited list of issue codes Defendants provided in their February 23, 2026 letter. The FTC understands that the list of codes provided by

---

[6] On March 9, 2026, Defendants produced the monthly and overall volumes of customer contacts for a limited number of issue codes (identified in their February 23, 2026 production letter, Ex. H) that they determined, without consultation, were potentially relevant. The FTC requests that if the parties determine other codes not included in the February 23 list are relevant, Defendants supplement their production in response to RFP 26.

Defendants is associated with over 4 million communications. Given this large volume, the FTC is open to discussing with Defendants the possibility of sampling communications. Lastly, Uber has only produced issue codes from one of its databases. The FTC asks the Court to compel Uber to confirm whether there are other repositories of responsive materials within five days.

**E. Defendants Must Produce Documents Responsive to RFP 27 Before the Parties Can Agree on the Scope of RFP 28 (RFPs 27-28)**

RFP 27 and 28 are also interrelated: RFP 27 requests all unique Uber One advertisements and RFP 28 requests the dissemination schedule for each advertisement. RFP 28 does not need to be addressed by the Court at this time because the scope of RFP 28 cannot be determined until Uber has responded to RFP 27.

On the evening of March 24, Defendants produced a new set of documents that allegedly includes materials responsive to RFP 27, which the FTC has not had the opportunity to review prior to submission of this statement.[7] Defendants have said, in response to RFP 28, they will only conduct a reasonable search for dissemination schedules for up to ten advertisements. Ex. I, Mar. 24, 2026 Production Letter. Without reviewing Defendants' production in response to RFP 27, the FTC cannot determine whether dissemination schedules for ten advertisements is sufficient. If the parties cannot reach an agreement on the scope of RFP 28, they will file a joint discovery letter addressing this request.[8]

## II. Uber's Statement

### A. Date Range for Documents to be Produced

The FTC is seeking documents from an unreasonably long time period—both two years before Uber One launched and eight months after this lawsuit was filed. The timing is as follows: Uber One launched on November 17, 2021. After an investigation, the FTC publicly filed its complaint and related press release on April 21, 2025. That complaint alleged that Uber One's advertisements, enrollment flows, and cancellation flows violated the law. The relevant date range for document production should therefore be October 1, 2021 (approximately 45 days before Uber One launched) through April 21, 2025 (the date the complaint was filed). This should be the default time period for discovery in this case. As explained below, the FTC's proposed start and end dates largely do not track their allegations and impose an undue burden on Uber.

---

[7] The FTC reserves its right to address new or ongoing disputes with Defendants' production, should they arise.

[8] RFP 29 was also addressed in the FTC's portion of the March 6, 2026 Joint Discovery Letter (see Dkt No. 145) but Defendants did not respond to this request in their portion of the letter and this request was not addressed at the March 11, 2026 Hearing. Uber claims to have produced materials responsive to this request in their March 9 production. The FTC is still reviewing the production and will bring any issues to the Court that the parties cannot resolve related to this request.

Starting Date: The FTC is seeking documents going back to November 8, 2019, which is more than two years before Uber One launched. Uber is willing to agree to the FTC's request—even though Uber finds it unjustified—where the burden is relatively minimal. Specifically, Uber is willing to search back to November 8, 2019, for RFPs 3, 9, 23, and 24. These requests include customer service training documents, call scripts, manuals, FAQs, and related materials that may have been created before October 1, 2021. Similarly, Uber is willing to search for documents sufficient to identify teams or groups that worked on Uber One for a longer period before its launch, though it is unclear what work Plaintiffs think would have been performed more than two years prior to launch.

Plaintiffs argue that documents from this period are needed because Uber One was preceded by a different subscription program, Uber Pass. But the FAC mentions Uber Pass just once (¶ 17), and only then to draw a contrast with Uber One. The FAC focuses squarely on Uber's practices with respect to Uber One. Discovery about a prior subscription model that bears some similarities to Uber One is not necessary to understand Uber's knowledge and scienter because Uber will produce more than four and a half years' worth of documents on its creation, advertisement, and dissemination of Uber One. Whatever minimal relevance might be gleaned from Uber's practices with respect to Uber Pass is simply disproportionate. This case is not at all like *FTC v. Precision Patient Outcomes, Inc.*, which concerned a health supplement where early research and development would have much more relevance. 2023 WL 4475604, at *2 (N.D. Cal. July 10, 2023). Even if this case were similar, the court in *Precision Patient* also noted that "[t]he discovery should be limited to the products identified in the First Amended Complaint - rather than to any product related to the immune system - because that definition is overly broad." *Id.* Here, too, the court should limit discovery to the subscription model that is the subject of the FAC—Uber One.

End Date: For the End Date, Uber is willing to respond through the FAC date for requests that go directly to the FTC's request for injunctive and monetary relief. This, for example, includes Uber's current advertising, enrollment, and cancellation practices, as well as current financial information for monetary relief. Indeed, Uber has already provided data for monetary relief through December 15, 2025, in response to RFPs 34-37, and also agrees to search for and produce documents through December 15, 2025 for 21 RFPs (3, 5, 6, 8, 9, 10, 11, 14, 18, 21, 22, 23, 24, 25, 26, 27, 28, 30, 33, 39, and 40).

By contrast, the filing of the original complaint is the appropriate ending date for the 15 RFPs that go to liability issues (not damages or injunctive relief) (RFPs 1, 2, 4, 7, 12, 13, 15, 16, 17, 19, 20, 29, 31, 32, and 38). The FTC said Uber violated the law at the time it filed its complaint and therefore it should prove liability based on those facts. There is minimal relevance to post-complaint items, especially considering that the FAC makes no mention of any changes to Uber One or additional complaints received between April 21, 2025 and December 15, 2025. The FTC's vague allusions to unspecified shifts in Uber's practices should not require Uber to wade through nearly eight more months of documents for these requests. Moreover, these requests sweep broadly, imposing substantial burden and expense. For example, these RFPs call for the production of all documents relating to the Uber One enrollment and cancellation processes, customer correspondence tagged with a code that mentions Uber One (regardless of their relevance to the FAC), and experiments and tests regarding Uber One. It is not proportionate to require Uber to search for documents from the eight months after the complaint

when the FTC has already made clear that it believes liability can be established based on conduct long before the original complaint. The FTC's citations prove only that there are some circumstances where post-complaint discovery is relevant and proportionate. Uber does not contest that; that is why Uber has agreed to produce documents through December 15, 2025 for more than half of the FTC's requests. But for the 15 RFPs that go to core liability, Uber has agreed to search for documents from October 1, 2021 (before many of these categories would even exist), through the filing of the original complaint (April 21, 2025), when Plaintiffs' allegations were already fully formed.

The court should limit the date range to Uber's proposed time periods as listed in Ex. B

**B.  RFPs 8 and 10: Enrollment and Cancellation Flows from Foreign Jurisdictions**

This case is about whether Uber violated United States laws because of its practices involving Uber One in the United States. The FTC's jurisdiction is limited to actions affecting commerce in the United States, and the Plaintiff States can enforce actions affecting commerce within their own boundaries. Uber has and will continue to produce documents relating to all relevant aspects of its Uber One offerings in the United States, including dozens of flows and hundreds of advertisements. But the FTC has asked for documents showing all Uber One enrollment and cancellation processes outside of the United States, as well as materials relating to Uber Pass, which is hardly mentioned in the FAC. This material is not relevant, would be hugely burdensome to produce, and would not advance the litigation in any way.

Uber One is available in 47 countries (including the United States). Each jurisdiction uses the same roughly 31 enrollment flow entry points (the same flows that are available in the U.S.). But these flows use the local language, include different benefits and disclosures, and feature other text and button variations. Each entry point may have used different targeting and pricing that evolved over time. Thus, the volume of variants called for by the FTC's request quickly reaches the thousands: 46 jurisdictions, multiplied by 31 entry points, multiplied by an indeterminate number of other changes.

Uber's practices in the 46 foreign jurisdictions are not relevant to Uber's practices in the United States. The core question of this case is whether United States consumers were deceived by Uber One. That question will not be answered by looking at Uber's practices abroad, where consumers have different customs, languages, habits, and perceptions. While the FTC contends that documents from foreign jurisdictions are relevant to the extent they show Uber is capable of changing the structure of Uber One, Uber's position is not that it was incapable of making changes to the Uber One enrollment and cancellation processes. Uber's position is that Uber One does not, and has never, violated the United States laws at issue here. That will not change with the production of foreign materials. The FTC claims in footnote 4 to have offered to limit this request to "between 5 and 10 foreign jurisdictions," but Uber was not aware of this offer until the FTC sent a draft of its portion of this brief at 12pm ET on the day it was due. Nevertheless, this offer is not acceptable because these materials are simply irrelevant.

Courts in this circuit have held that the sales practices of companies abroad are not probative of violations of U.S. law. In *Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*, No. CV 04-10077, 2008 WL 4755611, at *2 (C.D. Cal. Jan. 7, 2008), the court excluded evidence of the marketing

and sale of a product in foreign jurisdictions, where the party seeking to use the evidence had "not demonstrated that foreign laws or perceptions" were similar to those in the United States. *Id.* at \*2. Similarly, in *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, No. 22-md-03047, 2024 WL 3488659 (N.D. Cal. June 20, 2024), discovery into YouTube's features in markets outside of the United States was proper only upon a "sufficient showing of relevance." *Id.* at \*4. The court specifically stated at the discovery hearing that it was not "proportional or relevant to get wide ranging discovery on every version of YouTube across the globe." *In re Soc. Media*, 4:22-md-03047, Dkt. No. 903 at 34:13–15. As Uber stated in its prior letter on this subject, *FTC v. Amazon.com*, No. 2:23-cv-00932, Dkt. No. 248 (W.D. Wash. Mar. 14, 2025) is not on point because it concerned documents withheld for privilege, not Amazon's foreign enrollment and cancellation flows. The FTC's other citations are inapposite because they concern the safety of a vehicle design and risk factors of a drug, objective questions that do not depend on differences in language, customs, or beliefs. *See Crisp v. Nissan Motor*, 2020 WL 6163143, at \*2 (W.D. Tex. 2020); *In re Tylenol*, 181 F. Supp. 3d 278, 307 (E.D. Pa. 2016). Uber One features abroad are not relevant to the allegations in the FTC's complaint.

The FTC's argument to expand the scope of the complaint to include Uber Pass should be rejected for the same reasons. While the FTC argues that Uber's design of the Uber Pass enrollment and cancellation flows informs its knowledge and scienter, Uber does not claim that it was incapable of changing the design of Uber One's enrollment flows. The court should therefore reject the FTC's request for discovery into Uber's subscription practices that do not relate to Uber One in the United States.

**C. RFPs 16 and 17: Documents Relating to Government Investigations and Private Lawsuits**

RFP 16 requests "All Documents Relating to Any communications received from, or investigations or inquiries by, Any civil or criminal law enforcement or consumer protection agency, or Better Business Bureau, regarding Nonconsensual Enrollment or Uber One Cancellation or Enrollment Processes." RFP 17 requests "All Documents Relating to private lawsuits against You regarding Uber One and involving Uber One Enrollment or Cancellation Processes, Nonconsensual Enrollment, Diverted Cancels, or Uber One subscription benefits or savings."

Uber has agreed to produce consumer communications and complaints about Uber One's cancellation and enrollment processes, including those provided by the Better Business Bureau and State Attorneys General. These communications are categorized using the same codes that Uber has provided under RFPs 19, 25, and 26, so the only thing holding up production is the FTC's refusal to agree to a reasonable set of these codes (see Uber's position on RFPs 19, 25, and 26 below).

The only portion of these requests Uber has declined to produce are government investigations or private lawsuits. Plaintiffs have offered two arguments for why these documents are relevant. Both of these are unpersuasive. First, the FTC has said that the existence of any investigation puts Uber on notice of illegality. But many investigations reveal no wrongdoing. Take the FTC's own Voluntary Access Letter regarding Uber One. This letter stated that "[t]he purpose of this inquiry is to determine whether Uber is engaged in unfair or

deceptive acts or practices in violation of the Federal Trade Commission Act (FTC Act), 15 U.S.C § 45, and whether Uber is violating Section 4 of ROSCA, 15 U.S.C. § 8403." Presumably, the FTC had not yet drawn any conclusions about whether Uber One violated the law at the time it issued this letter. This Court has recognized that the relevance of investigations cannot simply be assumed by the fact that they were opened. *See In re Stubhub Refund Litig.*, No. 20-md-02951-HSG (TSH), 2022 WL 1640304, at *4 (N.D. Cal. May 24, 2022) (denying motion to compel "[d]ocuments . . . relating to any third-party investigations into StubHub's refund [p]olicies," as well as "[d]ocuments related to any enforcement actions [b]rought . . . involving . . . refund [p]olicies").

Second, Plaintiffs argue that if Uber produced documents in response to inquiries from other jurisdictions, it should get those documents here, too. This essentially seeks "cloned discovery," which courts in this circuit routinely reject as inappropriate. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 4680242, at *1 (N.D. Cal. Oct. 18, 2017) (collecting cases). Even if Plaintiffs could identify "certain similarities between [those inquiries] and this case, such similarities are not enough to require a carte blanche production of all documents from [those other contexts]." *Chen v. Ampco Sys. Parking*, 2009 WL 2496729, at *2 (S.D. Cal. Aug. 14, 2009); *King Cty. v. Merrill Lynch & Co.*, 2011 WL 3438491, at *3 (W.D. Wash. Aug. 5, 2011) ("It may very well be that each and every document produced in the government investigations is relevant to Plaintiff's claims. However, Plaintiff must make proper discovery requests, identifying the specific categories of documents sought, in order to obtain them—and each category must be relevant to its claims and defenses.").

With respect to RFP 17, non-privileged material regarding "private lawsuits" is not only of questionable relevance but also in the public record and therefore Plaintiffs can get this material without burdening Uber. Uber is not required to package it for the Plaintiffs' convenience. *Roberts v. Randy LL Corp.*, No. 3:24-cv-00523, 2025 WL 2717823, at *10 (D. Or. Sept. 24, 2025) (explaining that the requesting party "has access to PACER and can conduct a search" for matters involving the opposing party). The FTC has suggested that demand letters and other documents relating to threatened, but not filed, private lawsuits, would be responsive to RFP 17. But the fact that a plaintiff's lawyer threatened, but did not file, a lawsuit is in no way probative of any legal violation. The Court should limit RFPs 16 and 17 to consumer communications regarding the allegations in the complaint.

### D. RFPs 19, 25, and 26: Customer Correspondence

The FTC's approach to RFPs 19, 25, and 26 is indicative of its approach to discovery more generally. Uber has consistently said that it would identify relevant issue codes and the volume of contacts tagged with the relevant codes from its Bliss customer service system (where it manages all customer communications), and then negotiate a reasonably scoped search in response to those codes. Uber did just that: Uber provided a list of dozens of codes, which are associated with over 4 million communications. More specifically, Uber responded to RFP 25 on February 23, 2026, by providing potentially relevant codes relating to Uber One. Uber responded to RFP 26 on March 9, 2026, by providing the counts of customer communications (over 4 million) for all of the potentially relevant codes. Uber supplemented its response to RFPs 25 and 26 on March 24, 2026, by providing the remaining codes that include the words "Uber One" and the volume of communications associated with each. Uber has continually asked the FTC to

identify the codes that the FTC views to be most relevant so that Uber can produce a sample of documents using those codes. The FTC has refused to negotiate a reasonable sample.

Now, the FTC demands every code that Uber uses to categorize its customer communications, even if unrelated to Uber One, even though RFP 25 is clearly limited to Uber One-related communications. This covers all customer communications relating to Uber's other lines of business: drivers, couriers, restaurants, and more. Uber's proposed sampling of complaints from the most relevant codes that are actually related to Uber One subscriptions (as opposed to individual orders and rides) is reasonable in light of the plain text of the request,[9] is more than sufficient for Plaintiffs' case, and is an approach consistently approved of by courts in this circuit. *See, e.g.*, *Valentine v. Crocs, Inc.*, No. 22-cv-07463, 2024 WL 1636716, at *3 (N.D. Cal. Apr. 15, 2024) (rejecting similar request where the "full scope of customer complaints" relating to a topic would be "unduly burdensome and not proportional to the needs of a case"); *In re Toyota Motor Corp. Sec. Litig.*, No. CV 10-922, 2012 WL 3791716, at *14 (C.D. Cal. Mar. 12, 2012) (noting a request for "every customer complaint" is a "potentially overwhelming and highly burdensome request"). Plaintiffs should not be entitled to discovery on topics that are concededly unrelated to the litigation.

The FTC also wants Uber to produce all documents using each and every code that Uber has already disclosed, despite knowing there are over four million customer communications that were tagged with these codes. The FTC does not need four million customer communications, and it is not reasonable or proportionate for Uber to produce that volume of data. Moreover, Uber understands that many contain personally identifiable information like credit card numbers, which require manual review and redaction. Uber proposes that it produce a 10% sample of communications once the FTC narrows the list to the most relevant codes.

### E. RFP 28: Dissemination Schedules for Advertisements

RFP 28 requests "For Each Advertisement responsive to RFP 27,[10] a dissemination schedule, Including the dates and times of dissemination, number of disseminations, the media used, and the total cost of preparing and disseminating the Advertisement." Uber has agreed to search for dissemination schedules for up to ten advertisements produced under RFP 27, which is reasonable and proportionate given the needs of the case. It would be unduly burdensome to search for a dissemination schedule and number of disseminations for all advertisements that Uber has or will produce. Uber produced 264 advertisements on March 24, 2026, and may produce more in subsequent productions. Uber does not maintain a central marketing database or repository that houses dissemination information for advertisements, and advertisements can be prepared, reviewed, and run by different teams. This makes it particularly burdensome to track down dissemination information (beyond the media used, which will typically be clear from the face of the documents that Uber has produced or will produce). The scheduling, targeting, and budgeting may all be handled by different teams, depending on the advertisement. Therefore,

---

[9] RFP 25 requests "Documents sufficient to identify All codes, tags, or categorizations used by Your customer service, Uber support, Uber "customer obsession" teams, or Any other teams or contractors to label or sort Uber One Customer Correspondence, and the meaning of those codes, tags, or categorizations."

[10] RFP 27 seeks "All materially unique versions of Advertisements Relating to Uber One."

limiting this RFP to a discrete set of advertisements most important to the FTC's case, is a reasonable compromise.