UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UBER TECHNOLOGIES, INC., et al., <br><br> Defendants. | Case No. 25-cv-03477-JST <br><br> **ORDER ON MOTION TO DISMISS** <br> Re: ECF No. 116 |

Before the Court is a partial motion to dismiss filed by Defendants Uber Technologies, Inc. and Uber USA, LLC (collectively, "Uber"). The Court will grant the motion in part and deny it in part.

## I.    BACKGROUND

For the purpose of resolving the motion to dismiss, the Court accepts as true the allegations in the first amended complaint ("FAC"). *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

Uber facilitates ride-hailing and food delivery services for consumers through its smartphone app. ECF No. 46 ¶ 12. Since November 2021, Uber has offered a subscription plan called Uber One, for which enrollees typically pay $9.99 a month or $96 annually with automatic charging and renewal. *Id*. ¶ 17. The Uber One subscription purports to provide a "$0 Delivery Fee on eligible food, groceries, and more," "[u]p to 10% off eligible deliveries and pickup orders," the ability to "[e]arn 6% Uber One credits on eligible rides," "special offers and promotions," savings at "thousands of your favorite restaurants and stores," and the option to "[c]ancel anytime without fees or penalties." *Id*. ¶ 20, Ex. 2. Other marketing claims include that consumers in the United States "[s]ave $25 every month" on average. *Id*. ¶ 19, Ex. 1. After cancellation, the member's benefits continue through the end of the paid term, although members in the free trial

period lose access immediately. *Id*. ¶ 69, Ex. 25.

To use the Uber app's services, consumers provide payment information. *Id*. ¶ 33. Uber uses consumers' payment information to charge for Uber One, for which some consumers report they never signed up and have no idea why they were charged. *Id*. ¶¶ 4, 38.

Members seeking to cancel their Uber One subscriptions must "take at least 12 to 32 actions," including sometimes "calling [Uber's] customer support to cancel, where they experience long wait times and significant delays." ECF No. 147 at 8; ECF No. 46 ¶¶ 43–87. After navigating through several different screens in the app, consumers encounter a button called "End membership." *Id*. ¶¶ 43–50. Members who click the button must answer a survey about why they seek to cancel, with follow-up questions that vary according to their stated reason. *Id*. ¶ 52. Throughout the process, the button to continue towards cancellation is black with gray or white font (in contrast to the button for keeping Uber One, which is white), and its position relative to other options changes, potentially misleading consumers who might tap the same position on the screen in an unsuccessful attempt to continue cancellation. *Id*. ¶ 54.

"For a significant part of the relevant time period, [the] End Membership button was not visible to any consumers in the final 48 hours of their billing cycle." *Id*. ¶ 51. Even when consumers could view the End Membership button within 48 hours of the new billing period, the app made it more difficult for them to cancel. It directed them to a screen stating that they can keep their memberships active in exchange for savings of "$25 each month." *Id*. ¶ 57, Ex. 19; *id*. ¶ 58. "Consumers who wish to decline this purported 'savings' proposition have had to exit out of the cancellation flow or click a button labeled 'Close.'" *Id*. "In many instances, however, consumers who have clicked the 'Close' button have been bounced back to the [cancellation] survey . . . where their only options have been to (1) click 'Continue' again, sending them back in a loop through the same steps described above; (2) click [] 'Keep Uber One,' contrary to their intentions; or (3) manually navigate back to their home screen by closing out the cancellation flow." *Id*. Consumers describe this process as an infinite "loop" that never leads to cancellation. *Id*. ¶ 60.

The aforementioned $25 savings screen, presented to consumers attempting to cancel

within 48 hours of a new billing period, notifies consumers that their "next scheduled payment may be in process" and directs them to contact support. *Id*. ¶ 59, Ex. 20; ¶ 61. The FAC alleges that this advisement is false because "[i]n fact, Uber *always* charged consumers before the supposed billing date and never processed cancellations concluded via the in-app cancellation flow in the final 48-hour window." *Id*.; *see also id*. ¶ 81 (describing "Uber's misleading policy of charging consumers for a new subscription 24 to 48 hours before their stated billing date").

Moreover, "Uber did not provide any contact information for 'support' or give any guidance on where to navigate within the app to find 'support' for the vast majority of the relevant time period, and only offered the information after receiving notice of the FTC's investigation." *Id*. ¶ 63. Finding where to contact "support" in the app requires navigating to and scrolling to the bottom of several more screens. *Id*. ¶¶ 65–72. Members must navigate to a support page, enter a complaint, and then re-navigate to the same page from an earlier screen to view the chat window through which a customer service representative may respond to the cancellation request. *Id*. ¶¶ 72–74. However, "even consumers who have found their way to the cancellation support queue have often been unable to promptly cancel or avoid being charged due to excessively long hold times: consumers often report waiting hours or up to a full day to receive a response from Uber, and that they were already billed for the next payment in the interim." *Id*. ¶ 75. For consumers who reach customer service and cancel during this 48-hour window, Uber confirms cancellation and states that the consumer will not be charged after cancelling, but in fact, Uber always charges these users for one additional month. *Id*. ¶¶ 85–87.

The various marketing and enrollment materials vary in the information they provide about the cancellation process. While some materials note that cancellation is "with no additional fees" or "without fees or penalties," *id*. ¶¶ 19, 30, elsewhere Uber discloses in fine print that members must cancel up to 48 hours before the membership renewal date "[t]o avoid charges," *id*. ¶ 35.

The Federal Trade Commission ("FTC") brought this complaint on April 21, 2025. ECF No. 1. In December 2025, the FTC filed the FAC, adding 22 states as plaintiffs and numerous new legal theories under state laws. ECF No. 46. The FAC brings five counts: 1) advertising and marketing misrepresentation in violation of Section 5(a) of the Federal Trade Commission Act, 15

*United States District Court*
*Northern District of California*

U.S.C. § 45(a), and numerous state laws; 2) unfairly charging consumers without consent in violation of FTC Act Section 5, numerous state laws, and the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401 et seq.; 3) failure to provide disclosures of required terms in violation of Section 4 of ROSCA, 15 U.S.C. § 8403; 4) failure to obtain express informed consent before charges in violation of Section 4 of ROSCA; and 5) failure to provide simple mechanisms for stopping recurring charges in violation of Section 4 of ROSCA. *Id*. ¶¶ 98–117.

## II.    JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III.    LEGAL STANDARD

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations need not be detailed, but must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In determining whether a plaintiff has met the plausibility requirement, a court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

## IV.    DISCUSSION

### A.    FTC Act (Count One)

Challenging three out of the five misrepresentations alleged in Count One, Uber argues that there is nothing false or misleading about Uber's statements about savings, delivery fees, or cancellation. ECF No. 116 at 13. The Court will dismiss one of the three challenged Count One claims.

Section 5(a) of the Act declares unlawful "unfair or deceptive acts or practices in or

affecting commerce" and empowers the Commission to prevent such acts or practices. 15 U.S.C. § 45(a)(1) & (2). "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'" *F.T.C. v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (quoting *F.T.C. v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001)). When considering how a reasonable consumer would interpret marketing materials, courts consider the overall "net impression" conveyed. *See id.*; *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (collecting cases and holding that "[a] solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures," particularly if those disclosures are in fine print). In the context of the FTC Act, "[a]dvertising capable of being interpreted in a misleading way should be construed against the advertiser." *Resort Car Rental Sys., Inc. v. F. T. C.*, 518 F.2d 962, 964 (9th Cir. 1975).

### 1.    Pleading Standard

As a threshold matter, the parties dispute whether Federal Rule of Civil Procedure 8(a) or 9(b) governs Section 5 and analogous state-law deception claims. ECF No. 116 at 14; ECF No. 147 at 10. Although "[t]he Ninth Circuit has not resolved the question of whether Rule 9(b) applies to deceptive acts or practices claims under Section 5 of the FTC[,] [a] number of district courts in the Ninth Circuit . . . have found Rule 9(b) applies to Section 5 claims because Section 5 claims 'sound in fraud' by alleging the defendant acted fraudulently." *United States v. Stratics Networks Inc.*, 721 F. Supp. 3d 1080, 1097 (S.D. Cal. 2024); *see also F.T.C. v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 853–54 (C.D. Cal. 2010) (relying on "well-established Ninth Circuit law providing that, even where a claim does not include all of the elements of a claim for fraud, it is subject to the heightened pleading requirements of Rule 9(b) if it 'sound[s] in fraud'" (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003)); *F.T.C. v. Swish Mktg.*, No. C-0903814-RS, 2010 WL 653486, at *4 (N.D. Cal. Feb. 22, 2010) (noting that "[t]he general applicability of Rule 9(b) to section 5 actions is a real prospect" but finding it unnecessary to decide which pleading standard applied). Uber, unsurprisingly, would have the Court adopt this view. ECF No. 116 at 14.

5

United States District Court
Northern District of California

Plaintiffs would follow several other courts, including at least one in this circuit, to find that "[a] Section 5 deception claim 'simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b),' because it does not require proof of common law fraud elements, such as specific reliance or specific injury." ECF No. 147 at 10 (quoting *F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005)); *see also F.T.C. v. Grand Canyon Educ.*, Inc., 745 F. Supp. 3d 803, 837 (D. Ariz. 2024) (holding that Rule 9(b) did not apply to the FTC's Section 5 claims because they "do not require a showing that Defendants knew the challenged representations were false or deceptive or that Defendants acted with the intent to defraud").

The Court need not resolve this dispute because the FAC easily satisfies the more stringent requirements of Rule 9(b). *See F.T.C. v. Dave, Inc.*, No. 2:24-CV-09566-MRA-AGR, 2025 WL 2698698, at *9 (C.D. Cal. Sept. 12, 2025) ("Most district courts, however, have avoided the issue entirely by finding that even if the allegations [under Section 5 of the FTC Act] sound in fraud, the complaint meets the heightened pleading standard.") Rule 9(b) requires only that the allegations "detail[] the course of deceptive conduct at issue and enumerate[] the time frame for this conduct." *Id*. at *10; see *also F.T.C. v. Wellness Support Network, Inc.*, 2011 WL 1303419, at *10 (N.D. Cal. Apr. 4, 2011) (holding that "to satisfy Rule 9(b), a complaint must allege the 'who, what[,] where[,] and how' of the conduct at issue" (quoting *Vess*, 317 F.3d at 1106)). Claims must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985).

The FAC identifies with particularity each allegedly unfair or deceptive representation, ECF No. 46 ¶¶ 19-24, 30, 32, 35, 40–41, 57–58, 98, usually with screenshots and an accompanying explanation describing where and how the statements appeared on Uber's website and apps, *id*. ¶ 19 Ex.1, ¶ 20 Ex. 2, ¶ 27 Ex. 4, ¶ 30 Ex. 6, ¶ 35 Ex. 9, ¶ 57 Ex. 19. The FAC alleges the time frame of the conduct, *id*. ¶¶ 17, 39, and alleges that the statements were false, misleading, or unsubstantiated at the time they were made, *id*. ¶ 99. These allegations suffice to meet the requirements of Rule 9(b).

### 2.    Cancellation at Any Time with No Additional Fees

Plaintiffs argue that Uber's representation "that consumers may cancel their subscription services at any time with no additional fees" is false. ECF No. 46 ¶ 98. Uber first argues that cancellation procedures are available to consumers at any time, which Plaintiffs do not dispute. ECF No. 116 at 16; ECF No. 147 at 14–15. The primary problem, as Plaintiffs see it, is that cancellation within 48 hours of the next billing period causes consumers to incur "additional fees" of $9.99 a month or $96 a year. ECF No. 46 ¶ 98; ECF No. 147 at 13. Uber responds that these charges are not "additional fees" but rather subscription fees extending the benefits of the subscription through another period. ECF No. 116 at 18. Uber forces consumers who wish to cancel their subscription to resubscribe for a billing period that has not yet begun and whose benefits they have not yet begun to enjoy. Plaintiff's theory that advance payment for a subscription that is no longer desired constitutes an "additional fee" is intuitively colorable and Uber provides no authority to the contrary. ECF No. 116 at 18.

The fact that Uber sometimes warns consumers to cancel before the final 48 hours of the billing period does not preclude Plaintiffs from stating a claim. ECF No. 46 ¶ 27, Ex. 4; ¶ 35, Ex. 9; ¶ 77. First, it appears that such disclaimers do not appear until, at earliest, the checkout screen for Uber One. *Id*. ¶ 27, Ex. 4.; ¶ 35, Ex. 9. No caveat that fees may be incurred during the 48 - hour period accompanies Uber's promises earlier in the enrollment flow not to charge "additional fees" at cancellation. *See Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1496–97 (1st Cir. 1989) ("Each advertisement must stand on its own merits; even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads."); *see also F.T.C. v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), *aff'd,* 265 F.3d 944 (9th Cir. 2001). Moreover, as Plaintiffs argue, it is far from clear that the fine-print 48-hour-window disclosure is sufficient to alter the "net impression" created by Uber's statements that no additional fees are charged. ECF No. 46 ¶ 27, Ex. 4; ¶ 35, Ex. 9; *see F.T.C. v. Doxo, Inc.*, 771 F. Supp. 3d 1162, 1177 (W.D. Wash. 2025) ("Courts across the country have determined that, where a disclaimer is buried in fine print and is without accentuation, it is insufficient to alter the net impression" of a claim.).

United States District Court
Northern District of California

The complaint also includes several specific allegations supporting this claim, which Uber does not address.  Plaintiffs allege that for trial period subscriptions, Uber bills consumers before the stated billing date—the end of the trial period.  ECF No. 147 at 13; ECF No. 46 ¶ 82.  Likewise, Plaintiffs allege that some consumers who were told their subscriptions had been cancelled continued to receive charges for additional months.  *Id*. ¶¶ 81, 87.  Finally, the 48-hour window is expressed in hours, but no time is given for the billing date, obfuscating the cutoff for consumers to cancel without incurring a fee.  ECF No. 46 ¶ 77.

Because Plaintiffs have plausibly alleged that Uber charges an additional fee to those cancelling within 48 hours of the new billing period and have otherwise shown that Uber's cancellation policy representation is inaccurate, the motion to dismiss is denied as to this claim.

### 3.    Monthly Savings

Plaintiffs allege that Uber falsely represented that Uber One members would "save $25 every month" even though many members do not do so.  ECF No. 46 ¶¶ 22, 98.  Further, "Uber's savings claim assumes that the subscription is free; the purported savings does not subtract any costs."  *Id*. ¶ 22.  In its motion to dismiss, Uber responds that the FAC alleges that it represents that members "*could* save $25 each month" based on "average monthly savings" in the member's country.  ECF No. 116 at 15.

The FAC includes several screenshots showing Uber's representations concerning monthly savings—one presented to potential members during the enrollment flow, and the other presented to members attempting to cancel.  ECF No. 46 ¶ 19, Ex. 1; *id*. ¶ 57, Ex. 19.  In each instance, an explanation that $25 represents the average savings from "Uber One and promos in your country" immediately follows.  *Id*.; *Houser v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, No. 21-CV-09390-JST, 2023 WL 7284160, at *2 (N.D. Cal. Nov. 3, 2023) (dismissing a false advertising claim for failure to state a claim because "even if the representation were misleading, the corresponding disclaimer eliminates any doubt as to its meaning").  The FAC does not claim that $25 is *not* in fact the average savings enjoyed by Uber One members.  *See, e.g.*, ECF No. 46 ¶ 22 (listing several categories of members whose savings fall significantly below $25 a month).

One of the two $25 savings representations, presented to members attempting to cancel

United States District Court
Northern District of California

their subscriptions, includes two further disclaimers. First, it specifies that members "could" save $25. ECF No. 46 ¶ 57, Ex. 19; *see also id*. ¶ 59. The use of the word "could" communicates a possible but uncertain outcome. *See Houser*, 2023 WL 7284160, at *3 (holding that a statement that a result "can" happen was not misleading as a matter of law because the conditional term "can" indicates a result is "capable" of happening, not that it "typically or always" happens); *Could*, Merriam-Webster's Collegiate Dictionary 284 (11th ed. 2020) (noting that "could" is an alternate form of the word "can"). It also clarifies that "[e]stimated savings do not include membership price." ECF No. 46 ¶ 57, Ex. 19.

Plaintiffs also allege that the $25 savings representation is misleading because it does not account for the cost of the subscription. ECF No. 46 ¶ 22. While consumers attempting to cancel see the aforementioned disclaimer, consumers in the enrollment flow do not. Moreover, the enrollment flow screenshot is also arguably the more important, since it is presented to potential enrollees before enrollment, rather than only existing members seeking to cancel. Neither party cites authority addressing whether consumers are likely to assume that a savings claim accounts for a subscription fee or a similar fact pattern.[1] Because it is possible that reasonable consumers would assume that projected savings account for the subscription cost and Uber has not shown otherwise, the Court will not dismiss this claim.

### 4.   Delivery Fees on Eligible Orders

Uber argues that Plaintiffs have failed to state a claim that Uber's representations that Uber One members receive "$0 delivery fees" is false or misleading. ECF No. 116 at 14. The Court

---

[1] In opposing dismissal of this claim, Plaintiffs cite to a single case: *F.T.C. v. Corpay, Inc.*, 164 F.4th 807, 836 (11th Cir. 2026), which held that advertised savings were deceptive where they contained "a central, large-font claim . . . with small-print disclosures and caveats that effectively negated much, if not all, of the advertised savings." ECF No. 147 at 15. *Corpay* is inapposite. The outcome in that case relied on the fact that the disclaimers were "too small to suggest that consumers actually read them" and contained "vague, confusing, and arguably contradictory terms." 164 F.4th at 836. Here, the pre-cancellation disclaimer is in clear, legible font and unambiguously warns consumers that "[e]stimated savings do not include membership price." The remaining question—which neither party answers—is whether in the absence of such a disclaimer, a reasonable consumer would assume that advertised savings include or exclude the subscription price.

agrees with Uber.  The complaint does not allege that Uber promises "$0 delivery fees" on *all* orders; rather, it alleges that Uber advertises $0 delivery fees on *eligible* orders.  ECF No. 46 ¶ 20, Ex. 2.  It appears somewhat difficult to ascertain which orders are in fact "eligible":  Uber identifies only an Uber One informational webpage stating in fine print that members "[r]eceive $0 Delivery Fee on standard delivery within at least 3 miles, and discounted Service Fee, from participating stores when you meet the order minimums shown on the storefront."  *See* ECF No. 116 at 15; Uber One, https://www.ubereats.com/uber-one?access-point=web_upsell_banner. Nonetheless, "eligible" is a clear qualifier signaling that only orders meeting certain criteria will qualify for $0 delivery fees.  *See Eligible*, Merriam-Webster's Collegiate Dictionary 404 (11th ed. 2020) (noting that "eligible" means "qualified to participate or be chosen").  Even if a reasonable consumer may not know which orders will qualify, no reasonable consumer would assume that all orders do so.  *See Millam v. Energizer Brands, LLC*, No. 23-55192, 2024 WL 2988210, at *1 (9th Cir. June 14, 2024) (noting that consumers understand straightforward qualifying language).  The "net impression" that the $0 delivery fee marketing leaves, while more muddled than it could be, does not deceive the consumer.

Plaintiffs' argument that a contrary ruling would allow Uber to "promise $0 delivery fees on 'eligible' orders but designate all orders 'ineligible' without committing a deceptive act or practice" is not persuasive.  ECF No. 147 at 16.  If no orders were deemed "eligible," that would constitute a deceptive practice.  But that is not Plaintiffs' allegation.  Uber's motion to dismiss as this claim is granted.

### B.    ROSCA (Counts Three, Four, Five)

#### 1.    Negative Option Feature

In 2010, Congress passed ROSCA, 15 U.S.C. §§ 8401-05, to promote consumer confidence in online commerce.  *Fed. Trade Comm'n v. Cardiff*, No. ED CV 18-2104-DMG (PLAX), 2020 WL 6540509, at *17 (C.D. Cal. Oct. 9, 2020).  ROSCA applies only to "transaction[s] effected on the Internet through a negative option feature."  *See* 15 U.S.C. § 8403. A "[n]egative option feature means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to

10

reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." *See* 16 C.F.R. § 310.2(w) (emphasis omitted).[2]  Uber argues that Plaintiffs cannot show that ROSCA applies because users do not sign up for Uber One through silence or failure to take action, but through affirmative conduct, i.e., clicks.[3]  ECF No. 116 at 19.

The parties agree that users sign up for Uber One by taking affirmative actions.  The FAC describes sign-up methods that involve clicking a button labeled "Try for Free," "Claim offer," "Start Saving," or "Join Uber One."  *See* ECF No. 116 at 19 (summarizing sign-up methods).  The negative option feature arises later.  "Consumers in free trials 'are automatically enrolled in and charged for an Uber One subscription' before the end of their free trial period."  ECF No. 147 at 17 (quoting ECF No. 46 ¶ 39).  "And, regardless of the method of enrollment, Uber One renews automatically and charges consumers on a recurring basis unless they take affirmative action to cancel the agreement."  ECF No. 147 at 17 (quoting ECF No. 46 ¶ 3, 17).

"Subscriptions that automatically renew by default unless the consumer affirmatively cancels are 'textbook example[s] of a negative option feature.'"  *United States v. Adobe, Inc.*, 791 F. Supp. 3d 966, 982–83 (N.D. Cal. 2025) (quoting *United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 757, 762 (C.D. Cal. 2020)).  "Another type of negative option feature is a 'free-to-pay conversion or fee-to-pay conversion' plan, where consumers receive goods or services for free (or at a nominal fee) for a trial period until sellers begin charging a fee unless the consumer affirmatively cancels."  *Id*. at 983.

Numerous courts agree, concluding that the definition of a negative option feature applies "broadly to renewal subscriptions" that have features similar to Uber One.  *F.T.C. v. Doxo, Inc.*, 771 F. Supp. 3d at 1180; *see also F.T.C. v. Health Formulas, LLC*, No. 2:14-CV-01649-RFB, 2015 WL 2130504 (D. Nev. May 6, 2015) (finding that recurring payment plans constituted

---

[2] In its brief, Uber omits "or to cancel the agreement" in quoting this passage.  ECF No. 116 at 19.  The omission of this language, which is central to the application of the statute, is damaging to Uber's credibility.

[3] The FAC alleges that a number of consumers were enrolled in Uber One without their knowledge or consent.  ECF No. 46 ¶¶ 80, 82.  Such automatic enrollment would unquestionably constitute a negative option feature and Uber does not argue otherwise.

11

negative option features where customers were automatically enrolled and charged if they signed up for a free trial or buy-one-get-one-free promotion but took no further action); *F.T.C. v. Amazon.com, Inc.*, 2025 WL 2677086, at *5 (W.D. Wash. Sept. 17, 2025) ("The plain language of ROSCA" confirms that "Prime is subject to ROSCA" because Defendants "automatically continue billing consumers for the service until they affirmatively cancel their membership.").

Uber's argument that ROSCA does not apply where the customer consents to recurring charges by enrolling in the program and accepting its terms, ECF No. 116 at 20, "has no basis in the statute and has been rejected by courts." ECF No. 147 at 18. *See United States v. Adobe, Inc.*, 791 F. Supp. 3d at 983 (argument that Adobe subscriptions are not negative option features because consumers provide affirmative consent to recurring charges "misses the mark," as "[t]he relevant time for consumer action is not at the time of purchase but at the time of renewal"); *FTC v. Amazon.com*, 2025 WL 2677086, at *5 ("Defendants' artful application of contract law does not allow them to avoid this straightforward understanding of ROSCA" as applicable to provisions allowing automatic billing until a consumer cancels their membership and their "singular focus on the initial offer to join Prime is misplaced."). Indeed, a free-to-pay conversion like Uber's is explicitly identified in ROSCA as employing a negative option feature. 15 U.S.C. § 8401(8) (describing a free trial period after which consumers are charged until they affirmatively cancel their memberships as both "free-to-pay conversion" and "negative option sales"). Notably, in making its argument Uber both (1) omits relevant language from the statute, *see supra* note 2, and (2) fails to cite any relevant authority finding that ROSCA does not apply under the circumstances, *see, e.g.*, ECF No. 154 at 11.

### 2. Clear and Conspicuous Disclosure of Material Terms (Count Three)

Claim Three alleges that Uber violated Section 4 of ROSCA by "fail[ing] to clearly and conspicuously disclose before obtaining consumers' billing information all material transaction terms," including (1) the recurring nature of Uber One; (2) the "true benefits and savings of an Uber subscription," (3) the timing of charges; and (4) the method of cancellation. ECF No. 46 ¶ 112 (citing 15 U.S.C. § 8403(1)). Courts construe "clearly" to require disclosures be "reasonably understandable" and "conspicuously" to require they be "readily noticeable" to a

12

reasonable consumer. *See Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1091 (9th Cir. 2020) (citing *Gilberg v. California Check Cashing Stores, LLC*, 913 F.3d 1169, 1176 (9th Cir. 2019); *see also Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 892 (9th Cir. 2009) (defining "clear and conspicuous" as evaluated using a reasonable consumer standard in the analogous Truth in Lending Act context); *F.T.C. v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1314–15 (W.D. Wash. 2024), *motion to certify appeal denied*, No. 2:23-CV-00932-JHC, 2025 WL 2098599 (W.D. Wash. July 25, 2025) (citing *Barrer* and *Gilberg* in interpreting ROSCA).

### a.    Timing of Disclosures

ROSCA requires disclosure of "all material terms of the transaction before obtaining the consumer's billing information." *See* 15 U.S.C. § 8403(1).  In all or nearly all cases, consumers sign up for Uber One after providing billing information to use Uber for a single ride or delivery. ECF No. 46 ¶ 33.  Plaintiffs therefore argue that "regardless of the sufficiency of [Uber's] disclosures . . . the timing of those disclosures—occurring after Defendants had obtained the consumer's billing information—violates ROSCA." ECF No. 147 at 19.  Indeed, Plaintiffs argue, with support, that this is a per se violation of ROSCA.  *See F.T.C. v. Amazon.com*, 735 F. Supp. 3d at 1320 (rejecting argument that ROSCA permits Amazon to use billing information already on file—without providing an option to change or confirm—for Prime subscription enrollment, even though customers have "already chosen to save that information to make future transactions more convenient"); *F.T.C. v. Doxo, Inc.*, 771 F. Supp. 3d at 1181 (FTC stated a claim under ROSCA where customers enter billing information to receive a one-off service and are subsequently shown terms and enrollment info for a subscription service).

In its reply, Uber argues that "[n]othing in ROSCA says that companies . . . may not give consumers the option to autofill the billing information already on file." ECF No. 154 at 12 (quoting *F.T.C. v. Amazon.com*, 735 F. Supp. 3d at 1320).  The problem with this argument—as *Amazon.com* clearly states—is that "ROSCA requires that consumers be given that choice *after* the disclosures." *F.T.C. v. Amazon.com*, 735 F. Supp. 3d at 1320.  In the summary judgment order in the same case, the court again rejected Amazon's argument that ROSCA's billing information requirements were satisfied where "Amazon obtain[ed] consent to use a

United States District Court
Northern District of California

customer's billing information at the same time they disclose[d] [the Amazon Prime subscription service's] material terms." *F.T.C. v. Amazon.com*, 2025 WL 2677086, at *8.  Like Amazon, Uber shows consumers Uber One's terms on the same screen indicating that it will charge their preexisting payment method.  ECF No. 46 ¶ 35, Ex. 9.  Consumers consent to the use of that billing information only in the limited sense that they decline to select the "switch" option to input different billing information.  In other words, they are required to take an action that is a form or opting out.  As discussed at the hearing on this motion, the result here might be different if Uber were to give consumers the option to autofill their existing payment information or otherwise affirmatively opt-in to its use.  But Plaintiffs' description of Uber's actual practices plausibly alleges a violation of ROSCA's requirement of "text that clearly and conspicuously discloses all material terms of the transaction before obtaining the customer's billing information." 15 U.S.C. § 8403 (1).

Count Three will not be dismissed.  The Court now turns to Plaintiffs' specific arguments concerning Uber's alleged failures to disclose material terms.

### b.     Recurrence

Plaintiffs argue that Uber has failed to clearly and conspicuously disclose that consumers are being enrolled in a paid subscription.  ECF No. 46 ¶ 112.  Each method identified in the FAC for enrolling in Uber One does include, at some point before the consumer enrolls, a notice that Uber One members will incur recurring monthly charges.  *See, e.g.*, ECF No. 46 ¶ 27, Ex. 4; ¶ 30, Ex. 6.  Plaintiffs nonetheless argue that these notices are "in much smaller, lighter, and less prominent font than any other claims on" the same screens.  ECF No. 147 at 21 (citing *id.*).  ROSCA requires clear and conspicuous disclosures based both on "visual aspects" of the purported disclosure and the "context" of the transaction.  *F.T.C. v. Amazon.com*, 735 F. Supp. 3d at 1317–1320; *see also FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *16 (defendants violated ROSCA where terms were "buried in fine print on the payment page of [the] [d]efendants' websites").  Although Uber asserts in conclusory fashion that such text is "clear and conspicuous," at least in part because it is located "immediately next to a sign-up button," it does not argue that the size and color of the font is clear and conspicuous as a matter of law.  ECF No.

United States District Court
Northern District of California

116 at 21. And the cases that Uber cites do not help its case. For instance, in *Viveros v. Audible*, the court concluded that disclosures were clear and conspicuous in part because they "appear[] in a 'contrasting type[ or] font . . . to the surrounding text of the same size,'" which cannot be said of the disclosures here. No. C23-0925JLR, 2023 WL 6960281, at *7 (W.D. Wash. Oct. 20, 2023) (quoting Cal. Bus. & Prof. Code § 17601(c)).

Plaintiffs also persuasively argue that the "context" of the transaction weighs against the clarity and conspicuousness of the disclosures because many plaintiffs are enrolled via unsolicited push notifications, pop-ups, and advertisements that appear when they are trying to secure a ride or place a delivery. Courts have observed that consumers do not expect to be enrolled in a subscription when making a one-time purchase, and therefore have little reason to look for fine print notifying them of the subscription. *See F.T.C. v. Amazon.com*, 735 F. Supp. 3d at 1318–19.

While a court may examine exhibits to determine that material disclosures are clear and conspicuous as a matter of law, doing so is "far from routine." *F.T.C. v. Amazon.com*, 735 F. Supp. 3d at 1317; *see also Organic Consumers Ass'n v. Sanderson Farms, Inc.*, 284 F. Supp. 3d 1005, 1014 (N.D. Cal. 2018) ("[C]ourts grant motions to dismiss under the reasonable consumer test only in rare situations in which the facts alleged in the complaint 'compel the conclusion as a matter of law that consumers are not likely to be deceived.'" (quoting *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 226–27 (2013))). Given the subtle appearance of the disclosures, their context, and the lack of persuasive argument from Uber, the Court declines to reach such a conclusion under the circumstances.[4]

### c.    Timing of Charges

---

[4] Plaintiffs also identify marketing materials that appear to obfuscate Uber One's nature as a recurring subscription service. *See* ECF No. 147 at 20–21. The Court agrees, for instance, that "Love Uber One? Get 50% off 1 year / Save on your Uber One membership" could mislead a consumer into believing they are already subscribed to Uber One and are merely being offered the chance to continue using Uber at a lower rate. *Id*. at 20; ECF No. 46 ¶ 26, Ex. 3. Likewise, when the app directs a consumer attempting to book a ride to a popup asking them to sign up for Uber One or to "cancel," the Court agrees that a consumer might believe they must sign up for Uber One or risk cancelling the ride request. ECF No. 147 at 20–21; ECF No. 46 ¶ 30, Ex. 6. Because this ROSCA claim requires a failure to disclose material terms, however, these potentially confusing representations are not clearly relevant.

Plaintiffs also argue that Uber has failed to clearly and conspicuously disclose the timing of subscription fee charges. ECF No. 46 ¶ 112. Uber argues at length that it clearly discloses that charges will be incurred on certain dates. ECF No. 116 at 21–22; ECF No. 154 at 13. Plaintiffs respond that such disclosures are (1) in fine print and (2) inaccurate, because as Uber admits, it charges consumers 48 hours prior to the stated billing date. ECF No. 147 at 22 (citing ECF No. 116 at 12). Indeed, Plaintiffs have the better position on both points. First, given the FAC's unambiguous allegations that Uber charges customers prior to the billing date, ECF No. 46 ¶¶ 32, 33, 39, 41, Uber's disclosure of such dates is not only unhelpful but actively deceptive. Second, the timing disclosures appear potentially difficult to read given the small size of a smartphone screen. *See* ECF No. 46 ¶ 30, Ex. 6. The Court will not dismiss this claim.

### d.    Method of Cancellation

Plaintiffs argue that for consumers seeking to cancel their subscriptions within 48 hours of their removal date, Uber does not disclose the separate and more onerous method of cancellation they must use compared to consumers cancelling prior to that time. ECF No. 147 at 23. Uber responds that "each flow plainly states" that users should cancel "in the app." ECF No. 116 at 22.

First, "in the app" provides little guidance given how thoroughly the cancellation button is buried within the app. *See supra*, "Background." Uber's cited cases undermine its position because they uphold cancellation disclosures that tell consumers exactly where to go to cancel. For instance, in *Daly v. Amazon.com*, the court found sufficient a disclosure that told users exactly which page in their account—"Account Details"—to visit to cancel. *Daly v. Amazon.com, Inc.*, 718 F. Supp. 3d 1378, 1387 (W.D. Wash. 2024); see also *Nicholas v. Amazon.com, Inc.*, 740 F. Supp. 3d 1099, 1103 (W.D. Wash. 2024). As discussed above, one of the problems with Uber's disclosure is that the page upon which the cancellation button can be found is unintuitive and difficult to find.

Further, users within the 48-hour window actually cannot cancel within the app, but must instead contact customer service (although that process can be initiated through the app). Because only a customer service agent can cancel a subscription during that period, see ECF No. 46 ¶¶ 70, 75, it is not accurate to say that cancellation is "in the app." Thus, Uber's only purported attempt

United States District Court
Northern District of California

to disclose the cancellation method does not in fact tell users how to cancel.  The Court will not dismiss this claim.

### e.      True Benefits and Savings

Plaintiffs also argue that Uber fails to disclose the true benefits and savings of Uber One, referring back to its claims that Uber's representations of $25 savings and $0 delivery fees on eligible orders were false or misleading under the FTC Act.  ECF No. 147 at 22.  Evaluating those claims, the Court concluded that while "$0 delivery on eligible orders" was not misleading, "save $25" could be misleading insofar as a reasonable consumer believes it to include the subscription price.  On that ground, the Court declines to dismiss this disclosure claim.

### 3.      Informed Consent (Count Four)

Uber next argues that Count Four, alleging a violation of ROSCA's requirement that a seller obtain a consumer's "express informed consent" before charging the consumer, is not viable because consumers are required to take affirmative action before enrolling in Uber One.  ECF No. 116 at 23.  A consumer provides express informed consent if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  *Keebaugh v. Warner Brothers Entertainment Inc.*, 100 F.4th 1005, 1021 (9th Cir. 2024) (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)) (explaining the standard under California law).

Plaintiffs argue that this standard is not met.  They first point out that the complaint alleges that some consumers who were charged never signed up at all, ECF No. 147 at 24 (citing ECF No. 46 ¶¶ 4, 38, 80, 82), and that others took action to revoke their consent and were charged again anyway, either because of the unreasonably long wait times in the support chat queue or despite the fact that they appeared to have successfully cancelled their subscription, *id*. at 24–25 (citing ECF No. 46 ¶¶ 80–87).  In the first scenario, consumers obviously did not consent.  In the second, they consented up front only to terms that would allow them to cancel at any time, when in fact they were not able to do so.  In its reply, Uber argues that Plaintiffs have not alleged that "a significant minority of consumers were misled," as required to plead a violation of ROSCA.  ECF

17

No. 154 at 14. However, they cite no authority suggesting that Plaintiffs were required to affirmatively plead the precise number of consumers affected by each issue, and the Court finds the question unsuited for resolution on a motion to dismiss.

Second, Plaintiffs argue that consent is defeated by Uber's failure to sufficiently disclose material information, meaning that their informed consent claim succeeds to the extent that their disclosure claims do. This position is supported by the caselaw. *United States v. Adobe, Inc.*, 791 F. Supp. 3d at 986 (denying motion to dismiss express informed consent count because "the Court finds the complaint does plausibly allege a violation of ROSCA's clear and conspicuous requirement."); *F.T.C. v. Amazon*, 735 F. Supp. 3d at 1321 (holding a failure to clearly and conspicuously disclose material terms precludes express, informed consent). Because the Court does not dismiss the disclosure claim, it likewise does not dismiss this informed consent claim.

Third, Plaintiffs highlight the FAC's allegations that many consumers signed up for free trials under the guise that they would be able to cancel without incurring a fee, only to find that they had been prematurely charged for Uber One before the free trial ended. ECF No. 147 at 24 (citing ECF No. 46 ¶¶ 39–41, 81). Uber's position that "the relevant consent is obtained at signup" for the free trial is not responsive because Plaintiffs argue that consumers consented to terms under which they will not be charged until the trial ended, only to be charged before that time. ECF No. 154 at 14–15.

As Plaintiffs argue, the motion to dismiss does not explain how informed consent was obtained under any of these circumstances. ECF No. 147 at 24. The informed consent claim is not dismissed.

### C.    Civil Penalties

The FTC Act authorizes the FTC to "commence a civil action to recover a civil penalty in a district court of the United States against any person, partnership, or corporation which violates any rule under this subchapter respecting unfair or deceptive acts or practices . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). Moreover, "[a]ny person who violates [ROSCA] . . . shall be subject to the penalties and entitled to the privileges

and immunities provided in the Federal Trade Commission Act as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated in and made part of this chapter."  15 U.S.C. § 8404(b).

The motion to dismiss argues that civil penalties are unavailable here for several reasons. First, Uber argues that the FTC has failed to allege compliance with certain mandatory administrative procedures.  Second, Uber argues that Plaintiffs have failed to satisfy the requirements for civil penalties under the FTC Act.  Third, it argues that Plaintiffs failed to plead the requisite knowledge under ROSCA and state statutes.  Taking each argument in turn, the Court concludes that civil penalties are available.

### a.    Notice to the Attorney General

"[B]efore commencing" any civil action seeking civil penalties, the FTC must provide written notification to and undertake consultation with the Attorney General.  15 U.S.C. § 56(a)(1)(A).  Uber argues that civil penalties are unavailable because the FAC does not allege "that FTC sought the statutorily required approval to seek civil penalties."  ECF No. 116 at 25.

Plaintiffs respond that a federal agency need not "affirmatively allege compliance with all statutory procedures and prerequisites to sue" and assert that the FTC did in fact comply with Section 56.  ECF No. 147 at 25.  They cite *FTC v. Consolidated Foods Corp.*, 396 F. Supp. 1344, 1348-49 (S.D.N.Y. 1974), in which the court denied a plaintiff's motion to dismiss on similar grounds.  Although *Consolidated Foods Corp.* is a pre-*Twombly* case that relied on the then-existing and more lenient standard for "notice pleading," *id.*, the Court will follow its lead on this issue for three reasons.  First, it is Uber's burden to justify dismissal and it cites no authority suggesting that Plaintiffs are required to plead compliance with Section 56.  ECF No. 116 at 25. Second, as Plaintiffs argue, the presumption of regularity applies.  ECF No. 147 at 25; *United States v. Chem. Found.*, 272 U.S. 1, 15 (1926) (courts "presume [public officers] have properly discharged their official duties").  Third, the FTC states in its opposition, which was signed by counsel, that "the FTC complied with 15 U.S.C. § 56."  ECF No. 147 at 25; *cf.* ECF No. 156 at 15 (Uber distinguishing *Consolidated Foods Corp.* because an attorney for the FTC had submitted to the court an affidavit that it followed the required procedures).  If Uber believes that the FTC has

19

failed to comply with Section 56, it can seek that information during discovery.

### b.    Civil Penalties Under the FTC Act

Uber argues that civil penalties are not available here under the FTC Act.  ECF No. 116 at 25.  In their opposition, Plaintiffs clarify that they only seek civil penalties under ROSCA, not the FTC Act.  ECF No. 147 at 25.  The Court does not address the point further.

### c.    Failure to Plead the Requisite Knowledge under ROSCA or State Statutes

Uber argues that the FAC fails to allege that Uber violated "any rule" with "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that its actions were "unfair or deceptive" and "prohibited by such rule."  ECF No. 116 at 26 (quoting 15 U.S.C. § 45(m)(1)(A); 15 U.S.C. § 8404(a)).  For the same reason, Uber argues that the FAC fails to satisfy the scienter requirement for civil penalties under the statutes of several states requiring a knowing or willful violation.  ECF No. 116 at 27.  Plaintiffs respond that they have shown that Uber had the requisite knowledge when it violated ROSCA, 15 U.S.C. § 45(m)(1)(A).  ECF No. 147 at 25–26.  ROSCA's scienter requirement creates a variation of the "ignorance-of-the law defense," wherein "a business can be liable only if it either knew that the act was unlawful or if it should have known the act was unlawful."  *United States v. Dish Network L.L.C.*, 954 F.3d 970, 978 (7th Cir. 2020) (citing *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583–84 (2010)).  Uber argues that the FAC fails to allege that Uber was aware of its ROSCA obligations and knowingly violated them.  ECF No. 116 at 26–27.

In opposition, Plaintiffs identify factual allegations establishing Uber's knowledge.  ECF No. 147 at 26.  These include "more than a dozen actions against other companies under the FTC Act and ROSCA, including for failing to have simple cancellation mechanisms and charging consumers without authorization," ECF No. 46 ¶ 91; "a public outpouring of complaints about unauthorized charges and difficulty cancelling Uber's subscription services," *id.* ¶ 92; internal testing conducted by Uber reflecting significant customer confusion regarding the cancellation process, *id.*; "employee discussions of the problems with Uber's disclosures," *id.*; and even Uber's "receipt of a letter from the FTC in September 2024 probing about Uber's subscription programs,

including enrollment and cancellation mechanisms and compliance with ROSCA," *id*.

Other district courts in the Ninth Circuit have recently found similar—and even less robust—facts sufficient to plausibly allege the knowledge required for the imposition of civil penalties. *See, e.g.*, *United States v. Stratics Networks Inc.*, 721 F. Supp. 3d at 1100–01 (standard satisfied by public FTC enforcement actions against other ringless voicemail providers and by consumer complaints alleging violations of federal telemarketing regulations); *F.T.C. v. Amazon.com*, 735 F. Supp. 3d at 1332–34 (standard satisfied by consumer complaints, internal reports of consumer confusion, and Amazon's size and sophistication); *F.T.C. v. Dave, Inc.*, 2025 WL 2698698, at *18–19 (standard satisfied by consumer complaints and the company's compliance management system). Moreover, "on a motion to dismiss 'the [c]ourt need not decide whether Defendants had actual knowledge of the [applicable law]; rather, Plaintiff need only plausibly state Defendants had knowledge or were on notice that the [applicable law] applied to survive a motion to dismiss.'" *F.T.C. v. Amazon.com*, 735 F. Supp. 3d at 1333 (quoting *United States v. Stratics Networks Inc.*, 721 F.Supp.3d at 1101). The FAC's allegations exceed this standard.

Uber also argues that ROSCA is subject to more than one reasonable interpretation, including interpretations inconsistent with the FAC's view of the law. ECF No. 116 at 26. They assert that the FTC itself has "repeatedly admitted" that the statute is unclear. *Id*. "Given all this, it is implausible that Uber knew or should have known that its practices violated the FAC's view of ROSCA, simply because Uber employed lawyers." *Id*. at 27. Plaintiffs dispute whether the FTC has admitted the statute is unclear and cite another district court that found to the contrary. ECF No. 147 at 27 (citing *F.T.C. v. Amazon.com, Inc.*, 2025 WL 2098599, at *4 (W.D. Wash. July 25, 2025)).

At the motion to dismiss stage, Uber's cursory argument is insufficient to establish as a matter of law that any ambiguity in ROSCA prevented Uber from possessing the requisite knowledge or led it to make a mistake of law. It does not, for example, provide an interpretation of the statute and then explain why its conduct complied with that interpretation.

The Court declines to dismiss Plaintiffs' request for civil penalties.

21

**D.    State Plaintiffs**

Finally, Uber raises arguments specific to the state plaintiffs, arguing that they lack Article III standing and statutory authority to bring their claims.  Uber also argues that they have not sufficiently pleaded Claims One and Two because they do not describe the elements of each state-law claim.

**1.    Article III Standing**

States are bound by Article III's standing requirements of injury-in-fact, redressability, and causation.  *See Hawaii v. Trump*, 859 F.3d 741, 762 (9th Cir.), *vacated and remanded on other grounds*, 583 U.S. 941 (2017).  When a state sues to vindicate its own direct sovereign or proprietary interests, it need only meet Article III's standing requirements.  *See id.*, 859 F.3d at 763–65; *see also C.R. Dep't v. Grimmway Enters., Inc.*, 800 F. Supp. 3d 1084, 1103 (E.D. Cal. 2025).  But "[s]tates asserting parens patriae standing must meet both the basic requirements of Article III standing and the unique requirements of that doctrine."  *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017) (citing *Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001)).  Those requirements are whether the state "[1] 'allege[s] injury to a sufficiently substantial segment of its population,' [2] 'articulate[s] an interest apart from the interests of particular private parties,' and [3] 'express[es] a quasi-sovereign interest.'"  *Table Bluff Rsrv.*, 256 F.3d at 885 (quoting *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607 (1982)).

The Plaintiff States allege standing based on their interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction," which "involves the power to create and enforce a legal code, both civil and criminal."  *Snapp*, 458 U.S. at 601.  They argue that they are authorized by ROSCA and state consumer protection statutes to address conduct like Uber's.  ECF No. 147 at 30 (citing ECF No. 46 ¶¶ 2, 10).  But to establish entitlement to pursue these claims in federal court, the states must allege some injury beyond the mere violation of a law.  The Ninth Circuit has explained that the sovereign interest in creating and enforcing a legal code is "sufficient to convey standing to defend a state statute against a legal challenge in federal court, or challenge a federal statute that preempts or nullifies state law."  *Washington v. U.S. Food*

22

*& Drug Admin.*, 108 F.4th 1163, 1176 (9th Cir. 2024) (citations omitted).  In either case, the hypothetical state plaintiff litigates to protect its ability to enforce its laws.  Here, Uber's alleged violations of the FTC Act, ROSCA, and state statutes does not *itself* interfere with states' "power to create and enforce a legal code," although it may invade other legally protectable state interests. *Snapp*, 458 U.S. at 601. [5]

Plaintiffs also argue that the states have a sovereign interest "in protecting their marketplaces" from deceptive practices.  ECF No. 147 at 30.  This argument is more successful in establishing standing.  Fraudulent market conduct has the capacity to degrade faith in the state, chill economic activity, and deter participation in the market.  *See John Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010) ("The State's interest is particularly strong with respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well:  It 'drives honest citizens out of the democratic process and breeds distrust of our government.'" (quoting *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006)).  The Ninth Circuit has previously upheld state standing on this basis.  *See Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 671 (9th Cir. 2012) ("States have a sovereign interest in the enforcement of their consumer protection and antitrust laws . . . [and] in securing an honest marketplace and the economic well-being of their citizens." (quoting *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 2011 WL 560593, at *5 (N.D.Cal. Feb. 15, 2011)).  The FAC sufficiently alleges this harm, describing "a public outpouring of complaints" and "significant customer confusion" and explaining that "[c]onsumer confidence is essential to the growth of online commerce" and that "the Internet must provide consumers with clear,

---

[5] Plaintiffs cite *Massachusetts v. EPA*, ECF No. 147 at 30–31, but in that case, Massachusetts had standing because of the potential for harm to its sovereign territory occasioned by greenhouse gas emissions causing rising sea levels and other environmental harms.  549 U.S. 497, 519–20 (2007). States receive "special solicitude" in the standing analysis, but they still must demonstrate injury. *Id*.

Plaintiffs also cite *Pileggi v. Washington Newspaper Publ'g Co., LLC*, 146 F.4th 1219, 1226 (D.C. Cir. 2025) for the proposition that "Congress may elevate certain harms 'to the status of legally cognizable injuries.'"  But while that case held that Congress can "determine[] that liability should extend further back on the causal chain than the common law would otherwise allow" or "provid[e] a private right of action to remedy a harm that is a lesser form of a harm recognized at common law," it did not hold that statutes, merely by authorizing states to enforce certain prohibitions, relieved state plaintiffs of the need to plead injury.  *Id*. at 1227.

accurate information." ECF No. 46 ¶¶ 92, 106; *cf. Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 652 n.2 (9th Cir. 2017) (rejecting state standing for failure to allege "harm to more than just egg producers," where complaint stated only, "in conclusory fashion, that 'Missouri's economy and status within the federal system will be irreparably injured'"). Plaintiffs have standing to sue for this invasion of their sovereign interests.

For completeness, the Court also addresses the parties' arguments concerning parens patriae standing. First, the Plaintiff States have a "quasi-sovereign interest in the health and well-being— both physical and economic—of [their] residents in general." *Snapp*, 458 U.S. at 607. "One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id*. Here, the various plaintiff states have in fact addressed the alleged injury by enacting the consumer protection statutes under which they sue. Defendants do not contest that the FAC implicates an interest in the economic well-being of state citizenry. *See* ECF No. 116 at 29; ECF No. 154 at 18–19. Courts have also held that fraud and deception in state marketplaces implicate both sovereign and quasi-sovereign interests. *See, e.g.*, *Washington v. Nat'l Maint. Contractors, LLC*, No. 2:21-CV-638-BJR, 2021 WL 3886833, at *3 (W.D. Wash. Aug. 31, 2021).

Moreover, for the reasons explained above, the Court easily concludes that Plaintiff States articulate an interest apart from private parties in describing the harm to the integrity of their marketplaces.

The parties dispute, however, whether the states allege injury to sufficiently substantial segments of their populations. The FAC's allegations concerning the scope of harm are indeed thin, comprised of the statement that "[a]s of September 2024, Uber has enrolled more than 28.7 million consumers into Uber One subscriptions, including consumers who reside in each of the Plaintiff States' jurisdictions." ECF No. 46 ¶ 18. Defendants argue that the FAC must allege "the statewide magnitude of" any alleged harm to Uber One members in each state and "the extent to which" any harms "affect more than just an identifiable group of individual" Uber One consumers. ECF No. 116 at 29–30 (citing *Harris*, 847 F.3d at 652). In *Harris*, the Ninth Circuit rejected

24

parens patriae standing based on (1) lost profits for egg sellers and (2) fluctuations in the price of eggs.  As to the egg sellers, the court concluded that parens patriae standing could not be sustained by a defined, relatively small group of individuals capable of pursuing their own interests.  *Id*. at 653.  As to fluctuations in the price of eggs, the court held that any price effects were "remote, speculative, and contingent upon the decisions of many independent actors in the causal chain in response to [] laws that have no direct effect on either price or supply."  *Id*. at 654.

Defendants juxtapose *Harris* with *Maryland v. Louisiana*, 451 U.S. 725 (1981) and *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923), both of which *Harris* distinguished because they "presented state actions with nearly certain price effects for many or all of the plaintiffs' citizens."  *Harris*, 847 F.3d at 654.  *Maryland v. Louisiana* concerned a tax on certain uses of natural gas brought into Louisiana, while *Pennsylvania v. West Virginia* concerned a cut-off in natural gas supplies.  The *Harris* court emphasized the fact that gas is a utility product with "central economic significance to a state," unlike an ordinary consumer commodity such as eggs. *Harris*, 847 F.3d at 655.  But the Court does not consider the distinction between *Harris*, *Maryland*, and *Pennsylvania* relevant here, because this is not a case about fraudulent marketing practices, not increased prices, and the effects of those practices extend beyond the individual consumers to whom they are applied.  *See Nevada*, 672 F.3d at 671.

In alleging that 28.7 million consumers have been enrolled in Uber One and thereby harmed by Uber's conduct, Plaintiffs certainly allege harm to a larger group than the egg sellers in *Harris*.  And indeed, the law requires only that it allege "injury to a sufficiently substantial segment of its population." *Table Bluff Rsrv.*, 256 F.3d at 885.  Nonetheless, the Court finds that Plaintiffs have not met their burden.  There is no way to know how many of the 28.7 million customers live in the Plaintiffs' states, or even the United States.  And because the complaint gives no account of the distribution of Uber One members across states, it fails to eliminate the possibility that some states have no or very few Uber One members at all.  While fraudulent marketing practices may affect a substantial segment of the population, Plaintiffs do not make that argument.  The Court concludes that Plaintiffs have failed to satisfy the requirements of parens

patriae standing.[6]

Although the pleadings do not sufficiently allege parens patriae standing because they do not allege injury to a sufficiently substantial segment of the States' population, Plaintiff States have nevertheless alleged standing because fraudulent conduct harms their sovereign interest in the integrity of their marketplaces.

### 2.    States' Statutory Authority to Bring Claims

Uber next argues that many states lack statutory authority to bring their claims because the state statutes under which they are suing require them to do so in state court.  *See* ECF No. 116 at 31.  Plaintiffs respond that the relevant statutory grants are permissive, not exclusive.  *See, e.g.*, *United States v. Consumer L. Prot., LLC*, 2023 WL 6200774, at *5 (E.D. Mo. Sept. 22, 2023) (rejecting argument that state consumer protection claims must be brought in state court because "the word may is permissive, not exclusive"); *In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 2007 WL 2517851, at *12 (N.D. Cal. Aug. 31, 2007) (concluding that a state-law requirement that claims be brought in state court does not defeat federal supplemental jurisdiction over those claims).  As Plaintiffs argue, Uber "fail[s] to cite a single requirement that says a state may sue only in state court."  ECF No. 147 at 31.

### 3.    Sufficiency of the State Law Allegations

Uber argues that Plaintiffs' state law claims under Claims One and Two fail because Plaintiffs have not explained the specific content of each state law, the differences between them, or how Uber's content violated those distinct statutes.  ECF No. 116 at 32.  Count One lists the consumer protection laws of 21 different states, sometimes identifying more than one statute for a particular state.  Count Two does the same as to the laws of 15 states.  Neither count pleads the elements of any state law claim.  "A cursory listing of [several] states' statutes is insufficient to satisfy *Twombly* and *Iqbal*'s pleading requirements."  *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 994 (W.D. Wash. 2022) (quoting *Adams v. Target Corp.*, No. 2:13-cv-05944-GHK-

---

[6] Plaintiffs' cited cases do not help them.  ECF No. 147 at 29.  Neither case discusses the "substantial segment" requirement, and neither is governed by *Harris*.  *See In re Elec. Books Antitrust Litig.*, 14 F. Supp. 3d 525, 532 (S.D.N.Y. 2014); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 23 (D.D.C. 2021).

United States District Court
Northern District of California

PJW, 2014 WL 12558290, at *6 (C.D. Cal. Mar. 3, 2014)).  Defendants' motion to dismiss these claims is granted without prejudice.  With respect to the state law claims in any future amended complaint, Plaintiffs shall identify the state under whose law each claim is brought.  When claims which share a legal theory are brought under multiple laws (for example, a federal statute and more than one state statute), Plaintiffs shall state each claim as a separate count.  *See Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 847 (N.D. Cal. 2023) (ordering the same).

**CONCLUSION**

For the foregoing reasons, the motion to dismiss is granted as to Plaintiff's subclaim that Uber's "$0 delivery fee" representation was false or misleading, ECF No. 46 ¶ 98(d), and Plaintiffs' state law allegations.  As to the former claim, the representation at issue is plainly not misleading and dismissal is with prejudice because amendment would be futile.  As to the state law allegations, leave to amend is granted solely to correct the deficiencies identified in this order.  In all other respects, the motion is denied.  Any amended complaint is due 21 days from the date of this order.

**IT IS SO ORDERED.**

Dated: April 10, 2026



_____
JON S. TIGAR
United States District Judge