Paul Mezan (NY Bar No. 5357124)
Stephanie Liebner (VA Bar No. 90647)
James Doty (NY Bar No. 4552550)
Sarah Abutaleb (DC Bar No. 1779979)
Allison Wojcicki (DC Bar No. 1736349)
Patrick Roy (DC Bar 1023521)
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Phone: (202) 758-4177 (Mezan)
Email: pmezan@ftc.gov (Mezan)

*Attorneys for Plaintiff*
*Federal Trade Commission*

*Additional Counsel Listed on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION; THE ATTORNEYS GENERAL OF THE STATES OF ALABAMA, ARIZONA, CONNECTICUT, MARYLAND, MINNESOTA, MISSOURI, MONTANA, NEBRASKA, NEW HAMPSHIRE, NEW JERSEY, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, PENNSYLVANIA, VIRGINIA, WEST VIRGINIA, WISCONSIN, AND THE DISTRICT OF COLUMBIA; THE PEOPLE OF THE STATE OF CALIFORNIA, THE PEOPLE OF THE STATE OF ILLINOIS, AND THE PEOPLE OF THE STATE OF MICHIGAN, | Case No. 4:25-cv-03477-JST **SECOND AMENDED COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |
| Plaintiffs, v. | |
| UBER TECHNOLOGIES, INC., a corporation; and | |
| UBER USA, LLC, a limited liability company, | |
| Defendants. | |

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"); the Attorneys General of the States of Alabama, Arizona, Connecticut, Maryland,  Minnesota, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Virginia, West Virginia, Wisconsin, and the District of Columbia (collectively, "Attorneys General")*; the People of the State of California, by and through the District Attorney for Alameda County, the People of the State of Illinois, and the People of the State of Michigan (together with the Attorneys General, "Plaintiff States") (together with the FTC, "Plaintiffs"), for their Complaint allege:

1.     The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403, in connection with Defendants' false or misleading claims regarding their subscription services, their failure to provide simple mechanisms for customers to cancel their subscription services, and their charging of customers without their consent.  For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief, pursuant to Sections 5(m)(1)(A), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

2.     The Plaintiff States bring this action with the FTC pursuant to ROSCA, which provides "the attorney general of a State . . . alleging a violation of this chapter . . . that affects or may affect such State or its residents may bring an action on behalf of the residents of the State in any United States district court for the district in which the defendant is found . . . or wherever venue is proper . . . to obtain appropriate injunctive relief."  15 U.S.C. § 8405(a).  Additionally,

---

* The Attorneys General bring this action pursuant to their own law enforcement authority to seek statutory remedies and to obtain relief for their citizens and remediate all harm arising out of—and provide full relief for—violations of ROSCA and the state consumer law claims enumerated in this Complaint.  The Attorneys General bring their claims set forth in this Complaint in that capacity and not on behalf of any other state agency or state body.  However, references to the Attorney General of Connecticut with respect to its state law claims shall mean the Connecticut Attorney General acting at the request of the Commissioner of Consumer Protection.  References to the Attorney General of Maryland with respect to its state law claims shall mean the Consumer Protection Division, Office of the Attorney General of Maryland. References to the Attorney General of New Jersey with respect to its state law claims shall mean the New Jersey Attorney General and the Acting Director of the New Jersey Division of Consumer Affairs.

Second Amended Complaint
Case No. 4:25-cv-03477-JST

the Plaintiff States allege that Defendants' false or misleading claims discussed below, and their charging of customers without their consent, constitute unfair and/or deceptive acts and practices that are prohibited by the below enumerated state consumer protection laws. These laws authorize the Plaintiff States to seek injunctive relief, rescission or reformation of contracts, restitution, damages, the refund of monies paid, disgorgement of ill-gotten monies, or other equitable relief to stop ongoing fraud, deception, or unfair practices caused by Defendants' state law violations. These laws also authorize the Plaintiff States to obtain civil penalties, attorneys' fees, expenses, and/or costs.

## SUMMARY OF THE CASE

3. Defendants Uber Technologies, Inc. and Uber USA, LLC (collectively, "Uber") provide ride-hailing and food delivery services that consumers can book and pay for through an app on their smartphone. Defendants also charge consumers $9.99 a month or $96 a year for a subscription service called Uber One in connection with these services. In numerous instances, Uber claims that consumers in an Uber One membership will save certain amounts off ride bookings or food deliveries compared to those without an Uber One membership, and that Uber One consumers can "cancel anytime" without additional fees. Uber One renews automatically and charges consumers' credit cards or debits their bank accounts directly on a recurring basis.

4. Consumers have complained that they have been enrolled in an Uber One subscription without their consent, reporting that they never signed up and have no idea why they were charged. And internal Uber One testing shows that 85% of consumers who were being charged for Uber One and wanted to cancel it would not keep it even if it only cost $1.

5. Defendants have failed to provide a simple method to cancel Uber One, employing a series of obstacles that compound to deter and prevent consumers from stopping recurring charges. For any consumer wishing to cancel Uber One, Defendants require them to take at least 12 different actions and navigate a maze of at least 7 screens, if they guess the right paths to use, despite there being no mention of cancellation until the fourth screen. Cancellation is even more difficult for consumers within 48 hours of their billing date. During this period, Defendants have removed the option to cancel their subscription service from their applications,

forcing consumers to take as many as 32 actions and navigate as many as 23 screens, if they guess the right paths to use and only go through the loop described below once.  Even after that, they have had to contact customer service.  In numerous instances, even when consumers are able to reach Uber's customer service, the representatives have taken so long to respond to and effectuate consumers' cancellation requests that consumers end up being charged again without their consent.

### JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.  This Court also has subject matter jurisdiction over the supplemental state law claims asserted by the Plaintiff States under 28 U.S.C. § 1367.

7.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

### INTRADISTRICT ASSIGNMENT

8.    Assignment to the Oakland Division is proper because at all relevant times Defendants have conducted business, marketed, and sold their services throughout the United States, including throughout the County of Alameda.

### PLAINTIFFS

9.    The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-05, which, *inter alia*, prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers.  A negative option is an offer in which the seller treats a consumer's silence – their failure to reject an offer or cancel an agreement – as consent to be charged for goods or services. 16 C.F.R. § 310.2(w).

10.    The Attorneys General are the chief legal officers of their respective jurisdictions. The District Attorney for Alameda County is authorized to enforce state consumer protection

Second Amended Complaint
Case No. 4:25-cv-03477-JST

laws on behalf of the People of the State of California. The Attorney General for the State of Illinois is authorized to bring an action in the name of the People of the State of Illinois to enforce the Illinois Consumer Fraud Act. The Plaintiff States bring this action pursuant to consumer protection and/or business regulation authority conferred on them by the following state laws and/or pursuant to *parens patriae* and/or common law authority:

| STATE | STATUTORY AUTHORITY |
| --- | --- |
| Alabama | ALA. CODE § 8-19-1 *et seq.* |
| Arizona | ARIZ. REV. STAT. §§ 44-1521 to 44-1534 |
| California | CAL. BUS. & PROF. CODE § 17200 *et seq.* and § 17500 *et seq.* |
| Connecticut | CONN. GEN. STAT. § 42-110a *et seq.*, and more particularly, 42-110m |
| District of Columbia | D.C. CODE §§ 28-3901 *et seq.* |
| Illinois | 815 ILL. COMP. STAT. § 505/7(a) |
| Maryland | MD. CODE ANN., COM. LAW § 13-101 *et seq.* |
| Michigan | MICH. COMP. LAWS § 445.905 and § 445.910 |
| Minnesota | MINN. STAT. §§ 8.01, 8.31 |
| Missouri | MO. REV. STAT. § 407.020 *et seq.* |
| Montana | MONT. CODE ANN. §§ 30-14-101 through 30-14-160 |
| Nebraska | NEB. REV. STAT. §§ 87-303.05, 303.11 |
| New Hampshire | N.H. REV. STAT. ANN. § 358-A:1 *et seq.* |
| New Jersey | N.J. STAT. ANN. §§ 56:8-1 to -232, and N.J. STAT. ANN. §§ 52:17B-120, 52:17B-124 |
| New York | N.Y. EXEC. LAW § 63(12) and N.Y. GEN. BUS. LAW §§ 349 and 350 |
| North Carolina | N.C. GEN. STAT. § 75-1.1 *et seq.* |
| Ohio | OHIO REV. CODE ANN. § 1345.01 *et seq.* |
| Oklahoma | OKLA. STAT. tit. 15, § 756.1 |
| Pennsylvania | 73 PA. STAT. §§ 201-1 through 201-9.2 |
| West Virginia | W. VA. CODE § 46A-1-101 *et seq.* |
| Wisconsin | WIS. STAT. § 100.18(11)(d) |

11. The Plaintiff States also bring this action to enforce the consumer protections contained in ROSCA, which are described below.

**DEFENDANTS**

12. Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Defendant Uber Technologies, Inc. provides ride-hailing and food delivery services and transacts or has transacted business in this District and throughout the United States.

13. Defendant Uber USA, LLC is a Delaware limited liability company with its

principal place of business in San Francisco, California.  Together with Defendant Uber Technologies, Inc., Defendant Uber USA, LLC offers subscription services, such as Uber One, and transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

14.    Defendants Uber Technologies, Inc. and Uber USA, LLC have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  Uber has conducted the business practices described below through interrelated companies that have common ownership, office locations, advertising, and lack any real distinction.  Because Uber Technologies, Inc. and Uber USA, LLC have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

15.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

16.    Founded in 2009, Uber distributes mobile software applications that can be downloaded to a smartphone (the "Uber App" and the "Uber Eats App") (collectively, the "Uber Apps").  The Uber Apps connect transportation providers or couriers with consumers seeking transportation or food delivery services.  Consumers book a ride or a food delivery from an Uber driver using the Uber App or the Uber Eats App.  Following completion of the ride or food delivery, Uber bills the cost to the consumer, deducts fees, and remits a portion of that amount to the provider or courier.

17.    Uber has charged consumers for various subscription plans over the years, including Uber Pass, and since November 2021, Uber One.  Consumers enrolled in Uber One typically pay $9.99 per month for a monthly subscription or $96 per year for an annual subscription.  Uber One subscriptions renew automatically, charging consumers on a recurring basis unless they take affirmative action to cancel by a certain date.  Month-to-month plans are renewed and charged monthly, and annual plans are renewed and charged on a yearly basis,

unless consumers are able to cancel.

18.    As of September 2024, Uber has enrolled more than 28.7 million consumers into Uber One subscriptions, including consumers who reside in each of the Plaintiff States' jurisdictions.  These subscriptions account for about $935 million of Uber's gross revenues during just a 2-year period.

### Uber Misrepresents the Purported Benefits of Subscription Plans, including that Consumers Can Cancel Uber One Subscriptions "Anytime"

19.    Uber markets subscription plans.  For example, it advertises Uber One on its website, the Uber Apps, and various other media as a way for customers to qualify for certain discounts or promotions on eligible rides or deliveries by paying a monthly or annual membership fee.  As part of this marketing, Uber promises consumers certain savings and that they will be able to cancel their subscriptions at "anytime."  For example, during the enrollment flow for Uber One in the Uber apps, Uber states that consumers "[s]ave $25 every month" and can "cancel anytime" with no additional fees.[†]

---

[†] Some of the screenshots that appear in this complaint represent the customer experience for users who have had their mobile devices set to "dark mode."  In that experience, screenshots have appeared in light mode at times and dark mode at other times.

Second Amended Complaint
Case No. 4:25-cv-03477-JST



**Ex. 1**

20.    Similarly, the sign-up page on Uber's website markets six benefits of Uber One, including that Uber One consumers can "cancel anytime without fees or penalties."  Another purported benefit is "$0 delivery fees" on eligible orders.

**Ex. 2**

21. Further, Uber One's customer service representatives are encouraged to make the "cancel anytime" representation to consumers who contact Uber to inquire about enrolling in Uber One. For example, internal talking points documents encourage representatives to tell consumers, "You can cancel your membership in the app at any time."

22. In fact, these claims are false. Many consumers do not actually save $25 a month by using Uber One. In fact, Uber internal testing documents from January 2023 noted that, "Overall, ▮▮ of users who tried to cancel had ▮ savings. ▮▮ of users had lifetime savings between ▮ and ▮▮ where ▮▮ are free trial users among them with less than ▮ lifetime savings." Further, Uber's savings claim assumes that the subscription is free; the purported savings does not subtract any costs.

23. Additionally, consumers, including Uber One subscribers, have reported that they have had to pay delivery fees.

24. Likewise, consumers cannot cancel Uber One "anytime" without paying additional fees. As discussed below, it is difficult to cancel an Uber One subscription, and

Second Amended Complaint
Case No. 4:25-cv-03477-JST

consumers have not been able to cancel anytime.

**Uber Enrolls Consumers in Subscriptions in a Number of Ways,
Including Without Consent**

25.    Consumers are enrolled in subscriptions in a variety of ways.  For example, they are enrolled in Uber One through push notifications, pop-ups in the Uber App or Uber Eats App, on the checkout screen when booking a ride or delivery, on Uber's website, and through Uber's partnerships with credit card companies.  Regardless of the method, the enrollment process does not require any interaction with Uber customer service representatives and is processed immediately.

26.    Uber sends push notifications to consumers' phone lock screens and displays in-app pop-ups advertising savings, such as on the consumer's next ride or delivery.  For example, Defendants often present consumers using the Uber Apps with pop-up advertisements inviting them to "Claim offer," and promising savings such as, "Get 50% off 1 year."



**Ex. 3**

27.    Consumers that "Claim [the] offer" through a pop-up advertisement proceed directly to a checkout screen that says, "Try Uber One," crosses out the price of $9.99, and has a

big button labeled, "Try for free."

**Ex. 4**

28.     Once consumers click the "Try for free" button, they are immediately enrolled in Uber One and will be charged within 4 weeks (in the example above), and on a recurring basis thereafter.

29.     Other consumers who are using the Uber Apps to book a ride or food delivery are presented with an advertisement to enroll in Uber One on their checkout screen.  For example, a consumer attempting to book a ride in the Uber App would see a checkbox above the "Next" button on their checkout screen which tells them that if they check that box they can save a certain dollar amount off their ride with a free trial of Uber One.



**Ex. 5**

30.     If the consumer clicks to "check" the box, a pop-up appears prominently telling them that they will get Uber One "Free for 4 weeks" and can "cancel without fees or penalties," above a bold button labeled "Start Saving":

Second Amended Complaint
Case No. 4:25-cv-03477-JST



**Ex. 6**

31.    Once consumers click "Start saving," they are immediately enrolled in Uber One and will be charged every month or year for a subscription.  The only other choice is to "Cancel."  It is unclear what tapping that button would cancel at this point – it could be the delivery or ride they are trying to book; they have not signed up for Uber One and thus could not cancel it.

32.    If a consumer were to notice smaller text above the button, they would see language that states that, "You'll be charged $9.99 on [billing date] and every month until you cancel in the app."  However, as discussed more below, consumers are actually charged *before* that date.

33.    The consumers in the examples above never click a button labeled "Join Uber One" and do not need to affirmatively enter any billing information; Uber already has it stored if the consumer has ever taken a ride with Uber.  Nevertheless, Uber charges these consumers a recurring subscription fee before the stated billing date – and on a recurring basis thereafter, at least until the consumer notices the charges and tries to cancel them, and in many instances, even

after that.

34.    Consumers are also enrolled in Uber One if they do the following: first, tap "Account" on their home screen, then tap the "Uber One" button on their account screen.

 

**Exs. 7 & 8**

35.    This directs them to the screen that advertises the "benefits" of Uber One, including that consumers can "cancel anytime" with no additional fees (excerpted in Paragraph 19, above). Consumers then tap on the "Continue" button, which directs them to a checkout screen where they can complete their enrollment by tapping the "Join Uber One" button.



**Ex. 9**

36.    Consumers can also enroll using Uber's website.  Consumers simply click on the "Sign up now" button on the Uber One page and are directed to the checkout page where they can click the "Join Uber One" button to complete their enrollment.

37.    Further, in some instances, consumers are enrolled into Uber One memberships through Uber's partnerships with credit card companies.  Consumers with certain credit cards may be signed up for Uber One memberships for free for a set number of months, then are charged automatically on a recurring basis.

38.    Consumers report finding Uber One charges on their credit card bill despite *never* knowingly signing up for an Uber One subscription *at all*.  For example, one consumer said, "Uber is charging me for Uber [O]ne and I did not sign up nor gave them credit card info," while another consumer related that, "Uber One has been charging my bank account for $9.99 a month without my consent or me subscribing."  Consumers often complain about this:

- "I'm not sure how it happened but I did an Uber to my job and now Uber one has been taking $9.99 out of my account for the last 15 or 16 months."

- "I looked at a credit card bill and I realized that Uber Eats had been charging $9.99 for an Uber One account for the past 8 months. I have never signed up for this service."
- "I never signed up for Uber One subscription, but they automatically enrolled me and charged me for it. I have not used Uber at all in months."
- "I don[']t have an UBER account and NEVER have but I am being charged a monthly recurring fee of $9.99 for UBER ONE . I don[']t even know how they got my debit card info."
- "Uber unknowingly enrolled me in their Uber One membership and then charged me $9.99 for a monthly subscription. I was not notified that I had subscribed to the Uber One subscription and only became aware that I was enrolled in the Uber One membership after my credit card was charged $9.99."
- "When I created my account I had all those annoying Uber One popups. I clicked exit, reject, deny on all of them. Fast forward to today, Sept 16th 2024, I check my bank account and see that Uber has pulled $9.99 from my debit card both months that I've had it downloaded."
- Uber "makes you think you could try it for free for a day or for an order so this kind of feels like a scam."
- "They offered me Uber One for free for 3 months and instead charged me $96."
- "Uber One took my money for an allegedly complementary account connected to my Capital One card and then would not let me cancel it for a same day full refund!"

**Uber One's Free Trial Period**

39.     As referenced above, in numerous instances, Uber offers a free trial period. The length of the free trial period varies but can range between one week and three months. Since 2021, more than ███████ consumers have been enrolled in an Uber One free trial. Before the conclusion of the free trial period, consumers are automatically enrolled in and charged for an Uber One subscription.

40.     When consumers are enrolled in a free trial, Uber claims they will be charged on a

specific date unless they cancel beforehand (*see*, for example, the screen excerpted in Paragraph 35, above). Uber further promises consumers that they will "Save $25 every month" and may "cancel anytime."

41. However, Uber actually bills consumers *before* the stated billing date, during the free trial period.

42. Further, if a consumer successfully cancels his or her free trial before the free trial ends, then the consumer will lose access to Uber One immediately, on the date of his or her cancellation, as opposed to the end of the free trial. Uber instituted this policy of immediately ending access to Uber One upon cancellation in 2022 to "minimize the number of early quitters" and "reduce such likelihoods of users going through with early cancellations in the trial period." Consumers are therefore incentivized to wait until the last day of their trial before initiating cancellation, by which point Uber has already billed them.

### Uber Makes It Difficult For Customers To Cancel

43. Whether a consumer is in a free trial or a paid subscription, Uber has instituted a cancellation process that is difficult, time-consuming, and far from simple. Despite advertising that consumers can cancel "anytime," Uber One cancellation is actually time-restricted, time-intensive, and often ineffective. As detailed below, Uber utilizes various tactics that prevent or make it hard for consumers to cancel, especially when they attempt to do so within 48 hours of their billing date, often snaring consumers into additional months or even years of a service they no longer want or need.

44. For consumers attempting to cancel Uber One, they begin by navigating a series of screens within one of the Uber Apps. First, consumers must open the Uber Apps' home screen.



**Ex. 10**

45.    Because there is no mention of Uber One or "subscription" on the home screen, consumers who wish to cancel might try a few different tabs and buttons such as "Services" or "Activity," which will be futile.  Instead, consumers must find and click on the "Account Tab" at the bottom righthand corner of the screen to be directed to the "Account" screen, where they will begin the cancellation process.

Second Amended Complaint
Case No. 4:25-cv-03477-JST



**Ex. 11**

46.    On the Account screen, consumers encounter many buttons, none of which mention cancellation.  If they clicked on "Payment," for example, they would encounter other information, but not be able to cancel.  Instead, they must scroll further, to view more choices.

**Ex. 12**

Second Amended Complaint
Case No. 4:25-cv-03477-JST

47.   While scrolling, if a consumer clicks on "Settings" or "Manage Uber Account," they would be diverted from cancellation.  Instead, once they've reached this point, they must scroll down and tap the "Uber One" button.

**Ex. 13**

48.   After a consumer taps the "Uber One" button, they are directed to the "Uber One" screen, where still nothing about cancellation appears.  Instead, consumers must again scroll to the bottom of the screen.



**Ex. 14**

49.     Next, near the bottom of the "Uber One" screen consumers must tap the "Manage membership" button.  Once they tap "Manage Membership," they are directed to a new screen, which notes a purported renewal date and how much the consumer will be charged.  (In fact, as discussed elsewhere, consumers are charged before the stated renewal date.)

Second Amended Complaint
Case No. 4:25-cv-03477-JST



**Ex. 15**

50.     Scrolling to the bottom of this screen reveals another button in smaller text titled, "End membership."  This is the first time in the process that consumers would see anything related to cancellation, indicating they are on the right track.

51.     For a significant part of the relevant time period, this End Membership button was not visible to any consumers in the final 48 hours of their billing cycle.  In fact, consumers attempting to cancel within 48 hours of their billing cycle would get to this page and have no way of knowing where to go next to proceed with cancellation.  For those consumers lucky enough to have the button available to them, after a consumer taps the "End membership" button, the following screen has appeared:



**Ex. 16**

52.     Here, the consumer must answer a survey question about why they want to cancel their membership.  While the consumer considers one of six preset answers to the survey question, a button at the bottom of the screen labeled "Keep Uber One" is prominently displayed in a bright gray textbox, while a second button labeled "Continue" is presented in a black textbox with dark gray text, faded into the black background.  Consumers must go through different subsequent screens, depending on their answers to the survey.  Consumers cannot proceed with cancellation unless they select an answer.

53.     If the consumer picks an answer and taps the "Continue" button, then the following screen has appeared:



**Ex. 17**

54.     On this screen, Uber presents the consumer with the option to "pause" his or her membership for one month instead of cancelling.  At the bottom of the screen, a button labeled "Pause Uber One" appears prominently in a bright gray textbox, while beneath it is a button labeled "No thanks" in a subdued black textbox with white font.  Neither option mentions cancellation, making it unclear which button to choose to proceed with cancellation.  Further, these buttons are flipped from their placement on the previous screen: On the previous screen the button to click to proceed with cancellation is on the top, whereas, on this screen, the button to click to proceed with cancellation is now on the bottom.  This design interface steers the consumer who wishes to cancel away from the action they are trying to take: If a consumer intuitively clicks in the same place on both screens to move through the cancellation process, they will inadvertently abandon cancellation and merely pause their membership instead.  Indeed, if the consumer taps the "Pause Uber One" button, either because of its placement or because there is no clear cancellation option, then his or her subscription is paused for one month but not cancelled.  At the end of that month, consumers will be billed again in perpetuity unless

they attempt the cancellation process again.  Only by tapping the "No thanks" button may consumers continue with cancellation.

55.     If the consumer correctly taps the "No thanks" button, the following screen has appeared:



**Ex. 18**

56.     Here, Uber presents the consumer with yet another offer to continue their subscription at a lower rate for a limited time, usually one month.  At the bottom of this screen, a button labeled "Claim Offer" appears in a bright gray textbox, while a button labeled "End Uber One" appears beneath it in a black textbox with red font.  If the consumer taps the "Claim Offer" button, his or her subscription continues.  After navigating at least 7 screens that require at least 12 different actions (assuming the consumer never clicked through any wrong paths), only then, by selecting the red "End Uber One" button, may a consumer actually cancel his or her subscription.

Second Amended Complaint
Case No. 4:25-cv-03477-JST

**Uber Has Made It Even More Difficult to Cancel Near the End of a Subscription**

57.    Consumers who attempt to cancel within 48 hours of their billing date, however, have been directed to a different screen.



**Ex. 19**

58.    This screen has stated that consumers can keep their memberships active in exchange for savings of "$25 each month."  Consumers who wish to decline this purported "savings" proposition have had to exit out of the cancellation flow or click a button labeled "Close."  In many instances, however, consumers who have clicked the "Close" button have been bounced back to the survey question (excerpted in Paragraph 51, above), where their only options have been to (1) click "Continue" again, sending them back in a loop through the same steps described above; (2) click to "Keep Uber One," contrary to their intentions; or (3) manually navigate back to their home screen by closing out the cancellation flow.  No matter which of these three options they pick, these consumers have not cancelled, are still enrolled, and, most importantly, will be charged again.

59.    Consumers who have clicked the "Close" button then choose a survey response

again, click "Continue" again, proceed back through the pause offer screen and the savings offer screen again without being diverted, just to land on the same ending screen that tells them they "could save $25 each month."  If they click "Close" again, they have been sent back in the same loop again.  If they exit out to their home screen, they have been back at square one and continued to be charged.



**Ex. 20**

60.    Consumers have complained about getting stuck in this circuitous process, describing cancellation as a "loop" they can't get out of.  For example, one consumer described Uber One cancellation as "a circular loop" that was "impossibly difficult to navigate."  Another consumer recounted a similar experience: "When I tried to cancel the membership on my Uber app I encountered nothing but frustration because even after following all the steps to cancel, I could only get so far… It seems like they have created a loop that you cannot cancel an Uber One membership within 48 hours."

61.    If consumers on the final screen notice the small print language under the bold savings claim (*see* Paragraph 57, above), they have seen a warning that their next scheduled

payment "may" already be in process and that they should "contact support." In fact, Uber *always* charged consumers before the supposed billing date and *never* processed cancellations concluded via the in-app cancellation flow in the final 48-hour window, and consumers have had to pay in perpetuity.

62. If consumers do realize their plan wasn't cancelled, they may not realize why. For example, one consumer complained: "I tried to cancel the subscription before the end of the free trial but the option of Ending Subscription on their app just goes on a loop. After you click on it, it redirects you back to the membership page where it still shows that you are still subscribed."

63. Consumers who do realize they have not successfully cancelled must figure out where to go next. Uber did not provide any contact information for "support" or give any guidance on where to navigate within the app to find "support" for the vast majority of the relevant time period, and only offered the information after receiving notice of the FTC's investigation. As one consumer explained, "Uber is making it impossible to cancel your Uber One subscription without contacting support outside an app, but there's no mechanism to find out how to contact support. When I go to cancel my membership, it consistently says I am within 48 hours of renewal and will not let me cancel even for the following month. They're making it deliberately hard to cancel." And even if consumers do contact support after seeing this screen, they have been charged for another month anyway, as described further below. Uber employees have even raised concerns about this, with one stating in August 2023: "My concern about this is regarding the message shown in the screen that says 'contact support to cancel' and we might not be able to do so if the payment is pending."

64. Another consumer described having to navigate the various screens within the in-app cancellation flow before hitting a confusing roadblock: "After confirming my intent to cancel, I was redirected to a screen stating that I was within 48 hours of the renewal date and that I needed to contact support to cancel. However, there was no contact information provided on this screen. I attempted to find and use the support options available in the app but was unsure if my cancellation request was successfully submitted or received, leaving the status of my

membership unclear."

65.     After already navigating a battery of screens to reach a dead end, consumers who wished to contact customer support to cancel have then had to navigate a *second* maze of screens.  Here is the process Uber has required consumers to navigate:  First, they must start over by navigating back to the Uber Apps' home screen (excerpted in Paragraph 44, above).  Second, the consumer must tap on the "Account" button, which reveals the following screen again.

**Ex. 21**

66.     Next, the consumer must tap on the "Help" button, which directs them to a new screen.



**Ex. 22**

67.    On this screen, which mentions nothing about cancellation or Uber One, the consumer must tap the "Membership and loyalty" button, which opens another screen.



**Ex. 23**

Second Amended Complaint
Case No. 4:25-cv-03477-JST

68.     On the "Membership and loyalty" screen, the consumer must tap the "Uber One" button.  If the consumer taps the "Uber One" button, the following screen appears.



**Ex. 24**

69.     Here, the consumer must tap the "Uber One Membership Cancellation" button, which directs them to yet another screen.

Second Amended Complaint
Case No. 4:25-cv-03477-JST

**Ex. 25**

70.     Here, at the top of the screen, consumers see instructions for how to cancel their membership in the app.  If they have attempted to follow these instructions, they have ended up in the same loop described in Paragraphs 58-60 above.  If instead, they read down the page, they have seen a note that says, "If you are less than 48 hours before your next renewal, please contact Support."  There are no instructions on how to contact support, causing at least some consumers to click out of the flow to attempt to find a "Support" tab.  If, instead, the consumer stays on this page and scrolls to the very bottom of the screen, an empty text input field appears under the heading "Share details."



**Ex. 26**

71.     Consumers must then manually type their cancellation request into the empty box and click the "Submit" button.



**Ex. 27**

Second Amended Complaint
Case No. 4:25-cv-03477-JST

72. After consumers submit their cancellation request via the text input field, they have been presented with a new screen that does not indicate whether their request has been granted or where to follow-up next.



**Ex. 28**

73. If consumers click the button labeled "OK," they have been directed back to the Account screen, excerpted above in Paragraph 65. From there, if they click the "Help" button again, then scroll all the way to the bottom of the "Help" page, they have seen a button that was not there before titled, "Uber One Membership Cancellation," beneath text that reads, "Support messages."

Second Amended Complaint
Case No. 4:25-cv-03477-JST



**Ex. 29**

74.    If the consumer clicks "Uber One Membership Cancellation," a new screen has opened showing that they have entered a chat with Uber support.



**Ex. 30**

Second Amended Complaint
Case No. 4:25-cv-03477-JST

75.    By this point consumers have gone through as many as 23 screens and have taken at least 32 actions (including scrolling, clicking, and typing) if they follow the correct steps and only go back through the loop described above once.‡ Consumers then must wait for an Uber customer service representative to respond to their request and process their cancellation.  But even consumers who have found their way to the cancellation support queue have often been unable to promptly cancel or avoid being charged due to excessively long hold times: consumers often report waiting *hours or up to a full day* to receive a response from Uber, and that they were already billed for the next payment in the interim.

76.    Uber's restriction on cancelling within 48 hours has come as a surprise to consumers.  An internal Uber document from November 2023 explains that this policy, "[r]esults in customer frustration due to lack of transparency and high contact rate," and notes that, "Users are confused and reach out to Support."  The only place where Uber One mentions anything about a 48-hour period is on the initial checkout page (excerpted in Paragraph 35, above), where it appears in small, light gray fine print at the very bottom of the screen.

77.    Even if consumers notice this fine print when they enroll, it only tells them to "cancel up to 48 hours before [the billing date] in the app."  There is no information at all on where or how to cancel and avoid charges once you are in the 48-hour window during which consumers are likely to think about cancelling a subscription.  This small and confusingly worded disclosure lacks a date certain, only gives a time frame in reference to a different date, *and* fails to warn consumers how long cancellation can take outside the app or that Uber bills consumers before the promised billing date.

78.    And, as noted in Paragraph 42, above, Uber's internal documents show that Uber intentionally incentivizes enrollees to wait until the last possible day to cancel their free trials so they don't prematurely lose their benefits, making it more likely they will slip into this 48-hour

---

‡ Alternatively, consumers in the final 48 hours of their billing cycle who happen to tap the "Help" button instead of the "Account" button discussed in Paragraph 45, above, could potentially start customer support cancellation directly.  In that case, they would still need to proceed through 10 screens with at least 14 actions, then wait for a response from customer service representatives.  This is a less likely path, however, because the only cancellation instructions that Uber makes available (*see* Paragraph 70, above) direct consumers to the in-app cancellation path first, which would require them to proceed through customer service cancellation second, totaling as many as 23 screens with at least 32 actions.

Second Amended Complaint
Case No. 4:25-cv-03477-JST

cancellation black hole without realizing how hard it will be to come out the other side.

79.    Consumers regularly express their surprise, confusion, and frustration over Uber One's tiresome and complicated cancellation process.  In fact, the process is so challenging that it has spawned online tutorials attempting to explain how consumers can cancel Uber One, which have been viewed tens of thousands of times and include dozens of comments from fed up Uber One users.  Other consumers have also complained:

- "I signed up for an uber one account within the uber eats app. I have been trying to cancel but when I go to the membership management tab it tells me to contact customer support and no number is listed. After fully exploring the app to find customer support number which is not anywhere in the uber eats app, I googled the number only to find it is no longer in service. When you call the provided number it tells you to go thru the app!"

- "I have an Uber One account, I try and cancel it and there's no direct way to do it through either the website or the app. Instructions given in the app is either outdated or does not work! There's no button to end the subscription! There's no phone number to contact Uber directly! There's no email service! The only way to communicate with the company as a rider is to go through their in-app help service- which simply opens a claim through which they may or may not contact you. I'm not an old or confused person, I work in tech. This is clearly a means to deceive customers or intentionally make it difficult to stop monthly payments."

- "[A] courtesy trial period is offered but the credit card is charged 24-48 hours before the end of the trial period. When the customer goes to cancel the membership before the end of the trial period there is no way to cancel the membership except to contact customer service. Customer service then informs that the charge is not refundable even though it was made before the end of the trial period and the membership has been cancelled. … Customers are also discouraged from making the cancellation themselves through the app by saying that all membership benefits will suddenly end which does not seem true. Then you are forced into this period where customer

Second Amended Complaint
Case No. 4:25-cv-03477-JST

service can only cancel your membership and goes ahead and charges you anyway for an additional month."

### Uber One's Enrollment and Cancellation Processes Result in Unauthorized Charges for Customers

80. Uber One's enrollment and cancellation practices are not only frustrating to consumers; they are also costly. In numerous instances, consumers are unexpectedly charged significant sums of money for Uber One. For example, many consumers report finding charges for Uber One on their credit card statements despite never authorizing enrollment in a paid Uber One membership.

81. Additionally, many consumers in Uber One memberships are charged unexpectedly due to Uber's misleading policy of charging consumers for a new subscription 24 to 48 hours before their stated billing date. Consumers who have tried to cancel their Uber One subscriptions within the last 48 hours of their free trial often find out they have already been enrolled in and prematurely charged for a paid subscription before their free trial has even ended. Similarly, consumers trying to cancel within the last 48 hours of a paid subscription often discover they have been charged for another unwanted month *or even year* of Uber One prior to the expiration of their current subscription period, or that Uber has not processed any cancellation for them at all.

82. Some consumers who didn't know they were ever enrolled in Uber One in the first place, or who thought they had already cancelled, are surprised to see Uber One charges appear on their bills and then have trouble canceling. To recoup their losses, they must then expend significant time and effort requesting refunds, which, as described below, are not always granted:

- "I was signed up for an Uber One Membership. The due date for my next charge is supposed to be 12192023 [*sic*] and I was charged 48 hours in advance for the membership fee of 9.99, I spoke to customer support about it and while they cancelled the membership they would not refund the monthly charge."

Second Amended Complaint
Case No. 4:25-cv-03477-JST

- "UBER ONE will charge you for the monthly subscription one day before your current subscription expires.…My current subscription ends on March 22 but I was charged on March 21st and I tried to get refunded but they won't allow it."

- "I signed up for a student account of Uber one free trial. The trial was supposed to last thirty days, however today on the twenty ninth day I was charged $48 dollars to my account. The payment is still processing, so I cannot dispute the claim to my bank and must wait for it to be processed which can take about a week. Uber does not have an active or easily accessible customer support phone number. Instead, they have an in-app support guide which does little to help with any situation and makes it harder to contact anyone in customer support. It even says in the app for my account that I am supposed to be charged tomorrow, yet I was charged today."

- "On their terms, it says that if a user tries to cancel within 48 hours of their trial ending - they need to contact uber support. They basically hide the End my membership or manage my membership call to action button and I had to click through buttons to get support through chat. Cancellation only takes effect until the next billing cycle so even if you have 24 hours left of the trial -- they will still charge your credit card for this month's. What a scam."

- "I was attempting to cancel a membership to Uber One through their app. After going through a few pages in the process, I landed on a roadblock page that stated You are within 48 hours of your renewal window and must contact support to cancel. This never existed before and is not only a deceptive business practice but may be illegal. Rather than making it easy, or even possible to cancel in the app they tried to make it much more difficult and time consuming, despite there being no need to do so from a technical or accounting perspective. They also charged my debit card a day before the renewal date, taking my money before they were owed it, which is certainly illegal."

Second Amended Complaint
Case No. 4:25-cv-03477-JST

83.    Consumers are also hit with unwanted additional charges for Uber One due to unreasonably long wait times in the Uber customer support chat queue.  Many times, when consumers finally hear back from Uber's customer service representatives, they have already been charged for the next billing cycle, even when they initiated their cancellation request well before the end of their free trial or within the current billing cycle of their paid subscription.

84.    For example, one consumer complained, "I tried to cancel the subscription through the Uber application on my phone.  The app did not let me cancel the subscription and displayed this message: You are within 48 hours of your renewal date and your next scheduled payment may be in process.  Please contact support to cancel.  Uber does not have a phone number for support and only uses the email support feature on the app to provide support.  I submitted a request to cancel on June 22 at approximately 11:45 AM over the email support feature.  There were no customer service agents available and the app said I will receive a reply when a customer service agent is available.  I received a reply on June 23 at 9:59 AM saying that my membership auto renewal was cancelled and it will not renew after July 23.  So I was charged for a month of Uber one due to lack of proper way for a user to cancel Uber one subscription."

85.    If consumers are finally able to reach an Uber customer service representative and cancel, Uber confirms cancellation and states the consumer will not be charged after cancelling.  In the example below, Uber confirms cancellation and states "Moving forward, you will not be charged for Uber One":

Second Amended Complaint
Case No. 4:25-cv-03477-JST



**Ex. 31**

86.    But, in fact, Uber always charges consumers, including the one in this example who was enrolled in a four-week free trial, for one additional month.

87.    As a result, many consumers have complained that they were charged for Uber One subscription services that they believed were cancelled.  Some of these consumers completed the in-app cancellation flow, and clicked "Close," with the reasonable belief that they had cancelled their subscription, while others connected with customer support and were specifically told their subscriptions were cancelled and they wouldn't be charged again.  In some instances, consumers have been charged for months without their consent for subscriptions that were already cancelled and have even been forced to cancel their credit or debit cards to finally stop the charges.  Even after the primary payment method has been cancelled, Uber sometimes charges other cards it happens to have access to in the app if they have ever been used to book a ride or delivery in the past.  Below are some examples of related consumer complaints:

- "I signed up for Uber Eats (Uber One) via their application. I cancelled their app when given the opportunity to cancel. Uber One still charged my checking account

the monthly fee in the amount of $9.99 three times after cancelling. I reached out via chat, and I was refunded. A couple of months later, Uber One restarted charging my checking account for $9.99. As a result, I cancelled my bankcard, and was issued a new one so that the unauthorized charges would stop. Uber One then attempted numerous times to charge my account. but was unsuccessful. Then Uber one charged my wife's bank card (she used her bankcard once to make a purchase prior to me cancelling my account)."

- "I had signed up for a free trial of Uber One sometime last year. I attempted to cancel this subscription, and I was told by Uber that it had, in fact, cancelled. This week, I was suddenly charged $96 for the subscription that I had cancelled. I spoke with them and recieved [sic] a refund, but that same day I was charged AGAIN for the subscription. They are now refusing to help me or actually issue any refund and are instead putting me through a loop talking to representatives."

- "I also contacted the customer service at Uber one, they promised to pay me back for the reasnt [sic] charging and unsubscribe me, they said Yes, but they still talking [sic] money form [sic] my account even when I tried to delete my debit card from the Uber app. Please help, I did contact Uber 3 times. They still stealing me."

88.    The harm from unwanted recurring charges is not reasonably avoidable, as consumers who did not consent to enroll in Uber subscriptions would not know they needed to cancel to avoid charges, and those who did know do not expect that they will continue to be charged when they request cancellation before their billing dates.  In addition, there is no countervailing benefit to consumers or competition from this conduct because there is no benefit to consumers or competition from being enrolled into unwanted subscriptions or from being trapped by Uber One's circuitous cancellation flow.  In fact, there is significant injury.

89.    Uber's internal documents suggest consumers attempting to cancel find little value in continuing to use the Uber One service, further reinforcing the lack of consumer benefits or salutary effect on competition.  In fact, as of September 2024, ███████ consumers cancelled Uber One without using their membership benefits during their last month – or, for

annual subscribers, last year – of service; and ███████ consumers cancelled without ever having used their Uber One memberships *at all*. And Uber internal testing revealed that only 15% of cancelling consumers were willing to retain their Uber One membership even when their price was dropped to $1, indicating that 85% of cancelling consumers wouldn't even be willing to pay $1 to keep their Uber One membership benefits.

90.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

***

91.    Uber began or continued charging for its subscription programs after the FTC brought more than a dozen actions against other companies under the FTC Act and ROSCA, including for failing to have simple cancellation mechanisms and charging consumers without authorization. For example, the FTC recently concluded litigation against Amazon, alleging Amazon made consumers navigate "a four-page, six-click, fifteen-option cancellation process," and which the court found stated a claim under the FTC Act and ROSCA. As another example, the Department of Justice is currently litigating against Adobe on the FTC's behalf for similar practices.

92.    Uber persisted in the practices described above despite a public outpouring of complaints about unauthorized charges and difficulty cancelling Uber's subscription services; online tutorials attempting to explain how consumers can cancel Uber One, which have been viewed tens of thousands of times; internal testing reflecting significant customer confusion; employee discussions of the problems with Uber's disclosures; and receipt of a letter from the FTC in September 2024 probing about Uber's subscription programs, including enrollment and cancellation mechanisms and compliance with ROSCA.

93.    Uber also has experience with the FTC and is currently subject to two prior consent orders related to its advertising and data security practices. The data security consent order was expanded to include additional requirements after the company failed to disclose a significant data breach. As one of the world's largest technology companies, Uber has extensive

legal resources, including in-house and outside counsel who are responsible for ensuring Uber complies with all applicable consumer protection laws and regulations.

## VIOLATIONS OF THE FTC ACT

94.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

95.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

96.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## VIOLATIONS OF STATE LAW

97.     The state statutes listed below generally prohibit deceptive trade practices and, with certain exceptions, practices that are unfair in connection with the offer and sale of goods and services to consumers.

| STATE | STATUTORY AUTHORITY |
|---|---|
| Alabama | ALA. CODE § 8-19-1, *et seq.* |
| Arizona | ARIZ. REV. STAT. §§ 44-1521 to 44-1534 |
| California | CAL. BUS. & PROF. CODE § 17200 *et seq.* and § 17500 *et seq.* |
| Connecticut | CONN. GEN. STAT. § 42-110a *et seq.* |
| District of Columbia | D.C. CODE § 28-3901 *et seq.* |
| Illinois | 815 ILL. COMP. STAT. § 505/1 *et seq.* and 815 ILL. COMP. STAT. § 510/1 *et seq.* |
| Maryland | MD. CODE ANN., COM. LAW § 13-101 *et seq.* |
| Michigan | MICH. COMP. LAWS § 445.901 *et seq.* |
| Minnesota | MINN. STAT. §§ 325D.43 to 325D.48, 325F.68 to 325F.70 |
| Missouri | MO. REV. STAT. § 407.020 *et seq.* |
| Montana | MONT. CODE ANN. § 30-14-103 |
| Nebraska | NEB. REV. STAT. § 87-301 *et seq.* |
| New Hampshire | N.H. REV. STAT. ANN. 358-A:1 *et seq.* |
| New Jersey | N.J. STAT. ANN. § 56:8-2 and § 56:8-4(b) |
| New York | N.Y. EXEC. LAW § 63(12) and N.Y. GEN. BUS. LAW §§ 349 and 350 |
| North Carolina | N.C. GEN. STAT. § 75-1.1 |
| Ohio | OHIO REV. CODE ANN. § 1345.02 |
| Oklahoma | OKLA. STAT. tit. 15, §§ 751–764.1 |
| Pennsylvania | 73 PA. STAT. § 201-1 *et seq.* |

Second Amended Complaint
Case No. 4:25-cv-03477-JST

| West Virginia | W. Va. Code § 46A-6-104 |
| Wisconsin | Wis. Stat. § 100.18(1) |

**CLAIMS BROUGHT BY THE FEDERAL TRADE COMMISSION
PURSUANT TO THE FTC ACT**

**Count I
(Misrepresentations)**

98.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its subscription service, including through the means described in Paragraphs 19 to 42 above, Defendants represent, directly or indirectly, expressly or by implication:

    a.   that consumers may cancel their subscription services at any time with no additional fees;

    b.   a specific date on which consumers will be billed or charged;

    c.   that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month";

    d.   specific benefits of their subscription services, such as $0 delivery fees; and

    e.   that consumers have authorized Defendants' charges.

99.     In fact, the representations set forth in Paragraph 98 are false, misleading, or not substantiated at the time the representations were made.

100.     Therefore, the making of the representations as set forth in Paragraph 98 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a).

**Count II
(Unfairness)**

101.     In numerous instances, as described in Paragraphs 38 and 80 to 89 above, Defendants charge consumers without obtaining consumers' express informed consent.

102.     Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

103.    Therefore, Defendants' acts or practices as described in Paragraph 102 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**STATE LAW CLAIMS BROUGHT BY THE PLAINTIFF STATES**

**Claims and Relief Sought by the State of Alabama**
**Pursuant to the Alabama Deceptive Trade Practices Act**

**Count III**
**Deceptive Trade Practices**
**(By Plaintiff State of Alabama)**

104.    The State of Alabama incorporates paragraphs 1 through 103 as if they were fully alleged herein.

105.    Alabama's Deceptive Trade Practices Act forbids certain "deceptive acts or practices in the conduct of any trade or commerce." Ala. Code § 8-19-5. The term "trade or commerce" "[i]ncludes, but is not limited to, the advertising, buying, offering for sale, sale or distribution or performance of any service or goods, and any other article, commodity, or thing of value wherever situated and shall include any trade or commerce affecting the people of this state." Ala. Code § 8-19-3(8). Defendants' offering of their subscription services constitutes conduct in the course of trade or commerce under the Deceptive Trade Practices Act. *See id.*

106.    The misrepresentations that Defendants make have the capacity, tendency, or effect of deceiving or misleading consumers, and they are therefore deceptive trade practices prohibited by Section 8-19-5(27) of the Code of Alabama, which prohibits "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Specifically, Defendants have violated Section 8-19-5(27) by representing, directly or indirectly, expressly or by implication:

        a.   that consumers may cancel their subscription services at any time with no additional fees;

        b.   that consumers will be charged or billed on a specific date;

    c.   that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and

    d.   that consumers have authorized Defendants' charges.

<strong>Relief Under the Deceptive Trade Practices Act (Count III)</strong>

107.    Defendants should be ordered to cease and desist from engaging in their deceptive trade practices pursuant to Section 8-19-8(a) of the Code of Alabama.

108.    Defendants should be ordered to pay restitution to affected consumers pursuant to Section 8-19-8(e) of the Code of Alabama. *See Nunley v. State*, 628 So. 2d 619, 621 (Ala. 1993)(noting that an order of restitution is an appropriate remedy under Section 8-19-8(e)).

109.    Defendants knowingly engaged in the conduct described above and should be ordered to pay civil penalties in an amount up to $2,000 for each of their violations pursuant to Section 8-19-11(b) of the Code of Alabama.

110.    Defendants should be ordered to pay the costs of this action, including attorneys' fees, pursuant to Section 8-19-11(e) of the Code of Alabama.

<strong>Claims and Relief Sought by Arizona Attorney General<br>Pursuant to the Arizona Consumer Fraud Act</strong>

<strong><u>Count IV</u><br>(Deceptive Practices)</strong>

111.    The Arizona Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

112.    Defendants' practices, as set forth above, constitute deception, deceptive or unfair practices, fraud, false pretenses, false promises, or misrepresentations, in connection with the sale or advertisement of merchandise in violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 through 44-1534.

113.    Defendants' practices violate the Arizona Consumer Fraud Act whether or not any consumer has in fact been misled, deceived, or damaged as a result of those acts and

Second Amended Complaint<br>Case No. 4:25-cv-03477-JST

practices. A.R.S. § 44-1522(A).

114.    Defendants are "persons" within the meaning of A.R.S. § 44-1521(6).

115.    Defendants are engaged in the sale and advertisement of "merchandise," pursuant to A.R.S. § 44-1521(5), with their offer and sale of subscription services.

116.    The conduct described in the preceding paragraphs of this Complaint constitutes deception, deceptive or unfair practices, fraud, false pretenses, false promises, or misrepresentations, in violation of A.R.S. §§ 44-1521 to -1534, including, but not limited to Defendants' representations, directly or indirectly, expressly or by implication:

      a.  that consumers may cancel their subscription services at any time with no additional fees;

      b.  a specific date on which consumers will be billed or charged;

      c.  that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

      d.  that consumers have authorized Defendants' charges.

117.    Defendants' misrepresentations have a tendency and capacity to convey misleading impressions to consumers and are deceptive practices prohibited by A.R.S. § 44-1522.

118.    While engaging in the practices described above, Defendants knew or should have known that their conduct was of the nature prohibited by A.R.S. § 44-1522, subjecting themselves to enforcement and penalties as provided in A.R.S. § 44-1531(A).

119.    The Arizona Attorney General alleges that citizens in the State of Arizona are suffering economic harm and will continue to suffer economic harm unless the acts and practices complained of herein are permanently enjoined.

Second Amended Complaint
Case No. 4:25-cv-03477-JST

## Count V
### (Unfair Practices)

120.   The Arizona Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

121.   The Arizona Consumer Fraud Act prohibits the use of "unfair" acts and practices in connection with the sale or advertisement of merchandise.  A.R.S. § 44-1522(A).

122.   Defendants' practices set forth above have and are likely to cause substantial injury to consumers.  Consumers were and are substantially harmed each time they were or are misled into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the cost, payment dates, or cancellation process.

123.   Consumers who purchase Defendants' subscription services cannot reasonably avoid their injuries because of Defendants' misrepresentations and omissions of material fact.

124.   The injuries that consumers have suffered and are suffering as a result of Defendants' actions are not offset by any benefit to consumers or to competition and are unfair practices that violate A.R.S. § 44-1522(A).

### Relief Under the Arizona Consumer Fraud Act (Counts IV and V)

125.   Defendants should be permanently enjoined, pursuant to A.R.S. § 44-1528(A)(1), from engaging in deceptive, misleading, or unfair acts or practices, or concealments, suppressions, or omissions, that violate the Arizona Consumer Fraud Act, A.R.S. § 44-1522(A), including the unlawful acts and practices set forth above.

126.   Defendants should be ordered, pursuant to A.R.S. § 44-1528(A)(2), to restore to all persons in interest any monies or property, real or personal, which may have been acquired by any means or any practice in this article declared to be unlawful.

127.   Defendants should be ordered, pursuant to A.R.S. § 44-1528(A)(3), to disgorge all profits, gains, gross receipts, or other benefits obtained as a result of their unlawful acts alleged

herein.

128.    Defendants should be ordered, pursuant to A.R.S. § 44-1531, to pay to the State of Arizona a civil penalty of up to $10,000 for each willful violation by each Defendant of A.R.S. § 44-1522.

129.    Defendants should be ordered, pursuant to A.R.S. § 44-1534, to reimburse the State for its costs and attorneys' fees incurred in the investigation and prosecution of Defendants' activities alleged herein.

**Claims and Relief Sought by People of the State of California**
**Pursuant to the State of California's Unfair Competition Law and False Advertising Law**

**Count VI**
**California Business and Professions Code section 17500**
**(Untrue or Misleading Statements)**

130.    The People of the State of California incorporate paragraphs 1 through 103 as if they were fully alleged herein.

131.    Defendants, with the intent to perform services, or to induce members of the public to enter into obligations relating thereto make or disseminate or caused to be made or disseminated before the public in the State of California or disseminated from the State of California before the public in any state, statements concerning such services, or other matters of fact connected with the performance thereof, which are untrue or misleading, and which defendants knew or reasonably should have known are untrue or misleading and likely to deceive members of the public, in violation of Business and Professions Code section 17500 ("BPC 17500"). BPC 17500, effectively, prohibits not only statements which are false, but also statements which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.

132.    Such statements include all the untrue or misleading statements alleged above,

including but not limited to:

    a. that consumers may cancel their subscription services at any time with no additional fees;

    b. a specific date on which consumers will be billed or charged;

    c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

    d. that consumers have authorized Defendants' charges.

133. Each instance of Defendants making an untrue or misleading statement constitutes a separate violation of BPC 17500. (BPC 17536.)

134. Under BPC 17535, actions for violation of BPC 17500 brought in the name of the people of the State of California do not require a showing of injury in fact including lost money or property. It is not necessary to show an intent to deceive, reliance or damages to maintain a violation of BPC 17500. Any violation of the false advertising law necessarily violates California's Unfair Competition Law, alleged separately herein.

**Count VII**
**California Business and Professions Code section 17200 et seq.**
**(Unfair Competition)**

135. The People of the State of California incorporate paragraphs 1 through 103 and 430 through 442 as if they were fully alleged herein.

136. Defendants have engaged in and continue to engage in, unfair competition as defined in Business and Professions Code section 17200 ("BPC 17200"). The Unfair Competition Law ("UCL" or BPC 17200 *et seq.*) prohibits any person from engaging in any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with BPC 17500) of Part 3 of Div. 7 of the BPC.

137.    The prohibition of unlawful business acts or practices allows any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made, to serve as a predicate offense and independently actionable under the UCL.  Under BPC 17204, actions brought in the name of the people of the State of California do not require a showing of injury in fact including lost money or property.

138.    The unlawful business acts or practices engaged in by Defendants include, but are not limited to, the violations of the Section 5 of Federal Trade Commission Act, 15 U.S.C. § 45(a), (n), California's False Advertising Law ("FAL" or "BPC 17500 *et seq.*") and the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401 *et seq.* as alleged herein, and in Count I, II and VI above and Counts VLV through Counts XLVII below, respectively. Pursuant to BPC 17206, each instance of Defendants engaging in unfair competition constitutes a separate violation of the UCL.

### Relief Under California's False Advertising Law and Unfair Competition Law
### Business and Professions Code sections 17500 *et seq.* and 17200 *et seq.*
### (Counts VI and VII)

139.    Defendants should be enjoined from engaging in unfair competition and making untrue and misleading statements pursuant to California BPC 17203 and 17535.

140.    Defendants should be ordered to make restitution as necessary to restore to any person in interest any money which may have been acquired by means of such unfair competition or untrue or misleading statements pursuant to BPC 17203 and 17535, respectively.

141.    Defendants should be ordered to pay civil penalties in an amount up to $2,500 for each violation of the UCL and FAL pursuant to BPC 17206(a)-(b) and 17536(a)-(b), respectively.

142.    The remedies or penalties provided by the UCL and FAL are cumulative to each other and to the remedies or penalties available under all other laws of the state of California

pursuant to BPC 17204 and 17534.5, respectively.

**Claims and Relief Sought by Connecticut Attorney General**
**Pursuant to the Connecticut Unfair Trade Practices Act ("CUTPA")**

**Count VIII**
**(Deceptive Practices)**

143. The Connecticut Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

144. At all times relevant hereto, Defendants engage in trade or commerce in the State of Connecticut pursuant to Conn. Gen. Stat. § 42-110a(4).

145. In connection with the advertisement, marketing, offer, or sale of the subscription services, Defendants represented, directly or indirectly, expressly or by implication:

    a. that consumers may cancel their subscription services at any time with no additional fees;

    b. a specific date on which consumers will be billed or charged;

    c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

    d. that consumers have authorized Defendants' charges.

146. Defendants' representations, as described herein, are likely to mislead consumers acting reasonably under the circumstances in that they lead consumers to believe that: (a) they could cancel the subscription services at any time when in fact, they cannot; (b) Defendants charge them on a specific date when, in fact, the Defendants charge them on a different date; (c) they would receive benefits from the subscription services they did not, in fact, receive; (d) Defendants would charge them only when authorized to do so; and (e) they would save money using the subscription services.

147. Defendants' advertisements focused heavily on price and benefits of the

subscription services as material terms of their offers, and the price and benefits of the subscription services are material terms of all offers for goods and services.

148.    Defendants' representations related to the terms, price and benefits of the subscription services are material to consumers' decisions whether to subscribe.

149.    Defendants, therefore, engaged in deceptive acts or practices in violation of CUTPA, Conn. Gen. Stat. § 42-110b(a).

150.    Defendants' conduct , as alleged in this count, was willful pursuant to Conn. Gen. Stat. § 42-110o(b) in that Defendants knew or should have known that their acts or practices set forth above are deceptive in violation of  Conn. Gen. Stat § 42-110b(a).

## Count IX
### (Unfair Practices)

151.    The Connecticut Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

152.    Defendants' practices set forth above have caused and are likely to cause substantial injury to consumers in that consumers were and are substantially harmed each time they were or are misled into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the benefits, cost, payment dates, or cancellation process.

153.    Defendants' acts and practices, as described herein, therefore constitute unfair acts or practices in violation of CUTPA, Conn. Gen. Stat. § 42-110b(a).

154.    Defendants' conduct, as alleged in this count, was willful pursuant to Conn. Gen. Stat. § 42-110o(b) in that Defendants knew or should have known that the acts or practices above are unfair in violation of Conn. Gen. Stat. § 42-110b(a).

**Relief Under the Connecticut Unfair Trade Practices Act. (Counts VIII and IX)**

155.    Defendants should be ordered to cease and desist from engaging in their unfair

and deceptive trade practices pursuant to Conn. Gen. Stat. § 42-110m of CUTPA.

156. Defendants should be ordered to disgorge all ill-gotten gain in the amounts that they wrongfully received from Connecticut consumers pursuant to Conn. Gen. State § 42-110m.

157. Defendants should be ordered to pay the costs of this action, including attorneys' fees, pursuant to Conn. Gen. Stat. § 42-110m.

158. Defendants should be ordered to pay civil penalties in an amount up to $5,000 for each of their violations pursuant to Conn. Gen. Stat. §§ 42-110m and 42-110o.

**Claims and Relief Sought by the Attorney General for the District of Columbia Pursuant to the D.C. Consumer Protection Procedures Act**

**Count X**
**(Deceptive Trade Practices in Violation of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3904)**

159. The Attorney General for the District of Columbia incorporates paragraphs 1 through 103 as if they were fully alleged herein.

160. The District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.*, is a broadly construed remedial statute prohibiting unfair and deceptive trade practices. It establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia.

161. Defendants' practices, as set forth above, constitute deceptive trade practices in violation of the CPPA, D.C. Code § 28-3904.

162. Defendants' practices violate the CPPA whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice. D.C. Code § 28-3904.

163. The subscription services that Defendants provide to consumers are for personal, household, or family purposes, and therefore, are consumer goods and services pursuant to D.C. Code § 28-3901(a)(2)(B)(i).

Second Amended Complaint
Case No. 4:25-cv-03477-JST

164. Defendants, in the ordinary course of business, supply consumers goods and services, and therefore, are merchants as defined by D.C. Code § 28-3901(a)(3)(A).

165. The misrepresentations that Defendants make have the capacity, tendency, or effect of deceiving or misleading consumers, and are deceptive trade practices prohibited by D.C. Code § 28-3904, as defined in D.C. Code § 28-3901(a)(6), when they represent, directly or indirectly, expressly or by implication:

  a. that consumers may cancel their subscription services at any time with no additional fees;

  b. a specific date on which consumers will be billed or charged;

  c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

  d. that consumers have authorized Defendants' charges.

### Count XI
**(Unfair Trade Practices in Violation of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3904)**

166. The Attorney General for the District of Columbia incorporates paragraphs 1 through 103 as if they were fully alleged herein.

167. The CPPA prohibits unfair acts and practices that cause or are likely to cause substantial injury to consumers that is not reasonably avoidable and that is not outweighed by benefits to the consumer or to competition.

168. Defendants' practices set forth above have and are likely to cause substantial injury to consumers. Consumers were and are substantially harmed each time they were or are misled into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the cost, payment dates, or cancellation process.

169. Consumers who purchase Defendants' subscription services cannot reasonably

avoid their injuries because of Defendants' misrepresentations and omissions of material fact.

170.   The injuries that consumers have suffered and are suffering as a result of Defendants' actions are not offset by any benefit to consumers or to competition and are unfair trade practices that violate D.C. Code § 28-3904.

**Relief Under the D.C. Consumer Protection Procedures Act (Counts X and XI)**

171.   Defendants should be ordered to cease and desist from engaging in their unfair and deceptive trade practices pursuant to D.C. Code § 28-3909(a).

172.   Defendants should be ordered to pay restitution in the amounts that they wrongfully received from District consumers pursuant to D.C. Code § 28-3909(a) and (b).

173.   Defendants should be ordered to pay the costs of this action, including reasonable attorneys' fees, pursuant to D.C. Code § 28-3909(b).

174.   Defendants should be ordered to pay civil penalties in an amount up to $5,000 for each of their violations, pursuant to D.C. Code § 28-3909(b)(1).

**Claims and Relief Sought by The People of the State of Illinois**
**Pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act**

**Count XII**
**(Deception)**

175.   The People of the State of Illinois incorporates paragraphs 1 through 103 as if they were fully alleged herein.

176.   Defendants' practices, as set forth above, constitute deceptive acts and practices in the offer or sale of consumer goods and services that violate the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act"), 815 ILCS 505/2.

177.   Defendants' practices violate the Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice. 815 ILCS 505/2; 815 ILCS 510/2(b).

Second Amended Complaint
Case No. 4:25-cv-03477-JST

178.    Defendants offered and sold subscription services to consumers in the course of Defendants' business and while engaged in the conduct of trade or commerce.

179.    While engaged in such trade or commerce, Defendants committed the following deceptive acts or practices declared unlawful under Section 2 of the Consumer Fraud Act, 815 ILCS 505/2:

      a.   Making misrepresentations, with the intent that consumers rely on those misrepresentations, that consumers may cancel their subscription services at any time with no additional fees;

      b.   Making misrepresentations, with the intent that consumers rely on those misrepresentations, that consumers will be billed or charged on specific dates;

      c.   Making misrepresentations, with the intent that consumers rely on those misrepresentations, that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

      d.   Making misrepresentations, with the intent that consumers rely on those misrepresentations, that consumers have authorized Defendants' charges.

180.    The above misrepresentations are also violations of Sections 2(a)(5), 2(a)(9), and 2(a)(12) of the Uniform Deceptive Trade Practices Act. 815 ILCS 510/2(a)(5), 2(a)(9), 2(a)(12). Violations of the Uniform Deceptive Trade Practices Act are unlawful acts under the Illinois Consumer Fraud Act. 815 ILCS 505/2.

### Count XIII
**(Unfairness)**

181.    The People of the State of Illinois incorporates paragraphs 1 through 103 as if they were fully alleged herein.

182.    A practice is unfair under Section 2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2 if it is contrary to public policy, is immoral, unethical, oppressive or unscrupulous, and/or

is likely to cause substantial injury to consumers.

183. Defendants' practices are likely to cause substantial injury to consumers. Consumers were and are substantially harmed each time they were or are misled into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the cost, payment dates, or cancellation process.

184. Consumers who purchase Defendants' subscription services cannot reasonably avoid their injuries because of Defendants' misrepresentations and omissions of material fact.

185. Defendants' practices set forth above constitute unfair acts in violation of Section 2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2.

**Relief Under the Illinois Consumer Fraud Act (Counts XII and XIII)**

186. The People of the State of Illinois respectfully request the Court enter an order:

a. Permanently enjoining Defendants from engaging in the unfair and deceptive trade practices alleged in the Complaint pursuant to Section 7 of the Illinois Consumer Fraud Act. 815 ILCS 505/7.

b. Ordering Defendants to pay full restitution to consumers pursuant to Section 7 of the Illinois Consumer Fraud Act. *Id.*

c. Ordering Defendants to pay the costs of this action, pursuant to Section 10 of the Illinois Consumer Fraud Act. 815 ILCS 505/10.

d. Ordering Defendants to pay a civil penalty of $50,000 per deceptive or unfair act or practice, and an additional amount of $50,000 for each act or practice found to have been committed with the intent to defraud, all as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7.

**Claims and Relief Sought by Maryland Attorney General
Pursuant to the Maryland Consumer Protection Act**

**Count XIV**
**(Deceptive Practices)**

187.    The Maryland Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

188.    Defendants' practices, as set forth above, constitute deceptive trade practices in the offer or sale of consumer goods and services that violate the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 through 13-501.

189.    Defendants' practices violate the Maryland Consumer Protection Act whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice. *Id.* at § 13-302.

190.    The subscription services that Defendants offer and sell to consumers are consumer goods and services pursuant to § 13-101(d)(1) of the Maryland Consumer Protection Act because they are used for personal, family, or household purposes.

191.    Defendants act as merchants as defined by § 13-101(g)(1) of the CPA.

192.    The misrepresentations that Defendants make have the capacity, tendency, or effect of deceiving or misleading consumers, and are deceptive trade practices prohibited by § 13-303 of the CPA, as defined in § 13-301(1) of the CPA, when they represent, directly or indirectly, expressly or by implication:

    a.    that consumers may cancel their subscription services at any time with no additional fees;

    b.    a specific date on which consumers will be billed or charged;

    c.    that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

Second Amended Complaint
Case No. 4:25-cv-03477-JST

d.  that consumers have authorized Defendants' charges.

## Count XV
### (Unfair Practices)

193.    The Maryland Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

194.    Defendants' practices set forth above have and are likely to cause substantial injury to consumers.  Consumers were and are substantially harmed each time they were or are misled into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the cost, payment dates, or cancellation process.

195.    Consumers who purchase Defendants' subscription services cannot reasonably avoid their injuries because of Defendants' misrepresentations and omissions of material fact.

196.    The injuries that consumers have suffered and are suffering as a result of Defendants' actions are not offset by any benefit to consumers or to competition and are unfair trade practices that violate § 13-303 of the Consumer Protection Act.

### Relief Under the Maryland Consumer Protection Act (Counts XIV and XV)

197.    Defendants should be ordered to cease and desist from engaging in their unfair and deceptive trade practices pursuant to § 13-406 of the Maryland Consumer Protection Act.

198.    Defendants should be ordered to disgorge restitution in the amounts that they wrongfully received from Maryland consumers pursuant to § 13-406 of the Maryland Consumer Protection Act.

199.    Defendants should be ordered to pay the costs of this action, including attorneys' fees, pursuant to § 13-409 of the Maryland Consumer Protection Act.

200.    Defendants should be ordered to pay civil penalties in an amount up to $10,000 for each of their violations pursuant to § 13-410 of the Maryland Consumer Protection Act.

Second Amended Complaint
Case No. 4:25-cv-03477-JST

**Claims and Relief Sought by the People of the State of Michigan
Pursuant to the Michigan Consumer Protection Act**

**<u>Count XVI</u>
(Unfair, unconscionable, or deceptive methods, acts, or practices)**

201.    The People of Michigan incorporate paragraphs 1 through 103 as if they were fully alleged herein.

202.    The Michigan Attorney General is authorized to bring this claim under Mich. Comp. Laws §§ 445.905 and 445.910.

203.    Defendants offer and sale of subscription services constitutes trade or commerce pursuant to the MCPA, Mich. Comp. Laws § 445.902(g), because the Defendants provide services primarily for personal, family, or household purposes.

204.    Defendants' practices violate the Michigan Consumer Protection Act at the time a misrepresentation is made, regardless of Defendants' intent and regardless of whether any consumer relied on the misrepresentation.

205.    As described above, Defendants have falsely represented, directly or indirectly, expressly or by implication:

    a.  that consumers may cancel their subscription services at any time with no
        additional fees;

    b.  a specific date on which consumers will be billed or charged;

    c.  that consumers who enroll in their subscription services will save a specific
        amount, such as "$25 every month"; and/or

    d.  that consumers have authorized Defendants' charges.

206.    In making these misrepresentations, Defendants engage in the following unfair, unconscionable, and deceptive trade practices that are unlawful under the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903(1):

    (c) Representing that goods or services have sponsorship, approval,
    characteristics, ingredients, uses, benefits, or quantities that they do not have or

Second Amended Complaint
Case No. 4:25-cv-03477-JST

that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.

(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions.

(k) Representing to a party to whom goods or services are supplied that the goods or services are being supplied in response to a request made by or on behalf of the party, when they are not.

(n) Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction.

(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

207.    These misrepresentations are persistent and knowing.

**Relief Under the Michigan Consumer Protection Act (Count XVI)**

208.    The Michigan Attorney General may obtain injunctive relief, actual damages, and other appropriate relief under the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.905 and 445.910.

209.    Defendants should be ordered to cease and desist from engaging in their unlawful practices pursuant to Mich. Comp. Laws §§ 445.905(1) and 445.910(2).

210.    Defendants should be ordered to reimburse consumers for damages suffered or pay consumers damages in the amount of $250, whichever is greater, pursuant to Mich. Comp. Laws §§ 445.910(2) and 445.911(2).

211.    Defendants should be ordered to pay the costs of this action, including attorney fees, pursuant to Mich. Comp. Laws § 445.905(1).

212.    Defendants should be ordered to pay civil fines of not more than $25,000 for each persistent and knowing violation of the MCPA, pursuant to Mich. Comp. Laws § 445.905(1).

**Claims and Relief Sought by the Office of the Minnesota Attorney General**

**Count XVII**
**Uniform Deceptive Trade Practices Act**
**(Deceptive Practices)**

213.     The Office of the Minnesota Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

214.     The Uniform Deceptive Trade Practices Act (UDTPA), Minnesota Statutes, section 325D.44, provides that a "person . . . engages in a deceptive trade practice" in violation of the statute when "in the course of business, vocation, or occupation, the person:

. . .
(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ;
. . .
(7)  represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
. . .
(9) advertises goods or services with intent not to sell them as advertised; [or]
. . .
(14) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Minn. Stat. § 325D.44, Subd. 1(5), (7), (9), and (14).

215.     Defendants are "person[s]" within the meaning of the Minnesota Uniform Deceptive Trade Practices Act. *See* Minn. Stat. § 645.44, subd. 7 (defining "person" generally). Defendants are subject to the UDTPA because they engage in a "course of business" in Minnesota by offering their subscription services. Minn. Stat. § 325D.44, subd. 1.

216.     Defendants' practices violate the Minnesota Uniform Deceptive Trade Practices Act and may be enjoined without "proof of monetary damage, loss of profits, or intent to deceive" or "actual confusion or misunderstanding." *See* Minn. Stat. §§ 325D.44, subd. 2(a), 325D.45, subd. 1.

217.     The misrepresentations that Defendants make have the capacity, tendency, or

Second Amended Complaint
Case No. 4:25-cv-03477-JST

effect of deceiving or misleading consumers, and are deceptive trade practices prohibited by Minnesota Statutes sections 325D.44, subdivisions 1(5), (7), (9), and (14) when they represent, directly or indirectly, expressly or by implication:

> a. that consumers may cancel their subscription services at any time with no additional fees;
>
> b. a specific date on which consumers will be billed or charged;
>
> c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or
>
> d. that consumers have authorized Defendants' charges.

218. Defendants' practices and misrepresentations described in this Complaint constitute multiple violations of the Minnesota Uniform Deceptive Trade Practices Act.

**Count XVIII**
**Prevention of Consumer Fraud Act**
**(Deceptive Practices)**

219. The Office of the Minnesota Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

220. Minnesota Statutes section 325F.69, subdivision 1, states:

> The act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

221. Defendants' misrepresentations are made with the intent that others rely on them in connection with the sale of merchandise and thus violate the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §325F.69, Subd. 1.

222. Defendants are "person[s]" within the meaning of the Minnesota Prevention of Consumer Fraud Act. Minn. Stat. § 325F.68, subd. 3.

223. The subscription services that Defendants offered and sold to consumers are "merchandise" pursuant to Minnesota Statutes section 325F.68, subdivision 2 (defining merchandise to include, *inter alia,* "services").

224. Defendants' practices violate these acts whether any consumer in fact has been misled, deceived, or damaged as a result of that practice. Minn. Stat. § 325F.69, subd. 1.

225. The misrepresentations that Defendants make have the capacity, tendency, or effect of deceiving or misleading consumers, and are deceptive practices prohibited by Minnesota Statutes section 325F.69, subdivision 1, when they represent, directly or indirectly, expressly or by implication:

   a. that consumers may cancel their subscription services at any time with no additional fees;

   b. a specific date on which consumers will be billed or charged;

   c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

   d. that consumers have authorized Defendants' charges.

226. Defendants' practices and misrepresentations described in this Complaint constitute multiple violations of the Prevention of Consumer Fraud Act.

<u>**Count XIX**</u>
**Uniform Deceptive Trade Practices Act and Prevention of Consumer Fraud Act**
**(Unfair Practices)**

227. The Office of the Minnesota Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

228. Defendants' practices set forth above violate the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(13) and the Minnesota Prevention of

Consumer Fraud Act, Minn. Stat. §325F.69, subds. 1, 8 by engaging in unfair or unconscionable[§]

acts or practices in the course of business or with the intent that others rely thereon in connection

with the sale of merchandise.

229.    "Unfair" for purposes of the Uniform Deceptive Trade Practices Act and

Prevention of Consumer Fraud Act is defined to include "any method of competition, act, or

practice that: (1) offends public policy as established by the statutes, rules, or common law of

Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to

consumers.  Minn. Stat. §§ 325F.69, subd. 8; 325D.44, subd. 2(b).

230.    Defendants' practices are substantially injurious to consumers. Consumers were

and are substantially harmed each time they were and are misled into purchasing services they do

not realize they are purchasing, do not want, and for which they do not understand the cost,

payment dates, or the convoluted cancellation process.

231.    Defendants' practices as described in this Complaint constitute multiple violations

of the Minnesota Uniform Deceptive Trade Practice Act and the Prevention of Consumer Fraud

Act.

**Relief Under the Minnesota Uniform Deceptive Trade Practices Act and the Prevention of Minnesota Consumer Fraud Act (Counts XVII, XVIII and XIX)**

The Office of the Minnesota Attorney General respectfully asks this Court to award

judgment against Defendants, jointly and severally, as follows:

232.    Declaring that Defendants' conduct constitutes multiple, separate violations of the

Prevention of Consumer Fraud Act (Minn. Stat. § 325F.69), and the Uniform Deceptive Trade

Practices Act (Minn. Stat. § 325D.44);

233.    Enjoining Defendants and their employees, officers, directors, agents, servants,

---

[§] Pursuant to 2023 Minnesota Laws chapter 57, article 4, section 16, the prohibited conduct of "unfair or unconscionable" practices was added to Minnesota Statutes sections 325F.69, subdivision 1 and 325D.44, subdivision 1(13) and took effect August 1, 2023.

Second Amended Complaint
Case No. 4:25-cv-03477-JST

successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from engaging in conduct in violation of Minnesota Statutes sections 325D.44 and 325F.69.

234. Awarding judgment against Defendants for civil penalties pursuant to Minnesota Statutes section 8.31, subdivision 3, of up to $25,000 for each and every violation of Minnesota law;

235. Awarding judgment against Defendants for restitution and disgorgement under the equitable powers of the Court, Minnesota Statutes section 8.31, and any other authority;

236. Awarding judgment against Defendants for monetary relief pursuant to the equitable powers of the Court and Minnesota Statutes section 8.31 as necessary to remedy harms to Minnesotans resulting from Defendants' unlawful conduct;

237. Awarding costs, including costs of investigation and attorney fees, as authorized by Minnesota Statutes sections 8.31, subdivision 3a; and

238. Granting such further relief as provided by law or equity as the Court deems appropriate and just.

**Claims and Relief Sought by the Missouri Attorney General Pursuant to the Missouri Merchandising Practices Act**

**Count XX**
**(Deceptive Practices)**

239. The Missouri Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

240. Defendants' practices, as set forth above, constitute deceptive practices in connection with the sale of merchandise in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.020.

241. A violation of § 407.020 of the Missouri Merchandising Practices Act does not

require a showing that any consumer has been harmed as a result of the unlawful practice. Mo. Rev. Stat. § 407.020.

242. The subscription services Defendants offered and sold to consumers are merchandise within the definition provided in § 407.010(4) of the Missouri Merchandising Practices Act.

243. The misrepresentations that Defendants made to consumers would constitute a deceptive practice in connection with the sale or offer of sale of merchandise, Mo. Rev. Stat § 407.020.1, specifically by stating:

    a. that consumers may cancel their subscription services at any time with no additional fees;

    b. a specific date on which consumers will be billed or charged;

    c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month," and/or

    d. that consumers have authorized Defendants' charges.

### Count XXI

**(Unfair Practices)**
**(By Plaintiff Missouri Attorney General)**

244. The Missouri Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

245. The Missouri Merchandising Practices act prohibits unfair practices which is broadly defined to include any practice that offends public policy, is unethical, oppressive or unscrupulous and presents a risk of harm to consumers. *See* 15 CSR 60-8.020 – Unfair Practice in General.

246. Defendants' actions, as articulated above, present a risk of harm to consumers in violation of the MMPA.

**Relief Under the Missouri Merchandising Practices Act (Counts XX and XXI)**

247.    Defendants should be ordered to cease and desist from engaging in their deceptive and unfair trade practices pursuant to §407.100.1 and §407.100.3 of the Missouri Merchandising Practices Act.

248.    Defendants should be ordered to pay full restitution, in the amounts that they wrongfully received from Missouri consumers, pursuant to §407.100.4 of the Missouri Merchandising Practices Act.

249.    Defendants should be ordered to pay the costs of this action, including attorneys' fees, pursuant to §407.130 of the Missouri Merchandising Practices Act.

250.    Defendants should be ordered to pay civil penalties in an amount of $1,000.00 per violation pursuant to §407.100.6 of the Missouri Merchandising Practices Act.

251.    Defendants should be ordered to pay pre- and post-judgment interest pursuant to §408.040 of the Missouri Revised Statutes.

**Claims and Relief Sought by Montana Attorney General**
**Pursuant to the Montana Consumer Protection Act of 1973**

**Count XXII**
**(Deceptive Acts or Practices)**

252.    The Montana Attorney General repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 103 as if fully set forth herein.

253.    Defendants' acts or practices, as set forth herein, constitute deceptive acts or practices in the conduct of trade or commerce, and are therefore unlawful pursuant to the Montana Unfair Trade Practices and Consumer Protection Act of 1973 (the "MCPA"), Mont. Code Ann. §§ 30-14-101 through 30-14-160.

254.    The Montana Attorney General brings these claims pursuant to the MCPA to restrain unfair methods of competition and unfair or deceptive acts or practices in the conduct of

Second Amended Complaint
Case No. 4:25-cv-03477-JST

any trade or commerce. Mont. Code Ann. § 30-14-111.

255.    While the MCPA does not further define what constitutes a "deceptive" act or practice, in construing what is deceptive, Montana Courts give due consideration and weight to interpretations of the Federal Trade Commission and federal courts regarding § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C.S. 45(a)(1), as required by Mont. Code. Ann. § 30-14-104(1).

256.    A claim that an act or practice is deceptive under the MCPA does not require a showing of intent to deceive, nor knowledge a representation is untrue.

257.    Defendants have engaged in deceptive acts or practices prohibited by Mont. Code Ann. § 30-14-103, when they represent, directly or indirectly, expressly or by implication:

   a.    that consumers may cancel their subscription services at any time with no additional fees;

   b.    a specific date on which consumers will be billed or charged;

   c.    that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

   d.    that consumers have authorized Defendants' charges.

## Count XXIII
### (Unfair Acts or Practices)

258.    The Montana Attorney General repeats and incorporates by reference each and every allegation contained in paragraphs 1 through 103 as if fully set forth herein.

259.    The Montana Attorney General brings this claim pursuant to the MCPA to restrain unfair methods of competition and unfair acts or practices in the conduct of any trade or commerce. Mont. Code Ann. § 30-14-111.

260.     An unfair act or practice is one which offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to

consumers.

261.    Defendants have engaged in unfair acts or practices prohibited by Mont. Code Ann. § 30-14-103, in at least the following ways:

a.    Leading consumers to believe the subscription may be cancelled at any time with no additional fees;

b.    Billing consumers at least two days earlier than the disclosed due date; and/or

c.    Leading consumer to believe enrolling in their subscription services will save a specific amount, such as "$25 every month".

**Relief Under the Montana Consumer Protection Act (Counts XXII and XXIII)**

262.    Defendants should be ordered to cease and desist, and be permanently enjoined, from engaging in the unfair and deceptive trade practices as alleged herein. Mont. Code Ann. § 30-14-111.

263.    Defendants should be ordered to pay civil penalties not to exceed $10,000 for each violation in accordance with Mont. Code Ann. § 30-14-142.

264.    Defendants should be ordered to pay the costs of this action including expenses for expert witnesses, attorney fees and costs, and pre- and post-judgment interest. Mont. Code Ann. § 30-14-133.

265.    Defendants should be ordered to disgorge restitution in the amounts wrongfully received from Montana consumers.  Mont. Code Ann. § 30-14-131.

**Claims and Relief Sought by the State of Nebraska Pursuant to the Nebraska Uniform Deceptive Trade Practices Act**

**Count XXIV**
**(Deceptive Practices)**

266.    Plaintiff Nebraska incorporates paragraphs 1 through 103 as if they were fully

alleged herein.

267.    The Nebraska Uniform Deceptive Trade Practices Act ("NE UDTPA") prohibits persons from engaging in deceptive or unconscionable acts or practices in the course of business. *See* Neb. Rev. Stat. § 87-301 *et seq*.

268.    Under Section 87-302(a) of NE UDTPA deceptive trade practices include, without limitation, when a person (as defined in Neb. Rev. Stat. § 87-301(19)):

(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

(6) Represents that goods or services do not have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they have or that a person does not have a sponsorship, approval, status, affiliation, or connection that he or she has;

(10) Advertises goods or services with intent not to sell them as advertised or advertises the price in any manner calculated or tending to mislead or in any way deceive a person;

(16) Uses any scheme or device to defraud by means of:

(i) Obtaining money or property by knowingly false or fraudulent pretenses, representations, or promises; or

(ii) Selling, distributing, supplying, furnishing, or procuring any property for the purpose of furthering such scheme;

269.    The Attorney General is authorized to bring an action against any person who violates NE UDTPA for injunctive relief, restitution for Nebraska consumers, and civil penalties. Neb. Rev. Stat. § 87-303.05; 303.11.

270.    Defendants have engaged and continue to engage in deceptive acts or practices in violation of NE UDTPA.

271. In numerous instances, as described in the preceding paragraphs, Defendants have made false or misleading representations and advertisements, directly or indirectly, expressly or by implication regarding Uber subscriptions, including, but not limited to:

    a. that consumers may cancel their subscription services at any time with no additional fees;

    b. a specific date on which consumers will be billed or charged;

    c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month," and/or

    d. that consumers have authorized Defendants' charges.

272. In numerous instances, as described in the preceding paragraphs, Defendants have used a scheme or device to defraud consumers by means of:

    a. Obtaining money by knowingly false or fraudulent pretenses, representations, or promises, including, but not limited to enrolling consumers in Uber subscriptions without their consent.

    b. Selling, distributing, supplying, furnishing, or procuring any property for the purpose of furthering such scheme.

273. Defendants' deceptive acts and practices affect the people of the State of Nebraska.

274. Defendants engaged in the deceptive acts and practices willfully, knowing them to be deceptive.

275. Each deceptive act or practice as alleged herein constitutes a separate violation of NE UDTPA.

**Relief Under the Nebraska Uniform Deceptive Trade Practices Act (Count XXIV)**

276. Defendants should be ordered to cease and desist from engaging in their deceptive

trade practices pursuant to Neb. Rev. Stat. § 87-303.05(1).

277.    Defendants should be ordered to pay full restitution, in the amounts that they received from Nebraska consumers by means of any deceptive trade practice pursuant to Neb. Rev. Stat. § 87-303.05(1).

278.    Defendants should be ordered to pay the costs of this action, including attorneys' fees, pursuant to Neb. Rev. Stat. § 87-303(b).

279.    Defendants should be ordered to pay civil penalties in an amount up to $2,000.00 per violation pursuant to Neb. Rev. Stat. § 87-311(1).

**Claims and Relief Sought by the New Hampshire Attorney General
Pursuant to the N.H. Consumer Protection Act**

**Count XXV**
**(Unfair or Deceptive Acts or Practices)**

280.    The New Hampshire Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.s

281.    Per the New Hampshire Consumer Protection Act ("NH CPA"), N.H. Rev. Stat. Ann. § § 358-A:1 et seq., it is unlawful for any person to engage in any unfair or deceptive act or practice in the conduct of any trade or commerce within the state.  Such unfair or deceptive acts or practices include:

> V. Representing that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have . . . ;
> . . . .
> IX. Advertising goods or services with intent not to sell them as advertised; [and]
> . . . .
> XI. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions.

Rev. Stat. Ann. § 358-A:2, V, IX, XI.

282.    Defendant Uber Technologies, Inc. is a corporation and therefore a "person" as defined in Rev. Stat. Ann. § 358-A:1, I.

Second Amended Complaint
Case No. 4:25-cv-03477-JST

283. Defendant Uber USA, LLC, as a limited liability company, is a "legal entity" and therefore a "person" as defined in Rev. Stat. Ann. § 358-A:1, I.

284. By advertising, offering for sale, selling, and distributing their ride-hailing and food delivery services, subscriptions, and associated mobile software applications to New Hampshire consumers, Defendants conduct trade or commerce within the state as defined in Rev. Stat. Ann. § 358-A:1, II.

285. The misrepresentations that Defendants make have the capacity, tendency, or effect of deceiving or misleading consumers, and these misrepresentations are not merely good faith mistakes but instead constituted unfair or deceptive acts or practices prohibited by the NH CPA. Specifically, Defendants engaged in unfair or deceptive acts or practices in violation of Rev. Stat. Ann. § 358-A:2, V, IX, or XI by representing, directly or indirectly, expressly or by implication:

    a. that consumers may cancel their subscription services at any time with no additional fees;

    b. a specific date on which consumers will be billed or charged;

    c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

    d. that consumers have authorized Defendants' charges.

286. As a direct result of their unlawful unfair or deceptive acts and practices, Defendants obtained income, profits, and other benefits that they would not otherwise have obtained, and which it would be inequitable and unjust for Defendants to retain.

**Relief Under the New Hampshire Consumer Protection Act (Count XXV)**

The New Hampshire Attorney General respectfully requests that this Honorable Court:

287. Pursuant to Rev. Stat. Ann. § 358-A:4, III(a), permanently enjoin Defendants

from engaging in the unfair or deceptive acts or practices identified herein.

288.    Pursuant to Rev. Stat. Ann. § 358-A:4, III(a), order restitution of money or property to any person or class of persons injured by Defendants' unfair or deceptive acts and practices identified herein.

289.    Pursuant to Rev. Stat. Ann. § 358-A:4, III(b), assess a civil penalty of up to $10,000 against Defendants for each violation of the NH CPA.

290.    Pursuant to Rev. Stat. Ann. § 358-A:6, IV, award to the New Hampshire Attorney General its legal costs and expenses, including attorneys' fees.

**Claims and Relief Sought by Attorney General of New Jersey**
**Pursuant to the New Jersey Consumer Fraud Act ("NJCFA")**

**Count XXVI**
**(Unconscionable Commercial Practices and Acts of Deception)**

291.    Plaintiff Attorney General of New Jersey incorporates paragraphs 1 through 103 as if they were fully alleged herein..

292.    The NJCFA prohibits any commercial practice that is "unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2.

293.    The NJCFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J. Stat. Ann. § 56:8-l(c).

294.    At all relevant times, Defendants have been engaged in the sale or advertisement of merchandise in New Jersey.

295. Defendants engaged in unconscionable commercial practices and/or acts of deception by, without limitation, when they represent, directly or indirectly, expressly or by implication:

    a.   that consumers may cancel their subscription services at any time with no additional fees;

    b.   a specific date on which consumers will be billed or charged;

    c.   that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

    d.   that consumers have authorized Defendants' charges.

296. Each unconscionable commercial practice and/or act of deception by Defendants constitutes a separate violation of the NJCFA, N.J. Stat. Ann. § 56:8-2.

## Count XXVII
### (False Promises, Misrepresentations)

297. Plaintiff Attorney General of New Jersey incorporates paragraphs 1 through 103 as if they were fully alleged herein.

298. Defendants' conduct in violation of the NJCFA includes, but is not limited to, the following false promises and/or misrepresentations, directly or indirectly, expressly or by implication

    a.   that consumers may cancel their subscription services at any time with no additional fees

    b.   a specific date on which consumers will be billed or charged;

    c.   that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and

    d.   that consumers have authorized Defendants' charges.

299. Each false promise and/or misrepresentation by Defendants constitutes a separate

violation under of the NJCFA, N.J. Stat. Ann. § 56:8-2.

## Count XXVIII
### (Violations of Federal Law - FTC Act and ROSCA)

300.    Plaintiff Attorney General of New Jersey incorporates paragraphs 1 through 103 as if they were fully alleged herein.

301.    The NJCFA provides that "[i]n an action brought by the Attorney General, any commercial practice that violates State or federal law is conclusively presumed to be an unlawful practice." N.J. Stat. Ann. § 56:8-4(b).

302.    As set forth in the preceding paragraphs, Defendants have violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)'s prohibition of unfair or deceptive acts or practices in or affecting commerce in connection with the advertising, marketing, promotion, offering for sale, or sale of their subscription service.

303.    As set forth in the following paragraphs, Defendants have violated Section 4 of the Restore Online Shoppers' Confidence Act, 15 U.S.C. § 8403's prohibition on charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the TSR, 16 C.F.R. § 310.2(w), unless the seller, among other things, provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, obtains the consumer's express informed consent for the charges, and provides simple mechanisms for a consumer to stop recurring charges.

304.    Each violation of the FTC Act and ROSCA by Defendants constitutes a separate unlawful practice and violation of the NJCFA, N.J. Stat. Ann. § 56:8-2, under N.J. Stat. Ann. § 56:8-4(b).

**Relief Under the New Jersey Consumer Fraud Act (Counts XXVI, XXVII and XXVIII)**

305.    Defendants should be ordered to cease and desist from engaging in their unlawful

unconscionable and deceptive commercial practices, pursuant to N.J. Stat. Ann. § 56:8-8.

306.    Defendants should be ordered to pay restitution of any money acquired by an unlawful practice, pursuant to N.J. Stat. Ann. 56:8-8.

307.    Defendants should be ordered to pay the costs of this action, including investigative costs and attorneys' fees, pursuant to N.J. Stat. Ann. § 56:8-11 and -19.

308.    Defendants should be ordered to pay civil penalties in an amount not more than $10,000 for the first offense and not more than $20,000 for the second and each subsequent offense for each of their violations, pursuant to N.J. Stat. Ann. § 56:8-19.

## Claims and Relief Sought by New York Attorney General

### Count XXIX
### Fraud (Executive Law § 63(12))

309.    The New York Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

310.    New York's Executive Law § 63(12) authorizes the New York Attorney General to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent fraud in the carrying on, conducting, or transacting of business in the state of New York.

311.    New York Executive Law § 63(12) defines fraud as "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

312.    Defendants engage in repeated and persistent fraudulent acts and practices by representing directly or indirectly, expressly or by implication:

    a.   that consumers may cancel their subscription services at any time with no additional fees;

    b.   a specific date on which consumers will be billed or charged;

c.  that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month;" and

d.  that consumers have authorized Defendants' charges.

313.  Defendants also engage in repeated and persistent fraudulent acts and practices by misleading consumers into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the cost, payment dates, or cancellation process.

314.  Defendants have therefore engaged in repeated and persistent fraudulent conduct in violation of New York Executive Law § 63(12).

**Count XXX**
**Deceptive Acts or Practices (N.Y. GBL § 349)**

315.  The New York Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

316.  New York General Business Law prohibits deceptive acts or practices. N.Y. GBL § 349.

317.  New York's General Business Law authorizes the New York Attorney General, when a person is engaged in or is about to engage in deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York, to bring an action on behalf of the People of New York to enjoin such practices and to obtain restitution. N.Y. GBL § 349(a) & (b).

318.  Defendants engage in deceptive acts or practices by representing directly or indirectly, expressly, or by implication:

a.  that consumers may cancel their subscription services at any time with no additional fees;

b.  a specific date on which consumers will be billed or charged;

c.  that consumers who enroll in their subscription services will save a specific

amount, such as "$25 every month;" and

d.  that consumers have authorized Defendants' charges.

319.   Defendants have therefore engaged in deceptive acts or practices and false advertising in violation of N.Y. GBL § 349.

## Count XXXI
## False Advertising (N.Y. GBL § 350)

320.   The New York Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

321.   New York General Business Law prohibits false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the state of New York. N.Y. GBL § 350.

322.   Defendants engage in false advertising when they represent directly or indirectly, expressly, or by implication:

a.  That consumers may cancel their subscription services at any time with no additional fees; and

b.  that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month."

323.   Defendants have therefore engaged in false advertising in violation of N.Y. GBL § 350.

## Count XXXII
## Illegality (Executive Law 63(12)) (N.Y. GBL §§ 349 and 350)

324.   The New York Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

325.   New York's Executive Law § 63(12) authorizes the New York Attorney General to seek injunctive and other equitable relief when any individual or business engages in repeated

and persistent illegality in the carrying on, conducting, or transacting of business in the state of New York.

326. New York's General Business Law prohibits deceptive acts and practices and false advertising in the conduct of any business, trade, or commerce in the state of New York. N.Y. GBL §§ 349 and 350.

327. Defendants engage in repeated and persistent illegality through deceptive acts or practices in violation of N.Y. GBL § 349 by representing directly or indirectly, expressly or by implication:

a. that consumers may cancel their subscription services at any time with no additional fees;

b. a specific date on which consumers will be billed or charged;

c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and

d. that consumers have authorized Defendants' charges.

328. Defendants have engaged repeated and persistent illegality through false advertising in violation of N.Y. GBL§ 350 when they represent directly or indirectly, expressly or by implication:

a. That consumers may cancel their subscription services at any time with no additional fees; and

b. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month."

329. Defendants have therefore engaged in repeated and persistent illegality in violation of N.Y. Exec. Law § 63(12).

**Count XXXIII**
**Illegality (Executive Law 63(12)) (Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n))**

330.    The New York Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

331.    New York's Executive Law § 63(12) authorizes the New York Attorney General to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent illegality in the carrying on, conducting, or transacting of business in the state of New York.

332.    As set forth above, Defendants engage in repeated and persistent illegality by committing unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) & (n). Defendants' practices set forth above cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers competition.

333.    Consumers were and are substantially harmed each time they were or are misled into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the cost, payment dates, or cancellation process.

334.    Consumers who purchase Defendants' subscription services cannot reasonably avoid their injuries because of Defendants' misrepresentations and omissions of material fact.

335.    The injuries that consumers have suffered and are suffering as a result of Defendants' actions are not offset by any benefit to consumers or to competition.

336.    Defendants have therefore engaged in repeated and persistent illegality in violation of N.Y. Exec. Law § 63(12).

**Relief Under N.Y. GBL 349 & 350 and N.Y. Exec. Law § 63(12) (Counts XXIX, XXX, XXXI, XXXII and XXXIII)**

337.    Defendants should be ordered to cease and desist from engaging in deceptive acts or practices, false advertising, and repeated and persistent illegality and fraud, as alleged herein,

pursuant to N.Y. GBL §§ 349 and 350 and N.Y. Exec. Law § 63(12).

338. Defendants should be ordered to provide restitution and damages in the amounts that they wrongfully received from New York consumers, pursuant to N.Y. GBL§§ 349 and 350 and N.Y. Exec. Law § 63(12).

339. Defendants should be ordered to disgorge all profits from the illegal practices alleged herein, pursuant to N.Y. GBL§§ 349 and 350 and N.Y. Exec. Law § 63(12).

340. Defendants should be ordered to pay a civil penalty of $5,000 to the State of New York, pursuant to N.Y. GBL § 350-d, for each violation of N.Y. GBL §§ 349 and 350.

**Claims and Relief Sought by North Carolina Attorney General
Pursuant to the North Carolina Unfair or Deceptive Trade Practices Act**

**Count XXXIV
(Deceptive Practices)**

341. The North Carolina Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

342. At all relevant times, Defendants have been engaged in trade or commerce in the State of North Carolina and are subject to the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1 *et seq.*

343. An act or practice is deceptive and in violation of § 75-1.1 of the North Carolina Unfair or Deceptive Trade Practices Act if it has the capacity or tendency to deceive.

344. Defendants' acts and practices, as set forth above, constitute deceptive trade practices that violate § 75-1.1 of the North Carolina Unfair or Deceptive Trade Practices Act.

345. The misrepresentations that Defendants make have the capacity, tendency, or effect of deceiving or misleading consumers, and are deceptive trade practices prohibited by § 75-1.1 of the North Carolina Unfair or Deceptive Trade Practices Act, when Defendants represent, directly or indirectly, expressly or by implication:

a. that consumers may cancel their subscription services at any time with no additional fees;

b. a specific date on which consumers will be billed or charged;

c. that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

d. that consumers have authorized Defendants' charges.

346.    Defendants have knowingly perpetrated the above alleged acts, practices, representations, and omissions upon consumers.

### Count XXXV
### (Unfair Practices)

347.    The North Carolina Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

348.    At all relevant times, Defendants have been engaged in trade or commerce in the State of North Carolina and are subject to the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1 *et seq.*

349.    Acts or practices are unfair under N.C.G.S. § 75-1.1 when they offend established public policy, as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

350.    Defendants' acts and practices, as set forth above, constitute unfair trade practices that violate § 75-1.1 of the North Carolina Unfair or Deceptive Trade Practices Act.

351.    Defendants have knowingly perpetrated the above alleged acts, practices, representations, and omissions upon consumers.

### Relief Under the North Carolina Unfair or Deceptive Trade Practices Act
### (Counts XXXIV and XXXV)

352.    Pursuant to § 75-14 of the North Carolina Unfair or Deceptive Trade Practices

Act, Defendants should be ordered to cease and desist from engaging in their unfair or deceptive trade practices.

353.    Pursuant to § 75-15.1 of the North Carolina Unfair or Deceptive Trade Practices Act, Defendants should be ordered to cancel all contracts Defendant's wrongfully obtained from North Carolina consumers, at the consumers' discretion, restore all moneys that Defendants wrongfully collected from North Carolina consumers because of Defendants' violations of the North Carolina Unfair or Deceptive Trade Practices Act, and disgorge all amounts Defendants or their agents, employees, representatives, subcontractors, successors and assigns have received, or in the future receive, in connection with Defendants' violations of the North Carolina Unfair or Deceptive Trade Practices Act.

354.    Pursuant to § 75-15.2 of the North Carolina Unfair or Deceptive Trade Practices Act, Defendants should be ordered to pay civil penalties in an amount of up to $5,000 for each knowing violation of a statute, including but not limited to N.C.G.S. § 75-1.1, where Defendants violated N.C.G.S. § 75-1.1.

355.    Pursuant to § 75-16.1 of the North Carolina Unfair or Deceptive Trade Practices Act, Defendants should be ordered to pay Plaintiff State of North Carolina its costs, including reasonable attorneys' fees, incurred by the investigation and litigation of this action.

**Claims and Relief Sought by Ohio Attorney General
Pursuant to the Ohio Consumer Sales Practices Act**

**<u>Count XXXVI</u>
Misrepresentations**

356.    The Ohio Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

357.     Defendants are "suppliers," as they engaged in the business of effecting "consumer transactions" by soliciting "consumers" either directly or indirectly for services,

including the sale of its Uber One subscription service, for a purpose that was primarily for personal, family, or household use, as those terms are defined by Ohio R.C. 1345.01(A), (C), and (D).

358.    Defendants' practices, as set forth below, constitute unfair or deceptive trade practices violation of the Ohio Consumer Sales Practices Act, Ohio R.C. 1345.02(A) and Ohio R.C. 1345.02(B)(1), by representing that the subject of its consumer transactions has performance characteristics, accessories, uses or benefits that it does not have.

359.    The misrepresentations that Defendants make have the capacity, tendency, or effect of deceiving or misleading consumers, and are unfair and deceptive trade practices prohibited by of the Ohio Consumer Sales Practices Act, Ohio R.C. 1345.02(A) and Ohio R.C. 1345.02(B)(1, when they represent, directly or indirectly, expressly or by implication:

a.   that consumers may cancel their subscription services at any time with no additional fees;

b.   a specific date on which consumers will be billed or charged;

c.   that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

d.   that consumers have authorized Defendants' charges.

360.    Each unfair or deceptive act or practice engaged in by Defendants as recited above constitutes a separate violation of the Ohio Consumer Sales Practices Act.

**Relief Under the Ohio Consumer Sales Practices Act (Count XXXVI)**

361.    Issue a declaratory judgment that each act or practice complained of herein violates the Ohio Consumer Sales Practices Act, R.C. 1345.01 *et seq.*, in the manner set forth in the Complaint.

362.    Issue a permanent injunction enjoining the Defendants, their agents, employees,

successors or assigns, and all persons acting in concert and participation with them, directly or indirectly, through any corporate device, partnership, or other association, under these or any other names, from engaging in the acts and practices of which Plaintiff complains and from further violating the Ohio Consumer Sales Practices Act, R.C. 1345.01 *et seq*.

363.    Assess, fine and impose upon Defendants a civil penalty of up to $25,000.00 for each separate and appropriate violation of the Ohio Consumer Sales Practices Act described herein pursuant to R.C. 1345.07(D).

364.    Grant the Attorney General Of The State Of Ohio its costs incurred in bringing this action, including but not limited to, the cost of collecting on any judgment awarded.

365.    Order Defendants to pay all court costs associated with this matter.

366.    Grant such other relief as the court deems to be just, equitable, and appropriate.

**Claims and Relief Sought by Oklahoma Attorney General**
**Pursuant to the Oklahoma Consumer Protection Act**

**Count XXXVII**
**(False or Misleading Representations)**

367.    The Oklahoma Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

368.    Defendants, as set forth above, in the course of Defendants' business, knowingly or with reason to know, made false or misleading representations as to the characteristics, uses, and benefits of the subscription services that Defendants advertised, offered for sale, and sold, in violation of Okla. Stat. tit. 15, § 753(5).

369.    The subscription services that Defendants advertise, offer for sale, and sell, as set forth above, are consumer transactions pursuant to Okla. Stat. tit. 15, § 752(2) because the services are advertised, offered for sale, and sold for purposes that are personal, household, or business oriented.

370.    Defendants are persons within the meaning of the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 752(1) because they are corporations, incorporated associations, or other legal entities.

371.    The false representations that Defendants made regarding the characteristics, uses, and benefits of Defendants' subscription services include representations, directly or indirectly, expressly or by implication:

   a.  that consumers may cancel their subscription services at any time with no additional fees;

   b.  a specific date on which consumers will be billed or charged;

   c.  that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

   d.  that consumers have authorized Defendants' charges.

## Count XXXVIII
### (Unfair Trade Practices)

372.    The Oklahoma Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

373.    Defendants' practices, as set forth above, constitute unfair trade practices made in the course of Defendants' business that violate the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 753(21).

374.    Defendants' practices, as set forth above, constitute unfair trade practices because such practices are substantially injurious to consumers, Okla. Stat. tit. 15, § 752(14).

375.    Defendants' practices set forth above substantially harmed each time they were or are misled into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the cost, payment dates, or cancellation process.

Second Amended Complaint
Case No. 4:25-cv-03477-JST

**Count XXXIX**
**(Deceptive Trade Practices)**

376.   The Oklahoma Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

377.   Defendants' practices, as set forth above, constitute deceptive trade practices made in the course of Defendants' business that violate the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15, § 753(21).

378.   Defendants' practices, as set forth above, constitute deceptive trade practices because Defendants' practices misrepresented, omitted, deceived, or could reasonably be expected to deceive or mislead a person to their detriment into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the cost, payment dates, or cancellation process.

**Relief Under the Oklahoma Consumer Protection Act (Counts XXXVII, XXXVIII and XXXIX)**

379.   Defendants' practices, as set forth above, should be declared acts or practices that violate the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 756.1(A)(1).

380.   Defendants should be enjoined and restrained from violating the Oklahoma Consumer Protection Act pursuant to Okla. Stat. tit. 15, § 756.1(A)(2).

381.   Defendants should be ordered to pay restitution and other equitable relief in the amounts that they have wrongfully received by means of their unlawful practices described above to Oklahoma consumers pursuant to Okla. Stat. tit. 15, § 756.1(A), (C).

382.   Defendants should further be ordered, as ancillary equitable relief in support of injunctive relief, to disgorge all revenues, profits, and other benefits obtained from Oklahoma consumers as a result of the unlawful practices described herein, in order to prevent unjust enrichment and to effectuate the purposes of the Oklahoma Consumer Protection Act pursuant to

Second Amended Complaint
Case No. 4:25-cv-03477-JST

Okla. Stat. tit. 15, § 756.1(A)(2) and the Court's inherent equitable powers.

383.    Defendants should be ordered to pay civil penalties in the amount of Ten Thousand Dollars ($10,000) per violation of the Oklahoma Consumer Protection Act, in addition to other penalties that may be imposed by the Court, pursuant to Okla. Stat. tit. 15, § 761.1.

384.    Defendants should be ordered to pay the reasonable expenses, attorney's fees, and investigative fees incurred pursuant to Okla. Stat. tit. 15, §§ 756.1(A)(4), 761.1(D).

**Claims and Relief Sought by Pennsylvania Attorney General**
**Pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Act**

**Count XL**
**(Deceptive Practices)**

385.    The Pennsylvania Office of Attorney General ("PA-OAG') incorporates paragraphs 1 through 103 as if they were fully alleged herein.

386.    Defendants' practices, as set forth above, constitute deceptive trade practices in the offer or sale of consumer goods and services that violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* ("PA CPL").

387.    The PA-OAG brings its claims pursuant to the PA CPL to restrain unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful by section 201-3 of the PA CPL. 73 P.S. § 201-3.

388.    The PA CPL defines "trade" and "commerce" to mean, "The advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth." 73 P.S. § 201-2(3).

389.    Defendants engage in trade and commerce within the Commonwealth of Pennsylvania, as defined by section 201-2(3) of the PA CPL, by advertising, selling, and/or

Second Amended Complaint
Case No. 4:25-cv-03477-JST

offering for sale their subscription service to Pennsylvania consumers. *Id*.

390.   Defendants, in connection with marketing, promoting, selling, and supplying their services engage in misleading and deceptive trade practices in violation of the PA CPL, as defined in section 201-2(4) by misrepresenting that:

    a.   consumers may cancel their subscriptions services at any time with no additional fees;

    b.   a specific date on which consumers will be billed or charged;

    c.   consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

    d.   consumers have authorized Defendants' charges.

391.   Defendants' misrepresentations have the capacity, tendency, or effect of deceiving or misleading consumers, and are deceptive trade practices prohibited by section 201-3 of the PA CPL, as defined by section 201-2(4).

392.   The aforesaid methods, acts or practices constitute deceptive acts or practices in the conduct of trade or commerce by:

    a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have … in violation of section 201-2(4)(v) of the PA CPL, 73 P.S. § 201-2(4)(v);

    b.    Advertising goods or services with intent not to sell them as advertised in violation of section 201-2(4)(ix) of the PA CPL, 73 P.S. § 201-2(4)(ix); and

    c.   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of section 201-2(4)(xxi) of the PA CPL, 73 P.S. § 201-2(4)(xxi).

393.   The Commonwealth alleges that, at all times relevant hereto, all of the methods,

acts and practices described above are performed willfully by Defendant.

394.    The Commonwealth believes and therefore avers that citizens of the Commonwealth are suffering economic harm and will continue to suffer economic harm unless the acts and practices complained of herein are permanently enjoined.

## Count XLI
### (Unfair Practices)

395.    The PA-OAG incorporates paragraphs 1 through 103 as if they were fully alleged herein.

396.    Defendants' practices set forth above have and are likely to cause substantial injury to consumers.  Consumers were and are substantially harmed each time they were or are misled into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the cost, payment dates, or cancellation process.

397.    Consumers who purchase Defendants' subscription services cannot reasonably avoid their injuries because of Defendants' misrepresentations and omissions of material fact.

398.    The aforesaid methods, acts or practices constitute unfair methods of competition and unfair acts or practices in the conduct of trade or commerce as prohibited by section 201-3 of the PA CPL, as defined by section 201-2(4)(xxi) of the PA CPL, by engaging in fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding. 73 P.S. § 201-2(4)(xxi).

399.    The Commonwealth alleges that, at all times relevant hereto, all of the methods, acts and practices described above are performed willfully by Defendant.

400.    The Commonwealth believes and therefore avers that citizens of the Commonwealth are suffering economic harm and will continue to suffer economic harm unless the acts and practices complained of herein are permanently enjoined.

**Relief Under the Pennsylvania Unfair Trade Practices and Consumer Protection Act**
**(Counts XL and XLI)**

401.    Defendants should be ordered to cease and desist from unfair methods of competition or unfair or deceptive acts or practices pursuant to section 201-4 of the PA CPL.

402.    Defendants should be ordered to pay consumer restitution to all consumers who have suffered losses as a result of the unfair or deceptive acts and practices pursuant to section 201-4.1 of the PA CPL.

403.    Defendants should be ordered to pay the costs of this action, including attorneys' fees, pursuant to 72 P.S. §1602-U.

404.    Defendants should be ordered to pay civil penalties in the amount of $1,000.00 for each instance of a willful past or present violation of the PA CPL, and $3,000.00 for each instance of a willful past or present violation of the PA CPL involving consumers age 60 years of age or older. 73 P.S. § 201-8(b).

**Claims and Relief Sought by the West Virginia Attorney General**
**Pursuant to the West Virginia Consumer Credit and Protection Act**

**Count XLII**
**(Deceptive Practices)**

405.    The West Virginia Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

406.    Defendants' practices, as set forth above, constitute deceptive acts or practices in the offer or sale of consumer goods and services that violate the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101 through 104 and W. Va. Code §§ 46A-7-101 through 114.

407.    Defendants' practices violate the WVCCPA whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice. See W. Va. Code § 46A-6-102(7)(M).

Second Amended Complaint
Case No. 4:25-cv-03477-JST

408.    The subscription services that Defendants offered and sold to consumers are consumer goods and services pursuant to W. Va. Code § 46A-6-102(2) because they are used for personal, family, or household purposes.

409.    Defendants acted as merchants as defined by W. Va. Code § 46-2-104(1) of the Uniform Commercial Code and as that term is used generally throughout the WVCCPA.

410.    The misrepresentations that Defendants make have the capacity, tendency, or effect of deceiving or misleading consumers, and are deceptive practices prohibited by W. Va. Code § 46A-6-104 as defined in W. Va. Code § 46A-6-102(7)(L)(M), when they represent, directly or indirectly, expressly or by implication:

    a.  that consumers may cancel their subscription services at any time with no additional fees;

    b.  a specific date on which consumers will be billed or charged;

    c.  that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

    d.  that consumers have authorized Defendants' charges.

### Count XLIII
### (Unfair Practices)

411.    The West Virginia Attorney General incorporates paragraphs 1 through 103 as if they were fully alleged herein.

412.    Defendants' practices set forth above have and are likely to continue to cause substantial injury to consumers.  Consumers were and are substantially harmed each time they were or are misled into purchasing services they do not realize they are purchasing, do not want, and for which they do not understand the cost, payment dates, or cancellation process.

413.    Consumers who purchase Defendants' subscription services cannot reasonably avoid their injuries because of Defendants' misrepresentations and omissions of material fact.

414. The injuries that consumers have suffered and are suffering as a result of Defendants' actions are unfair acts or practices under W. Va. Code § 46A-6-102(7)(L)(M) that violate W. Va. Code § 46A-6-104.

### Relief Under the West Virginia Consumer Credit and Protection Act (Counts XLII and XLIII)

415. Defendants should be ordered to cease and desist from engaging in their unfair and deceptive acts or practices pursuant to W. Va. Code § 46A-7-108.

416. Defendants should be ordered to pay restitution in the amounts that they wrongfully received from West Virginia consumers pursuant to W. Va. Code § 46A-7-108.

417. Defendants should be ordered to pay the costs of this action, including attorneys' fees, pursuant to W. Va. Code § 46A-7-108.

418. Defendants should be ordered to pay civil penalties in an amount up to $5,000 for each of their violations pursuant to W. Va. Code § 46A-7-111(2).

### Claims and Relief Sought by State of Wisconsin Pursuant to the Wisconsin Deceptive Trade Practices Act

### Count XLIV
### (Deceptive Trade Practices)

419. The State of Wisoncsin incorporates paragraphs 1 through 103 paragraphs 1 through 103 as if they were fully alleged herein.

420. Defendants' practices, as set forth above, constitute deceptive acts or practices that violate the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18(1).

421. In numerous instances, with the intent to sell, distribute, or increase the consumption of its products and/or services, Defendants directly or indirectly make, publish, or place before the public in Wisconsin, representations that are untrue, deceptive, or misleading, including but not limited to the following representations by Defendants:

    a. that consumers may cancel their subscription services at any time with no

additional fees;

    b.   a specific date on which consumers will be billed or charged;

    c.   that consumers who enroll in their subscription services will save a specific amount, such as "$25 every month"; and/or

    d.   that consumers have authorized Defendants' charges.

422.    Each misrepresentation alleged herein constitutes a separate violation of the Wisconsin Deceptive Trade Practices Act. By engaging in acts and practices alleged herein, Defendants engaged in deceptive acts or practices declared unlawful under Wis. Stat. § 100.18(1).

## Relief Under the Wisconsin Deceptive Trade Practices Act (Count XLVI)

423.    Defendants should be ordered to cease and desist from engaging in deceptive acts and practices pursuant to Wis. Stat. § 100.18(11)(d).

424.    Defendants should be ordered to restore pecuniary losses suffered by any Wisconsin consumer because of Defendants' acts or practices in violation of the Deceptive Trade Practices Act pursuant to Wis. Stat. § 100.18(11)(d).

425.    Defendants should be ordered to pay the costs of this action, including attorneys' fees, pursuant to Wis. Stat. § 100.263.

426.    Defendants should be ordered to pay civil forfeitures in the amount of not less than $50 nor more than $200 for each violation of Wis. Stat. § 100.18(1) pursuant to Wis. Stat. § 100.26(4).

427.    Defendants should be ordered to pay supplemental forfeitures, not to exceed $10,000, pursuant to Wis. Stat. § 100.264 for each violation of the Deceptive Trade Practices Act that was perpetrated against a person at least 62 years of age.

428.    Defendants should be ordered to provide any such other and further relief as

justice and equity may require.

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

429.   In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010.  In passing ROSCA, Congress declared that "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  Section 2 of ROSCA, 15 U.S.C. § 8401.

430.   Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller, among other things, provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, obtains the consumer's express informed consent for the charges, and provides simple mechanisms for a consumer to stop recurring charges.  *See* 15 U.S.C. § 8403.

431.   The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

432.   As described in Paragraphs 16 to 42 above, Defendants have advertised and sold subscription services through a negative option feature as defined by the TSR.  16 C.F.R. § 310.2(w).

433.   Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

434.   Pursuant to Section 6 of ROSCA, 15 U.S.C. § 8405, the attorney general of a State, or other authorized State officer, may bring an action alleging a violation of this Act that affects or may affect such State or its residents, to obtain appropriate injunctive relief.

## Count XLV

### Failure to Provide Required Disclosures
### (By All Plaintiffs)

435.   In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 19 to 89 above, Defendants have failed to clearly and conspicuously disclose before obtaining consumers' billing information all material transaction terms, including the following terms:

    a.   That they are being enrolled in a recurring paid subscription;

    b.   The true benefits and savings of an Uber subscription;

    c.   When they will be billed or charged; and

    d.   The method of cancellation.

436.   Defendants' acts or practices, as described in Paragraph 112 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

## Count XLVI

### Failure to Obtain Express Informed Consent Before Charges
### (By All Plaintiffs)

437.   In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 19 to 89 above, Defendants have failed to obtain a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction.

438.   Defendants' acts or practices, as described in Paragraph 114 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

## Count XLVII

### Failure to Provide Simple Mechanisms for Stopping Recurring Charges
### (By All Plaintiffs)

439.   In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as

described in Paragraphs 19 to 89 above, Defendants have failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

440.   Defendants' acts or practices, as described in Paragraph 116 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

## CONSUMER INJURY

441.   Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and ROSCA.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

442.   Sections 5(m)(1)(A), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404 authorize this Court to enter a permanent injunction and award monetary relief, civil penalties, and other relief.

443.   Defendants violated ROSCA with actual knowledge or knowledge fairly implied by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## PRAYER FOR RELIEF

Wherefore, the FTC and Plaintiff States request that the Court:

A.   Enter a permanent injunction to prevent future violations of the FTC Act, the above-enumerated state consumer protection laws, and ROSCA;

B.   Award monetary and other relief within the Court's power to grant;

C.   Award any additional relief as the Court determines to be just and proper;

D.   Impose civil penalties for each violation of ROSCA; and

E.   Award Plaintiff States civil penalties, damages, restitution and/or forfeitures for each violation of their respective state laws, as well as attorneys' fees, costs, and expenses as provided under state law.

Dated: May 1, 2026

Respectfully submitted,

FEDERAL TRADE COMMISSION

*/s/ Paul Mezan*

Paul Mezan (NY Bar No. 5357124)
Stephanie Liebner (VA Bar No. 90647)
James Doty (NY Bar No. 4552550)
Sarah Abutaleb (DC Bar No. 1779979)
Allison Wojcicki (DC Bar No. 1736349)
Patrick Roy (DC Bar 1023521)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Stop CC-10232
Washington, DC 20580
Phone: (202) 758-4177 (Mezan)
Email: pmezan@ftc.gov (Mezan)
Fax: (202) 326-3395

*Attorneys for Plaintiff*
*Federal Trade Commission*

OFFICE OF THE ATTORNEY GENERAL
OF MARYLAND, CONSUMER
PROTECTION DIVISION

*/s/ Philip Ziperman*

Philip Ziperman (MD Bar No.: 9012190379)*
Deputy Chief
Consumer Protection Division
Office of the Attorney General of Maryland
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
pziperman@oag.maryland.gov
(410) 576-6417

Luke Riley (MD Bar No.: 2502271005)*
Assistant Attorney General
Consumer Protection Division
Office of the Attorney General of Maryland
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
lriley@oag.maryland.gov
(410) 576-6568

*Attorneys for Plaintiff*
*Office of the Maryland Attorney General,*
*Consumer Protection Division*

Second Amended Complaint
Case No. 4:25-cv-03477-JST

STEVE MARSHALL
*ATTORNEY GENERAL*

By:

/s/ Michael G. Dean

Michael G. Dean*
*Assistant Attorney General*

/s/ Lindsay D. Barton

Lindsay D. Barton*
*Assistant Attorney General*

Office of the Attorney General
Consumer Interest Division
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7300
Michael.Dean@AlabamaAG.gov
Lindsay.Barton@AlabamaAG.gov

*Attorneys for Plaintiff*
*Attorney General of Alabama*

**KRISTIN K. MAYES**
**Attorney General of Arizona**

/s/ Alyse Meislik

Alyse Meislik, AZ Bar No. 024052*
Assistant Attorney General
Office of the Arizona Attorney General
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3702
Fax: (602) 542-4377
Email:  consumer@azag.gov
Alyse.Meislik@azag.gov

*Attorney for Plaintiff*
*Arizona Attorney General*

URSULA JONES DICKSON
District Attorney of Alameda County

/s/ Andres H. Perez
ANDRES H. PEREZ (SBN 186219)
Assistant District Attorney
HUY T. LUONG (SBN 251507)
Deputy District Attorney
Consumer, Environmental & Worker
Protection Division
7677 Oakport Street, Suite 650
Oakland, CA 94621
Telephone (510) 383-8600
Email: andres.perez@acgov.org
        huy.luong@acgov.org

*Attorneys for Plaintiff*
*People of the State of California*

STATE OF CONNECTICUT

WILLIAM TONG

ATTORNEY GENERAL OF THE STATE
OF CONNECTICUT

/s/ Brendan T. Flynn
Brendan T. Flynn*
Fed. Bar No. ct04545
Assistant Attorney General
Office of the Attorney General of the
State of Connecticut
165 Capitol Ave.
Hartford, CT  06106
Tel: 860-808-5400
Fax: 860-808-5593
Brendan.Flynn@ct.gov

*Attorney for Plaintiff*
*Attorney General of the State of Connecticut*

BRIAN L. SCHWALB
Attorney General for the District of Columbia

*/s/ Coty Montag*

COTY MONTAG [CA BAR #255703]
Deputy Attorney General, Public Advocacy
Division
Coty.Montag@dc.gov

BETH MELLEN
WILLIAM STEPHENS
Assistant Deputy Attorneys General, Public
Advocacy Division

KEVIN VERMILLION
Director, Office of Consumer Protection

EMILY HOLNESS
Deputy Director, Office of Consumer
Protection

BRITTANY NYOVANIE
Assistant Attorney General, Office of
Consumer Protection

Office of the Attorney General
for the District of Columbia
400 6th Street NW, 10th Floor
Washington, DC 20001
Tel: (202) 702-5686
Email: Brittany.Nyovanie@dc.gov

*Attorneys for Plaintiff*
*District of Columbia*

Second Amended Complaint
Case No. 4:25-cv-03477-JST

PEOPLE OF THE STATE OF ILLINOIS

/s/ Hal B. Dworkin
HAL B. DWORKIN, IL Bar No. 6318213*
Senior Assistant Attorney General
Office of the Illinois Attorney General
Consumer Protection Division
Consumer Fraud Bureau
115 South LaSalle Street
Chicago, IL 60603
(312) 814-5159
Hal.Dworkin@ilag.gov

*Attorney for Plaintiff*
*The People of the State of Illinois*


FOR PLAINTIFF THE PEOPLE OF THE
STATE OF MICHIGAN:

/s/ Aaron W. Levin
AARON W. LEVIN*
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
525 W. Ottawa Street
P.O. Box 30736
Lansing, MI 48909
Tel: (517) 335-7632
Fax: (517) 335-6755
levina@michigan.gov

*Attorney for Plaintiff*
*The People of the State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

/s/ Daniel Rife

DANIEL RIFE*
SARAH DOKTORI*
Assistant Attorneys General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2130
daniel.rife@ag.state.mn.us
Telephone: (651) 757-1104
Sarah.doktori@ag.state.mn.us
Telephone: (651) 583-6694

*Attorneys for Plaintiff*
*State of Minnesota by its Attorney General*
*Keith Ellison*

Catherine Hanaway
Missouri Attorney General

/s/ Alison Esbeck

Alison Esbeck (MO Bar # 58501)*
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street, Ste 200
St. Louis, MO 63101
(314) 340-4977
Alison.Esbeck@ago.mo.gov

Connor McNeall (MO Bar # 76836)*
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street, Ste 200
St. Louis, MO 63101
(314) 340-7888
connor.mcneall@ago.mo.gov

*Attorneys for Plaintiff*
*Missouri Attorney General's Office*

STATE OF MONTANA

*/s/ Brent Mead*

Brent Mead (MT #68035000)*
Deputy Solicitor General
Office of Consumer Protection
Montana Department of Justice
P.O. Box 200151
Helena, MT 59620-0151
(406) 444-4500
Brent.mead2@mt.gov

*Attorney for Plaintiff*
*State of Montana*

STATE OF NEBRASKA

*/s/ Benjamin J. Swanson*

Benjamin J. Swanson (NE #27675)*
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68508
(402) 471-7759
benjamin.swanson@nebraska.gov

*Attorney for Plaintiff*
*State of Nebraska*

Second Amended Complaint
Case No. 4:25-cv-03477-JST

FOR PLAINTIFF STATE OF NEW
HAMPSHIRE:

JOHN M. FORMELLA
Attorney General

*/s/ Amanda N. Purcell*

Amanda N. Purcell, NH Bar #278532*
Assistant Attorney General
Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
One Granite Place South
Concord, NH 03301
Telephone: (603) 271-1215
Email: Amanda.N.Purcell@doj.nh.gov

*Attorney for Plaintiff*
*State of New Hampshire*

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Zeyad A. Assaf*

Zeyad A. Assaf *
Deputy Attorney General
New Jersey Office of the Attorney General
Division of Law
124 Halsey St., 5th Fl.
Newark, NJ 07102
Phone: (609) 696-5363
Email: Zeyad.Assaf@law.njoag.gov

*Attorney for Plaintiff*
*Attorney General of the State of New Jersey*

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of the State of New York

By:  /s/ Patrick Gibson

Patrick Gibson (NY Bar No. 5267489)*
Assistant Attorney General
Bureau of Consumer Frauds and Protection
28 Liberty Street
New York, NY 10005
Tel: (212) 416-6067
Email: patrick.gibson@ag.ny.gov

*Attorney for Plaintiff*
*The State of New York*


FOR PLAINTIFF THE STATE OF NORTH CAROLINA:

JEFF JACKSON
North Carolina Attorney General

/s/ Jesse Ramos

JESSE RAMOS (NC Bar No. 51663)*
Special Deputy Attorney General

KUNAL CHOKSI (NC Bar No. 55666)
Senior Deputy Attorney General

BRIAN RABINOVITZ (NC Bar No. 41538)*
Special Deputy Attorney General

Consumer Protection Division
North Carolina Department of Justice
Post Office Box 629
Raleigh, NC 27602
Tel: (919) 716-6000
Fax: (919) 716-6050
Email: jramos@ncdoj.gov

*Attorneys for Plaintiff*
*The State of North Carolina*

DAVE YOST
OHIO ATTORNEY GENERAL

/s/ Kevin R. Walsh

Kevin R. Walsh (0073999)*
Senior Assistant Attorney General
Consumer Protection Section
615 W. Superior Avenue, 11th Floor
Cleveland, Ohio 44113
Telephone: (216) 787-3447
Facsimile: (866) 947-3223
Email: Kevin.Walsh@ohioago.gov

Attorneys for Plaintiff
Ohio Attorney General

GENTNER DRUMMOND,
ATTORNEY GENERAL OF OKLAHOMA

/s/ Christopher J. Campbell

Cameron R. Capps, OBA No. 32742*
Christopher. J. Campbell, OBA No. 33649*
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 522-1260
Fax: (405) 521-3921
Cameron.Capps@oag.ok.gov
Chris.Campbell@oag.ok.gov

Attorneys for Plaintiff
Attorney General of Oklahoma

Second Amended Complaint
Case No. 4:25-cv-03477-JST

DAVID W. SUNDAY, Jr.
PENNSYLVANIA ATTORNEY GENERAL

By:

/s/ Merna T. Hoffman

MERNA T. HOFFMAN*
Senior Deputy Attorney General
PA Attorney I.D. No. 312897
15th Floor, Strawberry Square
Harrisburg, PA 17120
Email: mhoffman@attorneygeneral.gov

Attorney for Plaintiff
Attorney General of Pennsylvania


JASON S. MIYARES,
ATTORNEY GENERAL OF THE
COMMONWEALTH OF VIRGINIA

/s/ Mark S. Kubiak

Mark S. Kubiak (VSB No. 73119)*
Senior Assistant Attorney General
Timothy S. Allison (VSB No. 98083)*
Assistant Attorney General
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-7364 (Kubiak)
            (804) 786-0594 (Allison)
E-mail: mkubiak@oag.state.va.us
            tallison@oag.state.va.us

Attorneys for Plaintiff
Jason S. Miyares, Attorney General of the
Commonwealth of Virginia

**JOHN B. MCCUSKEY,
ATTORNEY GENERAL OF WEST
VIRGINIA**

*/s/ Tanya L. Godfrey*

Ann L. Haight (WVSB# 1527)*
Deputy Attorney General, Consumer Director
Tanya L. Godfrey (WVSB# 7448)*
Assistant Attorney General
Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, WV 25326
Telephone: (304) 558-8986
Ann.L.Haight@wvago.gov
Tanya.L.Godfrey@wvago.gov

*Attorneys for Plaintiff*
*Attorney General of West Virginia*

JOSHUA L. KAUL
Attorney General of Wisconsin

*/s/ Laura E. McFarlane*

LAURA E. MCFARLANE*
Assistant Attorney General
State Bar #1089358
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-8911
(608) 294-2907 (Fax)
laura.mcfarlane@wisdoj.gov

*Attorney for Plaintiff*
*State of Wisconsin*

Second Amended Complaint
Case No. 4:25-cv-03477-JST

Co-counsel for attorneys appearing *pro hac vice*:

Kerry O'Brien (CABN 149264)
Federal Trade Commission
Western Region San Francisco
90 Seventh St., Suite 14-300
San Francisco, CA 94103
Phone: (415) 848-5100
Email: kobrien@ftc.gov

**ECF ATTESTATION**

I, Paul Mezan, hereby attest that concurrence in the filing of this document has been obtained from the other signatories, and that this document was served by electronic filing or email on December 15, 2025, on all counsel of record.

*/s/ Paul Mezan*

Paul Mezan (NY Bar No. 5357124)
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Phone: (202) 758-4177
Email: pmezan@ftc.gov
Fax: (202) 326-3395