

Division of Financial Practices
Bureau of Consumer Protection

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

May 15, 2026

**By ECF**

Honorable Thomas S. Hixson
United States District Court, Northern District of California
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

  Re: *FTC et al. v. Uber Technologies, Inc. et al.*, Case No. 4:25-cv-03477-JST

  Dear Judge Hixson:

  Plaintiff Federal Trade Commission ("FTC") and Defendants Uber Technologies, Inc. and Uber USA, LLC ("Uber" or "Defendants") submit this joint status report pursuant to the Court's April 23, 2026 (ECF No. 190) Order.

  The parties hereby attest that they have met and conferred in good faith prior to filing this status report.

            Respectfully submitted,

            */s/ Allison B. Wojcicki*

            Allison B. Wojcicki
            Federal Trade Commission

            *Attorney for Plaintiff FTC*

            */s/ Ben Mundel*

            Ben Mundel
            Sidley Austin LLP

            *Attorney for Uber Technologies, Inc. and Uber USA, LLC*

## I. FTC's Statement

The FTC respectfully seeks the Court's assistance in resolving the disputes outlined below, regarding productions related to (A) consumer correspondence (RFP 19); (B) testing data and analysis (RFPs 31 and 32), United States enrollment and cancellation flows (RFPs 8 and 10), and consumer notification procedures (RFP 9); (C) data identifying enrollment processes (RFP 35(b)(i) and (vi)); and (D) Defendants' production of custodial documents. Because the Parties are continuing to meet and confer about outstanding and new discovery issues, the FTC requests the Court order the Parties to submit another joint status report by June 5.

### A. Defendants Should be Compelled to Produce All Customer Correspondence Relating to Uber One (RFP 19)

The FTC requests that the Court order Defendants to produce all customer correspondence associated with the Uber One issue codes that Defendants identified as relevant to the issues in this case.[1] These customer communications, which include complaints, are relevant because the alleged wrongdoing encompasses nearly every aspect of the Uber One customer experience: from enrollment, through utilization of advertised services, benefits, and savings, to cancellation. Production of all customer communications pertaining to Uber One is relevant and proportional because they are highly probative of whether customers were actually deceived and/or harmed, and whether Uber was aware that its practices were causing confusion or frustration.

Communications that Uber customers submit about Uber One are perhaps the most direct way of understanding whether customers were actually deceived, and evidence of actual deception is "highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006); *see also FTC v. Willms*, 2011 WL 4103542, at *5 (W.D. Wa. Sept. 13, 2011) ("Consumer complaints are highly probative of whether a practice is deceptive."). Indeed, customer communications go directly to Uber's defense that customers were not confused or deceived, and as such, Rule 26 warrants their production. Fed. R. Civ. P. 26(b)(1) (A party may generally obtain discovery regarding any nonprivileged matter that is relevant to any claim *or defense*) (emphasis added). Further, consumer communications are probative of Uber's knowledge, which is relevant to whether civil penalties should be imposed. *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1028 (9th Cir. 2017) (finding knowledge can be inferred from customer complaints in some circumstances); *ShopKo Stores Operating Co., LLC v. Balboa Capital Corp.*, 2016 WL 9308530, at *3 (C.D. Cal. Oct. 19, 2016) ("Persisting in an allegedly deceptive business practice after receiving customer complaints could be evidence of intent to

---

[1] The communications have already been significantly narrowed to the specific issue codes Uber has identified as relevant to the case. Uber did not provide the FTC with a full list of issue codes from which the FTC could identify additional issue codes that may be relevant, nor did Uber provide any further explanation of the issue codes when ordered to do so by the court (Uber said they were unable to locate any responsive documents). Thus, the issue codes for which the FTC requests customer communications already represent a limited selection of customer communications that has been unilaterally narrowed by Uber.

defraud."). Understanding the nature of consumers' interactions with Uber about Uber One bears directly on the issues of consumer deception and Uber's knowledge.

Production of all customer communications associated with these issue codes is proportional to the needs of the case, particularly given the fact that the communications are exclusively in Uber's possession and Defendants have identified no specific reason why producing these communications will be difficult apart from noting the sheer volume, but "[t]he fact that… responsive documents might be voluminous does not suffice to sustain a claim of undue burden." *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033 (E.D. Cal. 2010). And as this Court has found, there is little risk to production of customer communications because the FTC is well-equipped to handle sensitive consumer data, and the parties' protective order provides appropriate safeguards. Dkt. No. 177 (citing Dkt. Nos. 34, 144).

Defendants argue that they should not be required to produce all 4 million communications associated with the relevant Uber One issue codes (which they identified), and instead seek to further delay discovery and limit their production of responsive documents by undertaking lengthy and unnecessary privilege and relevance reviews. First, there is no need for a privilege review – definitionally, these communications are between Uber and third parties, and Uber has not identified any privileges that may apply. Second, every Uber One communication is relevant, because each communication was reviewed and categorized into an Uber One issue code, and every aspect of a customers' Uber One experience, including enrollment, use of benefits and services, and cancellation, is at issue in this case. Additionally, the manner in which Uber applied issue codes to consumer communications is itself relevant; for example, miscategorized complaints may demonstrate an effort to conceal the existence of damaging information, which is relevant to Defendants' knowledge.

The FTC is also concerned about Uber's proposed production date of June 12 for these materials, especially given the fact that these requests have been outstanding since July 2025 (even though they do not require search terms) and the close of fact discovery is imminent. The FTC believes that May 29 is a reasonable deadline for production of these documents, especially because there is no reason for Uber to review the communications for relevance or privilege.

B. <u>Defendants Should Be Required to Produce Materials Relating to Testing (RFPs 31 and 32), United States Enrollment and Cancellation Flows (RFPs 8 and 10), and Consumer Notification Procedures (RFP 9) by May 29</u>

Uber has represented to the FTC that it will not complete its direct document pull of materials responsive to RFPs 31 and 32 (relating to testing and analysis of Uber One) until June 30, and will not finish its production for RFPs 8 and 10 (United States enrollment and cancellation flows) and consumer notification procedures (RFP 9) until June 12. The close of discovery is fast-approaching and given that these requests have been outstanding since July 2025, the FTC respectfully requests that the Court order Uber to produce all materials obtained through direct pulls responsive to RFPs 8-10, 31, and 32 by May 29.

Uber's claims that they are too busy with other discovery requests to produce materials in a timely manner are unpersuasive. If they had meaningfully engaged with discovery from the

beginning, then they would not be in a position where requests are coming due at the same time before the close of discovery. Moreover, as argued above and in the May 5 joint status report (Dkt. No. 200), it is unnecessary for Defendants to conduct a responsiveness review on the ~647,000 documents identified by the carefully defined search terms, or the 4 million customer communications classified in relevant categories. Responsiveness review is not meant to be a shield against other discovery obligations; if Defendants cannot conduct those responsiveness reviews *and* fullfill their other discovery obligations in a timely manner then they should not get to conduct the unnecessary responsiveness review.

   C. Defendants Should Be Required to Produce Materials Identifying Enrollment Processes (RFPs 35(b)(i) and (vi)):

   The FTC requests that Defendants be ordered to produce materials sufficient to identify each enrollment process used by consumers to subscribe to Uber One. While Defendants have produced approximately 230 nondescript shorthand terms[2] that allegedly correspond to these enrollment processes, they have provided no means for the FTC to identify the enrollment processes to which they refer. For example, Defendants' data productions show that consumers were frequently enrolled into Uber One via "ONE CLICK," "SIGNUP," "INTERSTITIAL HOME" or "CCC," but nowhere in Defendants' data productions are these ambiguous terms defined or described. This information is crucial to Plaintiffs' case because it is the only means by which Plaintiffs can identify the specific enrollment processes through which consumers enrolled, and the extent to which Defendants deployed each of them.

   Defendants have not argued that producing this information is unduly burdensome. Instead, Defendants claim they do not possess a data dictionary or any documents that define the "entry point" variables. While it is difficult to believe that Uber has not memorialized the definitions of these terms in any form, even if this were true, it does not relieve Defendants of their obligation to provide data in a form that Plaintiffs can understand and interpret. *Hill v. Asset Acceptance, LLC*, 2014 WL 3014945, at *14 (S.D. Cal. July 3, 2014) (ordering Defendant to produce data dictionary or, if one did not exist, necessary information via alternative method); *In re Tiktok, Inc.*, 2025 WL 3628595, at *8 (C.D. Cal. Nov. 10, 2025) (ordering Defendants to provide "some means by which Plaintiffs can decipher the information pulled and produced" because "the production of user information would be useless to Plaintiffs if it [was] produced to them in such a way that it cannot be understood or interpreted."). In the event that Defendants truly do not possess a data dictionary or documents that define the "entry point" variables, the FTC has suggested an alternative method. Specifically, the FTC has proposed that Defendants identify by bates number every enrollment flow that corresponds to each "entry point" variable, but Defendants refuse to do so.

   Defendants do not credibly argue that providing the requested information would be unduly burdensome. Instead, they insist that the FTC must obtain the information through the issuance of an interrogatory. Defendants' position, however, is simply another attempt to unnecessarily delay and obstruct discovery. Since Defendants created the "entry point" variables and all the enrollment processes at issue, they clearly possess data or documents that show how

---

[2] In Defendants' data productions, these terms are collectively referred to as "entry point" variables.

their enrollment processes are categorized into the various "entry point" variables. And, if Defendants are unable to locate or produce those materials, the Court should require Uber to use an alternative method to provide the missing information so that the FTC may interpret and understand the data that Uber has produced. *See In re Tiktok, Inc.* (2025 WL 3628595, at *8 (C.D. Cal. Nov. 10, 2025) ("Whether defined as a data dictionary and regardless of how it is presented, Defendants must provide some means by which Plaintiffs can decipher the information pulled and produced."). Endorsing Defendants' approach would only cause delay and encourage Defendants to produce future data productions that are similarly deficient, which would force the FTC to issue interrogatories simply to understand and interpret Defendants' data productions.

D. The FTC's Proposed Search Terms Should be Used for All Custodial Documents (Including Slack and Google Drive Documents)

The FTC is still awaiting Defendants' proposed schedule for the production of custodial documents. The delay appears to be due in part to Uber's insistence on running additional hit reports for Slack and Google Drive materials in an effort to reopen search term negotiations. The FTC understands the Court's Discovery Order dated May 12, 2026 as setting the search terms for all custodial documents, regardless of their source. Given Uber's repeated attempts to delay the production of documents, the FTC requests that the Court order Uber to provide a proposed production schedule for all custodial documents (including Slack and Google Drive materials) no later than May 22, 2026.

E. Potential Disputes That Are Not Yet Ripe

In addition to the disputes addressed above, the Parties are discussing other issues that are not yet ripe for the Court's consideration. These issues include the following: whether Uber possesses and will produce the date and timestamp of chargebacks (RFP 35(b)(ii)(B)); whether Uber can produce transaction-level data for Uber One subscribers (RFP 35(b)(iii)(A)-(C)); whether Uber's production of consumer savings data is complete (RFP 35(b)(iii)(D)); and whether Uber possesses and will produce click-through data relating to its cancellation flows (RFP 35(b)(iv)(A)-(D)). Should these negotiations falter or if a dispute becomes ripe, the FTC will promptly notify the Court.

## II.    Uber's Statement

Uber responds to each of the FTC's four arguments below. In short, (A) Uber agrees to review the requested customer correspondence and produce the responsive, non-privileged correspondence by June 24, 2026; (B) Uber agrees to produce the United States enrollment and cancellation flows and related documents by June 12, 2026, the consumer notification-related documents by June 12, 2026, and the testing documents by June 30, 2026; (C) Uber does not have a document that defines or otherwise identifies the information regarding the enrollment processes that the FTC seeks; and (D) Uber agrees to provide the FTC with a custodial rolling production schedule by May 22, 2026. Lastly, Uber is not opposed to the FTC's request for the parties to submit another joint status report on June 5, 2026.

A. Customer Correspondence Relating to Uber One (RFP 19)

This is a non-issue. Uber has agreed to review every single one of the approximately 4 million communications tagged with any of the Uber One issue codes, even codes that do not have any apparent relevance to this case. Uber will produce every single responsive and non-privileged communication and can substantially complete this by June 24, 2026. The FTC argues that no responsiveness or privilege review is needed. This is wrong: the database of communication may include internal Uber communications with counsel about how to address complaints (including legal complaints) from customers. Those communications would be privileged. As to relevance, the customer communications could include complaints from customers about the restaurant selection on Uber One, a delayed delivery, or a missing item from an order. Those would not be relevant.

Uber offered different ideas to produce this material more quickly, including by reviewing and producing a statistical sample. The FTC represented to the Court on March 25, 2026, that it was amenable to sampling these communications. Dkt. 155 at 5-6 ("The FTC understands that the list of codes provided by Defendants is associated with over 4 million communications. Given this large volume, the FTC is open to discussing with Defendants the possibility of sampling communications."). The FTC never responded to Uber's requests for the FTC to identify the codes that the FTC viewed to be most relevant so that Uber could produce a sample of documents using those codes.

The FTC then informed Uber on May 12, 2026, during the parties' meet and confer that the FTC demanded all approximately 4 million communications across a very broad array of codes without a responsiveness or privilege review. The FTC's choice to delay and then seek such a wide swath of material does not justify forcing Uber to forgo standard responsiveness and privilege reviews.

B. Deadlines For United States Enrollment and Cancellation Flows and Related Documents (RFPs 8 and 10), Consumer Notification-Related Documents (RFP 9), and Consumer Testing Materials (RFPs 31 and 32)

Uber has agreed to complete its direct collection and productions in response to RFPs 8, 9, and 10 by June 12, 2026, and to RFPs 31 and 32 by June 30, 2026. Uber opposes the FTC's requested May 29, 2026 deadline because Uber needs more time to search for, collect, and review documents responsive to these RFPs.

These documents are not stored in one central repository, and Uber is still in the process of working with teams across its business to ensure it conducts a reasonable search for these materials. Moreover, documents responsive to RFPs 31 and 32 are very likely to be captured by the FTC's search terms, making any standalone direct pulls unnecessary and duplicative. In order to ensure that Uber meets the various other discovery deadlines in May and early June, Uber respectfully submits that Uber's proposed June 12 and June 30 deadlines for these materials are appropriate. Those deadlines include:

- May 15, 2026: Court-ordered deadline for Uber to complete production for RFP 27;

5

- May 18, 2026: Court-ordered deadline for Uber to complete production for RFPs 21, 23, and 24;
- May 22, 2026: Agreed deadline for Uber to provide the FTC with a rolling production schedule for Uber's custodial productions;
- May 27, 2026: Agreed deadline for Uber to research the FTC's complex and specific follow-up questions regarding whether additional data exists or is producible;
- May 29, 2026: Court-ordered deadline for Uber to complete production of foreign jurisdiction flows responsive to RFPs 8 and 10;
- June 5, 2026: Agreed deadline to submit another joint status report;
- June 12, 2026: Uber's proposed deadline to complete production for RFPs 8 and 10 (other than foreign jurisdiction flows);
- June 12, 2026: Uber's proposed deadline to complete production for RFP 9;
- June 24, 2026: Uber's proposed deadline to complete production of up to four million documents responsive to RFP 19; and
- June 30, 2026: Uber's proposed deadline to complete production for RFPs 31 and 32.

During that time, Uber will also be expeditiously reviewing approximately 650,000 Gmail documents that hit on the FTC's search terms (including for RFPs 31 and 32), to comply with the Court's recent order.

Uber told the FTC that if it wanted materials responsive to RFPs 31 and 32 sooner, the company could prioritize those materials over other requests. But the FTC declined to offer any re-prioritization. Particularly in light of the other discovery deadlines, Uber's proposed deadline is reasonable and will not prejudice the FTC. The FTC will still have the documents two and a half months before the close of fact discovery.

C. <u>Materials Identifying Enrollment Processes (RFP 35(b)(i) and (vi))</u>

In short, the FTC is asking for documents that do not exist. Uber has already produced the data it has in response to RFP 35(b)(i) and (vi), and produced the data dictionary it was able to create. Uber does not possess a document that contains the specific information that the FTC seeks, and Uber is not obligated to produce a document that it does not have. That should resolve the dispute over the request for document production. The FTC's alternative request—for Uber to identify by Bates number every enrollment flow that corresponds to each of the over 200 "entrypoint" variables within the data—should be denied because such information is properly sought through other discovery tools, like an interrogatory, which the FTC has not served.

More specifically, RFP 35(b)(i) and (vi) seek, "For each consumer who enrolled in an Uber One subscription or free trial: . . . (b): All Documents and data (including click-through data) Relating to: (i) The consumer's enrollment in Uber One, Including (A) the date, time, and Enrollment Process through which the consumer enrolled; (B) whether the consumer enrolled through a free trial or other promotion; and (C) if the consumer enrolled through a free trial or other promotion, the terms of the free trial or promotion (e.g., billing date, duration of free trial, etc.)" and "(vi) a data dictionary defining Each term or element in the dataset in sufficient detail for someone unfamiliar with the dataset to understand it."

6

Uber has undertaken tremendous effort to respond to this RFP with a significant amount of data and a data dictionary. While the data, as it is maintained in the ordinary course of business, lists over 200 "entrypoint" variables, Uber has explained repeatedly to the FTC that Uber does not have a document that defines or otherwise identifies each of those 200+ entry points. Uber wishes it did. If it did, Uber would have included the requested entrypoint information in the data dictionary that Uber produced. But as this Court has recognized, Uber is not obligated to produce a document that it does not have. *See* Dkt. 166 at 4 n.2 ("Of course, an order compelling the production of documents only compels the production of documents that exist.").

As an alternative, the FTC has asked this Court to require Uber to identify by Bates number every enrollment flow that corresponds to each of the over 200 "entrypoint" variables within the data. But the FTC cannot seek that information through an RFP; the FTC may seek that information through other discovery tools, such as through an interrogatory. The FTC has not done that. If the FTC chooses to serve an interrogatory, Uber will do the best it can to respond fully according to the Federal Rules of Civil Procedure. To be clear, responding will be highly burdensome: it will require a time-consuming, manual effort by various Uber teams and Uber lawyers to attempt to identify the Bates numbers for the over 200 "entrypoint" variables within the data. Uber estimates that it will take approximately 20 hours per entry point to try to trace the history. This means it would require approximately 4,000 hours to complete this task.

The FTC's cited cases do not support the relief that the FTC seeks. In *Hill*, the court discussed whether to compel production of a data dictionary in response to an *interrogatory* that sought data. *Hill v. Asset Acceptance, LLC*, No. 13-CV-1718, 2014 WL 3014945, at *14 (S.D. Cal. July 3, 2014). The FTC has not served an interrogatory, and in any event Uber *has* produced a data dictionary to the FTC (for this and the FTC's other data RFPs).

The *Tiktok* dispute involved an entirely different procedural posture: discovery had not commenced, the parties disputed the extent of evidence to be preserved, and the plaintiffs argued that they could establish the extent of evidence to be preserved only after having a better understanding of the defendants' data. *In re Tiktok, Inc.*, No. MDL 3144, 2025 WL 3628595, at *6–7 (C.D. Cal. Nov. 10, 2025). To that end, the plaintiffs sought a sample of exemplar data and "a 'data dictionary' or other means to enable [them] to understand the data contained therein." *Id.* at *3. The court simply agreed that the defendants would need to produce a data dictionary, which (again) Uber has already produced to the FTC. *Id.*

For these reasons, the Court should deny the FTC's requested relief.

D.    Timing of Uber's Custodial Productions and Use of the FTC's Gmail Search Terms for the Additional Slack and Drive Repositories

As an initial matter, Uber agrees to propose a complete production schedule by May 22. In order to quickly produce documents, Uber is planning to propose to the FTC a technology assisted review of documents by early next week. That proposal should be agreed to and final by the end of the week, which will allow Uber to quickly complete the review of the Gmail data and other custodial data, without the need for individual human review of every document that hits on the search terms (which would not be feasible under the current schedule).

The FTC also asks the Court to order Uber to use the agency's proposed search terms on the non-Gmail custodial data. That issue was not presented to the Court previously, and Uber is in the process of but has not yet completed loading the data for Uber to be able to run search terms to estimate the burden or expense. Nonetheless, Uber plans to use the FTC's proposed search terms on this additional data, as long as the hit reports do not make this infeasible under the current deadlines. Uber will confirm its plan to the FTC by May 22, and the parties will raise any issues in the next status report.