Division of Financial Practices
Bureau of Consumer Protection

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

June 5, 2026

**By ECF**

Honorable Thomas S. Hixson
United States District Court, Northern District of California
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

  Re: *FTC et al. v. Uber Technologies, Inc. et al.*, Case No. 4:25-cv-03477-JST

  Dear Judge Hixson:

  Plaintiff Federal Trade Commission ("FTC") and Defendants Uber Technologies, Inc. and Uber USA, LLC ("Uber" or "Defendants") submit this joint status report pursuant to the Court's May 18, 2026 (Dkt. 216) Order.

  The parties hereby attest that they have met and conferred in good faith prior to filing this status report.

           Respectfully submitted,

           */s/*
           James Doty
           Federal Trade Commission

           *Attorney for Plaintiff FTC*

           */s/*
           Ben Mundel
           Sidley Austin LLP

           *Attorney for Uber Technologies, Inc. and Uber USA, LLC*

## I.    FTC's Statement

As explained below, the FTC requests that the Court order Uber to produce by June 12 documents and data that Uber has failed to produce in violation of the Court's prior orders.  The FTC also requests that the Court reject Uber's black-box "technology assisted review" ("TAR") proposal, which by design would allow Uber to withhold a vast quantum of relevant material and would require extension of the discovery deadline.  Instead, to facilitate timely resolution of the action, the FTC requests that the Court order Uber to complete its custodial production by June 26, without a relevance review, and produce a privilege log by July 10.

A.  RFPs 14, 29, 33, 35(b)(iii), 35(b)(iv)

Uber has recently admitted that it has withheld critical data in contravention of this Court's discovery orders.

Uber's responses to the FTC's data requests—issued in July 2025 (*see* Ex. A)—were due, by this Court's order, on April 10.  *See* Docket No. 150.  Uber made a production on that date and stated that its production was complete.  After the FTC identified several categories of missing data, however, Uber on May 27 admitted that, contrary to its prior representations and the Court's deadline, several critical categories of data were withheld, including: (1) purported savings per-ride or per-delivery for each subscriber (*see* **RFP 35(b)(iii)**); (2) data on promotions to subscribers, which (according to Uber's May 27 email) were used to support Uber's savings claim (*see* Ex. B); and (3) click-through data regarding subscribers' cancellation attempts (*see* **RFP 35(b)(iv)**).  *See id.*

This information bears directly on Uber's allegedly false claim that subscribers save $25 a month, as well as Uber's expected defense that consumer harm should be offset by subscribers' purported savings.  And the clickthrough data responsive to RFP 35(b)(iii) may provide direct empirical evidence regarding whether the cancellation process was simple as required by law. *Cf. Rubio v. Capital One Bank*, 613 F.3d 1195, 1200 (9th Cir. 2010) ("[E]mpirical evidence is helpful in determining what a reasonable consumer will understand and readily notice.").

Uber has also failed to produce:  (1) documents and data regarding Uber's savings calculations—*e.g.*, the formulas it uses to calculate savings, all underlying data used in the calculations, and the calculations themselves (*see* **RFPs 14, 29**) and (2) Uber's policies and data regarding how ride and delivery prices differ for subscribers and non-subscribers.  *See, e.g.*, **RFPs 14, 33(c), (d)**.  This information is essential for assessing Uber's own basis (if any) for its savings claim, and to allow Plaintiffs (if they choose) to perform their own savings calculation.

Despite the Court's order requiring Uber to produce responsive material by April 10 (RFP 14) and April 27 (RFP 33), Uber has not produced any calculations, data, or work papers documenting the basis for its savings claim.[1]  Nor has Uber produced more than a smattering of

---

[1] Uber represented to the FTC on March 9 that it had produced exactly three documents regarding its savings claim.  The document that Uber claims provides a "formula" (*see infra*)—which dates from 2023, well after Uber first made the savings claim—in fact only lists categories

documents or data regarding how ride prices, or fees charged, differ for subscribers and non-subscribers. Although Uber cannot produce documents and data it does not have, it strains credulity that Uber would not have calculations or other work papers supporting the savings claims that it continues to make to this day, or information on how ride prices (*i.e.*, both base price and fees charged) differ for subscribers and non-subscribers.

Accordingly, the FTC respectfully requests that the Court order Uber, by June 12, to: (1) produce the documents and data responsive to the above RFPs, including all data and documents undergirding Uber's own calculation of subscriber savings; and (2) certify to the Court, under penalty of perjury, that it has produced all documents and data responsive to the above RFPs that can be located without custodial searches.[2]

B. Uber's Custodial Production

To give the parties a reasonable opportunity to complete fact discovery by the current deadline, the FTC respectfully requests that the Court order Uber to complete its custodial production by June 26, without a relevance review.

As background, on May 12, the Court ordered Uber to run the FTC's proposed search terms. *See* Docket No. 209. On May 21, Uber sent the FTC a generic proposal to use TAR to assist in its relevance review. *See* Ex. C. Apart from a few passing references in early May, this was the first time Uber proposed using TAR. Uber claims that a manual (*i.e.*, TAR-less) relevance review cannot be completed by the discovery deadline, and that even with TAR, the earliest it can complete its custodial production is August 14—one month before the close of fact discovery.

Vastly simplified, TAR generally works as follows: a model is trained on a review set of documents and assigns a score to the unreviewed documents estimating likely responsiveness. Reviewers periodically review a pool of documents deemed non-responsive by the model to estimate the number of documents in the non-responsive pool that are, in fact, responsive. This estimate is used to calculate a "recall rate"—*i.e.*, the percentage of responsive documents in the overall pool that the model deems responsive. When the recall rate reaches a certain threshold— under Uber's proposal, as low as 70%[3]—the use of TAR is complete. All documents deemed responsive by the model are then reviewed manually to confirm responsiveness. The remaining documents remain unreviewed and unproduced.

---

of inputs to the calculation, which the document states were in flux. Neither that document, nor any other produced by Uber, contains the final formulas, any data, or any calculations.

[2] Plaintiffs are continuing to review Uber's non-custodial productions for other deficiencies and respectfully propose to raise those issues with the Court when ripe.

[3] Although Uber is cagey on the point, it does not dispute that as many as 30% of relevant documents could be shielded from production under its proposal. (Uber's proposed recall rate is 75% with a 5% margin of error. *See* Ex. C at 3.) The FTC notes that Uber's submission is supported almost entirely by a mystery declaration that was not provided to the FTC prior to the FTC finalizing its statement.

By design, then, under TAR, a percentage of relevant documents are not produced—as many as 30%, in Uber's proposal. Deliberately withholding nearly a third of responsive material is unacceptable, particularly given that Uber—which controls how the model is trained and calibrated—exercises enormous power to determine which 30% of responsive documents remain unproduced. *Garner v. Amazon.com, Inc.*, No. 21-cv-00750, 2023 WL 3568055, at *3 n.5 (W.D. Wash. May 19, 2023) (calling Amazon's initial recall target of 75% "unacceptably low" and noting that "if TAR is cost-effective only if 25% of responsive, relevant, non-privileged documents remain hidden, it may cost[] less but is no longer effective"). While under a manual review, some relevant documents may be inadvertently and erroneously withheld at random, TAR raises the possibility that entire categories of relevant and crucial documents—*e.g.*, studies or surveys of Uber Pass, or Slack communications—may systematically be deemed non-responsive because of, for example, biases encoded in the model during training.

Given this possibility, complete transparency is essential. Instead, Uber has refused to disclose anything beyond the generic details of its proposal. Among the many questions raised by the FTC that Uber, as of the time of drafting, has declined to answer:  how many documents will be in the model's training set? What specific documents? How will such documents be coded? What will be done to ensure that the training set includes documents responsive to each of the RFPs, and each different form of document (*e.g.*, Google Drive materials, excels, Slack communications, etc)? What is the "TAR score threshold" below which Uber will deem documents not responsive (*see* Ex. C at 3)? Given Uber's failure to answer these and many other questions with any level of specificity, the FTC is left with a black box proposal—one that does not even have the benefit of speed, given that it will conclude mere weeks before the close of discovery.[4]

Although the ESI agreement contemplates that there may be circumstances where TAR is appropriate (*see* Docket No. 144 at 6(b)(iii)), the agreement makes clear that the Court ultimately determines if and how TAR is used. *See id.* ("[T]he Court has authority to decide whether a Responding Party is sufficiently preserving and producing information as required by the Federal Rules of Civil Procedure, this Order, and any other applicable rule or Court order"). Raised sufficiently early in the discovery process, with full transparency and appropriate guardrails in place, TAR might make sense. Given Uber's delay—proposing TAR for the first time ten months after the RFPs were issued—its failure even to attempt to secure the FTC's agreement on protocol, the disruption to the discovery schedule that would result, the proposal's opacity—and where transparent (*e.g.*, the recall rate) plain inappropriateness—its request to use TAR should be denied. And given Uber's representation that a manual relevance review cannot be completed by the discovery deadline, the FTC respectfully requests that the Court order Uber to finish its custodial production by June 26, without a relevance review, and with a privilege log completed by July 10. *See* Docket No. 209 at 2-3 ("The Court expects Uber to complete its custodial

---

[4] Uber did not accept the FTC's request to meet and confer until May 29, at which point Uber had—*in secret*—already been proceeding for a week with its TAR proposal. *See infra* p. 10 (noting that Uber started TAR review on May 22). The May 29 meet and confer was terminated by Uber's counsel after 30 minutes, and their answers to the FTC's written questions before and after the meeting fail to answer the FTC's questions with any level of specificity.

document productions expeditiously.  If Uber drags its feet, the FTC may renew its requests for a production and privilege log deadline and for Uber to screen only for privilege.").

## II.     Uber's Statement

### A.  Uber's Productions in Response to RFPs 14, 29, 33, and 35(b)(iii)-(iv)

First, the FTC suggests that Uber did not fully respond to RFPs 14 and 35 by April 10, or to RFP 33 by April 27. That is incorrect. Uber conducted a comprehensive and exhaustive search for responsive information and produced it on time. Since then, the FTC has asked questions about the documents and data, and Uber has worked collaboratively to provide answers and to search for and produce updated information where available. This is expected and appropriate in a good faith discovery process.

As set forth below, Uber requests that the Court set a June 24 deadline for Uber to complete its direct pull production for RFP 29 (as there is no Court order regarding the timing for Uber to complete its RFP 29 direct pull production), along with a supplemental direct pull production deadline for RFPs 14 and 33, if any further documents can be found. Uber also requests that the Court order Uber to complete a supplemental production to RFP 35 by June 24 (for the third category in Section II.A.2 below) and July 1 (for the first and second categories in Section II.A.2 below).

#### 1.  RFPs 14, 29, and 33

RFPs 14, 29, and 33 seek, among other things, Uber's policies, practices, and procedures for how Uber "calculate[s] savings claims that may appear in Uber One Advertisements, Enrollment Processes, and Cancellation Processes;" documents and underlying data relating "to savings claims"; and documents and underlying data showing how Uber "determine[s] the total price of Uber rides or Uber Eats deliveries," respectively.

Uber has conducted a comprehensive direct-pull search and produced at least 192 documents in response to RFPs 14, 29, and 33. For example, Uber has produced an 18-page document showing Uber's formula for its savings calculations, including the difference between inputs for member and non-member calculations (UBER-FTCU1-00002120); a 73-slide PowerPoint deck discussing how users are shown their savings, which discusses Uber's savings formula inputs (UBER-FTCU1-00002139); a document that defines Uber's approach to presenting subscribers' total savings number (UBER-FTCU1-00002138); and documents that detail experiments where Uber tested different inputs that would impact users' savings calculations and other features of the user experience (e.g., UBER-FTCU1-00007342, UBER-FTCU1-00007336, and UBER-FTCU1-00007381).

As explained to the FTC, Uber had not been able to identify anything further to produce for RFPs 14, 29, and 33 from its direct pulls. The FTC asked follow-up questions on May 29 about

whether certain other documents exist. Uber agreed to follow up and is searching for those documents and will produce any it can find by June 24.

As the FTC is aware, these RFPs are part of Uber's broad custodial review. To expedite finding documents responsive to those RFPs, while the custodial review is ongoing, Uber specifically searched for savings documents in the custodial set. Uber has located several documents about the Uber One launch that discuss the original Uber One savings claim and also work papers that show calculations for updating the Uber One savings claim since launch. Those are precisely the type of documents responsive to these requests and would ordinarily be produced as part of the custodial review. At the FTC's requests, Uber has expedited its search for and production of those documents following the May 29 meet-and-confer.

Uber will produce these documents in its upcoming June 12 production, in addition to any other documents it identifies before then, rather than waiting to produce them in Uber's first scheduled rolling production on June 18. Uber will of course continue to produce any other responsive documents identified in the custodial review.

**2.  RFP 35(b)(iii)-(iv)**

Uber has not withheld any data responsive to RFP 35(b)(iii)-(iv). In response to RFP 35, Uber produced nearly 50 GBs of data. This data included monthly data files from Uber's membership and initiations database for the time period November 2021 through December 15, 2025; aggregate membership savings per membership period; aggregate order and trip usage data per membership period; payments database files; Uber's customer list; and a data dictionary. It took Uber's data experts hundreds of hours to identify, understand, collect, and produce this information. After receiving this data, the FTC asked Uber to research the burden for Uber to produce an additional category of data and whether a few additional categories of data exist. Uber researched those questions and explained the status of the data and burden to the FTC on May 27.

More specifically, the FTC asked Uber to research (1) more information on the burden of producing transaction/order-level data; (2) whether any further data exists regarding a consumer's Uber One usage; (3) whether any clickthrough data exists; and (4) whether chargeback timestamp data exists. In response, (1) Uber again asked the FTC to explain what specific transaction/order-level data that the FTC needed beyond the aggregate membership savings per membership period data that Uber already produced, and provided more detail on the burden of producing the transaction/order-level data; (2) Uber identified that it could produce data on the promotions available to users, explained the challenges that Uber was facing regarding that data, and anticipated being able to include the data in aggregated form in its June 24 production; (3) Uber confirmed that some clickthrough data exists, explained the challenges that Uber was facing regarding that data, and anticipated being able to include the data in its June 24 production; and (4) Uber confirmed that chargeback timestamp data exists and agreed to include the data in its June 12 production.

The parties then met and conferred on May 29 to discuss Uber's answers, including Uber's question regarding the first category (i.e., what the FTC was asking for and what the FTC thought would be available at a transaction/order-level that could not be aggregated and provided at the

membership level, as Uber already produced). The dispute now is only about the timing of production for the first three categories of data. Each is discussed below.

**1. Transaction/Order-Level Data.** The FTC has asked Uber to provide transaction or order-level data, in addition to the substantial aggregate data already provided. There is no structured table or data with this information. Because the requested data was not reasonably available, Uber could not produce it. Even though the information was not available from Uber's standard data, Uber has proactively worked to pull, standardize, and present data from across more than 3 billion records that is stored across multiple data tables in Uber's system. This is data that is in different formats and different structures. Uber believes that it can complete this data creation effort and produce explainable transaction savings information by July 1.

**2. Promotions Available to Uber Consumers.** The second category of data includes promotions available to users. Uber identified this body of data in the course of its investigation of the FTC's questions about whether any possible additional data exists. Uber explained that the data is not structured, is not located in one table, and did not appear consistent. Rather than producing unstructured and unclear data that the FTC cannot use, Uber has been working hard to determine how to produce this data accurately and reliably. It will take at least 3 more weeks for Uber's data experts to finalize this data in a transactional form, as explained for the first category of data. Uber asks the Court to set a July 1 deadline to produce this data, given the high burden to create the database. If the FTC only wants the data in an aggregated form, it would be possible for Uber to prepare the data in aggregated form and include that form in its June 24 production.

**3. Clickthrough Data.** The third category of data requested is clickthrough data. The FTC asked Uber to research whether this data exists, and Uber was able to confirm that some clickthrough data exists but explained to the FTC that the data is inconsistent and may not be accurate. Uber is trying to get the data in a form that is reliable and accurate to avoid an inefficient back and forth where Uber produces unreliable data, the FTC does not understand the data, and then Uber has to go back and fix the data. It is not possible for Uber to produce this data by June 12. Uber asks the Court to set a June 24 deadline for Uber to produce this data.

During the parties' May 29 meet and confer, the FTC represented to Uber that it would ask the Court in this joint status report to set a June 27 deadline for Uber to produce all three categories of data discussed above. (June 27 is a Saturday, which neither party raised during the meet-and-confer, but the FTC's stated reasoning for that date was that June 27 was one month after Uber's May 27 email.) Despite the FTC's representation that it would ask the Court to set a June 27 deadline, the FTC is now asking for all data by June 12. It is not possible for Uber to prepare and produce the data by June 12, for the reasons explained above.

In sum, Uber asks the Court to set a July 1 deadline for Uber to produce the first two categories of data and a June 24 deadline for Uber to produce the third category of data.

B.  Uber's Custodial Review

In order to review the anticipated 1.2 million custodial documents as quickly and effectively as possible, Uber has proposed a technology assisted review (TAR) with continuous

active learning (CAL), known as TAR 2.0. TAR 2.0 is a well-established methodology that counsel for Uber and Uber itself has used many times effectively. TAR 2.0 is well accepted in the eDiscovery field, and Uber has retained a leading eDiscovery technology expert firm (Array) to manage the process. Uber has provided the FTC with standard disclosures of its TAR methodology, has answered all of the FTC's questions about TAR, and has offered to make its TAR consultant available to answer any further questions. To meet the aggressive schedule, Uber has already started its TAR review with two outside law firms and 42 contract attorneys. Uber requests that the Court order that Uber make its first production on June 18, continue monthly rolling productions thereafter, and complete its custodial production by August 14. Uber will push to complete its custodial production by July 31, but expects to complete it by August 14.

### 1. TAR is a reliable, well-accepted methodology.

The FTC's primary argument is that TAR is not a reliable review methodology. That is incorrect. "[I]t is now black letter law that where the producing party wants to utilize TAR for document review, courts will permit it." *Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 127 (S.D.N.Y. 2015).

Uber's eDiscovery technology consultant has also confirmed that the TAR 2.0 process is a reliable methodology. Indeed, the expert consultant has personally been involved in over 50 TAR/CAL reviews, and those reviews have been accepted in matters with the FTC, DOJ, SEC, and CFPB, among others. Ex. D, Declaration of Vincent Liu ("Decl.") ¶¶ 5-7.

The parties' ESI Order confirms that TAR was anticipated. According to the ESI Order:

> If the Producing Party intends to use TAR or similar advanced analytics for its review and production, the Parties agree to meet and confer in good faith to attempt to reach agreement about the appropriate disclosures, technology, and process that a Producing Party proposes to use to identify responsive ESI and a statistically sound methodology to assess the effectiveness of the tool and processes in identifying responsive documents. If the Parties cannot resolve any dispute regarding this section, consistent with The Sedona Conference Principles, Principle 6, the Responding Party is best suited to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own ESI. However, the Parties recognize that the Court has authority to decide whether a Responding Party is sufficiently preserving and producing information as required by the Federal Rules of Civil Procedure, this Order, and any other applicable rule or Court order.

ESI Order at 8-9 (Section 6(b)(iii)); *see Winfield v. City of New York*, No. 15:CV-05236-LTS-KHP, 2017 WL 5664852, at *9 (S.D.N.Y. Nov. 27, 2017) (endorsing Principle 6 of the Sedona Conference in a TAR dispute).

Thus, Uber is required to provide notice of its use of TAR and meet and confer with the FTC. As explained below, that is exactly what Uber has done here. The ESI Order does not require Uber to obtain the FTC's approval to use TAR.

Finally, the FTC's critique of TAR 2.0 is not accurate. The FTC states that "[w]hen the recall rate reaches a certain threshold—under Uber's proposal, as low as 70%—the use of TAR is complete." But that is not how TAR 2.0 (with CAL) works. *See* Decl. ¶¶ 8-17. Uber will *not* stop reviewing documents when it reaches a 75% recall rate. *Id.* ¶ 17. Uber will stop reviewing documents once the population of predicted responsive documents is exhausted, which will trigger a validation. *Id.* Uber expects to see recall numbers higher than 75% at validation, but Uber is just suggesting that as a minimum, not a proposed ceiling. *Id.*

The FTC's citation to *Garner v. Amazon.com, Inc.*, No. 2:21-CV-00750-RSL, 2023 WL 3568055, at *3 n.5 (W.D. Wash. May 19, 2023), is similarly misplaced. That court's reference to a 75% recall target being too low assumed that "25% of responsive, relevant, non-privileged documents [would] remain hidden." *Id.* at *3 & *3 n.5. For the reasons explained above, that is not true or expected here. Decl. ¶ 17. Notably, that court denied the plaintiffs' motion to prohibit the company's use of TAR. *Garner*, 2023 WL 3568055, at *3.

"Courts have found TAR processes achieving a 75% recall rate to be appropriate." *Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 1813395, at *8 (D. Kan. Apr. 9, 2020) (citing *The Sedona Conference Tar Case Law Primer*, 18 Sedona Conf. J. 1, 37 (2017)); *see* Maura R. Grossman & Gordon V. Cormack (FNaa1), *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, 17 Rich. J.L. & Tech. 11, 55 (2011) ("For three of the five topics . . . the results show no significant difference in recall between the technology-assisted and manual reviews. This result is perhaps not surprising, since the recall scores are all on the order of 70% - the best that might be reasonably achieved, given the level of agreement among human assessors. As such, the results support the conclusion that technology-assisted review can achieve at least as high recall as manual review, and higher precision, at a fraction of the review effort, and hence, a fraction of the cost."); *see also Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 129 (S.D.N.Y. 2015) ("[I]t is inappropriate to hold TAR to a higher standard than keywords or manual review. Doing so discourages parties from using TAR for fear of spending more in motion practice than the savings from using TAR for review.").

### 2. TAR is particularly needed in this case.

TAR is not only generally accepted, it is particularly needed in this case due to the volume of documents and discovery schedule. The FTC's proposed search terms over the 27 custodians has resulted in 736,376 hits from Gmail and Google Drive, which does not include the documents from Slack. The computers are still working to collect the Slack documents, but the final review population is estimated to be over 1.2 million documents.

Given the volume of data to review and produce with discovery closing in mid-September, TAR is the surest way to get this done in time. TAR is designed to efficiently and accurately review large-scale document populations. *Id.* ¶ 5. TAR enables effective culling of non-responsive material, significantly reducing the number of documents requiring manual review. *Id.* ¶ 21. In this matter, Uber is expecting a responsiveness rate of roughly 12% based on initial sampling of the current review population, meaning that the review population is overinclusive. *Id.* ¶ 23.

Manual review alone would be impractical and disproportionate in terms of time and cost. A manual review with a reasonable number of reviewers would take more than six months to complete and cost an estimated $1.5 million more than Uber's proposed TAR workflow. Decl. ¶ 24. Not only is TAR faster and cheaper than a manual review, it produces more accurate results. *Winfield v. City of New York*, No. 15:CV-05236-LTS-KHP, 2017 WL 5664852, at *4 (S.D.N.Y. Nov. 27, 2017) ("TAR allows parties to prioritize and/or categorize documents for purposes of document review and has been shown to produce more accurate results than manual review.").

Uber has two outside counsel law firms (Sidley and WilmerHale) for this matter and has hired 42 contract attorneys to review the custodial documents. Uber has explained to the FTC that the earliest it believes it can complete its document production is July 31 (if everything goes according to plan); otherwise, it will take until August 14 to complete. The FTC has never proposed its own production schedule to Uber. Instead, Uber learned for the first time upon receiving the FTC's draft of this joint status report on June 3 that the FTC intended to ask the Court for Uber to forgo a responsiveness review and produce all documents by June 26 and a privilege log by July 10. That is simply not feasible or appropriate.

### 3. Uber has provided standard disclosures of its TAR methodology, has answered all of the FTC's questions, and has offered to make its TAR consultant available to the FTC to answer any further questions.

Consistent with the ESI Order, Uber provided the FTC with a TAR proposal on May 21 that contained standard disclosures regarding the use of that methodology. *See* Ex. C; Decl. ¶ 18. Uber understands the importance of transparency in the TAR process and has answered every question that the FTC has asked (approximately 43 written questions, which does not not include those raised and answered during the May 29 meet-and-confer).

In response to Uber's TAR proposal, the FTC responded on May 22 that "it read[] like a 30,000 foot Wikipedia description of how TAR works generally" and asked for Uber to identify "what specific documents will be used to train the model, how they will be coded, how you propose to ensure that all categories of documents are included in the review pool, what cutoffs you're proposing for the 'TAR score threshold,' why you've set the recall percentage at only 75%, the use you plan to make of a precision estimate, whether you propose a manual review of all documents for responsiveness, how you plan to calculate an elusion rate and overall number of eluded documents, etc etc." Ex. E at 18-19.

Uber responded immediately that it would work on answers to the questions and circle back, *id.* at 17-18, and Uber immediately began consulting with Array to provide answers to the FTC's follow-up questions (some of which were already answered in Uber's TAR proposal) and responded to the FTC's questions on the next business day, May 26. *Id.* at 14-17. The FTC responded on May 27 that the "email doesn't answer any of our questions with any specificity" and asked to meet and confer. *Id.* at 13-14. On May 28, Uber provided its availability to meet and confer, explained that it answered the FTC's questions with specificity, and asked the FTC to send specific questions in advance of the meet and confer so that Uber could prepare, if further detail was needed. *Id.* at 13. The FTC refused to send any specific questions before the meet and confer. *Id.* at 12-13.

9

During the May 29 meet and confer, the FTC asked basic questions about TAR, which Uber answered. Uber offered to make its TAR consultant, Array, available to the FTC to answer any further questions the FTC had about TAR. The FTC declined. Uber also agreed to follow up with answers to five questions raised during the meet-and-confer.[5]

After the meet-and-confer, the FTC sent two emails with additional written questions regarding TAR. *Id.* at 9-11. Uber provided answers to the FTC's approximately 34 follow-up questions (including subparts) on Tuesday, June 2, and Uber asked the FTC when it was available to discuss. *Id.* at 1-7. In response, the FTC asked what Uber wanted to discuss, and Uber explained that it would "like to discuss any remaining questions you have about TAR." *Id.* at 1. The FTC did not respond or otherwise take Uber up on its offer to discuss any remaining questions that the FTC has. Instead, the FTC sent Uber its section of the joint status report.

The only thing Uber has declined to do is share with the FTC the documents used and attorney coding decisions made for the initial training of the TAR/CAL model. This is Uber's protected attorney work product and not standard practice to share. Decl. ¶ 20. Typical disclosures include the statistics of the validation sets and final recall, precision, elusion, and total document universe numbers, not the underlying content of any of the documents used for training. *Id.* This is particularly true when a TAR workflow uses CAL, like Uber's. *See Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 128-29 (S.D.N.Y. 2015) ("If the TAR methodology uses 'continuous active learning' (CAL) (as opposed to simple passive learning (SPL) or simple active learning (SAL)), the contents of the seed set is much less significant. . . . [R]equesting parties can insure that training and review was done appropriately by other means, such as statistical estimation of recall at the conclusion of the review as well as by whether there are gaps in the production, and quality control review of samples from the documents categorized as non-responsive.").

### 4. Uber is expeditiously completing its custodial review and production.

The FTC has again asked the Court to require Uber to forgo a responsiveness review, relying on the Court's May 12 Discovery Order that permitted the FTC to renew its request "[i]f Uber drags its feet." Dkt. 209 at 2-3. That is not the case here—Uber has acted expeditiously.

After the Court ordered Uber to use the FTC's proposed search terms on May 12, Dkt. 209, Uber immediately began collecting documents from Gmail, Drive, and Slack. Uber also began immediately researching the most efficient way for it to meet its custodial document review obligations. To that end, Uber informed the FTC in the process of submitting the May 15 joint status report that it intended to use TAR, Dkt. 212 at 7, which the Court also addressed during the May 18 hearing. Consistent with the ESI Order, Uber provided its TAR proposal to the FTC on May 21. Ex. C. And consistent with the Court's Discovery Order, Uber proposed its rolling production schedule to the FTC on May 22. Ex. F. Beginning May 22 and through Memorial Day Weekend, Uber's outside counsel reviewed the initial sample of 1,114 documents by May 26. *See*

---

[5] The meet-and-confer on May 29 was scheduled for 30 minutes, so Uber had to end the meet-and-confer after the scheduled time for another obligation, but Uber asked the FTC when it would like to schedule an additional time to meet and confer, both during and after the call. *See* Ex. E at 11.

Decl. ¶ 9. Uber's outside counsel completed the coverage review of 3,126 documents from May 27 to May 29. *See* Decl. ¶ 13. Uber then conducted a document review training session at 9 a.m. PT on Monday, June 1, for 42 contract reviewers to start conducting the prioritized review queue and review documents for 8 hours each day. *See* Decl. ¶ 14. As of June 5 at 11:20 a.m. PT, 27,511 documents have been coded. Uber's outside counsel is engaging in ongoing management and QC of the review.

For these reasons, Uber is not dragging its feet, and there is no basis for the Court to reconsider its decision to allow Uber to conduct a responsiveness review.