Division of Financial Practices
Bureau of Consumer Protection

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

June 26, 2026

**By ECF**

Honorable Thomas S. Hixson
United States District Court, Northern District of California
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

  Re: *FTC et al. v. Uber Technologies, Inc. et al.*, Case No. 4:25-cv-03477-JST

Dear Judge Hixson:

  Plaintiffs Federal Trade Commission ("FTC"), the Attorneys Generals of the States of Alabama, Arizona, Connecticut, Maryland, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Virginia, West Virginia, Wisconsin, and the District of Columbia, the People of the State of California, the People of the State of Illinois, and the People of the State of Michigan, (collectively, the "States") and Defendants Uber Technologies, Inc. and Uber USA, LLC ("Uber" or "Defendants") submit this joint discovery status report pursuant to the Court's June 16, 2026 (Dkt. 237) Order.

  The parties hereby attest that they have met and conferred in good faith prior to filing this discovery letter.

           Respectfully submitted,

         */s/*
         Federal Trade Commission

         *Attorney for Plaintiff FTC*

         */s/*
         Michael G. Dean
         *Assistant Attorney General*
         *Attorney for Plaintiff State of Alabama*

_/s/_
_____

Philip Ziperman
Deputy Chief, Consumer Protection Division
Attorney for Plaintiff Attorney General of Maryland


_/s/_
_____

Ben Mundel
Sidley Austin LLP

_Attorney for Uber Technologies, Inc._
_and Uber USA, LLC_

## I.      FTC's Statement

As explained below, the FTC respectfully requests that the Court order: (A) Uber to produce all video recordings responsive to RFP 11 by July 6, 2026; (B) Uber to confirm that it has produced all non-custodial documents responsive to RFPs 33 (c) and (d); (C) the parties to exchange privilege logs on the schedule proposed below; (D) Uber to explain the discrepancy between what it represented to the Court in its March 25, 2026 (Dkt. No. 158) joint discovery report and the number of foreign jurisdiction flows produced; and (E) Uber to refine its TAR protocol as further described below.

### A.  Production Deadline for RFP 11

RFP 11 seeks all video recordings of consumers interacting with the Uber One enrollment and cancellation processes.  Dkt. No. 226-1.  On June 22, Defendants stated that their production in response to this request was complete but given that Uber's production to date includes only a single cancellation flow video, the FTC is concerned Defendants' production is deficient.  This RFP has not yet been addressed by the Court, and there is no Court-ordered deadline for Defendants to finish their production.  Accordingly, the FTC requests that the Court order Defendants to produce all video recordings responsive to RFP 11 by July 6.[1]

### B.  Confirmation That Uber Has Produced all Non-Custodial Documents Responsive to RFPs 33 (c) and (d)

Uber's non-custodial production for RFPs 33 (c) and (d) was due, by this Court's order, on April 25.  *See* Dkt. No. 150.  On April 27, Uber made a production but only produced a smattering of documents or data, none of which explain how ride and delivery prices (*i.e.*, base price, promotions offered, and fees charged) differ for subscribers and non-subscribers.  After the Court's June 9 Order (Dkt. No. 230), Uber produced only four additional documents that, again, do not appear directly responsive to RFP 33 (c) & (d).

Uber has been unclear in its communications with the FTC regarding the completion of non-custodial documents in response to this RFP.  The FTC requests that the Court order Uber to confirm whether it has produced all documents that can be located without custodial searches regarding how ride and delivery prices (*i.e.*, base price, promotions offered, and fees charged) differ for subscribers and non-subscribers.  The FTC has twice asked Uber in writing to confirm this fact.  Each time, the request was ignored, and even now, Uber refuses to confirm, simply repeating they have finished production while refusing to say what they have searched for.

### C.  Exchange of Privilege Logs

Below, Uber proposes that it produce an initial privilege log, with approximately half of its privileged documents, by July 24, with a supplemental log with the remaining privileged documents by July 31.  The FTC respectfully requests that the Court enter Uber's proposal.

---

[1] To reiterate, Uber has produced only one video that shows the cancellation process.  It is not clear why Uber thinks it relevant that it has produced videos that show the *enrollment* process, or non-video cancellation materials.  *See infra* n.7.

1

Alternatively, to the extent the Court is persuaded that Uber needs additional time to comply with the FTC's proposed revised TAR protocol (*see infra*), the FTC respectfully requests that the Court order Uber to provide its supplemental log 14 days after its custodial production is complete.

### D. Enrollment and Cancellation Flows from Foreign Jurisdictions (RFPs 8 and 10)

In its portion of the Joint Discovery Letter dated March 26, Uber represented to the Court that producing enrollment and cancellation flows from foreign jurisdictions pursuant to RFPs 8 and 10 would be "hugely burdensome" because each jurisdiction uses roughly 31 enrollment flow entry points with an indeterminate number of variations.  Dkt. No. 158.  On April 3, the Court ordered Uber to produce documents responsive to these RFPs for five countries selected by the FTC, noting the FTC's compromise appropriately balanced relevance and burden concerns.  Dkt No. 167.  While subsequent deadlines of April 27 (*see* Dkt. Nos. 188 and 191) and May 29 (*see* Dkt. No. 191) for Uber's production of these documents have passed, Uber has produced a total of only 37 enrollment and cancellation flows across all five countries enumerated in the Court's April 3 Order.  The FTC respectfully requests that Uber provide the FTC with all documents sufficient to show Uber's enrollment and cancellation flows from the five countries listed in the Court's April 3 Order as soon as possible or, alternatively, that Uber be ordered to explain the reasons for the significant discrepancy between its estimate of the number of responsive documents and the number of documents that Uber has actually produced.

Uber's response confirms that it has failed to produce responsive materials.  It attempts to defend its non-production with an artificial distinction between the "entry point" and the rest of the enrollment flow.  But the "entry point" is, of course, part of the enrollment flow.  If there were any doubt, the RFPs specifically define the enrollment flow as including the entry point.[2]

### E. Adjustments to Uber's TAR protocol

As the Court is aware, Uber implemented a TAR protocol at the eleventh hour and, in contravention of the ESI Agreement, began implementing it in secret before making itself available to meet-and-confer with the FTC.  The preliminary results show that enormous prejudice to the FTC has resulted.  Uber has made its first production of approximately 18,000 documents, and it has represented that its production is 25% complete, indicating that its custodial production will be in the neighborhood of 72,000 documents.  Even this number dramatically overstates the number of unique documents, as the documents have been neither threaded or de-duped and include (for example) dozens of copies of the same emails,

---

[2] *See* Dkt. No. 226-1 at 7 ("'Enrollment' or 'Enrollment Process' means the process, flow, or experience through which a consumer accepts an offer or arrangement to receive a product or service, whether through silence, failure to take affirmative action to reject such offer or arrangement, or otherwise, *including all immediately preceding or immediately subsequent steps that form part of that proces*s, flow, or experience (such as any elements that could influence the consumer's behavior during, or understanding of, the process, flow, or experience") (emphasis added).

advertisements, and presentations.  (If Uber has attempted de-duping and threading, as it claims, then its efforts have failed, as the production contains many duplicates and un-threaded emails, which the FTC would be happy to provide to the Court.)

This is a shockingly low figure,[3] all the more so given Uber's position that responsive documents generally cannot be located via non-custodial searches.  Although the FTC does not wish to relitigate matters already decided by Your Honor, the record is clear that Uber's protocol, supported by vague declarations of comportment with industry standards, prejudices the FTC and handicaps the FTC's ability to build its case.  Accordingly, the FTC requests that the Court order Uber to make the following adjustments to its protocol to ensure that responsive documents are not withheld due to inadequate model design choices or validation efforts.

(1) Uber Should Raise the Recall Rate Target to 85%

Uber's decision to set the recall rate at 75% (+/- 5%) means that up to 30% of relevant documents could be excluded from its production (or, even more, once the shortcomings of a manual review compound the shortcomings of TAR).  A TAR model that is designed to withhold at least a quarter of relevant documents, and that has now resulted in actual low output, is ineffective.  *See, e.g. Garner v. Amazon.com, Inc.*, 2023 WL 3568055 at *3 & n.3 (W.D. Wash. May 19, 2023) (calling recall target of 75% "unacceptable" and noting that "if TAR is cost-effective only if 25% of responsive, relevant, non-privileged documents remain hidden, it may cost less, but it is no longer effective").  The FTC's request to raise the recall rate target to 85% is reasonable, and Uber has provided no justification for why any (yet unspecified) burden to them is disproportional to Plaintiffs' need for the responsive documents.  *Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 1813395, at *8 (D. Kan. Apr. 9, 2020); *id*. (court finding 85% recall rate "reasonable under the circumstances of this case, and falls within the range that commentators . . . indicate is typical for most cases").

Uber's suggestion that the FTC delayed in raising a recall rate objection to its proposal is absurd.  The FTC raised the issue the very next day after receiving Uber's proposal, Dkt. 226-5 at 11, 19, during the parties' meet-and-confer, and in all three of the parties' prior submissions to the Court regarding TAR.  To the extent an 85% recall rate would require a fourth and final deadline for production of custodial documents after July 13, that is acceptable to the FTC.[4]

Uber finally seeks refuge in its mantra that a manual review purportedly has a 30% error rate, but the cited article talks about agreement among multiple human reviewers and does not support Uber's frequently stated belief that manual reviews miss 30% of relevant documents.  In any event, as the FTC has pointed out multiple times, and which Uber has never refuted, its TAR process will perform significantly worse, because its reviewers are manually reviewing every

---

[3] In a recent case involving a single auto dealership, for example, the defendants produced roughly 140,000 custodial documents.  *See FTC v. Lindsay Automotive*, No. 24-cv-2362 (E.D. Va. Filed December 27, 2024).  And as noted in a prior submission, in the agency's recent ROSCA case against *Amazon*, the defendants produced more than 600,000 documents.

[4] As the Court is aware, Uber has proven itself capable of meeting more demanding deadlines should the need arise, as it formerly said it could not complete its custodial production until August 14.

document prior to production. Thus, Uber's proposal layers a 30% manual error rate (according to Uber) on top of TAR's up-to-30% error rate.[5]

In any event, the key question is whether an 85% recall rate is proportional to the needs of the case. Given the importance of this action and the fact that, for large categories of critical material, Uber has represented that materials can be located only via custodial searches, an 85% recall rate is appropriate. Notably, Uber makes no argument whatsoever that an 85% recall rate would be overly burdensome in light of the needs of this action.

> (2) Uber Should Produce a Random Sample of the Training Documents Marked Non-Responsive

As noted above, given Uber's paltry custodial production, it appears something has gone dramatically wrong with Uber's initial coding decisions; Uber implausibly claims that only 10% of documents reviewed are responsive, even though the case involves a broad challenge to Uber's subscription practices and nearly every search string includes "Uber One" as a limiting term. In line with the holdings of other courts, the FTC respectfully requests that the Court order Uber to produce a random sample of 300 non-responsive training documents so that the parties can verify that the model has been accurately trained. *Winfield v. City of New York*, No. 15CV05236LTSKHP, 2017 WL 5664852, at *11 (S.D.N.Y. Nov. 27, 2017) (ordering defendant to produce sample of 300 non-privileged training documents marked non-responsive).

Notably, Uber itself has taken the position in other litigation that "relevance and responsiveness is to some degree in the eye of the beholder, and production therefore should not be limited to [the responding party's] unilateral determination" of what is responsive. *In re Uber Technologies, Inc. Passenger Sexual Assault Litigation*, No. 23-md-03084, 2025 WL 1554332, *4 (N.D. Cal. June 2, 2025) *citing* Dkt. 3050 at 4. In that case, Uber agreed to let plaintiffs review a sample of documents marked non-responsive as part of the TAR process and Uber successfully argued that they should get to review a sample of documents from plaintiffs. *Id.* ("The parties have separately agreed to a procedure for Plaintiffs' counsel to audit defense counsel's assessments of responsive documents as part of Uber's TAR production process. A corresponding, albeit not identical, validation process is appropriate here."). And, in fact, in reviewing the sample in that case the plaintiffs identified three whole *categories* of documents that Uber had improperly coded as non-responsive and were therefore excluded by Uber's TAR model. *In re Uber Techs., Inc.*, No. 23-md-03084-CRB (LJC), 2025 U.S. Dist. LEXIS 76871 (N.D. Cal. Mar. 6, 2025). The FTC is concerned similar problems could go undetected in this

---

[5] Relying on a declaration, Uber also suggests that the recall rate may end up being higher than 75%, but of course, it very well may not be—that is entirely the reason that Uber has selected a 75% recall rate (which, considering the confidence interval, could be as low as 70%). Uber also claims that responsive Slack materials—none of which have been produced yet—are supposedly voluminous. But Uber's claims on analogous issues have proven wrong. Originally, Uber represented to the Court that 12% of email and Google Drive material were responsive. Dkt. 226 at 8. Based on Uber's latest representations, it appears that the current hit rate is less than 10%, a roughly 17% difference.

4

case unless Plaintiffs have the ability to review a sample of documents marked unresponsive by Uber.  Uber tries to raise immaterial distinctions with *In re Uber Techs.*, but cannot obscure the fact that the plaintiffs in that case reviewed a sample of 4,500 Uber documents marked non-responsive during the TAR process, and the Court ruled that three categories of documents coded non-responsive were actually responsive and Uber was ordered to retrain its TAR model to include additional documents.  *See id.*

Uber also makes the preposterous argument that their coding of training documents marked non-responsive reflects their attorneys' mental impressions and thereby makes the documents privileged.  If that were the standard then any document marked responsive by an attorney would likewise become privileged and parties would never be under an obligation to produce documents in discovery.

> (3) Uber Should Ensure that Documents Responsive to Each RFP and/or Search String are Included in the Model's Training Set

Plaintiffs have repeatedly asked for assurances that a sufficient number of documents from each search string be used in the model training set to ensure that whole categories of documents are not excluded because the model was never trained on them.  Uber below has represented that at least 50 documents responsive to each search string have been manually reviewed and coded.  The FTC accepts Uber's representation and leaves this portion of the joint statement so that this representation is part of the record before the Court.

### F.  Scheduling

Uber has asked the Court to order an exchange schedule for future submissions.  If the Court is inclined, the FTC respectfully requests that the schedule order the moving party to produce its portion by 9:00am Pacific two days before the deadline, the responding party to send its responses by midnight on the following day, and for the parties to file the statement by noon Pacific.[6]

## II.   The States' Statement

### A.  Interrogatory 12

In response to Uber's interrogatory that the State Plaintiffs "State whether You contend that Uber did not disclose the date on which the following month or year's Uber One subscription would be charged," the State Plaintiffs wrote in part "[w]ithout waiving and subject to the foregoing objections, Maryland [or each of the other State Plaintiffs] answers that its allegations do not revolve around Uber's failure to disclose a billing date. Rather, Maryland [or each of the other State Plaintiffs] alleges that Uber charged consumers up to forty-eight hours before the stated billing date, thereby charging consumers without their express informed

---

[6] Although the FTC does not believe recriminations are productive, it must point out that in each of the last three status reports, including this one, Uber supported its position with declarations that were provided to the FTC only after the filing deadline and to which the FTC had no opportunity to respond.  Uber has taken the position that it cannot share the declarations with the FTC until the FTC finalizes its portion of the statement.

consent and causing them to pay additional fees despite the consumers having cancelled their subscriptions before the stated billing date." Dkt. 185-1.

Uber takes issue with the sentence explaining that the allegations do not revolve around a failure to disclose a billing date, suggesting this is an improper relevance objection. But Uber ignores the next sentence in which the State Plaintiffs explain how their contention differs from Uber's interrogatory. Uber appears to want to confine the State Plaintiffs to single a yes or no answer, but there are two parts to its question: (1) did Uber disclose a billing date; and (2) was that date accurate. As the State Plaintiffs' response makes clear, there was a "stated billing date," but "Uber charged consumers forty-eight hours before" that. *Id*.

Uber also objects—in an argument not raised until this report—that the phrase "stated billing date" is vague because it does not mirror Uber's language regarding the date on which the "subscription would be charged." But the problem here is Uber's own language. It is not clear whether the date the "subscription would be charged" refers to the billing date Uber disclosed or the date it actually processed the charges, which is why the State Plaintiffs needed to clarify that their contention is that while Uber did disclose a billing date, the date wasn't accurate.

### B. Interrogatories 9, 10, 11

Uber's contention that the State Plaintiffs have "concededly violated this Court's Order" is incorrect. Interrogatory 11 was not subject to the Court's April 27 Order. *See* Dkt. 192. With respect to the Interrogatories 9 and 10, while the State Plaintiffs maintained that their supplemental responses were appropriate, they agreed to further supplement in response to Uber's objections to avoid an unnecessary and easily resolvable dispute. Now, Uber attempts to use the State Plaintiffs' agreement to supplement as a basis to request a Court order requiring supplementation. That turns the purpose of the meet-and-confer requirement on its head. Uber did not raise these objections until this week, and the parties met and conferred on this issue just yesterday—there is no basis to suggest that the State Plaintiffs will be delayed in supplementing their responses, and no reason for the Court to intervene at this time.

### III.    Uber's Statement

The FTC did not provide its section of this report until the day before it was due, ignoring Uber's repeated requests that it share at least the issues it intended to raise with the Court. As Uber has stated before, the FTC's failure to provide its sections and the issues it intends to raise with the Court with sufficient time for the issues to be briefed is prejudicial and counterproductive. It also prevents the parties from meeting and conferring to resolve issues before they come before the Court.

Uber therefore requests that the Court order a structure for future status reports. The moving party should provide its sections of a status report at least five business days before the status report is due; the responding party should provide its responses at least two business days before the status report is due; and the moving party should then send any revisions one business day before the status report is due, with final drafts to be exchanged on the filing date.

6

### A. Uber's Responses to the FTC's Arguments

#### 1. Deadline for RFP 11

Uber agrees to perform a reasonable search for and produce any additional videos that it locates responsive to RFP 11 by the FTC's requested deadline of July 6.[7]

#### 2. Completion of Non-Custodial Production for RFP 33(c)-(d)

Contrary to the FTC's complaint that Uber has been unclear, Uber responded to the FTC in writing, and repeats here, that Uber conducted a non-custodial search for documents responsive to RFP 33(c)-(d), identified 41 responsive documents, and completed that production by the April 27 deadline. *See* UBER-FTCU1-00013712 – UBER-FTCU1-00014846. Uber also expedited its non-custodial production in response to this RFP, even though the Court's June 9 Discovery Order made clear that Uber was not obligated to do so. Dkt. 230 at 2. Accordingly, Uber produced four additional custodial documents on June 11. Uber has also repeatedly explained that this RFP is part of Uber's custodial review. Uber produced additional custodial documents responsive to RFP 33(c)-(d) on June 18 and expects to produce more responsive custodial documents in its forthcoming rolling custodial productions. Uber's deadline to complete its custodial production is July 13.

#### 3. Exchange of Privilege Logs

Uber proposes two deadlines for privilege logs: a July 24 deadline for Uber's first privilege log (expected to include approximately half of the documents) and a July 31 deadline for Uber's final log (to include the remaining privileged custodial documents).

#### 4. Production of Enrollment and Cancellation Flows from Foreign Jurisdictions for RFPs 8 and 10

Uber completed its production of enrollment and cancellation flows from the five foreign jurisdictions (Brazil, Mexico, South Korea, Germany, and the United Kingdom) by the Court-ordered May 29 deadline. *See* Dkt. 191. This was a highly burdensome effort by foreign teams in the five foreign jurisdictions. There is no central repository of foreign flows. Instead, this review required a country-by-country workstream to identify all available enrollment and cancellation flows. For each country, there are multiple ways for consumers to enter the Uber One enrollment flows—for example, through an email, advertisement, or pop-up. Uber refers to these multiple methods to enter the enrollment flows as "entry points." By definition, an entry point is the place where a consumer is *before* the consumer enters an enrollment flow. For each of the foreign countries, each foreign team had to research the multiple entry points and determine the corresponding enrollment flows for Uber to produce. Uber then produced all unique enrollment flows it identified, regardless of entry point. Uber did not produce images of items prior to the enrollment flow because those steps do not "*form part of that [enrollment or cancellation]*

---

[7] The FTC's representation that "Uber's production to date includes only a single cancellation flow video" is misleading because Uber has produced numerous videos, images, and screenshots of the Uber One cancellation and enrollment processes.

*process,"* and documents showing them are not maintained with the enrollment flows. While there are multiple entry points for each country, there was not a unique enrollment flow for each of the different entry points. The difference between entry points and enrollment flows is not a new issue: Uber is responding to an interrogatory that the FTC recently served that asks Uber to match entry points to enrollment flows that Uber has produced.

### 5.  Uber's TAR Proposal

As the Court knows, Uber shared its TAR proposal with the FTC on May 21, answered 43 written questions from the FTC regarding TAR, and offered to make its TAR consultant (Array) available to the FTC to answer any further questions the FTC had about TAR. *See* Dkt. 226 at 9-11. The FTC declined Uber's offer and asked the Court to prohibit Uber from using TAR altogether. *See* Dkt. 226, 231. On June 12, the Court found that Uber's TAR proposal is "appropriate," "consistent with industry standards," and "well suited for this type of document review." Dkt. 233 at 2 (citing declarations that Uber submitted with its June 5 and June 12 briefing regarding TAR). Uber continues to dedicate substantial resources to completing this TAR review, and Uber still has 110 contract attorneys working full time to complete the review.

With only ten business days remaining for the completion of Uber's custodial review, the FTC now requests adjustments to Uber's TAR proposal because the FTC thinks that Uber's total custodial production volume will be too small. But the FTC's representation regarding the size of Uber's anticipated custodial production is inaccurate. Uber made its first custodial production of 18,038 documents on June 18. In Uber's June 18 production letter, Uber explained to the FTC that the "production contain[ed] 18,038 documents, which is estimated to be approximately 25% of the expected responsive, *non-Slack* materials." The collection of the Slack repository was only recently completed. Based on the sampling and review of Slack done to date, Uber's custodial production of Gmail, Google Drive, and Slack materials is expected to be about 243,525 documents. Ex. A, Supplemental Declaration of Jeff Grobart dated June 26, 2026 ("Supp. Decl."). ¶ 7. Further, the FTC's claim that the documents have not been threaded or de-duped is incorrect; email threading was applied to Gmail, and global de-duplication was applied to the Gmail, Google Drive, and Slack materials. Supp. Decl. ¶ 6. To the extent that the FTC has questions about documents that it thinks are duplicates, it has not sent Uber the Bates numbers to review. Lastly, it's hardly surprising that there are fewer documents about Uber One than Amazon Prime, given that Amazon Prime is much larger than Uber One.

Uber further responds below to each of the FTC's requested modifications.

### a.  Uber Should Not Be Required to Raise the Recall Rate to 85%

The FTC already asserted that the 75% recall rate was too low, but this Court rejected that argument and should do so again. In the June 12 Discovery Order, the Court found Uber's TAR proposal with the 75% recall rate to be "appropriate," "consistent with industry standards," and "well suited for this type of document review," Dkt. 233 at 2, and the Court ordered Uber to complete its custodial production by July 13, *see* Dkt. 233 at 1-2,. Uber proposed that expedited deadline based on the time that it would take to review documents with the 75% recall rate in Uber's TAR proposal. The FTC's request now for Uber to raise the recall rate in Uber's TAR

proposal from 75% to 85% is unreasonable and inappropriate for a number of reasons, including because Uber's Court-ordered deadline to complete its custodial production is only ten business days after the date of the filing of this joint status report.

Aside from the unreasonable timing of the FTC's requested modification, the request itself is unreasonable because the FTC's demand suggests that TAR should be held to a higher standard than other review options. Supp. Decl. ¶ 9. As Uber already briefed, *see* Dkt. 226 at 8, a 75% recall rate is reasonable and industry standard. "Courts have found TAR processes achieving a 75% recall rate to be appropriate." *Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 1813395, at *8 (D. Kan. Apr. 9, 2020) (citing *The Sedona Conference Tar Case Law Primer*, 18 Sedona Conf. J. 1, 37 (2017));[8] *see* Maura R. Grossman & Gordon V. Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, 17 Rich. J.L. & Tech. 11, 55 (2011) ("For three of the five topics . . . the results show no significant difference in recall between the technology-assisted and manual reviews. This result is perhaps not surprising, since the recall scores are all on the order of 70% - the best that might be reasonably achieved, given the level of agreement among human assessors. As such, the results support the conclusion that technology-assisted review can achieve at least as high recall as manual review, and higher precision, at a fraction of the review effort, and hence, a fraction of the cost."); *see also Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 129 (S.D.N.Y. 2015) ("[I]t is inappropriate to hold TAR to a higher standard than keywords or manual review. Doing so discourages parties from using TAR for fear of spending more in motion practice than the savings from using TAR for review.").

Uber also already explained why the FTC's citation to *Garner v. Amazon.com, Inc.*, No. 2:21-CV-00750-RSL, 2023 WL 3568055, at *3 n.5 (W.D. Wash. May 19, 2023), is misplaced. *See* Dkt. 226 at 8. The *Garner* court's reference to a 75% recall target being too low assumed that "25% of responsive, relevant, non-privileged documents [would] remain hidden." *Amazon*, 2023 WL 3568055, at *3 & *3 n.5. That is not true or expected here. Dkt. 226-4 (Declaration of Vincent Liu) ¶ 17.

Uber still has 110 contract reviewers working on the custodial review. Even with 110 contract reviewers, raising the recall rate from 75% to 85% would require at least another 25 days to complete the responsiveness review, which does not include the additional time also needed to complete the privilege review and redactions. Supp. Decl. ¶ 10.[9]

### b.  Uber Should Not Be Required to Produce Training Documents

The FTC's request for training documents should be rejected. The FTC gives the Court no reason to reconsider its prior decision that Uber's TAR proposal is "appropriate," "consistent with industry standards," and "well suited for this type of document review." Dkt. 233 at 2.

---

[8] The FTC cites *Lawson* for the proposition that the Court should order an 85% recall rate, but the *Lawson* court did not order an 85% recall rate. 2020 WL 1813395, at *8. There, the parties agreed to an 80% recall rate, and the producing party ultimately produced 85% of responsive documents, reaching an 85% recall rate. *Id.*

[9] The FTC states that the difference between 10% and 12% is 17%. *See note* 5. Uber does not understand that math.

As Uber already briefed, *see* Dkt. 226 at 10, courts have held that documents used to train a TAR model are work product, and it is not standard practice to share them. *See* Dkt. 226-4, Decl. ¶ 20; *Winfield v. City of New York*, No. 15:CV-05236-LTS-KHP, 2017 WL 5664852, at *11 (S.D.N.Y. Nov. 27, 2017) (explaining "internal attorney ESI work processes may reveal work product, litigation tactics, and trial strategy") (citing *Disability Rights Council of Greater Wash. v. Wash. Metro Transit Auth.*, 242 F.R.D. 139, 142-43 (D.D.C. 2007)). Typical disclosures include the statistics of the validation sets and final recall, precision, elusion, and total document universe numbers, not the underlying content of any of the documents used for training. *See* Dkt. 226-4, Decl. ¶ 20. This is particularly true when a TAR workflow uses CAL, like Uber's. *See Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 128-29 (S.D.N.Y. 2015) ("If the TAR methodology uses 'continuous active learning' (CAL) (as opposed to simple passive learning (SPL) or simple active learning (SAL)), the contents of the seed set is much less significant. . . . [R]equesting parties can insure that training and review was done appropriately by other means, such as statistical estimation of recall at the conclusion of the review as well as by whether there are gaps in the production, and quality control review of samples from the documents categorized as non-responsive.").

The FTC's citation to *Winfield* does not support the FTC's requested relief. That court explained that "there is nothing so exceptional about ESI production that should cause courts to insert themselves as super-managers of the parties' internal review processes, including training of TAR software, or to permit discovery about such process, in the absence of evidence of good cause such as a showing of gross negligence in the review and production process, the failure to produce relevant specific documents known to exist or that are likely to exist, or other malfeasance." 2017 WL 5664852, at *9. The FTC has presented no such evidence.

The FTC's suggestion that something has gone wrong with Uber's initial coding because only approximately 10% of documents are responsive is a false and baseless accusation. The search terms are broad and hit many non-responsive documents that have nothing to do with the FTC's challenges to the Uber One enrollment and cancellation processes. For example, the terms capture emails regarding employees signing up for unrelated "memberships" and emails that include employees on the "Membership" team solely because of their job titles—not because the communications are responsive to the FTC's requests or relevant to the issues in the case. The volume of non-responsive documents is a predictable consequence of the breadth of the search terms, not evidence of any deficiency in Uber's coding.

Finally, the FTC's reliance on *In re Uber Techs., Inc., Passenger Sexual Assault Litigation*, No. 23-md-03084, 2025 WL 1554332, at *4 (N.D. Cal. June 2, 2025), is misplaced. The quoted statement was about a dispute over the proper scope and relevance of social media discovery. Uber noted that the responsiveness of social media content in particular tends to be "in the eye of the beholder." *In re Uber Techs., Inc., Passenger Sexual Assault Litigation*, No. 3:23-md-03084, Jt. Ltr., Dkt. 3050 at 4. That court agreed: "the responsiveness of social media information may sometimes be a subjective question." 2025 WL 1554332, at *4. The court thus reasoned that some validation was warranted. Uber did not—as the FTC asserts—argue that it should review a sample of documents to ensure TAR coding was accurate. The FTC also mischaracterizes the other proceedings in that case. First, Uber did not "agree[]" to the plaintiffs' review of documents

marked non-responsive as part of the TAR process. *See In re Uber Techs., Inc., Passenger Sexual Assault Litigation*, No. 3:23-md-03084, Mem. in Supp. of Defs.' Proposed ESI Protocol, Dkt. 262 at 7-8. Second, the FTC overstates the March 6, 2025 order. That order addressed disputes regarding whether certain categories of documents were responsive and discoverable; it did not hold that Uber had "improperly coded" three categories of documents as non-responsive. *See In re Uber Techs., Inc., Passenger Sexual Assault Litigation*, No. 23-md-03084, 2025 U.S. Dist. LEXIS 76871, at *57-66 (N.D. Cal. Mar. 6, 2025).

### c.   Uber's TAR Model Has Already Been Trained, and Continues to Be Trained, on a Sufficient Number of Documents from Each Search String

As outlined in Uber's TAR proposal, Uber is using a TAR 2.0/CAL model and initiated training with a statistically valid random sample drawn from the TAR-eligible population for the Gmail, Drive, and Slack collections. Dkt. 226-3 at 1-2. Uber is following the TAR methodology outlined in its proposal, which the Court found to be, among things, industry standard. Dkt. 233.

With ten business days remaining before Uber's custodial production completion deadline, and after the initial models for Gmail, Drive, and Slack have already been trained, the FTC asked "Uber to ensure at least 50 documents from each search string be included in the training set, as well as at least 10 documents that reference ROSCA." (The FTC shared this request with Uber for the first time at 7:05 a.m. PT on June 25.)

As the FTC now appears to accept, Uber has effectively already done this. With a TAR 2.0/CAL review, every document reviewed is necessarily used to train the model, even if not part of the initial training set. *See* Dkt 226-4, Decl. ¶ 10 ("[T]he system learns from reviewers as they code and constantly updates its predictions."). Uber has already reviewed well over 50 documents from each search string, including over 10 documents that hit on "ROSCA." Supp. Decl. ¶¶ 11-15.

Accordingly, Uber's TAR model has already been trained, and continues to be trained, on a sufficient number of documents from each search string.

### B.   Uber's Requested Relief Regarding Deficiencies in State Interrogatory Responses

Several of the States' interrogatory responses remain in violation of the Court's April 27 order granting Uber's motion to compel (Dkt. 192) because the States still refuse to answer Uber's proper contention interrogatories. Uber met and conferred with the States about this issue on June 25, 2026.[10] With respect to Interrogatory Nos. 9, 10, and 11, the States have agreed to provide supplemental responses by Monday, July 6. Since the States' initial responses concededly violated

---

[10] In asking the States to meet and confer before the deadline for this report, Uber demonstrated a level of cooperation that it hopes Plaintiffs will adopt in the future, but as revealed by the number of issues Plaintiffs are raising for the first time in this report, they have not shown to date.

this Court's Order, Uber requests that the Court codify this deadline to supplement with another Order.

The parties have reached an impasse on Interrogatory No. 12, and that issue is thus ripe for judicial resolution. Uber requests an order requiring the States to provide all non-privileged, responsive information to Interrogatory No. 12 no later than Thursday, July 2.

Interrogatory No. 12 asks each State to advise whether it contends "that Uber did not disclose the date on which the following month or year's Uber One subscription would be charged." If the State does so contend, the State is asked to identify "all facts in support of [that] response." The States have dodged their obligation to answer Interrogatory No. 12 by trying to grant their own relevance objections to it—they contend that their "allegations do not revolve around Uber's failure to disclose a billing date." Ex. B (Alabama's Objections and Responses to Defendant's First Set of Interrogatories) at 17. That is improper. It may be the States' view that their "allegations do not revolve around Uber's failure to disclose a billing date," Ex. A at 16-17, but so long as the topic is relevant (and it undisputedly is), each State still needs to answer this contention interrogatory about it. As the Court explained with respect to Interrogatory No. 9, "Uber is entitled to know if the States make the contention it asks about" because that contention is "about a relevant subject." Dkt. 192 at 5; *see id*. ("The States must answer[.] Their answer is up to them. If they think [the Interrogatory] misstates their contentions, they can say they do not make that contention. If they don't make any contentions about [the topic], they can say that. Of course, they will then be stuck with that answer on summary judgment or trial.").

Nor is it sufficient for the States to allude to a "stated billing date" without further detail. Ex. B at 17. The Interrogatory asks whether the States contend that Uber failed to disclose a certain kind of date—the "date on which the following month or year's Uber One subscription would be charged." Vague reference to a "stated billing date," Ex. B at 17, does not provide an answer to that question. The Court should compel one.

12