Division of Financial Practices
Bureau of Consumer Protection

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

July 17, 2026

***By ECF***

Honorable Thomas S. Hixson
United States District Court, Northern District of California
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

      Re:    *FTC et al. v. Uber Technologies, Inc. et al.*, Case No. 4:25-cv-03477-JST

Dear Judge Hixson:

Plaintiffs the FTC and Attorneys General of Alabama and Maryland, on behalf of themselves and the Attorneys General of the States of Arizona, Connecticut, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Virginia, West Virginia, Wisconsin, and the District of Columbia, the People of the State of California, the People of the State of Illinois, and the People of the State of Michigan, (collectively, the "States") and defendants Uber Technologies, Inc. and Uber USA, LLC submit this joint discovery status report pursuant to the Court's July 2, 2026 Discovery Order (Dkt. No. 248).

The parties hereby attest that they have met and conferred in good faith to resolve their disputes prior to filing this statement.

Respectfully submitted,

*/s/* Patrick Roy

Patrick Roy
Federal Trade Commission
*Attorney for Plaintiff FTC*

*/s/ Michael Dean*

Michael G. Dean
*Assistant Attorney General*
*Attorney for Plaintiff State of Alabama*

*/s/ Philip Ziperman*

Philip Ziperman

*Deputy Chief, Consumer Protection Division*
*Attorney for Plaintiff Attorney General of*
*Maryland*


                    */s/ David Gringer*
David Gringer
Wilmer Cutler Pickering Hale and Dorr LLP
*Attorney for Uber Technologies, Inc.*
*and Uber USA, LLC*



                    */s/ Ben Mundel*
Ben Mundel
Sidley Austin LLP

*Attorney for Uber Technologies, Inc.*
*and Uber USA, LLC*

## I.    Plaintiffs' Affirmative Statement

As explained below, the FTC respectfully requests that the Court order Uber to: (A) produce non-custodial documents responsive to RFPs 52 and 53 by August 12; (B) complete its responses to Interrogatories 2 and 3 by July 29; and (C) respond to Interrogatory 4 by providing the number of impressions for advertisements identified by the FTC by August 5. Further, for the reason identified below, the Court should (D) deny Uber's request for Plaintiffs to narrow its initial disclosures to only include witnesses it intends to call at trial; (E) deny Uber's request for leave to file additional interrogatories beyond the 25 allowed under the Federal Rules; and (F) deny Uber's request for the FTC to supplement its response to Uber's Interrogatory 11 by July 31, 2026.  The FTC agrees to Uber's proposed privilege log schedule (*see* Section G).

### A.  Production Deadline for RFPs 52 and 53

On May 29, 2026, the FTC served RFPs 52 and 53, seeking documents (and underlying data) relating to analyses, experiments, reviews, studies, and testing of Uber Pass. Ex. A.[1]  For these two RFPs, the FTC asked, and Uber agreed, to perform non-custodial direct pulls.  Uber has yet to produce these documents.  The FTC requests that the Court order Defendants to produce all materials responsive to RFPs 52 and 53 via non-custodial direct pulls, by August 12.

### B.  Uber's Response to Interrogatories 2 and 3 Are Incomplete and Deficient

The FTC served Interrogatories 2 and 3 to obtain information identifying the specific enrollment processes each Uber One subscriber completed, and the specific representations those subscribers each saw while enrolling.  Uber has confirmed it possesses additional information responsive to both interrogatories, but its response remains incomplete and does not allow the FTC to determine how the majority of subscribers were enrolled in Uber One, or which representations they saw when they were enrolled.

#### 1.  Interrogatory 2

On May 29, the FTC served its second set of interrogatories on Defendants. Ex. B. Interrogatory 2 requests: "For each Uber One subscriber, identify by Bates number(s) any enrollment flow completed by the consumer, including any advertisements clicked on by the consumer." *Id.* Uber's response to this interrogatory is deficient and incomplete.  In its response, Uber directs the FTC to previously produced membership database files and its incomplete response to the FTC's third interrogatory, which correlates to a limited number of enrollment flows with "entry point variables" that appear in Uber's membership database files.

---

[1] These requests correspond to RFPs 31 and 32 (see Dkt. No. 226-1) that were served on July 22, 2025.  The FTC issued these requests because Uber's position is that Uber Pass documents are not responsive unless the RFP specifically references "Uber Pass."  Plaintiffs do not agree with this position and believe Uber Pass materials are responsive to RFPs 31 and 32. However, to avoid a dispute on the issue, the FTC served a second set of RFPs that specifically reference Uber Pass.

1

Ex. C.  However, roughly 19.4 million consumers in Uber's membership database files are missing entry point variables for their first subscription period of Uber One, leaving the FTC with no way to ascertain how these consumers were enrolled.[2]  In its response, Uber states that roughly 60% of the 19.4 million consumers that are missing entry point data were enrolled between November 2021 and November 2022, and that it is "investigating why this data was not populated."  But is completely silent on the other 40% of consumers (over 7.5 million consumers) who are missing entry point variables.  Accordingly, the FTC requests that the Court order Uber by July 29 to identify the enrollment flows completed by *all* Uber One subscribers (including those who are missing entry point variables in Uber's membership database files).  If Uber is incapable of identifying the specific enrollment flows completed by all Uber One subscribers, then Uber should clearly confirm that fact in writing and explain, to the extent it can, how Uber One subscribers who are missing entry point variables came to be enrolled in Uber One.  This should entail, at a minimum, a written update on its investigation into the 60% enrolled in Uber One between November 2021 and November 2022 and an explanation on the other 40%, including why they are missing entry point variables.

### 2.  Interrogatory 3

Uber's response to Interrogatory 3 is also incomplete.  Interrogatory 3 requests: "For each entry point variable listed in Uber's data productions responsive to RFP 35 (e.g., 'checkout interstitial,' 'one click,' and 'interstitial home') identify by Bates number all enrollment flows and advertisements that correspond to the entry point variable."  Ex. C.  Uber's previous productions indicate that there are approximately 230 different entry point variables, but Uber's response identifies enrollment flows for only 35 entry point variables.  And for 32 of the 35 entry points, the FTC cannot determine the specific enrollment flows used to enroll each subscriber because there are multiple (sometimes as many as 5) enrollment flows associated with a single entry point variable, and Defendants refuse to confirm whether more precise enrollment data exists and can be produced.  Further, Uber has produced enrollment flows that do not correspond to any of the entry point variables listed in Uber's response, which further confuses the facts around its enrollment processes.

During the parties' meet and confer, Uber acknowledged that its response was not exhaustive and that it was still working on supplementing its response.  The FTC requests that the Court order Uber, by July 29: (1) to identify the Bates numbers of all enrollment flows and advertisements that correspond to all 230 different entry point variables; (2) for entry point variables that correspond to multiple enrollment flows, to provide information showing the specific enrollment flow a subscriber completed to enroll or confirm in a supplemental response that such information does not exist; and (3) to provide a complete list of all corresponding

---

[2] During the parties' July 8 meet and confer, Uber suggested this data was missing because when a member is auto-renewed for another month or year of Uber One, their membership is not associated with an additional entry point because the member did not go through an enrollment flow for a renewal.  However, these are not the members the FTC is referring to.  Approximately 19.4 million subscribers included in Uber's membership database files do not have an entry point variable for their first month or year of Uber One, so there is no way for the FTC to determine which enrollment flow these subscribers used to enroll.

enrollment flows and advertisements for the entry point variables listed in Uber's initial response to the FTC's Interrogatory number 3.

### C. Interrogatory 4

Interrogatory 4 requests: "State the number of impressions received for each advertisement produced by Uber." Uber did not respond to this interrogatory and instead asked for the parties to meet and confer, where Uber requested that the FTC narrow the universe of advertisements for which it seeks impressions. In an effort to compromise, the FTC has searched Uber's advertisement productions for advertisements that include the FTC's alleged misrepresentations and requests that Uber be ordered to produce the impressions for those specific advertisements. *See* Ex. D. Consumer impressions for Uber One advertisements are relevant to the question of whether Uber's allegedly deceptive claims were relied on by consumers. *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 605-06 (9th Cir. 1993) (Under the FTC Act, "[a] presumption of actual reliance arises once the [FTC] has proved that the defendant made material representations, that they were widely disseminated, and that consumers purchased the defendant's product."); *United States v. Stratics Networks, Inc.*, 2026 WL 1974742, at *15 (S.D. Cal. July 8, 2026) (same); *see also FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (evidence of actual customer deception is "highly probative to show that a practice is likely to mislead consumers acting reasonably"). The FTC has done what it can to reduce the burden on Defendants by narrowing its request to only include advertisements highly likely to contain the misrepresentations at issue in the case (thereby eliminating the Defendants' burden of retrieving responsive information for over 2,000 advertisements), but cannot narrow the universe any further. It is necessary to obtain responsive information for *all* advertisements containing deceptive claims, because even virtually identical iterations of an advertisement might have vastly different impression ranges depending on how the advertisement was employed. Accordingly, the FTC requests that the Court order Uber to produce impression data for each of the advertisements identified in Exhibit D by August 5.[3]

## II.    Uber's Response to Plaintiffs' Affirmative Statement

### A. Non-Custodial Production Deadline for RFPs 52 and 53 (Uber Pass Testing Documents)

On May 29, 2026, the FTC served 13 supplemental discovery requests seeking information about Uber Pass, which was a subscription program Uber launched eight years ago and ended five years ago. Despite the FTC's delay in serving these requests and the tenuous connection to this case, Uber updated its custodial review protocol and was able to produce approximately 3,121 responsive documents about Uber Pass as part of its custodial search. Uber also agreed to do non-custodial searches for documents responsive to RFPs 52 and 53.

---

[3] Uber states in its portion that it does not believe it will be able to identify impression data for 19 of the advertisements specified in Exhibit D. The FTC requests that the Court order Uber to identify these 19 advertisements and provide a reason, in writing, why it cannot produce impression data.

Searching for non-custodial documents in response to RFPs 52 and 53 is a very time consuming and difficult task because of how long ago the documents were created, but Uber continues to search for additional documents. Uber proposes a deadline of August 12, 2026, to ensure it has sufficient time to conduct a reasonable search for any other non-custodial responsive documents.

## B. Uber's Responses to Interrogatories 2, 3, and 4

### 1. Interrogatory 2

In Interrogatory 2, the FTC asks Uber to identify exactly how all approximately 46.2 million Uber One subscribers enrolled in Uber One. The only accessible data Uber has about how a member signed up is through its "entrypoint" field in its customer data. For each Uber One member, Uber's produced customer list includes all of the specific coding that it has that identifies how (and when) each member enrolled. Uber has then gone through the time consuming manual process of connecting those specific entrypoint codes to its produced enrollment flows—which is work that it continues to undertake and supplement, as discussed further below in the section on Interrogatory 3—linking the customers and the flows as the FTC has requested.

The FTC's complaint about Interrogatory 2 is that Uber did not produce the entrypoint code for 19.4 million customers. That is accurate. Uber did not produce that data because its membership database does not have entrypoint variables for those customers. Roughly 60% of these 19.4 million customers enrolled in Uber One between November 2021 and November 2022; for these customers, the data tables used to extract this information do not have an entrypoint populated. Uber is investigating why this data was not populated for the full universe of 19.4 million customers and whether it may exist in another source,[4] but Uber has not been able to locate it and cannot produce data it does not have.

### 2. Interrogatory 3

Interrogatory 3 asks Uber to tie each of the entrypoint codes in its database to specific produced entrypoints and enrollment flows, by Bates number. Uber does not maintain a data dictionary or key to automate this process. Instead, Uber has had teams of employees and lawyers comb its historical records to recreate history and match the enrollment flow entrypoints with the produced documents by Bates number.

In its initial response to Interrogatory 3, Uber provided Bates matches for 35 of the approximately 230 entrypoint variables in the US memberships database. Though there are over 200 entrypoint variables in the data, Uber focused on the most common entry points: these 35 entrypoint variables it produced account for 84.60% of the enrollments across all entrypoints.

---

[4] To the extent the Court is inclined to order Uber to provide an update on this investigation by a date certain, Uber asks that it be given until August 5, 2026 to do so.

4

Uber's work is not done. Since its initial production, it has been working to identify by Bates number the entrypoints for the remaining variables (the last 15%). That work is even more difficult and time consuming because the more rarely used entrypoints are not as well documented. Over half of the remaining entrypoints make up less than 0.005% of all enrollments each, and many of the remaining variables appear to be historical or "legacy" entrypoints that are no longer in use, which makes it even harder to identify a match.

Identifying a match for these more niche variables therefore first requires Uber to determine which group has responsibility for that entrypoint variable across its global network, and then determine how it can map the term onto a specific entrypoint record or flow that was produced in this case. In light of this significant burden, Uber asks that the Court grant it at least until **August 14** to supplement its response. Still by this date, Uber may not be able to match images to all entrypoints, but the Court and the FTC can be assured that Uber is doing everything it can to do so.

Finally, the FTC complains that Uber identified numerous Bates numbered flows for some of the entrypoint variables in the database. But that is a complaint about how Uber maintains data, not a complaint about discovery. As part of its work in responding to RFP 8, Uber in many cases identified and produced multiple documents and/or videos showing the same—or iterations of the same—enrollment flow. When that was the case, Uber—consistent with its discovery obligations—identified all produced flows that it could match to the variable in the dataset. This is a feature, not a bug, of Uber's discovery work.

### 3. Interrogatory 4

Uber agrees to the FTC's requested deadline of August 5, 2026, to complete its response to Interrogatory 4. Uber is actively working with its data teams to compile impressions data for all of the ads that the FTC has requested in Exhibit D. At this time, Uber believes it will be able to identify impression data for all but 19 of the 1,167 specific advertisements that the FTC has requested.[5] Uber's data personnel estimate that this work can be completed by the August 5 deadline that the FTC has requested, and Uber respectfully asks that the Court enter an Order accordingly.

### III.    Uber's Affirmative Statement

Uber seeks an order requiring Plaintiffs to serve focused Rule 26(a)(1) disclosures with the likely individuals that Plaintiffs may call at trial, so that Uber can proceed with the rest of fact discovery in an orderly and focused manner, including by deposing the witnesses Plaintiffs are likely to rely on at trial. Currently, Plaintiffs have disclosed more than 800 individuals, the vast majority of whom Plaintiffs clearly do not intend to call live.

---

[5] For the remaining 19 advertisements, Uber does not have a specific numeric identifier that would allow it to track ad impressions.

Further, because Uber cannot take depositions of the Plaintiffs in this case, Uber would like the ability to serve additional contention interrogatories so that it may challenge Plaintiffs' theories and learn Plaintiffs' position in response to exculpatory evidence in the record. Uber therefore requests leave of court to serve 11 interrogatories over the limit on each of the parties (for a total of 36 interrogatories).

Last, Uber requests that the Court set deadlines for the FTC to supplement its response to Uber's Interrogatory No. 11 and to produce its privilege logs.

**A. Plaintiffs Must Narrow Their List Of Individuals In Their Initial And Supplemental Disclosures.**

The FTC's initial disclosures identify more than 200 current or former Uber employees and more than 600 purported Uber customers, without including contact information or state of residence. The States' initial disclosures incorporate by reference all individuals identified in the FTC and Uber's initial disclosures. The States' supplemental disclosures name one or two investigators or officials with knowledge for only three of the States (Alabama, New York, Pennsylvania). At this late stage of fact discovery, these disclosures severely impede Uber's ability to determine which witnesses to depose, consistent with Rule 30's limitations, before the close of fact discovery on September 14, 2026.

Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires parties to identify "the name and, if known, the address and telephone number of each individual likely to have discoverable information" that the party may use to support its claims or defenses. Rule 26(e) requires supplementation, and Rule 37(c)(1) limits the use of undisclosed witnesses. These rules ensure that parties can prepare for trial without uncertainty about the witnesses that will be relied upon. While Plaintiffs may contend that identifying hundreds of individuals avoids surprise, that can no longer be true at the current stage of the case. So much so that the list's sheer length works the same result as a list containing no names at all. *See generally In re 640 Fifth Ave. & Related Props.*, 2013 WL 12183225, at *2 (S.D.N.Y. June 5, 2013) (noting the court's prior order that "the purpose of disclosing trial witness lists was to assist in focusing depositions." (alteration adopted)); *United States v. Town of Colo. City*, 2014 WL 5431209, at *1 (D. Ariz. Oct. 27, 2014) (noting "the primary purpose of disclosing witnesses by name: that is, to make it possible for a party to evaluate whether or not to depose someone who may be called at trial."). Indeed, the FTC represented to the Court that its portion of the trial would take no more than eight business days. Joint Case Mgmt. Statement 13 (Jul. 29, 2025), ECF 30. The Court set the "estimate of trial length" at eight days total. Scheduling Order 2 (Aug. 5, 2025), ECF 32. It is logistically impossible for Plaintiffs to call 800 witnesses during that window (or anywhere close).

Given the number of individuals identified, and the lack of updates from Plaintiffs even as discovery moves to a close, Uber cannot make informed decisions about depositions within the remaining discovery period. Uber does not intend to depose any of its own current or former employees (so there is no information asymmetry), but that still leaves more than 600 potential consumer deponents at issue. Uber is only permitted to take 10 depositions, and in any event, could not in the time remaining for fact discovery depose the 600 consumer witnesses listed in the FTC's initial disclosures.

Plaintiffs' opposition rests on a fundamental mischaracterization of Uber's request. Uber is not seeking final trial-witness disclosures, a binding election of trial witnesses, or a waiver of Plaintiffs' ability to supplement as discovery develops. Uber seeks only a good-faith identification of the consumers upon which Plaintiffs presently expect to rely so that Uber can conduct discovery in a manner consistent with Rule 30's deposition limits and the September 14 fact-discovery deadline. Plaintiffs' 600-plus-person consumer disclosure, without contact information, prioritization, or any indication of which consumer experiences Plaintiffs actually intend to use, does not serve the practical purpose of Rule 26(a)(1). It leaves Uber to guess which of hundreds of consumers Plaintiffs will feature, even though that information is uniquely within Plaintiffs' knowledge.[6]

Plaintiffs' reliance on consumer complaints and declarations proves Uber's point. Plaintiffs appear to have already selected certain consumers to support their case, including six declarants. But Plaintiffs do not say they will rely on those declarants and certainly do not say that those are the only six consumers that they will rely on. Thus, they leave every consumer in play while committing to none.

Uber respectfully requests that the Court order Plaintiffs to supplement their disclosures to make a good-faith identification of 20 consumers that they are most likely to rely on in support of their claims by **July 31, 2026**, along with their known contact information, so that Uber can conduct a reasonable number of depositions before the close of fact discovery. Uber also requests that the Court order Plaintiffs to confirm that Plaintiffs do not intend to add additional witnesses beyond those presently known by that same date. If Plaintiffs maintain that all 600-plus disclosed consumers remain equally likely to be used, Uber respectfully requests leave to take additional consumer depositions sufficient to test the consumer evidence Plaintiffs may present.

---

[6] The cases cited by Plaintiffs do not compel a different result. In *Saniefar*, the disclosed witnesses were all victims of the alleged racketeering scheme at issue; because defendants had litigated cases against those individuals, defendants already knew their relevance. *Saniefar v. Moore*, 2019 WL 3202924, at *4 (E.D. Cal. July 16, 2019). In *Nugent*, the identified witnesses were all current and former employees of the defendants themselves. *Nugent v. Spectrum Juv. Just. Servs.*, 2024 WL 4173743, *8 (E.D. Mich. Sept. 12, 2024). In *Perez*, the court denied a request for a premature disclosure of the actual trial list because defendants had not shown sufficient need and, under the circumstances of that case, could obtain the same information from any of the approximately 300 witnesses identified. *Perez v. L & J Farm Picking, Inc.*, 2013 WL 5446625, at *3 (S.D. Fla. Sept. 30, 2013). Lastly, C&E Services rejected a request to preclude testimony from late-disclosed witnesses who had not been deposed. *C & E Servs. v. Ashland Inc.*, 2008 WL 1744618, at *3 (D.D.C. Apr. 14, 2008). First, these cases are inapposite: Uber is not seeking the relief sought by the parties in those cases because Uber is not seeking premature disclosure of a trial witness list or exclusion of any witnesses not so identified. And second, nothing in any of these four cases considered whether case-management relief of the type Uber is requesting may be appropriate when a party's disclosures are so expansive that they provide no guidance for targeted discovery.

**B.  Uber's Additional Contention Interrogatories Should Be Granted.**

Parties may serve up to 25 interrogatories, unless otherwise stipulated or ordered by the Court. Fed. R. Civ. P. 33(a)(1). Uber has served 20 interrogatories on the FTC and 20 interrogatories on the States and now seeks leave to serve 11 interrogatories over the limit on both parties (for a total of 36 on each). All the interrogatories Uber seeks to serve are listed below.

In granting the Plaintiff States' motion to quash Uber's Rule 30(b)(6) deposition notice, the Court already recognized that contention interrogatories are the proper vehicle to understand the facts that the Plaintiffs intend to use to support their claims, their position on contested issues, and to confront Plaintiffs with exculpatory evidence: "This is what contention interrogatories are for." Discovery Order (re Dkt. Nos. 180, 181) 3:10–11 (Apr. 16, 2026), ECF 183. The Court further observed that "Uber is entitled to know [the basis for Plaintiffs' contentions regarding Uber's business practices] so it can defend against the accusation" at trial. *See id.* at 5:15–16; *see also* Discovery Order (re Dkt. Nos. 185, 186) 5: 17–18, ECF 192 (for a contention interrogatory about "a relevant subject," Uber "is entitled to know if the States make the contention it asks about").

Contention interrogatories serve the critical and tailored function of requiring a party to identify the factual bases for its claims or defenses, which clarifies and can narrow the issues for discovery, summary judgment, and trial. That function is especially important here because Plaintiffs' claims span multiple jurisdictions, legal theories, alleged representations and omissions, consumer experiences, cancellation pathways, and remedial theories. Uber's proposed interrogatories target the specific contentions Plaintiffs intend to advance and the facts supporting them. They do not seek duplicative discovery or impose undue burden. Instead, they will focus depositions, expert discovery, dispositive-motion practice, and trial preparation. Uber has more interrogatories that it wishes to serve than it has remaining under the Federal Rules.

Plaintiffs' opposition ignores the procedural posture that makes these interrogatories necessary. The Court has already held that Uber may not obtain Rule 30(b)(6) testimony from Plaintiffs about the factual bases for their claims. That is good cause for the discovery Uber seeks: Plaintiffs are government entities who were not participants in the challenged transactions, Uber cannot depose Plaintiffs themselves about their contentions, Plaintiffs' claims turn on how they interpret a large factual record and thousands of consumer interactions, and fact discovery closes on September 14. The proposed interrogatories therefore are not optional follow-up discovery; they are the only mechanism available to Uber to learn the contentions Plaintiffs intend to press and to test whether those contentions survive the evidence developed in discovery.

Plaintiffs' assertion that Uber still has a handful of unused interrogatories does not answer the issue. Uber intends to serve the unused interrogatories, but in total, Uber has identified sixteen specific, non-duplicative contention topics that are central to the claims and defenses in this case, and Rule 33 expressly permits the Court to allow additional interrogatories where proportional to the needs of the case. Requiring Uber to choose only five of those topics would leave core liability, causation, remedy, and civil-penalty theories unexplored, even though Plaintiffs will be free to rely on those theories in expert reports, dispositive motions, and at trial.

Plaintiffs' burden and work-product objections are overstated. Contention interrogatories necessarily require a party to identify the facts, documents, and evidence supporting its legal

positions; that does not convert them into requests for privileged mental impressions. Uber does not seek Plaintiffs' internal deliberations, attorney rankings of evidence, or counsel's strategic assessments. It seeks the ***factual bases*** for Plaintiffs' claims and responses to specific, record-based propositions that go directly to liability, materiality, consumer understanding, causation, injury, and penalties. That information is discoverable, and Plaintiffs can answer without revealing privileged communications or opinion work product by identifying the facts and evidence on which they intend to rely. If Plaintiffs believe a particular interrogatory is objectionable in whole or in part, the appropriate course is to serve specific objections and answer to the extent possible, not to deny Uber leave to serve the interrogatories altogether.

The FTC's position would leave Uber in an untenable position: Plaintiffs could assert broad theories based on a massive record, resist testimony about those theories, decline to identify the witnesses and consumer experiences they actually intend to use, and then block the contention interrogatories needed to understand and test their case. That is not what Rules 26 or 33 require or intend. The requested additional interrogatories are targeted to the central disputed issues, proportional to the size and complexity of this litigation, and necessary to allow Uber to prepare its defenses within the remaining discovery schedule. Uber therefore respectfully requests leave to serve the proposed additional contention interrogatories under Rule 33(a)(1).

*Proposed Interrogatory 1*: For each theory on which You contend that Uber made a false, misleading, or deceptive statement or omission concerning Uber One, state whether You contend that the following facts do not undermine Your theory and the factual basis for that contention: (a) the median time to complete the in-app cancellation flow is 20 seconds and 90 percent of consumers cancel in less than one minute; (b) the majority of consumers see only three screens when cancelling Uber One; (c) the 48-hour policy was disclosed in the enrollment flow, the terms and conditions, and in the Help Center; (d) members now have access to the self-cancellation flow at all times and Uber automatically refunds users who cancel during the 24-hour window before the renewal date after payment authorization has been initiated; (e) the sign-up screen for Uber One shows the date when billing will start, that the charges continue per billing period until cancelled, and how to cancel; (f) Uber advertises that $25 is the average savings and that "actual savings may vary,"; (g) Uber tells customers that "estimated savings do not include membership price"; and (h) Uber frequently reminds customers that they enrolled in Uber One via enrollment, marketing emails, delivery orders, and receipts.

*Proposed Interrogatory 2*: For each statement or omission that You contend was a false, misleading, or deceptive statement or omission concerning Uber One, state whether You contend it was material to consumers, and identify all facts, documents, consumer complaints, testimony, analyses, surveys, studies, or other evidence supporting Your contention that the statement or omission was material.

*Proposed Interrogatory 3*: For each statement concerning Uber One savings, benefits, billing, cancellation, renewal, authorization, or enrollment that You contend was likely to mislead reasonable consumers, identify all facts supporting Your contention regarding how reasonable consumers understood or were likely to understand the statement.

*Proposed Interrogatory 4*: State whether You contend that consumers who successfully cancelled Uber One during the Relevant Period nevertheless did not have or use a "simple"

9

mechanism to stop recurring charges. If so, identify the categories of such consumers, the factual basis for that contention, and the facts supporting Your contention notwithstanding the consumers' successful cancellations.

*Proposed Interrogatory 5*: State whether You deny that some Uber One consumers were able to completely cancel, or if You do not deny that some Uber One cancellations were completed, state whether you contend that any category of completed cancellations is irrelevant to, or does not undermine, Your claim that Uber failed to provide a simple cancellation mechanism, including all facts supporting that contention.

*Proposed Interrogatory 6*: Identify each consumer whose experience You presently intend to rely on, cite, summarize, describe, or introduce in support of any claim, motion, expert report, summary judgment filing, trial presentation, or request for relief in this Action. For each such consumer, identify the allegation or theory the consumer's experience supports, the facts supporting that use, and the documents or communications reflecting the consumer's experience.

*Proposed Interrogatory 7*: For each consumer complaint, consumer communication, quotation, paraphrase, or consumer example referenced in the Second Amended Complaint or your Initial Disclosures that You do not presently intend to rely on in support of any claim, motion, expert report, summary judgment filing, trial presentation, or request for relief, identify the complaint, communication, quotation, paraphrase, or example and state that You do not presently intend to rely on it.

*Proposed Interrogatory 8*: For each Uber One enrollment flow in which You contend consumers did not provide express informed consent because Uber used stored payment credentials, identify the flow, the act or omission You contend made the consent insufficient, the facts supporting that contention, and any disclosures or consumer actions You contend were inadequate to establish express informed consent.

*Proposed Interrogatory 9*: State whether You contend that Uber's use of payment credentials previously stored in a consumer's Uber account during enrollment for an Uber One account violated ROSCA. If so, identify each legal theory and factual basis for that contention, including whether You contend that previously stored payment credentials constitute billing information "obtained" during the challenged Uber One enrollment flow.

*Proposed Interrogatory 10*: State whether You contend that Uber knew that the use of payment credentials previously stored in a consumer's Uber account was impermissible under ROSCA. If so, identify each legal theory and factual basis for that contention, including whether You contend that previously stored payment credentials constitute billing information "obtained" during the challenged Uber One enrollment flow.

*Proposed Interrogatory 11*: State whether You contend that there was any consumer injury from Uber's use of payment credentials previously stored in a consumer's Uber account during enrollment for an Uber One account. If so, identify each legal theory and factual basis for that contention, including whether You contend that previously stored payment credentials constitute billing information "obtained" during the challenged Uber One enrollment flow.

*Proposed Interrogatory 12*: For each category of consumers for whom You seek monetary relief, identify the Uber One benefits You contend consumers in that category received or redeemed, the time period during which such benefits were received or redeemed, and the facts supporting Your contention.

*Proposed Interrogatory 13*: For each theory of liability under which You seek monetary relief, state whether You contend that Uber One benefits received or redeemed by consumers are relevant to calculating consumer injury or monetary relief. If You contend they are not relevant, identify all facts and legal bases supporting that contention.

*Proposed Interrogatory 14*: For each category of monetary injury for which You seek relief, identify the act or practice You contend caused the injury, the facts supporting causation, the facts supporting Your contention that the injury was not outweighed by countervailing benefits to consumers or competition, and the facts supporting Your contention that Uber had knowledge sufficient to support civil penalties for the act or practice.

*Proposed Interrogatory 15*: For each act or practice You contend was unfair under Section 5 of the FTC Act, identify the alleged consumer injury caused or likely caused by that act or practice and all facts supporting Your contention that such injury was not outweighed by countervailing benefits to consumers or competition, including any facts, analyses, calculations, data, testimony, documents, or other evidence concerning benefits to consumers or competition that You contend do or do not offset, justify, or outweigh the alleged injury.

*Proposed Interrogatory 16*: For each claim, count, or requested civil penalty for which You contend Defendants acted with knowledge sufficient to support civil penalties, identify the specific act or practice You contend was committed with such knowledge, the particular legal requirement or prohibition You contend Defendants knew applied to that act or practice, the date by which You contend Defendants acquired that knowledge, and all facts and evidence supporting Your contention, including any prior FTC order, FTC enforcement action, FTC guidance, consumer complaint, internal Uber communication, employee statement, investigation notice, or other document on which You rely.

### C.  The Court Should Set Deadlines for the FTC to Supplement Its Response to Uber's Interrogatory No. 11 and to Exchange Its Privilege Logs.

#### 1.  Deadline for the FTC to Supplement Its Response to Uber's Interrogatory No. 11

Uber served Interrogatory No. 11 on the FTC on July 11, 2025. Interrogatory No. 11 asks the FTC to "Identify each iteration and feature of the Enrollment Flows and Cancellation Flows that You contend violate ROSCA and explain why." Joint Discovery Letter Ex. A at 7:16–18 (Apr. 14, 2026), ECF 181-1. The FTC responded only, "the Complaint sets forth information showing how Defendants' Enrollment Flows and Cancellation Flows violate ROSCA." Joint Discovery Letter Ex. B at 13:21–22, 14:16–18, ECF 181-2. The FTC's response to Interrogatory No. 11 is deficient. As the Court has previously ruled, "Uber is entitled to know the case against it." Discovery Order (re Dkt. Nos. 180, 181) at 4:21, ECF 183.

11

The FTC has agreed to supplement its response. The FTC now contends that it cannot do so until it obtains and reviews additional discovery from Uber. But that is not the standard. Rule 33 requires a party to answer interrogatories based on the information reasonably available to it at the time, *see* Fed. R. Civ. P. 33(b)(1)(B), and Rule 26 requires a party to supplement those responses, *see* Fed. R. Civ. P. 26(e)(1)(A). The FTC cannot withhold its current contentions simply because discovery is ongoing. *See, e.g.*, Fed. R. Civ. P. 26(e)(1)(A) ("A party . . . who has responded to an interrogatory . . . must supplement or correct its . . . response . . . in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."); *Peck v. Cnty. of Orange*, No. 2:19-CV-04654, 2020 WL 4218223, at *6 (C.D. Cal. July 10, 2020) ("Plaintiff shall fully answer these interrogatories based on the information available . . . at present."). Nor does the FTC's asserted need for additional information about particular enrollment flows excuse its failure to identify the iterations and features that it presently contends violate ROSCA and explain why. If the FTC later develops additional contentions based on further discovery, the Rules require supplementation—not withholding its response altogether.

Given the fast-approaching close of fact discovery, Uber requests that the Court set a deadline of **July 31, 2026**, for the FTC to respond fully to Interrogatory No. 11.

### 2.  Deadlines for the FTC to Exchange Its Privilege Logs

The Court set July 24, 2026 and July 31, 2026 deadlines for Uber to exchange its privilege logs with the FTC. Discovery Order (re: Dkt. 243) at 2:1–5 (July 2, 2026), ECF 248. Uber requests that the Court similarly set a **July 24, 2026** deadline for the FTC's first privilege log (with approximately half of the documents) and a July 31, 2026 deadline for the FTC's final privilege log (to include the remaining privileged documents).

## IV.   Plaintiffs' Response to Uber's Affirmative Statement

### A.  Plaintiffs Should Not Be Required to Prematurely Select Trial Witnesses

Uber moves for an order requiring Plaintiffs to supplement its initial disclosures to narrow their list of individuals likely to have discoverable information to only include witnesses it intends to call at trial.  This exceeds Plaintiffs' legal obligation under Rule 26(a)(1), which does not limit the number of potential witnesses that a party may identify, and actually requires a party to identify "*each* individual" that it "*may* use to support its claims or defenses."  *See* Fed. R. Civ. P. 26(a)(1)(A)(i) (emphasis added).  It is also unnecessary here because Uber already has the information it needs to conduct effective discovery, due to the fact that it knows (better than the Plaintiffs at this point) which of its employees have knowledge most relevant to issues in this case, and because Plaintiffs have produced all non-privileged documents in its possession pertaining to individual consumers (including six consumer declarations).

Moreover, Rule 26(a)(3)(A) sets the time to disclose trial witnesses, and it is not during discovery, but after the close of discovery and before trial.  Plaintiffs should not be forced to prematurely select trial witnesses before discovery has even closed.  *See Saniefar v. Moore*, 2019 WL 3202924, at *4 (E.D. Cal. July 16, 2019) (rejecting motion to compel premature witness

12

identification where plaintiff identified over 600 witnesses in its Rule 26 disclosures, recognizing that in complex cases "it is not inconceivable that the number of potential witnesses well-exceeds that of standard litigation."); *Perez v. L & J Farm Picking, Inc.*, 2013 WL 5446625, at *3 (S.D. Fla. Sept. 30, 2013) (denying motion to compel identification during discovery of which individuals, among 300 identified in initial disclosures, would be called at trial; defendants must use their own judgment to determine who to depose); *C & E Servs. v. Ashland Inc.*, 2008 WL 1744618, at *3 (D.D.C. Apr. 14, 2008) ("[T]he Rules contemplate that parties will conduct their depositions without the benefit of knowing which witnesses will be called at trial.").[7]

Uber's claim that they need a narrowed list of witnesses in order to conduct discovery is especially disingenuous given Uber's knowledge and access to information. Because of the nature of this suit—a law enforcement action by government agencies—Plaintiffs have no independent, firsthand knowledge of the facts in this case. Most of the evidence is in Defendants' possession—either because it came from Defendants or because Plaintiffs have produced it to Defendants. Uber is well aware which of its own employees have information relevant to the case; indeed, given that Uber completed its custodial production only this week, Uber is currently far *better* situated than Plaintiffs to identify which of its employees have the most relevant information. Aside from Uber employees, the remaining identified prospective fact witnesses are Uber's own consumers, whose factual knowledge arises from their personal experiences with Uber One. For months, Uber has had the consumer information it needs to conduct effective discovery of information related to these witnesses. On January 26, 2026, following a reasonably-tailored search, the FTC produced all non-privileged documents in its possession that relate to specific Uber One consumers in response to Uber's requests for production. These documents included the FTC's communications with certain consumers, six signed consumer declarations (and associated exhibits), consumer complaints, and documents in the FTC's possession from consumers who have experience with Uber One. Similarly, the State Plaintiffs have produced the consumer complaints against Uber that they received, both with their initial disclosures and in response to Uber's discovery requests. Uber's "failure to learn more about any of [the] witnesses does not put the burden on Plaintiffs to narrow their list at this stage." *Nugent v. Spectrum Juv. Just. Servs.*, 2024 WL 4173743, *8 (E.D. Mich. Sept. 12, 2024) ("Defendants were on notice of the 375 witnesses… and had the tools of discovery available to them to learn which of those witnesses has relevant information").

Not only is narrowing the initial disclosure list unnecessary due to Uber's existing knowledge and access to information, it would also be improper and prejudicial, because Plaintiffs are still receiving documents, learning new facts, and developing their litigation strategy. Given that Uber has access to the same non-privileged customer information as

---

[7] The cases cited by Uber to support their argument are inapposite. *Colorado City* does not concern a compelled early identification of trial witnesses during discovery, but rather the adequacy of a pretrial witness list disclosed pursuant to Rule 26(a)(3)(A). *United States v. Town of Colorado City*, No. 12-8123, 2014 WL 5431209, at *1 (D. Ariz. Oct. 27, 2014). And in *In re 650 Fifth Avenue,* the court had directed early identification of witnesses due to the "history and nature of this particular matter" which involved discovery "uniquely in the possession of the government." *In re 640 Fifth Ave. & Related Props.*, 2013 WL 12183225, at *2 (S.D.N.Y. June 5, 2013).

Plaintiffs, the only purpose of requiring Plaintiffs to select witnesses at this time would be to prematurely pigeon-hole Plaintiffs into a trial strategy. Accordingly, the Court should deny Uber's request for Plaintiffs to narrow its initial disclosures to only include witnesses it intends to call at trial.

## B. The Court Should Deny Uber's Request for Additional Interrogatories

Fed. R. Civ. P. 33(a)(1) permits a party to serve "no more than 25 written interrogatories, including all discrete subparts." Uber has already served 20 interrogatories on the FTC and 20 interrogatories on each of the Plaintiff States. Uber is now seeking leave of the court to serve an additional 16 interrogatories[8] on each of the Plaintiffs: 11 interrogatories over the limit per party. The Court should deny Uber's request.

First, Uber has failed to make any "particularized showing" as to why additional discovery is necessary in this case. *See Castaneda v. Burger King Corp.*, 2009 WL 4282596, at *1 (N.D. Cal. Nov. 25, 2009) (citing *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minnesota*, 187 F.R.D. 578, 586 (D. Minn. 1999)) ("In practical terms, a party seeking leave to…serve more Interrogatories than are contemplated by the Federal Rules…must make a particularized showing of why the discovery is necessary."). Uber bears the burden of justifying its need for additional interrogatories beyond the allotted 25, consistent with FRCP 26(b)(1) and (2), but has failed to put forth any justification beyond extolling the virtue of contention interrogatories generally, as opposed to why additional interrogatories are needed in this case specifically. Fed. R. Civ. P. 33(a)(1); *Smith v. Premiere Valet Servs., Inc.*, 2020 WL 7034346, at *10 (C.D. Cal. Aug. 4, 2020) ("[T]he authorities interpreting Rule 33(a) make clear that the party seeking leave to propound additional interrogatories bears the burden of justifying its need and that leave may be granted only if doing so is consistent with Rule 26(b)(2)."). Uber fails to offer a sufficient explanation for why these *additional* interrogatories are necessary or why it is necessary to deviate from the Federal Rules here.[9]

Under Rule 26(b)(2)(C)(i)-(iii), a court must limit discovery if it determines (1) the discovery sought is cumulative or duplicative, or can better be obtained from some other source; (2) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; and (3) the burden or expense of the proposed discovery outweighs its likely benefit. *Doubt v. NCR Corp.*, No. C 09-5917 SBA, 2011 WL 3740853, at *5 (N.D. Cal. Aug. 25, 2011). Here, Uber has had ample opportunity to ask these proposed questions in the prior 20 interrogatories they already served on each of the Plaintiffs. *See Suta v. Home Depot, Inc.*, No. 2:22-CV-00744-RSL, 2023 WL 2758426, at *1 (W.D. Wash. Apr. 3, 2023) ("the new discovery topics should have been anticipated at the time the first 25 interrogatories were served" and

---

[8] Although Uber lists 16 proposed interrogatories, many are multi-part and impermissibly compound. Fed. R. Civ. P. 33(a)(1); *See e.g.*, Proposed Interrogatories 1 and 16.

[9] Uber points to Dkt. No. 183, in which the Court noted that "[t]his is what contention interrogatories are for" when granting the Plaintiff States' motion to quash Uber's Rule 30(b)(6) deposition notice. Unlike Uber, Plaintiffs do not read the Court's statement as an endorsement of additional interrogatories for Uber beyond its allotted 25. A party does not become entitled to additional interrogatories by serving an improper deposition notice.

"[t]he Court declines to authorize additional interrogatories where plaintiff had ample opportunity to obtain the information he now seeks"). Further, Uber still has 5 remaining interrogatories it can serve per Plaintiff. Uber may thus choose 5 from their proposed interrogatories. *See Forster v. Clendenin*, 2024 WL 1021985, at *3 (E.D. Cal. Mar. 8, 2024) ("Plaintiff cannot claim additional interrogatories are needed before he has exhausted the twenty-five allowed by Rule 33(a)(1).").

Second, it would be unfairly burdensome for Plaintiffs to have to respond to an additional 11 very long and all-encompassing interrogatories. This would amount to each Plaintiff being required to respond to 36 multi-part interrogatories, many of which cover the same topics, in a case where the Defendants already possess all of the relevant facts. Accordingly, the burden imposed on Plaintiffs by the additional interrogatories outweighs the relevance or importance of the information requested.

Finally, if the Court is inclined to grant Defendants leave to serve their proposed interrogatories, Plaintiffs reserve the right to lodge specific objections per interrogatory at the time they are served. For example, many of Defendants' proposed interrogatories are facially improper because they do not seek facts but rather Plaintiffs' work product concerning the significance and interpretation of factual materials. *E.g.*, Proposed Interrogatory No. 1 (seeking attorney work product concerning Plaintiffs' interpretation of the significance of each of a list of eight purported "facts"); Proposed Interrogatory No. 5 (seeking attorney work product and analysis concerning the legal significance that "some Uber One cancellations were completed"). As the Court has already ruled in the 30(b)(6) context (*see* Dkt. No. 183), Plaintiffs' internal thought process and evaluation of which facts support their claims are privileged. *See EEOC v. Evans Fruit Co.*, No. 10-cv-3033, 2012 WL 442025, at *1 (E.D. Wa. Feb. 10, 2012) (granting motion to quash where defendants sought the "interpretation or evaluation of how particular facts support or refute the allegations" in the complaint); *EEOC v. Justin Vineyards & Winery LLC*, No. 22-32 cv-06039, 2024 WL 5431489*, at *4 (C.D. Cal. Dec. 10, 2024) (granting motion to quash because the "ordering of proof and collection of facts that [a law enforcement plaintiff] intends to use to support certain claims or allegations" is work product); *SEC v. Buntrock*, 227 F.R.D. 441, 446 (N.D. Ill. 2003) ("factual knowledge underlying legal conclusions" held protected work product); *SEC v. Morelli*, 143 F.R.D. 42, 46-48 (S.D.N.Y 1992) (rejecting argument that deposition would not intrude on work product protection where defendant sought testimony "on the underlying facts alone" because defendant already had access to all facts available to the agency).

Further, many of the proposed interrogatories are facially overbroad. They do not just ask Plaintiffs to define the scope of their claims; they require Plaintiffs to recite *all* the facts—which overwhelmingly come from documents Uber produced to Plaintiffs—that support each issue in the case. *E.g.*, Proposed Interrogatories 2, 3, 5, 13, 15 and 16 (seeking "all facts" that support a contention). *See, e.g.*, *Alfaro v. City of San Diego*, 2018 WL 4562240, at *2 (S.D. Cal. Sept. 21, 2018) ("Courts 'will generally find [contention interrogatories] overly broad and unduly burdensome on their face to the extent they ask for 'every fact' [or 'all facts'] which support[ ] identified allegations or defenses.'") (quoting *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 405 (D. Kan. 1998)).

15

For these reasons, the Court should deny Uber's request for leave to file additional interrogatories beyond the 25 allowed under the Federal Rules.

### C.  The FTC Cannot Yet Supplement its Response to Interrogatory 11

The FTC agrees to supplement its response to Uber's Interrogatory 11 but cannot do so by Uber's proposed deadline of July 31, 2026.  As explained in Section B of Plaintiffs' portion of this status report, the FTC still does not have sufficient information from Uber identifying the specific enrollment processes each Uber One subscriber completed, and the specific representations those subscribers saw while enrolling.  Further, Uber has not provided information to allow the FTC to determine which enrollment flows correspond to which entry points.  And the FTC is still reviewing Uber's latest custodial production which was produced on July 13.[10]  Without this information, and the time to review Uber's latest custodial production which includes documents related to Uber's enrollment and cancellation flows, the FTC is unable to supplement its response to Interrogatory 11.

### D.  The FTC Agrees to Produce its Privilege Log in Accordance with the Proposed Schedule

The FTC agrees to produce its first privilege log (with approximately half of the documents) on July 24, 2026 and its final privilege log (to include the remaining privileged documents) by July 31, 2026.

---

[10] Further, Plaintiffs are still reviewing Uber's July 10, 2026 production of 300 non-privileged, non-responsive documents from the initial TAR seed set.  If Plaintiffs find evidence that the model was not trained properly, they will promptly bring this to the Court which may require Uber to re-train the model.