# Exhibit A

Lauren C. Freeman (SBN 324572)
lfreeman@sidley.com
SIDLEY AUSTIN LLP
101 California Street
San Francisco, CA 94111
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Benjamin M. Mundel
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

*Attorneys for Defendants*
*Uber Technologies, Inc., and Uber USA, LLC*

Sonal N. Mehta (SBN 222086)
sonal.mehta@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: 650-600-5051

David Gringer (*pro hac vice*)
david.gringer@wilmerhale.com
Marissa M. Wenzel (*pro hac vice*)
marissa.wenzel@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

FEDERAL TRADE COMMISSION; THE ATTORNEYS GENERAL OF THE STATES OF ALABAMA, ARIZONA, CONNECTICUT, MARYLAND, MINNESOTA, MISSOURI, MONTANA, NEBRASKA, NEW HAMPSHIRE, NEW JERSEY, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, PENNSYLVANIA, VIRGINIA, WEST VIRGINIA, WISCONSIN, AND THE DISTRICT OF COLUMBIA; THE PEOPLE OF THE STATE OF CALIFORNIA, THE PEOPLE OF THE STATE OF ILLINOIS, AND THE PEOPLE OF THE STATE OF MICHIGAN,

Plaintiffs,

vs.

UBER TECHNOLOGIES, INC., a corporation, and Uber USA, LLC, a limited liability company,

Defendants.

Case No. 4:25-CV-3477-JST

**DEFENDANT UBER TECHNOLOGIES, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF FTC'S THIRD SET OF INTERROGATORIES**

Complaint Filed: April 21, 2025

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Rules"), Defendants Uber Technologies, Inc. and Uber USA, LLC (collectively "Defendants" or "Uber") hereby provide these objections and responses to Plaintiff Federal Trade Commission's ("Plaintiff" or "FTC") Third Set of Interrogatories (the "Interrogatories"). Uber reserves the right to supplement or amend these objections and responses as necessary in accordance with the Federal Rules of Civil Procedure and any Local Rules or orders of this Court.

**GENERAL OBJECTIONS**

The following General Objections apply to each of the Interrogatories whether or not specifically referred to and/or incorporated in each response:

1. Privilege. Uber objects to the Interrogatories to the extent they seek documents or information subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity from discovery (including, without limitation, all communications with, or work product of, any outside attorney) (collectively, "Privileged Information"). Any inadvertent disclosure of Privileged Information by Uber shall not constitute a waiver of any applicable privilege, doctrine, or immunity.

2. Reservation of Right to Supplement. These responses and objections are made without prejudice to, and are not a waiver of, Uber's right to amend, correct, or supplement these responses, and are subject to Uber's right to produce evidence of any subsequently discovered facts, or additional facts, information, or documents that may exist. Uber provides these responses in good faith after a reasonable inquiry and based on information that it knows or can readily obtain.

3. No Waiver. By responding to these Interrogatories, Uber does not concede the relevance of any Interrogatory nor the relevance or admissibility of any information provided in response thereto. Uber expressly reserves its right to assert any and all objections to the admissibility of any responses into evidence at any hearing or trial of this proceeding, or in any other actions or proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, confidentiality, hearsay, or admissibility as evidence for any other purpose.

4. Uber objects to the Interrogatories to the extent that they seek information, documents, or communications that are already in the possession, custody, or control of Plaintiff, in

particular through Uber's prior responses to the FTC's September 5, 2024 Voluntary Access Letter ("VAL"), and through prior productions of documents in the present litigation on November 21, 2025 and January 26, February 23, March 9, March 24, April 10, April 27, May 8, May 15, May 27, May 29, June 11, June 12, June 18, June 23, June 24, July 2, July 6, July 10, July 13, July 23, August 5, August 7, August 12, and August 14, 2026 (collectively, Uber's "Prior Productions") which, upon information and belief, have been provided in their entirety to FTC. Uber will provide responsive, non-privileged information, to the extent it exists, that is not duplicative of that already provided to FTC.

**SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS**

5. Uber specifically objects to the Instructions and the Definitions to the extent they purport to impose obligations on Uber that exceed those imposed by the Rules and the Local Rules. In responding to these Interrogatories, Uber will follow the requirements set forth in the Rules and the Local Rules.

6. Uber specifically objects to Instruction H as imposing an undue burden on Uber. Uber has provided information for the time period beginning October 1, 2021 in response to the VAL and for similarly more limited periods in its Prior Productions, consistent with the parties' prior agreement and the Court's Discovery Order (ECF No. 167). It is disproportionate to the needs of the case to require Uber to provide information from November 8, 2019—nearly two full years before the launch of the membership program at issue in FTC's Complaint. Additionally, Instruction H purports to extend the applicable time period to "the date of full and complete response" to the Interrogatories, an indefinite endpoint that extends far after the filing of the Complaint and is an ever-moving goalpost. Uber will interpret these Interrogatories as requesting information from October 1, 2021 to December 15, 2025 ("Applicable Time Period").

7. Uber further objects to Instruction H to the extent it purports to impose a time period inconsistent with the Court's prior discovery orders and the parties' agreements.

8. Uber specifically objects to the definition of "Cancellation Procedure" and "Cancellation Process" as overbroad, vague, and imprecise. Defining the terms to include "all immediately preceding steps" and "elements that could influence the consumer's behavior during, or

understanding of, the process" makes the starting point of a "Cancellation Procedure" or "Cancellation Process" indeterminate, circular, and potentially limitless.[1]

9. Uber specifically objects to the definition of "Customer Correspondence" as overbroad and seeking irrelevant information to the extent it includes any Uber customers who were not Uber One members. Uber objects that "Customer Correspondence" is overbroad to the extent it includes publicly available information (for example, reviews on social media and app stores) that is not in the custody of Uber and is equally accessible to FTC. Further, Uber objects that the phrase "indirectly received from . . . a customer" is overbroad, vague, and imprecise.

10. Uber specifically objects to the definition of "Diverted Cancel" as vague. The phrase "have any reason to believe" lacks any objective, articulable standard for determining what level of information, inference, or supposition is sufficient to trigger an affirmative duty to identify a person as "intend[ing] to cancel Uber One." Uber further objects that this term is overbroad to the extent that it would include consumers who "commence a cancellation procedure" with no intention of cancelling Uber One, but instead for purposes of obtaining a Save Offer. Further, the definition improperly requires Uber to speculate about the state of mind of third parties. To the extent an Interrogatory demands that Uber divine the intentions or beliefs of customers, it calls for information not within Uber's knowledge, is incapable of verification, and is not reasonably calculated to lead to the discovery of admissible evidence. Because this definition does not enable Uber to ascertain, without resort to speculation, who must be included in or excluded from the responsive universe, Uber cannot reasonably provide a complete or accurate response to Interrogatories using this term.

11. Uber specifically objects to the definition of "Enrollment" or "Enrollment Process" as overbroad, vague, and imprecise. By defining the terms as encompassing "all immediately preceding steps or immediately subsequent steps," the definition refers back to itself without specifying any determinate starting or ending point, thereby rendering it circular and the scope limitless. Further, the inclusion of the phrase "any elements that could influence the consumer's behavior during, or

---

[1] Uber does not include specific objections to defined terms that are not used in the substance of FTC's Interrogatory, even if listed as a definition. Uber expressly reserves the right to further object to FTC's definitions to the extent they are used in subsequent Interrogatories.

understanding of, the process" compounds the ambiguity by introducing an undefined, potentially boundless, and similarly circular variable.

12. Uber specifically objects to the definition of "Nonconsensual Enrollee" and "Nonconsensual Enrollment" as vague. The phrase "have any reason to believe" lacks any objective, articulable standard for determining what level of information, inference, or supposition is sufficient to trigger an affirmative duty to identify a person as having enrolled "without . . . knowing or realizing." Uber further objects that, by requiring evaluation of individuals based on subjective impressions or conjecture, the definition is overbroad and unduly burdensome. Compliance would necessitate an indefinite, exhaustive review of innumerable records coupled with guesswork as to whether any circumstance—however trivial—could constitute "a reason to believe" enrollment was mistaken. Further, the definition improperly requires Uber to speculate about the state of mind of third parties. To the extent an Interrogatory demands that Uber divine the intentions or beliefs of customers, it calls for information not within Uber's knowledge, is incapable of verification, and is not reasonably calculated to lead to the discovery of admissible evidence. Because this definition does not enable Uber to ascertain, without resort to speculation, who must be included in or excluded from the responsive universe, Uber cannot reasonably provide a complete or accurate response to Interrogatories using this term.

13. Uber specifically objects to the definition of "You" and "Your" as overbroad. These Interrogatories were propounded to Defendants Uber Technologies, Inc., and Uber USA, LLC, and Defendants can only provide information that is within their own possession, custody, or control.

14. The foregoing general objections and specific objections to the instructions and definitions provided by Plaintiff shall be fully incorporated by reference into each of the below specific objections to the Interrogatories.

## INTERROGATORIES

**INTERROGATORY 5:** State, by month, the number of unique Uber One subscribers in the United States who clicked any hyperlink that displayed the Uber One Terms and Conditions or comparable terms-related disclosures during their enrollment in Uber One, including hyperlinks labeled "more information," "See terms and benefit details," and "Uber One Terms and Conditions."

**RESPONSE:**

Uber objects to this Interrogatory as overbroad and unduly burdensome, and as disproportionate to the needs of the case, in that it demands a month-by-month computation of unique users across multiple application, enrollment surfaces, and years, which Uber does not maintain this information in the ordinary course of its business. Uber further objects that "comparable terms-related disclosures" is vague and undefined, and incorporates its objections to the defined term "Enrollment."

Subject to and without waiving the foregoing specific and general objections, Uber responds that this information does not exist for the time period before 2025. Moreover, while raw data may exist for 2025, Uber has not yet been able to identify the relevant datapoints that would allow it to answer this Interrogatory, despite making reasonable efforts to do so. Uber will supplement its response to this Interrogatory in accordance with Rule 26(e)(1)(A) if and when it is able to do so.

**INTERROGATORY 6:** Describe with specificity how Uber calculates savings claims presented to consumers when they enroll in Uber One or Uber Pass (e.g., "Save $25 per month" or "Save $25 on average per month") and any changes Uber has made to how it calculates savings claims during the Applicable Time Period.

**RESPONSE:**

Uber objects to this Interrogatory as vague and ambiguous in its use of the undefined term "savings claims." For purposes of this Response, Uber interprets "savings claims" to mean the savings claims challenged in the Second Amended Complaint. Uber further objects that the phrase "any changes Uber has made" is overbroad and disproportionate to the extent it reaches changes unrelated to the specific disclosures and practices challenged in the Complaint. Uber does not maintain in the ordinary course of business a compilation of every savings claim presented during

the Applicable Time Period. Uber responds to the best of its ability following a reasonable investigation, but reserves the right to revise or supplement its response should additional information become available.

Subject to and without waiving the foregoing specific and general objections, Uber responds that it has presented three types of savings claims to consumers during enrollment, each of which was calculated from data reflecting actual member savings and updated periodically as new data became available.

First, Uber presented average member savings. Until July 2025, average member savings was calculated based on a sum of the averages saved by United States subscribers across the following categories:

- Savings on Delivery Fees on Uber Eats and Grocery orders;
- Savings on member pricing on eligible Uber Eats and Grocery orders and Rides;
- Uber Cash redeemed on Rides until August 2024. After August 2024, this benefit was replaced by Uber One Credits and was also counted only if redeemed;
- Amounts saved from promotions.

In July 2025, Uber updated its methodology to calculate the average over the trailing three months of data, to include only members who had placed an order or taken a ride within the preceding month, and to exclude promotions available to all users. UBER-FTCU1-00099168.

Second, Uber presented personalized potential savings, calculated on a per-month basis from the individual user's own activity:

- Amount the user would have saved on their Eats and Grocery orders in the last 30 days as a result of $0 Delivery Fee and member pricing discounts;
- Amount the user would have saved on their Rides orders in the last 30 days as a result of member pricing discounts and earned Uber One Credits;
- Amount the user would have saved from the Uber One Promise;
- Amount the user would have saved from Uber One Exclusives;

UBER-FTCU1-00025932.

Third, Uber presented order-based potential savings, informing users how much they would have saved on their most recent purchase had they been an Uber One member or how much they could save on their current order. *See, e.g.*, UBER-FTCU1-00002139.

**INTERROGATORY 7:** State the timeframe during which Uber presented each savings claim to consumers (e.g., that Uber One or Uber Pass customers save or can save a certain amount of money per month) and the circumstances in which a consumer would see each claim, including: (a) the medium in which the claim was presented to consumers; (b) the categories of consumers to whom the claim was made; and (c) the Enrollment Processes, Cancellation Processes, or Advertisements associated with each savings claim.

**RESPONSE:**

Uber objects to this Interrogatory as vague and ambiguous in its use of the undefined term "savings claims." For purposes of this Response, Uber interprets the term to mean the savings claims challenged in the Second Amended Complaint. Uber incorporates its objections to the defined terms "Enrollment Processes" and "Cancellation Processes." Uber further objects that "categories of consumers" and "medium" are undefined. Uber understands "medium" to refer to presentation in the Uber or Uber Eats apps, on Uber's websites, by email, or by push notification, and identifies in its answer the consumers to whom each claim was presented. Uber further objects that this Interrogatory contains multiple discrete subparts constituting separate interrogatories under Rule 33(a)(1), and reserves all rights with respect to Plaintiffs' interrogatory count. Uber does not maintain in the ordinary course of business a compilation of each savings claim and the circumstances of its presentation. Uber responds based on reasonable investigation and will supplement as required by Rule 26(e).

Subject to and without waiving the foregoing specific and general objections, Uber responds as follows: Uber presented three types of savings claims to consumers: (1) average member savings, (2) personalized potential savings, and (3) personalized actual savings. Uber addresses each of these in turn.

1. Average member savings

a. Timeframe: throughout the Applicable Time Period. Uber updated the advertised average as new data became available. From November 2021 to February 2022, the average member savings presented to customers were $19 per month. In February 2022, the average member savings presented to customers was revised to $22 per month. In July 2022, the average member savings presented to customers was revised to $27 per month. In September 2022, the average member savings presented to customers was revised to $25 per month. Under the updated methodology instituted in 2025, the average member savings was revised to $28 per month in July 2025 and $30 per month in October 2025.

b. Medium: in-app, email, web, and push.

c. Categories: non-members may have been presented with the average monthly savings for members in the United States.

d. Enrollment/Cancellation/Advertisements: The average monthly savings claim may have been presented in at least the following enrollment flows if the user did not meet the criteria for seeing a personalized savings claim: activity_home, bottom_sheet_app_launch, BOTTOM_SHEET_APP_LAUNCH, bottom_sheet_home, bottom_sheet_remove_payment, ccc, deeplink_payment_partner, deeplink_payment_partner_amex, deeplink_payment_partner_amex_extneral, eats_ccc, eft_ccc, family_hub, feed_banner, identity, identity_card, identity_list_item, interstitial_home, menu, order_tracking_carousel, partner_rewards, partner_rewards_wallet_screen, post_trip_push, promo_manager, promo_manger, promomanager, promo_screen_banner, ring_enroute,

ring_on_trip, ring_ontrip, settings, SETTINGS, signup, store_menu_info_box, storefront_student_plan_billboard, u4b_org_funded, web_upsell_banner. The average monthly savings claim may have also been presented to consumers interacting with any cancellation process. Uber also included average member savings in advertisements, such as "Members save $300/year on average," (UBER-FTCU1-00004321), which annualized the per-month average savings amount.

2. Personalized potential savings (last month, last order, and current order)

a. Timeframe:

(i) Last month and last order: from April 2023 to the end of the Applicable Time Period. UBER-FTCU1-00025932.

(ii) Current order: throughout the Applicable Time Period.

b. Medium:

(i) Last month and last order: in-app, email, web, and push.

(ii) Current order: in-app, web, and push.

c. Categories:

(i) Last month and last order: non-members may have been presented with this claim depending on whether their last month's potential savings or last order potential savings reached a certain threshold. *See, e.g.*, UBER-FTCU1-00024900; UBER-FTCU1-00025932.

(ii) Current order: non-members may have been presented with this claim depending on whether their current order savings reached a certain threshold. *See, e.g.*, UBER-FTCU1-00025794.

d. Enrollment/Cancellation/Advertisements:

(i) Last month and last order potential savings were shown in enrollment flows, including activity_home, checkout_interstitial, identity, identity_card, identity_list_itemb, in-order entrypoints utilizing the lite flow, and entrypoints utilizing the sell page flow. Personalized potential savings also appeared in email, push, and in-app advertisements, such as UBER-FTCU1-00004265, UBER-FTCU1-00004263, UBER-FTCU1-00004260, UBER-FTCU1-00004266, UBER-FTCU1-00004262, UBER-FTCU1-00004257, UBER-FTCU1-00004258, UBER-FTCU1-00004261, UBER-FTCU1-00004264, UBER-FTCU1-00004267.

(ii) Current order potential savings were shown in enrollment flows, including the following: cart_footer_banner, checkout, CHECKOUT, checkout_banner, checkout_exclusives_footer_banner, checkout_fomo_interstitial, checkout_one_click_banner, checkout_footer_banner, checkout_interstitial, one_click, order_tracking_carousel, post_trip_push, product_selector.

3. Personalized actual savings, calculated based on adding the quantitative benefits Uber One offered during the Relevant Time Period.

a. Timeframe: throughout the Applicable Time Period.

b. Medium: in-app, web.

c. Categories: All categories of members could view their personalized actual savings.

d. Enrollment/Cancellation/Advertisements: Personalized actual savings were shown in the cancellation flow to users who had saved more than

a certain threshold over their subscription cost. Personalized actual savings were also shown on certain surfaces in the app, when members clicked on the Account tab and in the "Uber One" menu. Additionally, personalized savings were displayed in in-app pop-ups.

**INTERROGATORY 8:** State the circumstances in which a consumer would see a personalized savings claim (e.g., that the consumer could save a certain amount of money per month based on their personalized usage history), including the date ranges when Uber presented personalized savings claims, and any changes made to which consumers would see a personalized savings claim.

**RESPONSE:**

Uber objects to this Interrogatory as vague and ambiguous in its use of the undefined term "personalized savings claim." Uber interprets the term to mean the personalized potential savings claims described in Responses Nos. 6 and 7. Uber does not maintain in the ordinary course of business a compilation of the circumstances in which personalized savings claims were presented. Uber responds based on a reasonable investigation and will supplement as required by Rule 26(e).

Subject to and without waiving the foregoing specific and general objections, Uber responds that a consumer may have seen a personalized savings claim based on their usage history beginning in Q2 2023 and extending through the end of the Applicable Time Period. UBER-FTCU1-00025932. This messaging was presented on enrollment flow entrypoint surfaces to consumers whose last month or last order potential savings reached a certain threshold. *See, e.g.*, UBER-FTCU1-00024900; UBER-FTCU1-00025932. This messaging was also presented in email, push, and in-app advertisements to consumers who had just completed a trip or order and who would have saved more than a certain threshold in the last month.

**INTERROGATORY 9:** Describe any circumstances in which an Uber One or Uber Pass subscriber could pay more for the same Uber ride or Uber Eats delivery as a consumer who is not enrolled in Uber One or Uber Pass.

**RESPONSE:**

Uber objects to this Interrogatory as vague and ambiguous in its use of the phrase "the same Uber ride or Uber Eats delivery," because prices are generated per transaction based on real-time conditions, and no two consumers transact under identical conditions.

Subject to and without waiving the foregoing specific and general objections, Uber responds as follows: Uber, like many companies, offers targeted promotions to particular user segments. For example, a segment of users Uber sometimes targets with promotions are new Uber users. If a non-subscriber is a new user, and a subscriber is not a new user, the non-subscriber may be offered a promotion that would not be offered to the subscriber. Where a non-subscriber receives such a transaction-specific promotion and a subscriber does not, the promotional discount applied to that individual transaction could exceed the membership discounts applied to the subscriber's comparable transaction. Any such difference in transaction-specific promotional targeting does not alter the membership benefits the subscriber receives on that or other eligible transactions.

**INTERROGATORY 10:** Describe all benefits of an Uber One subscription (e.g., Uber One credits, cashback, member pricing, etc.), including the circumstances in which subscribers receive these benefits, how Uber calculates the monetary value of these benefits, whether the benefits are available to non-Uber One subscribers, and how the benefits have changed during the Applicable Time Period.

**RESPONSE:**

Uber objects to this Interrogatory as compound and containing multiple discrete subparts constituting separate interrogatories under Rule 33(a)(1) and reserves all rights with respect to Plaintiffs' interrogatory count. Uber further objects that "all benefits" is overbroad to the extent it reaches benefits unrelated to the claims challenged in the Complaint. Uber does not maintain in the ordinary course of business a compilation of every benefit and its precise launch and end dates. Uber responds based on a reasonable investigation and will supplement as required by Rule 26(e).

Subject to and without waiving the foregoing specific and general objections, Uber responds that Uber One offered the following benefits during the Applicable Time Period:

- $0 Delivery Fee on qualifying delivery orders, throughout the Applicable Time Period. Quantified as the delivery fee a non-member would have paid on the qualifying order, as identified on the member's receipt.
- Member pricing, which offered a flat discount on rides and delivery orders. The discount was 5% on Rides from November 17, 2021 through May 2023. The discount was 5% on Eats from November 2021 through June 2022. In July 2022, the discount on Eats was increased to up to 10%. Uber quantified the value of this benefit on a user's receipt.
- From May 2023 through August 2024, members earned Uber Cash on eligible rides. In August 2024, this benefit was replaced by Uber One Credits, promotional credits earned as percentage of eligible ride spend, redeemable against future eligible purchases while the membership remains active.
- Uber One Promise, which offered $5 in Uber Cash if a delivery arrived after the Latest Arrival estimate shown post-order. This was a benefit from November 17, 2021 through January 2024.
- Priority support, which was a benefit throughout the Applicable Time Period. Uber does not quantify the value of this benefit in any consumer-facing communications.
- Priority access to top-rated drivers, which was a benefit throughout the Applicable Time Period. Uber does not quantify the value of this benefit in any consumer-facing communications.
- Ride upgrades, which was a benefit from July 2025 through the end of the Applicable Time Period. This benefit increased the likelihood that a member would receive an upgraded ride.
- Surge savings, which was a benefit from July 2025 through the end of the Applicable Time Period. Uber quantifies the value of this benefit in a user's Rides receipt as the difference between the fare with surge in effect and the fare with surge savings applied.

- Fresh Tuesdays, which offers 30% off select fresh items, like produce, dairy, and more, every Tuesday, which was a benefit from around September 25, 2025 through the end of the Applicable Time Period. Uber quantifies the value of this benefit on a user's receipt.
- Lime on Uber benefits that provided 10% Uber One credits on all Lime rides. Plus, first time users of Lime on Uber get 5 free unlocks. This benefit was available from around July 8, 2025 through the end of the Applicable Time Period. Uber quantifies the value of this benefit in a user's Rides receipt.
- 10% Uber One Credits on car rentals through Uber. This benefit was available from around July 2, 2025 through the end of the Applicable Time Period. Uber quantifies the value of this benefit in a user's Uber Rent receipt.
- Uber offered "Uber One Exclusives" beginning in March 2023. These member-exclusive offers on delivery orders were things like "buy one, get one free" offers, and offers that gave members a discount if they spent over a certain amount of money (i.e., "Spend $20, Save $5"). UBER-FTCU1-00108033.
- From time to time in 2023, Uber has offered members access to exclusive products, such as Tom's Perfect 10 Crème Brulee flavored granola, Van Leeuwen BBQ Gold Cornbread Crumble Ice Cream, and more. UBER-FTCU1-00193181; UBER-FTCU1-00544912. Uber referred to this benefit as "Uber One Member Drops." Uber did not quantify the value of this benefit.
- Extra time to meet driver and cancellation protection at airports, which was a benefit from December 2024 through the end of the Applicable Time Period. Uber did not quantify the value of this benefit.
- Access to exclusive spaces at festivals and sporting events. Uber did not calculate the value of this benefit.

This list may not be exhaustive and the launch and end dates are approximate. This answer represents Uber's best effort to respond to this Interrogatory in good faith following a reasonable investigation. The benefits described above were exclusive to Uber One.

**INTERROGATORY 11:** Describe with specificity all circumstances in which consumers are enrolled in an Uber One subscription via partnerships that Uber has with third-party businesses.

**RESPONSE:**

Uber objects to this Interrogatory as vague and ambiguous in its use of the undefined terms "partnership" and "via," which do not specify what relationship between an enrollment and a third-party business the Interrogatory intends to capture. For purposes of this response, Uber interprets the Interrogatory to seek a description of enrollment opportunities offered in connection with Uber's commercial arrangements with third-party businesses. Uber does not maintain in the ordinary course of business a compilation of all such arrangements during the Applicable Time Period. Uber responds based on a reasonable investigation and will supplement as required by Rule 26(e).

Subject to and without waiving the foregoing specific and general objections, Uber responds that it had contractual relationships with at least the following third-party businesses to provide opportunities to enroll in Uber One:

- Albertson's: eligible users enrolled through the Uber App or Uber Website and received an extended free trial of Uber One during the promotional period(s).
- American Express: eligible users enrolled through the Uber App or Uber Website and received a statement credit from American Express during the promotional period(s).
- Apple: eligible users enrolled through the Uber App or Uber Website and received an extended free trial of Uber One during the promotional period(s).
- Capital One: eligible users enrolled through the Uber App or Uber Website and received a statement credit from Capital One during the promotion period(s).
- Clear: eligible users enrolled through the Uber App or Uber Website and received an extended free trial of Uber One during the promotional period(s).

- Costco: eligible users enrolled through the Uber App or Uber Website and received a discount on Uber One during the promotional period(s).
- Disney+: eligible users enrolled through the Uber App or Uber Website and received an extended free trial of Uber One during the promotional period(s).
- Hulu: eligible users enrolled through the Uber App or Uber Website and received an extended free trial of Uber One during the promotional period(s).
- Marriott: eligible users enrolled through the Uber App or Uber Website and received an extended free trial of Uber One during the promotional period(s).
- Microsoft: eligible users enrolled through the Uber App or Uber Website and received an extended free trial of Uber One during the promotional period(s).
- OpenTable: eligible users enrolled through the Uber App or Uber Website and received an extended free trial of Uber One during the promotional period(s).
- PayPal: eligible users enrolled through the Uber App or Uber Website and received an extended free trial of Uber One during the promotional period(s).
- Verizon: eligible users enrolled through Verizon's +play site and received an extended free trial of Uber One during the promotional period(s).
- YouTube TV: eligible users enrolled through the Uber App or Uber Website and received an extended free trial of Uber One during the promotional period(s).

**INTERROGATORY 12:** State whether You have been aware of the Restore Online Shopper's Confidence Act ("ROSCA") since at least November 8, 2019, and if not, state when You first learned about ROSCA.

**RESPONSE:**

Uber objects to this Interrogatory as overbroad and unduly burdensome to the extent it demands that Uber pinpoint a precise date on which a corporation "became aware" of a statute, and objects that "aware" is vague as applied to a corporate entity, as the Interrogatory does not identify whose knowledge it would attribute to Uber. Uber further objects that the date on which Uber first became aware of ROSCA's existence is not the knowledge standard applicable to Plaintiffs' claims.

Awareness of a statute is not knowledge, actual or fairly implied, that any act or practice is unfair, deceptive, or prohibited within the meaning of 15 U.S.C. § 45(m)(1)(A). Uber further objects to this Interrogatory to the extent it seeks the substance of privileged communications or attorney work product. In responding, Uber does not disclose, characterize, or waive any privileged communication or analysis.

Subject to and without waiving the foregoing objections, Uber responds that, while it cannot pinpoint an exact date, it is fair to say that Uber has known of ROSCA since at least the development and launch of its earliest online subscription products, and accordingly since before November 8, 2019. Uber denies any implication that its awareness of ROSCA constitutes knowledge that any of its practices violated ROSCA, and states that its practices complied with ROSCA at all times. Uber further responds that the Company follows all relevant laws and stays up to date on legal and regulatory changes in all jurisdictions in which it operates. Uber understands that the FTC has repeatedly admitted that ROSCA's "simple mechanisms" standard "lacks specificity about cancellation procedures" and requires marketers to provide "simple mechanisms" to stop recurring charges "without guidance about what is simple." Negative Option Rule, 88 Fed. Reg. 24,716, 24,718 (Apr. 24, 2023); *see also* Rule Concerning the Use of Prenotification Negative Option Plans, 84 Fed. Reg. 52,393, 52,396 (Oct. 2, 2019) (ROSCA "does not specify what methods would satisfy" the requirement).

**INTERROGATORY 13:** State whether You contend that during the Applicable Time Period You believed Your subscription services did not violate the Restore Online Shopper's Confidence Act ("ROSCA"), and if so the basis for that belief, who was involved in formulating that belief, and when any discussions relating to that belief occurred.

**RESPONSE:**

Uber objects to this Interrogatory as seeking information protected by the attorney-client privilege and work-product doctrine. Uber will not disclose privileged communications or deliberations, and nothing in this Response waives, or places at issue, any privileged matter. Uber further objects that "You believed" is vague as applied to a corporate entity and improperly

presupposes a single, unified corporate state of mind. Uber further objects that this Interrogatory is compound, containing multiple discrete subparts constituting separate interrogatories under Rule 33(a)(1), and reserves all rights with respect to Plaintiffs' interrogatory count.

Subject to and without waiving the foregoing specific and general objections, Uber responds as follows: Uber's subscription products have complied with ROSCA throughout the Applicable Time Period, and Uber is aware of no facts showing that it did not comply. The non-privileged bases for Uber's contention include the features of its advertisements, enrollment flows, and cancellation flows during the Applicable Time Period. Uber disclosed all material terms prior to and during enrollment. Uber also obtained express informed consent for enrollment. Uber also provided multiple simple mechanisms for customers to cancel. Uber's compliance with ROSCA is confirmed by the following categories of produced material: billing data, usage data, customer behavior data, customer communications/complaints, email/slack messages, and complaints produced by Plaintiffs.

This conclusion was reached by Uber personnel responsible for Uber One, including business and legal leadership. Uber maintains that any specific legal advice and guidance is privileged.

**INTERROGATORY 14:** State the circumstances (including the time during an Uber One subscriber's billing cycle) in which the "End Membership" button would be hidden or unavailable for Uber One subscribers, including the date range(s) when that policy, practice or procedure was in effect, any changes to that policy, practice or procedure (including all versions), and the dates any changes to those policies, practices or procedures went into effect.

**RESPONSE:**

Uber objects to this Interrogatory as compound and containing multiple discrete subparts constituting separate interrogatories under Rule 33(a)(1), and reserves all rights with respect to Plaintiffs' interrogatory count. Uber responds based on a reasonable investigation into its policies, practices, and procedures as designed and implemented. Uber cannot exclude the possibility of isolated technical errors causing unintended display issues in individual instances, and this response does not address such unintended occurrences.

Subject to and without waiving the foregoing specific and general objections, Uber responds as follows: Throughout the Applicable Time Period, Uber One subscribers could cancel their memberships at any time. During certain periods, the in-app "End Membership" button was not displayed in the following circumstances, during which subscribers could cancel through Uber's Help center support flow.

First, from November 17, 2021 until November 15, 2023, the "End Membership" button on the "Manage Membership" page was not displayed to subscribers within 24 hours of their next billing date and users could instead cancel through Uber support. UBER-FTCU1-00385139.

Second, from November 17, 2021 through September 2023, the "End Membership" button on the "Manage Membership" page was not displayed to subscribers who had upgraded from a monthly to an annual plan, for the remainder of the billing cycle of the original monthly plan and users could instead cancel through Uber support. UBER-FTCU1-00418328 at -333.

**INTERROGATORY 15:** For each Uber One or Uber Pass Cancellation Process, describe all changes made to the Cancellation Process during the Applicable Time Period, when those changes occurred, the reason(s) for those changes, and, if applicable, how the Cancellation Process differed based on consumer engagement (e.g., a consumer's selected reason for cancellation).

**RESPONSE:**

Uber objects to this Interrogatory as compound and containing multiple discrete subparts constituting separate interrogatories under Rule 33(a)(1), and reserves all rights with respect to Plaintiffs' interrogatory count. Uber further objects that "the reason(s) for those changes" is unduly burdensome to the extent it demands a reconstruction of multiple product decisions reflecting considerations distributed across many individuals and not always documented. To the extent it seeks changes made at the direction of or reflecting the advice of counsel, Uber will not disclose privileged information. Uber does not maintain in the ordinary course of business a compilation of all changes made to the cancellation processes during the Applicable Time Period. Uber describes below the material changes identified through reasonable investigation.

Subject to and without waiving the foregoing specific and general objections, Uber responds as follows:

Until approximately August 25, 2021, subscribers to Uber Pass could cancel by toggling a button labeled "auto-renew" in the Uber Pass menu. After August 25, 2021, a new cancellation process began to roll out where subscribers to Uber Pass could cancel their membership by clicking "Manage membership" in the Uber Pass menu, then "End Membership," then "Leave Uber Pass."

From the launch of Uber One through the end of the Applicable Time Period, users could cancel Uber One by navigating to the "Account" tile, clicking "Uber One," clicking "Manage membership," clicking "End membership," and completing the flow, which consisted of screens described below. These screens changed slightly during the Applicable Time Period and also differed slightly depending on the user's answer to the cancellation survey question. Uber has made a good faith effort to describe the material changes to the Uber One cancellation processes during the Applicable Time Period below.

<u>Survey page</u>: The first page after clicking "End membership" presented six reasons for cancelling:

- Issues with my rides or orders
- Not saving enough
- Fees are too high on my rides or orders
- Not satisfied with Uber One benefits
- Want to take a break
- Something else

The order of these options was randomized, with the exception of "Something else," which appeared last. UBER-FTCU1-00002369 at -379. When a user selected an option, an optional text box appeared that allowed the user to type in more information explaining their selection. *Id.* The page offered users two choices: "Continue," which would submit the user's response to the cancellation survey, and "Keep Uber One," which would exit the flow.

In July 2025, Uber instituted changes to the cancellation process in California. The call to action buttons on the survey page were (1) "Continue and see offers," which directed users to the rest of the cancellation process, (2) "Skip survey and cancel now," which cancels the user's auto renewal and directs them back to their membership hub, and (3) "Keep Uber One," which exits the flow. This process was rolled out to Colorado in August 2025 and Massachusetts in September 2025.

Savings page: The second page users could see was a savings message. The savings message was added in November 2022. The contents of the savings message depended on the user's history with Uber One. If the user's lifetime savings were less than $1, they were shown the US average monthly savings. If the user's lifetime savings were greater than $1 but less than $9.99, and their average trip savings were less than $2.40, they were shown their savings from the last month. If the user's lifetime savings were greater than $1 but less than $9.99, and their average trip savings were greater than $2.40, they were shown their average trip savings. If the user's lifetime savings were greater than $9.99, they were shown their lifetime savings. UBER-FTCU1-00022617. From the savings page, users could select "Continue to cancel," which would show them a retention offer, or "Keep Uber One," which would exit the flow.

Pause page: The third page users could see was an offer to pause their Uber One membership. The pause option was added in October 2023. If the user had a monthly plan and selected "Want to take a break" or "Something else," they were shown an option to pause their membership for one month or two months. UBER-FTCU1-00032745. The user could decline this pause offer by clicking "No thanks." UBER-FTCU1-00002466. Alternatively, the user could select one of the pause length options and click "Pause Uber One," which would pause their benefits starting at the end of the current billing cycle. UBER-SEPT24-00000136 at -137.

Downgrade to monthly plan page: Beginning in November 2023, Users on an annual plan were also shown a screen offering to switch to a monthly plan. UBER-FTCU1-00022944 at -954. Users could click "End Uber One," which would exit the flow, or "Switch to monthly plan," which would present another screen. On the next screen, users could select "Switch to $9.99/mo" to remain a member on a monthly plan, or "Cancel" to exit the flow. *Id.*

Retention offer page: The final page is a retention offer, where users were shown offers to keep Uber One at a discounted price. Users not eligible for a retention offer may have also been shown a screen with a pending offer on their account. UBER-FTCU1-00002466 at -470. Users proceeded to this screen if they declined the pause opportunity or chose not to keep Uber One after viewing the savings screen.

Users could also cancel through support at any time. To reach support, users could navigate to the "Account" tab, click "Help," and follow the prompts for membership issues. Between November 17, 2021 and December 2024, users who were within 48 hours of their renewal date were directed to cancel Uber One through support, because their payment for the next billing cycle may have begun processing in this window and Uber did not yet have the ability to automatically refund them for the next membership period. Users could access the regular cancellation flow until 24 hours before their renewal. From November 17, 2021 to approximately November 15, 2023, users within 24 hours of renewal could navigate to the "Account" tab, click "Help," and follow the prompts for membership issues. From November 15, 2023 through October 2024, users within 24 hours of renewal who clicked "End membership" were shown a savings screen and prompted to contact support to cancel. From November 2024 through approximately December 12, 2024, users within 24 hours of renewal who clicked "End membership" were shown a savings screen and shown two linked options: (1) "Get help," which took them to a support page where they could submit a ticket to cancel their membership, or (2) "Keep Uber One" to return to the manage membership page. From December 12, 2024 through the end of the Applicable Time Period, users within 24 hours of renewal had the same experience as users outside 24 hours of renewal.

**INTERROGATORY 16:** For each Uber One and Uber Pass Enrollment Process (including variations or iterations of those Enrollment Processes), state the time period during which the Enrollment Process was made available to consumers. If the Enrollment Process (or a variation or iteration of the Enrollment Process) was never made available to consumers, please so state.

**RESPONSE:**

Uber objects to this Interrogatory on the ground that "variations or iterations" is vague and undefined. Uber interprets the Interrogatory to seek the materially distinct enrollment flows and surfaces through which consumers could enroll in Uber One or Uber Pass, rather than every visual or copy revision. Uber notes that the defined term "Enrollment Process" describes a process "through which a consumer accepts an offer or arrangement to receive a product or service," while the Interrogatory's final sentence contemplates processes never made available to consumers. Uber does not maintain in the ordinary course of business a compilation of the availability dates for each enrollment flow. Uber responds based on a reasonable investigation and will supplement as required by Rule 26(e).

Subject to and without waiving the foregoing objections, Uber responds with the following chart showing the earliest and latest appearances for each entrypoint value within its produced data. The entrypoint names have been normalized (i.e., merging values that appear in all lowercase and all capital letters into a single value; merging values with a typo into the value that is spelled correctly):

| **Entrypoint value** | **Earliest appearance in database** | **Latest appearance in database** |
|---|---|---|
| checkout | Nov 2021 | Oct 2025 |
| checkout_interstitial | May 2024 | Dec 2025 |
| upsell | Nov 2021 | Dec 2025 |
| identity_card | Nov 2021 | Dec 2025 |
| cart_footer_banner | Jan 2023 | Dec 2025 |
| one_click | Nov 2022 | Dec 2025 |
| deeplink_ | Nov 2021 | Dec 2025 |
| settings | Nov 2021 | Dec 2025 |
| deeplink_unknown | Nov 2021 | Dec 2025 |

| | | |
|---|---|---|
| signup | Nov 2022 | Dec 2025 |
| checkout_banner | Nov 2021 | Dec 2025 |
| identity_list_item | Nov 2021 | Dec 2025 |
| interstitial_home | Nov 2021 | Dec 2025 |
| checkout_footer_banner | Jan 2023 | Dec 2025 |
| subscription_tab | Nov 2021 | Jan 2025 |
| storefront_banner | Dec 2022 | Dec 2025 |
| bottom_sheet_app_launch | Nov 2021 | Dec 2025 |
| bottom_sheet_home | Nov 2021 | Dec 2025 |
| ccc | Oct 2022 | Dec 2025 |
| signup_upsell | Nov 2021 | Dec 2025 |
| eats_ccc | Mar 2022 | Aug 2024 |
| billboard | Nov 2021 | Dec 2025 |
| identity | Apr 2022 | Dec 2025 |
| menu | Nov 2021 | Dec 2025 |
| deeplink_payment_partner_amex | Nov 2021 | Jan 2025 |
| deeplink_payment_partner | Nov 2021 | Jan 2025 |
| plus_one_step | Nov 2021 | May 2024 |
| request_blocker | Feb 2023 | Nov 2024 |
| push | Jun 2022 | Dec 2025 |
| store_menu_info_box | Nov 2021 | Dec 2025 |
| donut_surface | Nov 2021 | Mar 2024 |
| promo_manager | Feb 2024 | Dec 2025 |

| | | |
|---|---|---|
| eft_ccc | Jun 2022 | Dec 2025 |
| product_selector | Feb 2024 | Dec 2025 |
| checkout_button | Nov 2023 | Sep 2024 |
| bottom_sheet_remove_payment | Nov 2022 | Dec 2025 |
| messaging_web_view | Nov 2021 | Jul 2025 |
| unknown_deeplink | Oct 2022 | Dec 2025 |
| email | Apr 2022 | Dec 2025 |
| deeplink_global-crm-savings | Nov 2021 | Mar 2024 |
| bottom_navigation_tab | Nov 2021 | Jul 2024 |
| ring_ontrip_interstitial | Mar 2025 | Dec 2025 |
| create_delivery_order | Jun 2025 | Dec 2025 |
| upsell_billboard | Feb 2022 | Dec 2025 |
| ring_dispatch | Aug 2023 | Dec 2025 |
| order_tracking_carousel | Dec 2021 | Dec 2025 |
| ring | Jun 2022 | Dec 2025 |
| expiration_renew_interstitial | Nov 2021 | Mar 2024 |
| invalid | Nov 2021 | Jul 2024 |
| promo_screen_banner | Oct 2022 | Dec 2025 |
| u4b_org_funded | Mar 2022 | Aug 2024 |
| upsell_badgeable_promomanager | Jun 2025 | Dec 2025 |
| donut_carousel | Nov 2021 | Mar 2024 |
| deeplink_global-crm-launch | Nov 2021 | Mar 2024 |
| web_upsell_banner | May 2023 | Dec 2025 |

| | | |
|---|---|---|
| activity_home | May 2024 | Dec 2025 |
| storefront_promo_detail | Jun 2024 | Dec 2025 |
| is | Dec 2023 | Nov 2025 |
| genie_banner | Nov 2021 | Mar 2024 |
| bottom_sheet_store_menu | Nov 2021 | Feb 2024 |
| partner | Nov 2022 | Dec 2025 |
| partner_capitalone | Jun 2022 | Jan 2025 |
| u1_optimizations_phase4_ring | Mar 2022 | Feb 2024 |
| store_exclusives_header | May 2024 | Dec 2025 |
| promo_manger | Jul 2023 | Dec 2025 |
| post_trip_push | Sep 2024 | Dec 2025 |
| checkout_fomo_interstitial | Nov 2024 | Dec 2025 |
| referrals | Aug 2024 | Dec 2025 |
| feed_banner | Jul 2022 | Oct 2025 |
| deeplink_billboard_auto_renew | Nov 2021 | Mar 2024 |
| deeplink | Nov 2021 | Dec 2025 |
| genie_annual_v2 | Nov 2021 | Mar 2024 |
| storefront_item | Apr 2024 | Dec 2025 |
| employee_linking | Nov 2022 | Dec 2025 |
| mobilitymemberpricingxp_ring | May 2022 | Mar 2023 |
| masthead | Apr 2025 | Jun 2025 |
| merchant_carousel | Nov 2023 | Dec 2025 |
| deeplink_global-rider-crm | Nov 2021 | Mar 2024 |

| | | |
|---|---|---|
| abc123 | Jan 2022 | Jun 2024 |
| home_feed_banner | Sep 2023 | Dec 2025 |
| deeplink_payment_partner_amex_external | Nov 2021 | Mar 2023 |
| deeplink_annual_offers | Nov 2021 | Jan 2025 |
| business_hub | Oct 2022 | Dec 2025 |
| storefront_carousel | Apr 2024 | Dec 2025 |
| email_annual_v2 | Nov 2021 | Mar 2024 |
| deeplink_pf-xp-ring | Nov 2021 | Mar 2024 |
| storefront_billboard | Aug 2024 | Dec 2025 |
| billboard_auto_renew | Nov 2021 | Oct 2023 |
| eftdxgy | Dec 2021 | Mar 2023 |
| cart_exclusives_footer_banner | Oct 2024 | Dec 2025 |
| feed_item | Nov 2021 | Mar 2024 |
| social | Jun 2023 | Sep 2025 |
| billboard_annual_v2 | Nov 2021 | Jun 2024 |
| mobilitymemberpricingxp_push | May 2022 | Mar 2023 |
| push_annual_v2 | Nov 2021 | Mar 2024 |
| promomanager | Sep 2024 | Dec 2025 |
| disclaimer | Jul 2024 | Dec 2025 |
| checkout_one_click_banner | Apr 2024 | Dec 2025 |
| eater_message | Nov 2021 | Oct 2023 |
| order_termination | May 2023 | Dec 2025 |
| home_feed_item | Nov 2022 | May 2024 |

| | | |
|---|---|---|
| evergreen_ring | Apr 2022 | Jan 2023 |
| support_s4_csat | Sep 2023 | Dec 2025 |
| deeplink_global-eater-crm | Nov 2021 | Mar 2023 |
| support | Jul 2022 | Dec 2025 |
| cta_store_item_details | May 2023 | Dec 2025 |
| storefront_student_plan_billboard | Jun 2024 | Dec 2025 |
| storefront | Dec 2023 | Dec 2025 |
| checkout_exclusives_footer_banner | Oct 2024 | Dec 2025 |
| manual | Oct 2022 | Dec 2025 |
| partner_rewards | Oct 2024 | Dec 2025 |
| shortcut | Feb 2025 | May 2025 |
| deeplink_annual_purchase_flow | Nov 2021 | Mar 2024 |
| push_last_giving_tuesday | Dec 2021 | Nov 2022 |
| storefront_footer_savings_banner | Nov 2024 | Dec 2025 |
| tip_modal | Nov 2023 | Sep 2024 |
| checkout_renew_banner | Feb 2023 | Dec 2025 |
| home_feed_takeover | May 2025 | Jul 2025 |
| identity_pill | Aug 2022 | Dec 2025 |
| push_rem_giving_tuesday | Dec 2021 | Dec 2022 |
| support_landing_banner | Sep 2023 | Sep 2024 |
| deeplink_pf-xp-push | Nov 2021 | Mar 2023 |
| donut | May 2022 | Dec 2025 |
| external | Mar 2023 | Dec 2025 |

| | | |
|---|---|---|
| deeplink_crm | Nov 2021 | Apr 2023 |
| eftdxgy_522_push | Jun 2022 | Dec 2022 |
| partner_reseller | Dec 2023 | Jul 2025 |
| ring_home | Jan 2024 | Dec 2025 |
| home-feed-fomo | Feb 2025 | Dec 2025 |
| preview_billboard | Aug 2022 | Jul 2025 |
| commute_pass_manager | Feb 2025 | Dec 2025 |
| fiat | Oct 2025 | Dec 2025 |
| ring_mbv | May 2022 | Nov 2022 |
| deeplink_pf-xp-email | Nov 2021 | Mar 2023 |
| cash_hub_details_page | Apr 2024 | Dec 2025 |
| ring_annual_v2 | Nov 2021 | Nov 2023 |
| one_click_checkout_purchase | Jun 2025 | Dec 2025 |
| partnerhub | Sep 2024 | Dec 2025 |
| tracking_hub | Dec 2023 | May 2025 |
| partner_rewards_wallet_screen | Nov 2022 | Dec 2025 |
| offer_details | May 2025 | Dec 2025 |
| support_chat_csat | Oct 2023 | Dec 2025 |
| menu_bottomsheet | Feb 2022 | Nov 2022 |
| deeplink_billboard_expiration | Nov 2021 | Oct 2023 |
| u4b_ranked_offer | Mar 2024 | Dec 2025 |
| genie | Nov 2022 | Dec 2025 |
| push_mbv_eats | May 2022 | Oct 2022 |

| | | |
|---|---|---|
| checkout_see_all_item | May 2024 | Dec 2025 |
| deeplink_regional-rider-crm | Nov 2021 | Oct 2023 |
| membershippreview_push | Jul 2022 | Feb 2023 |
| ring_ontrip | Dec 2023 | Dec 2025 |
| mobilitymemberpricingxp_bb | May 2022 | Dec 2022 |
| ring_enroute | Nov 2023 | Dec 2025 |
| home_feed_exclusive_carousel | May 2025 | May 2025 |
| ride_details | Nov 2024 | Dec 2025 |
| push_rider_post_trip | May 2022 | Nov 2022 |
| deeplink_latam-crm-uber-one-mx-launch | Apr 2022 | Nov 2022 |
| actionable_feed_item | Nov 2021 | Sep 2023 |
| potentialsavingsus_push_psdxgy | Apr 2022 | Nov 2022 |
| storefront_footer_renewal_banner | Jun 2024 | Dec 2025 |
| payment_reward_screen | Dec 2022 | May 2024 |
| ring_giving_tuesday | Dec 2021 | Nov 2022 |
| upcoming_trips_screen_banner | Jan 2023 | Oct 2024 |
| push_mbv | May 2022 | Nov 2022 |
| deeplink_membership | Nov 2022 | May 2023 |
| preview_last_day_billboard | Aug 2022 | Dec 2025 |
| cash_earning_details_page | Aug 2023 | Dec 2025 |
| order_tracking_interstitial | Oct 2024 | Dec 2025 |
| deals_hub_billboard | Mar 2022 | Dec 2022 |
| welcome_see_all_item | Jul 2024 | Dec 2025 |

| | | |
|---|---|---|
| reorder_upsell_banner | Sep 2025 | Dec 2025 |
| postexpiration_billboard | Jun 2025 | Dec 2025 |
| <entrypoint> | Jun 2025 | Jul 2025 |
| autodismissupsell | Dec 2021 | Oct 2023 |
| push_mbv2 | Jun 2022 | Nov 2022 |
| billboard_giving_tuesday | Dec 2021 | Oct 2022 |
| deeplink_one-click-checkout-purchase | Jul 2022 | Aug 2023 |
| ring_on_trip | Sep 2025 | Dec 2025 |
| enroute_ring | Sep 2025 | Dec 2025 |
| partner_ucraft | Jun 2024 | Jan 2025 |
| deeplink_ring | Sep 2023 | Oct 2023 |
| ring_merchandising_carousel | Oct 2025 | Dec 2025 |
| evergreen_free_trial_ccc | Jul 2025 | Dec 2025 |
| google_ads | Jan 2025 | Mar 2025 |
| order_tracking_feed_item | Nov 2021 | Oct 2023 |
| ring_rider_post_trip | May 2022 | Oct 2022 |
| membership_hub | Jul 2023 | Oct 2023 |
| partner_email | May 2023 | Jul 2024 |
| eats_offer_details_page | May 2025 | May 2025 |
| plus_one_step_request_blocker | Jun 2024 | Oct 2024 |
| deeplink_mx-potential-savings | Aug 2022 | Nov 2022 |
| u1calau | Jul 2022 | Oct 2022 |
| collections-carousel-fomo | May 2025 | Dec 2025 |

| | | |
|---|---|---|
| payment_partner_td_aeroplan | Apr 2022 | Jul 2023 |
| $entry_point_identity_pill | Aug 2022 | Dec 2022 |
| commute_pass | Jul 2025 | Dec 2025 |
| homefeed_modal_push | May 2025 | Dec 2025 |
| bb_mbv_eats | May 2022 | Oct 2022 |
| family_hub | Jun 2025 | Dec 2025 |
| payment_partner_cibc_aeroplan | Apr 2022 | Feb 2023 |
| arrears_payment_screen_banner | May 2024 | Jan 2025 |
| subscription_tab_purchase_success | Nov 2021 | Oct 2022 |
| ucraft | May 2024 | Dec 2025 |
| uber_billboard | Feb 2022 | Nov 2022 |
| web_blog | May 2023 | Dec 2024 |
| deeplink_everywhere-latam-nonmembers-crm | Jul 2022 | Nov 2022 |
| payment_partner_aircanada_aeroplan_external | Feb 2022 | Oct 2022 |
| <entrypoint | Jun 2025 | Oct 2025 |
| partner_web | Dec 2022 | Jul 2024 |
| carousel | Oct 2024 | Sep 2025 |
| memberhub | Dec 2024 | Dec 2024 |
| payment_partner_amex_aeroplan | Apr 2022 | Oct 2022 |
| test | Feb 2024 | Jul 2024 |
| digitalads | Dec 2023 | Aug 2024 |
| deeplink_just-completed-trip-campaign | Aug 2022 | Oct 2022 |
| bottom_sheet | Oct 2023 | Oct 2023 |

| | | |
|---|---|---|
| apple_wallet | Nov 2025 | Dec 2025 |
| unknown_impossible | Aug 2023 | Aug 2023 |
| googlead | Feb 2025 | Mar 2025 |
| deeplink_email | Sep 2023 | Oct 2023 |
| on_trip_interstitial | Jul 2025 | Jul 2025 |
| partner_web_logged_out | Dec 2023 | Feb 2025 |
| partner_unidays | Jul 2025 | Aug 2025 |
| […]namic_6meft_w_a | Jul 2025 | Oct 2025 |
| email_amr | Sep 2023 | Nov 2023 |
| potentialsavingsus_push_ps | May 2022 | Jun 2022 |
| edm | May 2024 | Jun 2024 |
| uber_cash_hub | Apr 2024 | Apr 2024 |
| identity_pill" | Nov 2022 | Oct 2023 |
| car | Aug 2024 | Aug 2024 |
| payment_partner_amex_aeroplan_external | Feb 2022 | Mar 2022 |
| deeplink_ring_en_route | Oct 2023 | Oct 2023 |
| member_hub | May 2025 | May 2025 |
| deeplink_push | Oct 2023 | Oct 2023 |
| undefined | Nov 2022 | Nov 2022 |
| deeplink_ring_on_trip | Oct 2023 | Oct 2023 |
| new_user_promo_sign | Nov 2023 | Nov 2023 |
| sampleentrypoint | Jan 2025 | Jan 2025 |
| ofd_carousel | May 2025 | May 2025 |

| | | |
|---|---|---|
| home_feed_push_bottom_modal | Nov 2022 | Nov 2022 |
| partner_tic | Apr 2025 | Apr 2025 |
| dispatch_ring | Sep 2025 | Sep 2025 |
| settings,/uber-one?access-point=settings | Dec 2022 | Dec 2022 |
| interstitial | Oct 2025 | Oct 2025 |
| cupsealer | Nov 2025 | Nov 2025 |
| partner_external | Aug 2023 | Aug 2023 |
| anniversary | Dec 2024 | Dec 2024 |
| utility_banner | Jan 2025 | Jan 2025 |

With respect to Uber Pass, enrollment processes like those produced at UBER-FTCU1-00010299 and UBER-FTCU1-00010300 were in place for the duration of the Applicable Time Period during which Uber Pass was available.

Dated: August 24, 2026

*<u>/s/ Lauren C. Freeman</u>*

Lauren C. Freeman (SBN 324572)
lfreeman@sidley.com
SIDLEY AUSTIN LLP
101 California Street
San Francisco, CA 94111
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Benjamin M. Mundel (*pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

Sonal N. Mehta (SBN 222086)
sonal.mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP

2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: 650-600-5051

David Gringer (*pro hac vice*)
david.gringer@wilmerhale.com
Marissa M. Wenzel (*pro hac vice*)
marissa.wenzel@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800

*Attorneys for Defendants*
*Uber Technologies, Inc., and Uber USA, LLC*