Division of Financial Practices
Bureau of Consumer Protection

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

October 2, 2026

***By ECF***

Honorable Thomas S. Hixson
United States District Court, Northern District of California
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Re: *FTC et al. v. Uber Technologies, Inc. et al.*, Case No. 4:25-cv-03477-JST

Dear Judge Hixson:

Plaintiff Federal Trade Commission ("FTC") and Defendants Uber Technologies, Inc. and Uber USA, LLC ("Uber" or "Defendants") submit this joint discovery letter pursuant to Fed. R. Civ. P. 37(a) and the Court's local rules.

The parties hereby attest that they have met and conferred in good faith prior to filing this discovery letter.

Respectfully submitted,

*/s/ Paul Mezan*

Paul Mezan
Federal Trade Commission
*Attorney for Plaintiff FTC*

*/s/ Ben Mundel*

Ben Mundel
Sidley Austin LLP

*Attorney for Uber Technologies, Inc. and Uber USA, LLC*

## I. <u>FTC's Statement</u>

As discussed further below, the FTC respectfully requests that the Court order Uber to (A) supplement its response to the FTC's Interrogatory 5 by October 9, 2026; (B) produce data responsive to FTC Request for Production 61 by October 16, 2026; and (C) produce data or information responsive to FTC Requests for Production 62 and 63 by November 1, 2026. In addition, the FTC requests that the Court permit the FTC to depose five additional fact witnesses and address various issues related to the FTC's 30(b)(6) deposition notice.

### A. Interrogatory 5

Interrogatory 5 requests that Defendants: "State, by month, the number of unique Uber One subscribers in the United States who clicked any hyperlink that displayed the Uber One Terms and Conditions or comparable terms-related disclosures during their enrollment in Uber One, including hyperlinks labeled 'more information,' 'See terms and benefit details,' and 'Uber One Terms and Conditions.'" Ex. A. Uber has admitted that it does not possess information responsive to Interrogatory 5 for the time period prior to 2025. With respect to 2025, however, Uber has provided only a qualified and evasive response, while resisting requests for clarity.

Uber initially stated, in response to Interrogatory 5, that "raw data *may* exist for 2025" (emphasis added) that would allow it to answer the interrogatory for that year, and that "Uber will supplement its response . . . *if and when* it is able to do so." (emphasis added). The FTC subsequently asked Uber whether it, in fact, "possesses information responsive to Rog 5 and, if so, when it expects it will provide that information." In response, Uber appeared to confirm that there was indeed responsive "raw data available from 2025," but Uber merely reiterated its prior response that it would "supplement its response *if and when* it is able to do so."

By failing to provide a timely and conclusive response to Interrogatory 5, Uber is taking an untenable position. Uber repeatedly cites the terms and conditions throughout its Answer to defend against the FTC's allegations, including claiming that "Uber clearly and conspicuously disclosed all material terms of Uber One, and consumers agreed to those terms *before enrolling*." Dkt. 213 (Answer to Second Amended Complaint) at 4-5 (general response) (emphasis added); *see also id.* ¶¶ 4, 19-22, 26-27, 29, 30, 32, 35, 40, 42, 44-57, 65-74, 76, 85, 89, 91, 93. Having thus made the terms and conditions a centerpiece of its defense, Uber now refuses to confirm whether it possesses data for 2025 supporting that defense—while admitting it has *no* data supporting its defense for the period before 2025.

Accordingly, the FTC respectfully requests that the Court order Uber, by no later than October 9, 2026, to either provide a conclusive response to Interrogatory 5 providing such data or to confirm that no such data exists.

### B. RFP 61

RFP 61 requests that Defendants produce certain transaction-level data for a random sample of their U.S.-based consumers reflecting prices and fees paid by Uber users and the factors that determine those prices and fees. Ex. B. In their response, Defendants state they will

not produce responsive documents or data because the request is irrelevant, unduly burdensome, and duplicative of prior requests that the Court has rejected. *Id*. Defendants' objections are without merit for the following reasons.

First, the request bears directly on the veracity of Defendants' representations about the amount of money that consumers save when they are enrolled in an Uber subscription. Defendants argue the request is irrelevant merely because it calls for data associated with users who were not enrolled in one of its subscriptions. *Id*. But the prices paid by non-subscribers are, by definition, essential to determining whether consumers enrolled in an Uber subscription actually achieve Defendants' promised savings. Furthermore, the documents and data requested by RFP 61 are relevant to Defendants' expected argument that any consumer harm should be offset by subscription benefits. To the extent Defendants argue that its subscribers realized a certain amount of savings, Plaintiffs should be allowed to test that claim by assessing how much money subscribers actually saved compared to non-subscribers; Uber cannot argue that subscribers obtained significant benefits while shielding discovery on the topic.

Discovery has already produced evidence Uber engaged in deceptive conduct centered on this data: for example, until July 2025, Uber's calculations of the savings attributable to Uber One subscriptions included promotions available to all users regardless of whether they were enrolled in an Uber subscription. *See* Ex. A at 7. In addition, internal Uber documents indicate that service and delivery fees are higher for subscribers than they are for non-subscribers, suggesting that Defendants' promised "savings" are achieved in part by the waiver of inflated fees rather than access to meaningful benefits. *See* Ex. C. The documents and data requested by RFP 61 will allow Plaintiffs to follow this trail of evidence by analyzing whether consumers who were enrolled in an Uber subscription actually achieved the savings amounts promised by Defendants.[1]

Second, RFP 61 is not unduly burdensome. While the data requested is substantial, it is directly relevant to core issues in the case and follows up on evidence already obtained in discovery. RFP 61 does not request transaction-level data for all Uber users; it seeks only such data from a limited and random sample of users. In addition, the request is limited to data reflecting prices paid by Uber users and the factors that determine those prices. Indeed, such data would be necessary for Defendants to substantiate any claims about the savings that result from an Uber subscription.

Third, RFP 61 is neither duplicative of the FTC's previous requests nor inconsistent with the Court's prior decisions. Defendants reference RFP 33(a), (b), and (e) in support of their objection. These requests sought materials sufficient to show *how* Uber calculates the total price of rides and deliveries, such as the weights that Defendants assign to contributing factors and how and when they assess fees. RFP 61, by contrast, seeks data and information that will allow the FTC to assess how enrolling in an Uber subscription qualitatively affects the prices consumers pay. It is similar to RFP 33(c), which sought information concerning "the effect, if Any, that a consumer's enrollment or membership status in Uber One has on the total price or Any fees that may be included in the total price," and on which the Court compelled production.

[1] Publicly available complaints from consumers further support Plaintiffs' position. See https://x.com/MitchOrshal/status/2105460243291672724.

Dkt. 150 (Discovery Order) at 2–3 (compelling production); Dkt. 145 (Joint Status Report), Ex. A at 90 (text of RFP 33). In addition, RFP 61 is particularly appropriate given newly discovered evidence suggesting that Defendants may be manipulating prices and fees to artificially inflate the savings their subscribers appear to receive.

Accordingly, the FTC respectfully requests that the Court order Defendants to produce documents and data responsive to RFP 61 by October 16.

**C. RFPs 62 and 63**

The parties have agreed that Uber will produce data and information responsive to RFPs 62 and 63. The FTC respectfully requests that the Court order Uber to do so by November 1, 2026.

**D. Additional Depositions**

Plaintiffs request that they be permitted to take a total of 15 fact depositions, inclusive of party and non-party witnesses.

Rule 30(a)(2) provides that a party "must grant leave" for more than 10 depositions "to the extent consistent with Rule 26(b)(1) and (2)." Here, the Rule 26(b)(1) and (2) factors favor additional depositions: As the Court has noted, the "issues at stake" are of "widespread public importance." *See* Dkt. No. 177, at 1. The amount in controversy is high; Plaintiffs allege pervasive misconduct with respect to Defendants' subscription service(s), which have yielded billions of dollars of revenue since launch, and Plaintiffs also seek civil penalties. "[N]early all of" the information remains in Uber's possession (*see id.* at 1-2), and Defendants' total document production—approximately 175,000 documents—is slim compared to cases of comparable size and complexity. Defendants, which are represented by two preeminent law firms, have the resources necessary to defend five additional deponents, and Plaintiffs have the resources to take them.

Moreover, the additional depositions are important in resolving the issues in the action. The case involves, as noted, a broad-based attack on Defendants' subscription service(s)—alleging, for example, that Defendants charged consumers without consent, lured them with false promises, and made it difficult to cancel. Relevant topics of inquiry include the design of the enrollment and cancellation processes, including Uber's extensive testing of the same; contemplated changes to enrollment and cancellation processes in light of admitted problems with each; the calculation of Uber's savings claim (*e.g.*, the data used in the calculation, changes to the calculation over time, and the prices charged to subscribers compared to non-subscribers); where and how the savings claim was made to consumers; Uber's discussions regarding what features are important to consumers; internal surveys; consumer complaints; and Uber's purported conclusion that its practices complied with ROSCA. Given the centrality of these issues, which were handled by literally hundreds of employees across disparate teams, the likely benefit of the request clearly outweighs the relatively modest burden of five additional depositions. Even a limit of 15 depositions will require Plaintiffs to exercise extreme selectivity in identifying deponents.

Notably, the requested depositions can be taken efficiently in the time remaining for fact discovery. Plaintiffs have noticed six depositions and taken two. There are six weeks remaining in the fact discovery period, which is more than sufficient time to accommodate five additional depositions. Accordingly, Defendants respectfully request leave to take a total of 15 fact depositions. *See, e.g.*, *Kadrey v. Meta Platforms, Inc.*, 2024 WL 4502099, at *2 (N.D. Cal. Oct. 15, 2024) (permitting 25 depositions) (Hixson, J.); *Andersen v. Stability AI Ltd.*, 2025 WL 870358, at *10 (N.D. Cal. Mar. 19, 2025) (granting plaintiffs "leave to take thirty depositions, to be allocated at [p]laintiffs' discretion"); *Del Campo v. Am. Corrective Counseling Servs., Inc.*, 2007 WL 3306496, at *6 (N.D. Cal. Nov. 6, 2007) (permitting plaintiffs to take at least 23 depositions "where the complexity clearly warrants more than ten depositions"); *In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 2024 WL 3643253, at *2 (N.D. Cal. Aug. 1, 2024) (setting a "soft cap of forty-five (45) deposition at outset of litigation"); *Doe 1 v. Univ. of San Francisco,* 2026 WL 1971134, at *3 (N.D. Cal. July 7, 2026) (granting leave to take 35 depositions); *C & C Jewelry Mfg., Inc. v. West*, 2011 WL 767839, at *2 (N.D. Cal. Feb. 28, 2011) (in private patent infringement action, permitting 14 fact depositions). Uber states that it plans to take several depositions but never explains why these depositions, along with Plaintiffs' planned depositions, cannot be accommodated under the current schedule.[2]

**E. 30(b)(6) Issues**

The FTC sent Uber its list of twenty-one Rule 30(b)(6) topics on September 2, following this up with a formal deposition notice sent on September 15. Ex. D. On September 25, Defendants provided their responses and objections to the FTC's deposition notice. Ex. E. As further described below, the FTC requests the Court's assistance in resolving several disputes.

*i. Applicable Time Period*

Uber objects generally to the FTC's instruction A, which states that the "time period for the topics is November 8, 2019 to the present." Ex. D. Uber, instead, seeks to artificially limit testimony to the precise time period covered by the majority of its document production to date (October 1, 2021 to December 15, 2025). For the reasons described below, Uber's objection is unreasonable and will unduly limit the FTC's ability to obtain relevant evidence.

Uber objects that November 8, 2019 is nearly two years before the launch of the membership programs at issue. However, it should be self-evident that actions taken by Uber in advance of, and in preparation for, the launch of Uber Pass and Uber One are relevant to the issues in this case. For example, Uber's design and testing of its marketing program, enrollment flows, and cancellation flows all would have taken place in advance of the actual launch of these subscription programs to consumers. Similarly, Uber would have set policies for operating such programs before either was initiated. These issues are relevant to numerous topics, and the FTC's self-imposed limitation of two years before program launch balances Uber's need to prepare its witnesses with the probative value of the information to the FTC's case. There are

[2] Uber's suggestion that Plaintiffs were dilatory in identifying deponents and proceeding to deposition discovery ignores reality. As the Court will recall, Uber obstructed custodial production for nearly a year, producing not a single custodial document until mid-June and finishing its custodial production only in mid-July.

numerous 30(b)(6) topics that may implicate practices that arose before the programs came to fruition. For example, Topic 10 addresses enrollment practices, Topic 4 addresses cancellation flows, and Topic 5 addresses Uber's practices in charging consumers' accounts. Topics 11, 12, 14, 17, 19, 20, and 21 also may implicate practices prior to the public launch of the programs.

The FTC's ability to question Uber's 30(b)(6) witnesses about their conduct through the present day is also highly relevant. The FTC seeks a permanent injunction, and "[i]n a case governed by the Federal Trade Commission Act ("FTCA"), an injunction will issue only if the wrongs are ongoing or likely to recur." *FTC v. Qualcomm Inc*., 2018 WL 6597273, at *3 (N.D. Cal. Dec. 13, 2018) (cleaned up). Uber's ongoing conduct is also relevant to civil penalties, as courts have found that "a significant fine is appropriate" in cases like this, where the defendant "continued to engage in conduct violating the TSR even after learning that he was under FTC investigation." *FTC v. Jones*, 2017 WL 11198503, at *6 (C.D. Cal. May 25, 2017).

Finally, Uber's dramatic claim that requiring its 30(b)(6) witnesses to answer questions covering the time period of November 8, 2019 to the present would subject them to "an indefinite endpoint . . . and is an ever-moving goalpost" is simply false. Uber's 30(b)(6) witnesses would be required to answer questions between two concrete dates: November 8, 2019, and the date of their deposition.

Accordingly, the FTC respectfully requests that the Court order Uber to prepare its 30(b)(6) witnesses to answer questions covering the full noticed time period of November 8, 2019 to the present.

After the parties met and conferred on September 30, 2026, the FTC proposed limiting the time period for all topics to November 2020 through August 2026. On October 2, Defendants counter-offered with a time period from November 2020 through December 15, 2025. This issue remains in dispute.

*ii. Topic 2*

Topic 2 concerns Uber's knowledge of the Restore Online Shopper's Confidence Act ("ROSCA"), and how it applies to Uber One and Uber Pass. *See* Ex. D. Uber wholly refuses to designate a witness to testify regarding Topic 2, objecting to the Topic "to the extent it seeks the substance of privileged communications or attorney work product." Ex. E.

However, Uber has put its conclusions about ROSCA compliance squarely at issue by asserting an affirmative defense of good faith, (Dkt. 213 at 53-54) and by using Uber's supposed beliefs about ROSCA to argue that civil penalties should not be awarded (*see* Dkt. 116 at 19-20 (arguing civil penalties should be dismissed because "it is implausible that Uber knew or should have known that its practices violated the FAC's view of ROSCA")).[3] Uber's position is that

[3] *See United States v. Ormat Indus., Ltd.*, 2016 WL 4107682, at *4-5 (D. Nev. Aug. 1, 2016) ("Because such good faith defenses are asserted with respect to [the defendant's] understanding and compliance with the law, [evidence concerning the defendant's] knowledge about the law is vital") (citations omitted); *United States v. Dish Network, LLC*, 2011 WL 98951, at *3 (C.D. Ill. Jan. 10, 2011) (ordering defendant to provide information relating to defendant's actual or

this conclusion "was reached by Uber personnel responsible for Uber One, including business leadership;" in fact, Uber specifically amended its response to Interrogatory 13 to revoke its previous assertion that its good faith belief was based, in part, on legal advice. *See* Ex. F.

Uber cannot have it both ways. If its conclusion that it complied in good faith with ROSCA *was* based on legal advice, then Uber has waived any applicable privilege by putting the conclusions of legal personnel at issue (*see, e.g., United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1995); Dkt. 269 at 1-4).[4] Conversely, if Uber's conclusion that it complied with ROSCA *was not* based on legal advice, then there is no applicable privilege. The conclusions of "business leadership" are well within the scope of 30(b)(6) testimony. Either way, the FTC must be permitted to investigate Uber's state of mind as it concerns compliance with ROSCA because Uber has made that an issue in this case. *Gold v. Midland Credit Mgmt., Inc.*, 2014 WL 3371429, at *3 (N.D. Cal. July 9, 2014) ("Just as Defendants are entitled to raise affirmative defenses, Plaintiff is entitled to conduct discovery based those defenses.").

In its response, Uber argues only that "[t]his dispute is not ripe" because it has been ordered to supplement by October 2 its response to Interrogatory 13, which also concerns Uber's belief that it did not violate ROSCA. But there is nothing unusual or improper about Rule 30(b)(6) testimony on a topic about which there has also been written discovery, and Uber's obligation to respond to Interrogatory 13 does not render Topic 3 resolution of this issue premature.[5]

*iii. Topic 3*

The FTC agreed by email on October 1 to Defendants' proposal, made during the parties' conference on September 30, that Defendants provide a substantive written response in lieu of Rule 30(b)(6) testimony on Topic 3, and requests that the Court order Uber to do so.

*iv. Topic 12*

Topic 12 concerns "Uber's practice of 'wallet cycling' as a means of collecting subscription fees from consumers enrolled in Uber One or Uber Pass." Ex. D. Defendants do not deny this topic is relevant, but refuse to designate a witness to testify regarding this topic anyway, claiming, it is "overbroad, unduly burdensome and not proportionate to the needs of the

---

implied knowledge and finding such information is relevant and discoverable when civil penalties are sought under the FTC Act or state statutes).

[4] If Uber's affirmative defense relies on privileged material, waiver is appropriate regardless of whether Uber explicitly states that it relied on the advice of counsel. *See, e.g Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2018 WL 6138160, at *5 (C.D. Cal. Jan. 24, 2018) ("Courts have found implied waiver of attorney-client privilege in instances in which the magic words 'advice of counsel' are not used but where the circumstances underlying an affirmative defense necessarily rely on otherwise privileged material.").

[5] While deposition testimony would be appropriate even if Uber had provided a fulsome response to Interrogatory 13, Uber's stonewalling on this interrogatory underscores the importance of deposition testimony on this topic, as Defendants have already purported to answer this interrogatory twice without providing any substantive information whatsoever.

case insofar as it covers a practice not discussed in the Second Amended Complaint." *See* Ex. E, Uber's Responses and Objections to Notice of 30(b)(6) Deposition. As a preliminary matter, Defendants are incorrect. In fact, the SAC discusses this practice on page 41, paragraph 87, which states: "Even after the primary payment method has been cancelled, Uber sometimes charges other cards it happens to have access to in the app if they have ever been used to book a ride or delivery in the past." SAC ¶ 87. There are also several consumer complaints related to wallet cycling cited in the SAC. *See, e.g.*, SAC p. 41-42.

Defendants also fail to articulate any actual burden in designating a witness to testify regarding this topic. "[A] party claiming that discovery imposes an undue burden must 'allege specific facts which indicate the nature and extent of the burden…Conclusory or speculative statements of harm, inconvenience, or expense are plainly insufficient." *Nationstar Mortg., LLC v. Flamingo Trails No. 7 Landscape Maint. Ass'n*, 316 F.R.D. 327, 334 (D. Nev. 2016) (internal citations omitted). Defendants allege no such facts. Therefore, the FTC requests that the Court order Defendants to designate a witness to testify on this topic.

*v. Topic 16*

Topic 16 concerns "Uber's efforts, either directly or through any third-party service, to monitor or improve the reputation of Uber One or Uber Pass, including the use of search engine optimization." Ex. D.

Uber also does not dispute the relevance of this topic, but instead objects based on the factually incorrect assertion that "it does not use search engine optimization for Uber One." Belying this claim, however, Uber produced documents clearly demonstrating that it uses search engine optimization (or SEO) for Uber One. For example, a "2024 Membership Strategy" document observes, "[t]here is an opportunity to improve the **SEO of Uber One** and surface Uber created content, consumer reviews of Uber One and sponsored Ads." (emphasis in original) [UBER-FTCU1-00232916, at 2918, 2953]. Uber described this as "[a]n opportunity to **consolidate and create one source of truth** for Uber One content." *Id*. (emphasis in original).

Uber also objects that this topic is "overbroad, unduly burdensome, and not proportionate to the needs of the case because it seeks information without connection to the specific disclosures and enrollment and cancellation practices challenged in the [SAC]." The extent of Uber's use of search engine optimization, however, is directly relevant to the disclosures, enrollment, and cancellation practices in this case. For example, Uber's search engine optimization practices would have been one way in which Uber widely disseminated misleading content leading to enrollment. It also would have affected what consumers saw when they attempted to find information about cancellation.

Because Uber plainly did engage in search engine optimization with respect to Uber One, and such practices are relevant to consumers' interaction with Uber One, as well as the deceptive conduct and resulting injury at issue, the FTC respectfully requests that the Court order Uber to produce a 30(b)(6) witness on this topic.

The parties met and conferred regarding this topic on September 30, 2026, but did not reach an agreement.

*vi. Scheduling of 30(b)(6) Designees*

Once the Court has resolved the topics on which designees must be identified, the parties must turn to scheduling the depositions, some of which will involve designees whose testimony will also be taken in their individual capacity. Defendants have asserted that "[t]o the extent witnesses are already testifying in their individual capacities, any 30(b)(6) testimony can take place the same day." While it may be practical in some instances to take a witness's testimony in both their individual and corporate capacities in one day,[6] in other instances it will not, and there is no obligation to do so. *E.g.*, *Dynetix Design Sols. Inc. v. Synopsys Inc.*, 2012 WL 5943105, at *2 (N.D. Cal. Nov. 27, 2012) (Grewal, J.). To the contrary, when an individual is deposed both in their individual capacity under Rule 30(b)(1) and in their corporate capacity under Rule 30(b)(6), the presumption under the Federal Rules is that each deposition is subject to independent seven-hour time limits. *YYGM S.A. v. Hanger 221 Santa Monica Inc.*, 2015 WL 12660401, at *1 (C.D. Cal. July 24, 2015) (Rosenbluth, J.); *Dynetix Design*, 2012 WL 5943105, at *2; *Wesley v. Gates*, 2009 WL 1955997, at *1 (N.D. Cal. July 2, 2009) (Illston, J.).

Because Defendants' full list of designees is not yet known, and because the parties are continuing to discuss issues relating to scheduling parties who will deposed in dual capacities and possible stipulations concerning the duration of Rule 30(b)(6) testimony, there is not yet a ripe issue for Court resolution concerning the scheduling of witnesses who will be testifying in dual capacities. The FTC respectfully notes, however, that if the parties cannot come to agreement on these issues, the FTC may seek the assistance of the Court.

## II. <u>Uber's Statement</u>

Plaintiffs seek the Court's intervention on a number of issues that are moot, remain the subject of ongoing meet-and-confer discussions, or do not warrant the relief requested. The Court should decline to order relief on issues that have been resolved or are not ripe and should deny the remaining requests. The parties can reach agreement promptly on each of the issues Plaintiffs raise.

### A. Interrogatory 5

Plaintiffs' position reveals that Uber already told the FTC that it would respond to the Interrogatory if it were able. Uber will supplement its response by October 9, 2026, rendering this issue moot.

Plaintiffs also suggest that the information requested by Interrogatory 5 is the only way Uber can demonstrate clear and conspicuous disclosure of all material terms. That is both wrong and irrelevant to this Joint *Discovery* Status Report.

[6] For example, the FTC has offered that it will make an effort to depose Alex Wagner in his corporate capacity on the same day he is scheduled to be deposed in his individual capacity.

**B. RFP 61**

At the end of fact discovery, the FTC seeks a massive new trove of minimally relevant information, on a topic that this Court has already adjudicated, all based on a misreading of one document out of the 175,000+ documents that Uber has produced. The Court should deny the FTC's request for several reasons.

First, the FTC's asserted need for additional data should be considered with the discovery Uber has already produced concerning member savings, including productions in response to the FTC's RFPs 6, 14, 29, 33(c) and (d), 34, and 35. Those productions address how Uber measures and reports savings attributable to Uber One membership. For example, Uber has produced a data field titled "total_savings_usd" and has designated a 30(b)(6) witness to explain this field further. The FTC does not explain what material gap remains that requires the substantial additional transaction-level production sought by RFP 61. There is no reason to order Uber to produce more, particularly in light of the burden explained below.

Second, the FTC's justification for seeking more is meritless. For the first time in its draft JSR sent on September 29, Plaintiffs told Uber about one document, UBER-FTCU1-00215038, that the FTC interprets to claim that Uber One inflated fees for members. Rather than give Uber an opportunity to explain this document, however, the FTC seeks to use it as a pretext for a dramatic expansion of discovery. The FTC is mistaken and, as Uber could have explained, has simply overread the document. Although the FTC does not provide a citation, Uber presumes that its position is based on a chart (at -044), which lists average fees paid by a sample of Uber One members in one column, and average fees paid by a separate sample of non-Uber One members in another column. The chart shows that average fees for this particular sample of Uber One members were higher than the average fees for this particular sample of non-Uber One members. But these numbers were pulled by an external vendor and were not meant to be compared in the way the FTC posits. Members on average have a higher basket size (i.e. have larger, more expensive orders than non-members), and the basket size affects the fees charged.[7] These figures are not adjusted to account for that basic fact—making the FTC's invented comparison inapt. The FTC's out-of-context reading establishes nothing.

Third, this Court has already considered and rejected the FTC's previous attempts to expand the scope of discovery to cover how Uber sets its prices for rides and deliveries. In connection with RFP 33, the Court limited the request to only the sub-parts that specifically covered Uber One policies (sub-parts (c) and (d)). ECF No. 150 at 2–3. The portions that the Court blocked (sub-parts (a) and (b)) read in full:

> "All Documents and underlying data Relating to how You determine the total price of Uber rides or Uber Eats deliveries, Including (a) the factors You use to determine the total price of Uber rides or Uber Eats deliveries and the weights assigned to those factors; (b) Any fees that You may include in the total price and how and when those fees are assessed"

[7] Uber, *What fees may apply to my order?*, https://help.uber.com/prs-AF/ubereats/restaurants/article/what-fees-may-apply-to-my-order?nodeId=65d229e2-a2b4-4fa0-b10f-b36c9546cf55 (last visited Oct. 1, 2026) (noting that service fee "varies based on factors like basket size").

RFP 61 is just another way of re-asking for what the FTC tried to get through these requests. RFP 33 asked for the "factors" Uber uses to set prices and the "fees" embedded in those prices; RFP 61 asks for the underlying data necessary to analyze precisely those factors and fees. *See, e.g.*, RFP 61(b)(K) (seeking "all other data that Uber contends would be necessary or appropriate for a difference-in-difference analysis of ride prices for consumers who are enrolled in Uber One and consumers who are not").[8] These are two ways of trying to get at the same—and irrelevant—information. Permitting RFP 61 to proceed would swallow the Court's prior ruling and open the door to the unbounded general pricing discovery that ECF No. 150 expressly foreclosed.

The FTC's contrary argument does not hold together. The FTC says that RFP 61 is "neither duplicative of the FTC's previous requests nor inconsistent with the Court's prior decisions," because RFP 33 was about "*how* Uber calculates the total price of rides and deliveries," while RFP 61 "seeks data and information that will allow the FTC to assess how enrolling in an Uber subscription qualitatively affects the prices consumers pay." The FTC does not explain what it means to "qualitatively affect[] the prices consumers pay," and the proposed distinction makes no sense. In the FTC's own words, both RFPs seek information about "how" Uber calculates what "consumers pay." The Court should preclude the FTC's attempt to pursue the same basic information under a new label.

Finally, as even the FTC seems to appreciate, RFP 61 would impose an extraordinary burden on Uber. The FTC candidly recognizes that the information requested is "substantial." It certainly is. RFP 61 has 26 total sub-parts that would require pulling together many disparate sources of data. This data covers billions of transactions. Even the FTC's proposed 10% sample would amount to billions of transactions, each with dozens of datapoints. And Uber's data team is already hard at work pulling together updated data pursuant to RFPs 62 and 63, as noted below. It is far too late in discovery to seek this massive amount of discovery, especially when irrelevant.

RFP 61 is disproportionate to the needs of the case, contrary to the Court's prior discovery order, and unduly burdensome. The Court should deny the FTC's motion to compel.

**C. RFPs 62 and 63**

Uber has agreed to a single production of data and information responsive to RFPs 62 and 63. Uber will produce data through August 31, 2026 by November 1, 2026.

**D. Additional Depositions**

As discovery comes to a close, Plaintiffs seek permission to increase the number of depositions by 50 percent—from the 10 permitted by Rule 30(a)(2), to 15 total. Plaintiffs are also insisting on unlimited time for 30(b)(6) depositions. Plaintiffs have not carried their burden to justify 15 total depositions. When pressed, Plaintiffs provided a non-final list of sixteen potential deponents, two of whom are outside of the country and several of whom appear to be duplicative of other noticed witnesses. Uber has no objection to providing Plaintiffs with a reasonable

[8] Sub-part (c)(K) is the same for Uber Eats deliveries orders. For the avoidance of doubt, Uber objects to all sub-parts of RFP 61.

increase, but Plaintiffs' proposed increase is unmoored from any articulated need. During the meet and confer on September 30, 2026, Uber told Plaintiffs that it would agree to a total of two additional depositions beyond the presumptive limit (for 12 total), given Plaintiffs' justification. On October 1, 2026, Plaintiffs told Uber they would stipulate to 14 fact depositions, while reserving the right to seek additional depositions for good cause. Plaintiffs do not need 14 depositions.

Rule 30(a)(2) exists precisely to prevent deposition practice from becoming disproportionate to the needs of the case. Fed. R. Civ. P. 26(b)(2)(C). The moving party bears the burden of demonstrating that the information it seeks cannot be obtained through ten depositions or through other, less burdensome means. "A party seeking to exceed the presumptive number of depositions must make a particularized showing of the need for the additional discovery." *Authentec, Inc. v. Atrua Techs., Inc.*, No. C 08-1423 PJH, 2008 WL 5120767, at *1 (N.D. Cal. Dec. 4, 2008). *See also Neonode Smartphone LLC v. Apple Inc.*, No. 21-CV-08872-EMC (RMI), 2026 WL 381316, at *3 (N.D. Cal. Feb. 11, 2026) (denying a request for additional deposition time because "[a]sserting that there are multiple witnesses with knowledge and that the events surrounding willfulness 'touch on different events happening years apart' does not provide a basis for additional discovery")). Plaintiffs have not met this burden. The FTC broadly gestures at the "hundreds of employees across disparate teams" who allegedly touched the issues in this case, and the fact that "the amount in controversy is high." But that is entirely conclusory and does not specify how or why ten depositions would be insufficient. Indeed, the FTC has not identified *any* specific gap in the record that could only be filled with more depositions beyond the ten allotted. The best that the FTC can do is to speculate that there might be a "*likely* benefit" from more depositions.

The FTC's cited cases do not support its position. In each of those cases, plaintiffs demonstrated that more depositions were necessary. In *Kadrey*, the court actually rejected plaintiffs request for 35 depositions, settling on 25 depositions contingent on the remaining depositions being "spread appropriately in a balanced way through the remainder of the fact discovery period." 2024 WL 4502099, at *2 (N.D. Cal. Oct. 15, 2024). The court noted that "the fact that Plaintiffs have taken only four depositions to date is a big red flag." *Id.*. Here, the FTC is only today taking its *second* deposition. *Andersen* is also inapposite because it involved five separate defendants. *Andersen v. Stability AI Ltd.*, No. 23-CV-00201-WHO (LJC), 2025 WL 870358 (N.D. Cal. Mar. 19, 2025). The court permitted thirty depositions of defendants' fact witnesses, or six per defendant, citing "the complexity of the case." *Id.* at *10. *In re Uber Techs., Inc., Passenger Sexual Assault Litigation* is a multi-district litigation (MDL) with a significantly broader scope than this case. No. 23-MD-03084-CRB (LJC), 2024 WL 3643253, at *2 (N.D. Cal. Aug. 1, 2024). *Del Campo* was a putative class action with five plaintiffs, eleven defendants, and conduct going back ten years. *Del Campo v. Am. Corrective Counseling Servs., Inc.*, No. C-01-21151 JW (PVT), 2007 WL 3306496, at *5 (N.D. Cal. Nov. 6, 2007). The court nevertheless limited depositions to "the eleven remaining defendants; two merchants; five former employees; and five district attorneys." *Id.* at *6. *Doe 1 v. Univ. of San Francisco* involved nineteen plaintiffs. 2026 WL 1971134,Id. at *2. The court landed on thirty-five depositions, which the court noted was "fewer than two per plaintiff." *Id.* at *3. Finally, in *C&C Jewelry*, the additional depositions the court allowed were a discrete set of "non-parties-several of whom have voluntarily agreed to be deposed, and some of whom may not be available for trial." *C & C*

*Jewelry Mfg., Inc. v. West*, No. C09-01303 JF (HRL), 2011 WL 767839, at *2 (N.D. Cal. Feb. 28, 2011). The court granted those extra depositions because the plaintiff in that case had made the required showing under Rule 26. *Id.*

The FTC also has no one to blame but itself. Uber has provided extensive discovery on the topics cited by the FTC—enrollment and cancellation design, A/B testing, the savings claim, consumer complaints—and the FTC has had that information for more than two months. Yet the FTC did not identify a single potential deponent until August 14, 2026, when it was ordered to do so by the Court.[9] *See* ECF No. 257. After Uber worked diligently to schedule depositions of the first five employees the FTC identified, the FTC removed two of them from the calendar without explanation. With just six weeks left in discovery, the FTC has only scheduled five of the ten depositions allotted under Rule 30.

Plaintiffs' assertion that "six weeks remaining" in the fact discovery period is "more than sufficient" to accommodate 13 more depositions makes little sense. On the existing calendar, six depositions are already scheduled or need to be scheduled before the November 16 close of fact discovery: Jesse Prehodick (October 2), Kelsie Sausville (October 15), Abbey Stauffer (October 21), Danielle Sheridan (November 5), and two 30(b)(6) designees—Saloni Kishinchandani and Breta Bharucha—whose dates remain to be set. Defendants are also taking at least three depositions of their own during this same window: Jessica Nelson (October 6), Mia Paone (October 8), and Andy Lugo (date TBD). At Uber's insistence, the FTC finally provided Uber with a list of sixteen people who it was considering deposing on September 29, *after* it had sent Uber its portion of the JSR. But that belated list does nothing to establish that the depositions are necessary, and its non-definitive nature makes it useless for actually scheduling depositions. Moreover, the FTC's list of sixteen potential deponents includes people for whom depositions are clearly inappropriate, including a C-Suite executive and an employee in a role unrelated to Uber One who appears in just eight documents out of more than 175,000. Deposing executives requires showing they have unique, first-hand knowledge and exhausting alternatives. *See, e.g.*, *In re Mosaic LLM Litig.*, No. 24-CV-01451-CRB (LJC), 2025 WL 3080548, at *1 (N.D. Cal. Nov. 4, 2025). The FTC has not established that here.

If the Court is inclined to grant any additional depositions, Defendants respectfully submit that the increase should be limited to no more than two non-Apex witnesses (for a total of 12 total depositions).

**E. 30(b)(6) Issues**

As with several other issues, many of the alleged disputes about the Rule 30(b)(6) depositions are not ripe, and the parties are actively engaging in efforts to reach an agreement without the Court's intervention. The Court should allow the parties to finish those productive discussions and the parties can follow up if any issues remain. To the extent the FTC continues to pursue a Court ruling, however, it should be denied.

*i. Applicable Time Period*

---

[9] On August 14, 2026, the FTC told Uber the names of five employees it intended to depose. After Uber worked diligently to schedule their depositions, the FTC removed two of them from the calendar without explanation.

At the parties' September 30, 2026 meet and confer, the FTC indicated that it would re-examine the topics and provide a narrowed set on which they feel a broader date range is necessary. On October 1, 2026, the FTC proposed a date range for all topics of November 2020 through August 2026. On October 2, 2026, Uber sent its counter-proposal of a date range for all topics of November 2020 through December 15, 2025. The Court should allow the parties to complete this negotiation before intervening.

If the Court reaches the issue, Uber respectfully submits that the FTC seeks 30(b)(6) testimony on a time period that significantly exceeds the time period for the rest of discovery and is neither reasonable nor necessary.

First, the FTC is trying again to expand the start date for discovery to November 8, 2019—more than two years before Uber One launched. As the Court has already held with respect to document requests, "the FTC has not justified a two-year look back." ECF No. 167 at 2. The FTC articulates no reason why 30(b)(6) depositions should be treated any differently. If anything, the burden on Uber to educate a witness on events that occurred nearly seven years ago would be *higher* than the burden to produce documents.

Second, and similarly, the FTC is also trying to invoke other subscriptions services to justify the expanded time period. As the Court held in the same order, however, the FTC's "allegations of unlawful conduct are directed at only one subscription service by name: Uber One." ECF No. 167 at 2 n.1. The Second Amended Complaint made no specific allegations regarding "Uber Pass," and it therefore provides no basis to expand the applicable time period.

Third, the FTC is trying to expand the end date for discovery to the indefinite end point of whenever it decides to take its 30(b)(6) depositions. Similar to document productions, Uber requires an end date for 30(b)(6) depositions that is in the past so that it can properly prepare witnesses on each topic, on which the documentary record is essential. Uber proposes using the same end date as was used for document productions, December 15, 2025, because this captures the conduct central to the FTC's case and these materials are readily available. Uber is making changes to Uber One all the time, and those changes can be observed by anyone interacting with Uber's App or Website. The FTC has not added any of them to its Second Amended Complaint. Uber should not be forced to educate witnesses on nearly a year's worth of changes that the FTC itself did not include in its allegations.

*ii. Topic 2*

This dispute is not ripe. The parties met and conferred on this topic on September 30, 2026. Uber expressed its position that this topic covers the same information as requested by Interrogatory 13. As the Court ordered last week, Uber will supplement its response to Interrogatory 13 by October 2, 2026. This dispute should at least be held in abeyance until Uber has had a reasonable opportunity to supplement its response to Interrogatory 13 pursuant to the parties' agreement and the parties are able to assess whether any nonprivileged factual issue remains for 30(b)(6) testimony. Uber is willing to designate its Interrogatory response as its Rule 30(b)(6) testimony on this Topic.

*iii. Topic 12*

Uber is willing to designate a witness on Topic 12 subject to its general objections and the applicable time period.

*iv. Topic 16*

This dispute is not yet ripe for the Court's consideration. The parties met and conferred on this topic on September 30, 2026, and made progress toward a treatment of this Topic that would be acceptable to all parties.

Uber's search engine optimization team has stated that Uber does not engage in search engine optimization for Uber One. The FTC appears to be misreading a single document from Uber's productions. The quote the FTC uses references "an opportunity to improve the SEO of Uber One." UBER-FTCU1-00232916 at 2953. One document that discusses "an opportunity" to do SEO for Uber One does not mean that Uber actually engaged in SEO for Uber One. Even if Uber had actually engaged in this single "opportunity" to do SEO on YouTube, it is not at all clear why that necessitates a 30(b)(6) Topic in this case. Uber believes further discussions on this topic could result in a proportionate compromise.

*v. Duration of 30(b)(6) Depositions*

Uber believes an hours cap on 30(b)(6) testimony is appropriate. Uber informed the FTC on September 18 that Uber's position was that a total of 10 hours of 30(b)(6) across all designees was reasonable given the scope of this case, a position Uber reiterated at the parties' September 30, 2026 meet and confer. The FTC sent its position on October 1, and Uber responded on October 2. The parties should be permitted to continue negotiations before the Court intervenes.

The FTC has taken the position that if Uber designates any of its employees to testify as Rule 30(b)(6) deponents, it is entitled to take 14 hours of depositions over multiple days. That is unreasonable and disproportionate to the needs of the case. Uber notes that if the parties cannot come to an agreement on this issue, Uber will seek the assistance of the Court.

However, if the issue remains disputed, Uber requests a presumptive aggregate limit of ten hours across all designees, with additional time available only by agreement or upon a particularized showing of need. This approach ensures that the FTC receives sufficient time to examine the corporate topics at issue while preventing cumulative and disproportionate discovery. An aggregate limit is also consistent with *Kadrey*, 2024 WL 4362744, at *2 (N.D. Cal. Oct. 1, 2024), in which this Court allocated an aggregate number of hours to the Rule 30(b)(6) notice based on the number of discrete topics after considering the degree of overlap between them. Here, as in *Kadrey*, the noticed topics contain material areas of overlap. For example, Topics 6, 7, 8, 9, and 14 concern calculation, measurement, eligibility relating to membership savings; Topics 10, 11, and 17 concern enrollment-related communications and messages to consumers; Topics 4, 5, and 12 concern subscription charging, retention, and cancellation practices; and Topics 15, 19, and 20 concern Uber's assessment of consumer

experiences through complaints, surveys, and other consumer-feedback methods. The overlap is particularly significant because many of the same subjects are also the focus of fact-witness depositions the FTC has already noticed or indicated it will seek. The appropriate amount of time should be connected to the number of genuinely discrete subject matters at issue, not the number of topics listed in the notice.