Division of Financial Practices
Bureau of Consumer Protection

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

October 22, 2026

***By ECF***

Honorable Thomas S. Hixson
United States District Court, Northern District of California
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Re: *FTC et al. v. Uber Technologies, Inc. et al.*, Case No. 4:25-cv-03477-JST

Dear Judge Hixson:

Plaintiff Federal Trade Commission ("FTC") and Defendants Uber Technologies, Inc. and Uber USA, LLC ("Uber" or "Defendants") submit this joint discovery letter pursuant to the Court's October 15, 2026 Order (Dkt. 281), Fed. R. Civ. P. 37(a) and the Court's local rules.

The parties hereby attest that they have met and conferred in good faith prior to filing this discovery letter.

Respectfully submitted,

*/s/ Paul Mezan*

Paul Mezan
Federal Trade Commission
*Attorney for Plaintiff FTC*

*/s/ Ben Mundel*

Ben Mundel
Sidley Austin LLP

*Attorney for Uber Technologies, Inc. and Uber USA, LLC*

## I. FTC's Statement

Following the Court's October 15, 2026 Order, the parties continued to meet and confer on the outstanding issues regarding 30(b)(6) testimony. There is one issue raised in the parties' prior joint submission that remains in dispute. For reasons explained below, the FTC requests that the Court order Defendants to designate and prepare a witness to testify about Topic 2. Additionally, the FTC respectfully requests leave to file a motion requesting reconsideration of the Court's October 15, 2026 Order denying the FTC's motion to compel Uber to respond to RFP 61.

### A. Topic 2

Topic 2 concerns Uber's knowledge of the Restore Online Shopper's Confidence Act ("ROSCA"), and how it applies to Uber One and Uber Pass. Ex. A. Defendants ask the FTC to accept its response to Interrogatory 13 in lieu of designating a 30(b)(6) witness to answer questions about this Topic. However, the FTC requests the Court permit 30(b)(6) testimony about Topic 2 because Uber's response to Interrogatory 13 remains deficient, and material related to *when* Uber personnel determined Uber's practices at issue were in compliance with ROSCA is relevant to Defendants' asserted affirmative defense of good faith. *See* Dkt. 213 at 53-54.

As established, Uber has put the development of its conclusions about ROSCA compliance squarely at issue by asserting an affirmative defense of good faith, (Dkt. 213 at 53-54) and by using Uber's supposed beliefs about ROSCA compliance to argue that civil penalties should not be awarded (*see* Dkt. 116 at 19-20 (arguing civil penalties should be dismissed because "it is implausible that Uber knew or should have known that its practices violated the FAC's view of ROSCA")). *See* Dkt. 275 at 5-6.[1] However, Defendants' supplemental response to Interrogatory 13 provides no information about when "Uber personnel responsible for Uber One, including business leadership" had relevant conversations about ROSCA compliance—information at the heart of their affirmative defense. *See* Ex. B. Without providing any sense of timing behind Uber's belief that its practices comply with ROSCA, its supplemental response to Interrogatory 13 is nothing more than a recitation of Uber's arguments that it currently does believe it complied with ROSCA. This information is not sufficiently probative to Defendants' good faith defense, which at its core rests on the *timing* of Defendants' belief (specifically, that Defendants believed at the time of the alleged unlawful conduct that it was in compliance with ROSCA).[2]

---

[1] *United States v. Ormat Indus., Ltd.*, 2016 WL 4107682, at *4-5 (D. Nev. Aug. 1, 2016) ("Because such good faith defenses are asserted with respect to [the defendant's] understanding and compliance with the law, [evidence concerning the defendant's] knowledge about the law is vital") (citations omitted); *United States v. Dish Network, LLC*, 2011 WL 98951, at *3 (C.D. Ill. Jan. 10, 2011) (ordering defendant to provide information relating to defendant's actual or implied knowledge and finding such information is relevant and discoverable when civil penalties are sought under the FTC Act or state statutes).

[2] The FTC does not seek "exact dates" of all relevant discussions, but central to the good faith defense (as well as the ask of Interrogatory 13) is the question of *when* the referenced Uber

Further, it is normal and proper for a party to obtain Rule 30(b)(6) testimony on a topic which has been addressed in written discovery, such that even if Defendants' response to Interrogatory 13 is adequate (it is not), Plaintiffs should be permitted to inquire about such information through a 30(b)(6) deposition. For these reasons, the FTC respectfully requests the Court permit 30(b)(6) deposition testimony on Topic 2, and order that Defendants adequately prepare a witness to testify to Topic 2.

**B. Reconsideration of the Court's Order Denying Defendants' Compliance with RFP 61**

Under L.R. 7-9(b)(2), a motion for reconsideration may be brought upon "[t]he emergence of new material facts" occurring after the time of the order challenged, as well as when the Court manifestly failed to consider material facts that existed at the time of the order. The FTC respectfully submits that the Court's order extending the close of fact discovery to December 16, 2026, constitutes a material difference of fact that justifies reconsideration of the Court's order denying the FTC's motion to compel compliance with RFP 61. *See* Dkt. 294. Under the new schedule, the FTC's request was served almost four months in advance of the current discovery cut-off date, leaving Defendants ample time to produce the requested information. In addition, the FTC believes the Court "manifest[ly]" failed to consider "material facts"—namely, that the FTC acted with speed and diligence in seeking the requested material. Specifically, as explained below, the FTC sought similar categories of information in July 2025, which was denied by the Court in March 2026, when crediting Defendants' argument that the FTC's request was a "fishing expedition." The FTC then sought a refined version of the information as soon as Defendants' interrogatory responses and custodial documents demonstrated the information was vital, and moved to compel immediately after Defendants' refusal to comply. The FTC understands the Court's concern about burden and is willing to limit the request to a random sample of 1% (as opposed to 10%) of Uber's consumers.

As the Court recognized, the information requested is directly relevant to Plaintiffs' savings claim. *See* Docket No. 281, at 2 ("This information would allow the FTC to determine with incredible precision the price benefits (or lack of benefit) of being a member of Uber One, after controlling for all other factors that affect pricing."). In finding that the request was made too late, however, the Court overlooked that the FTC sought and *was denied* information on the topic of non-subscriber pricing information in March of this year.

Specifically, the FTC sought documents on the facts Defendants use to determine the total price of rides and deliveries, and how and when Defendants charge fees. *See* Dkt. 145-1, at 13 (RFP 33). The purpose of the request was, in part, to investigate whether Defendants include in their savings calculation savings also made available to non-subscribers, or otherwise inflated its savings claim (by, e.g., charging subscribers more in fees or base prices). For example, if Uber included within "Uber One" savings calculations certain non-exclusive promotions

---

personnel developed the belief that Uber was in compliance with ROSCA. The FTC's position is that it would be sufficient, to the extent exact dates cannot be ascertained, that Defendants verify in writing that there are no written records to establish exact dates, and then instead provide month-based time frames, for example, "in or around May 2023."

available to every Uber user, member or not, a representation to consumers that these savings were derived from their Uber One membership would be a misrepresentation. The relevant fact is not when Uber disclosed it used promotions in its calculations—it is whether Uber included in its calculations promotions that were available to *all* Uber users, subscribers or not. This was the fact that Uber admitted only on August 24, 2026, when it produced its interrogatory responses. *See* Dkt. 275, Ex. A. As noted, Uber categorically denied to this Court that non-subscriber information was relevant in the March 6, 2016 hearing before the Court.[3]

Defendants claimed the request was a "fishing expedition for information about how Uber sets prices across its services," *see* Dkt. No. 145, at 5, and the Court denied the request in relevant part on March 11, 2026. Dkt. 150. However, Defendants' subsequent June and July custodial productions revealed that, far from a "fishing expedition," the FTC's request was well-founded: strong evidence was uncovered that Uber had, in fact, inflated savings figures by either charging subscribers more than non-subscribers or by including in its savings calculation non-exclusive promotions available to all Uber users. *See* Exs. C, D, and E. Almost immediately after uncovering such evidence, in July 2026, the FTC issued an interrogatory seeking further information on the issue. On August 24, 2026, Uber's response *confirmed* that until July 2025—months after this lawsuit was filed—Uber included generally available promotions in its savings calculations and representations. *See* Dkt. 275, Ex. A. The FTC issued RFP 61 *the next day* and moved to compel eight days after receiving Uber's response. Ex. F.

In short, the FTC sought information related to RFP 61 soon after the case was filed, was denied the information by the Court based on Uber's representations about the nature of the information sought, discovered unequivocal evidence in subsequent productions that the information sought was vital, and immediately issued a precisely crafted RFP to allow it to determine the exact scope of the issue. The FTC thus respectfully requests that the Court's suggestion that the FTC delayed in seeking the information is manifestly erroneous.

Defendants' discovery responses thus far demonstrate that the savings claim is inflated. Denying the FTC's request will deprive the FTC (and the factfinder, Judge Tigar) of evidence allowing the FTC to attempt to quantify the magnitude of the issue. And it will allow Defendants, speciously, to argue that harm should be offset by purported subscriber "savings," while shielding evidence that, in fact, those savings are illusory because subscribers often do not save money compared to non-subscribers.[4] The FTC respectfully submits that this result would

[3] Nothing in the documents cited by Uber remotely indicate that their calculations included generally available promotions, which is presumably why they do not quote from the documents. On the exact page cited by Uber, the document says "When/Where" promos are included in the savings calculation is an "Open Question." *See* Ex. G. Defendants have thus only confirmed that the information became available to the FTC only the day before the FTC issued RFP 61.

[4] Uber claims that it has given the FTC data on subscriber savings, but what Uber has actually given is its hand-picked figures regarding subscriber savings. Without *any* data on non-subscriber pricing and fees, it is impossible to quantify whether subscribers save money *compared to non-subscribers*, which is what Uber claims in its advertising.

be profoundly unjust, particularly given the FTC's efforts to obtain the information from the beginning of the case.

As noted, the FTC understands the Court's concern regarding burden[5] and is willing to dramatically limit its request to seek information only on 1% of Uber customers. For these reasons, the FTC respectfully requests the Court grant leave to file a Motion for Reconsideration of its October 15, 2026 Order concerning the FTC's RFP 61 or, alternatively, deem this filing the FTC's motion, and grant the motion.

## II. <u>Uber's Statement</u>

The FTC asks the Court to compel cumulative testimony on a topic Uber has answered twice in writing and grant leave for a motion to reconsider a ruling issued only days ago. Neither of those requests are warranted.

### A. The FTC's Request Concerning Topic 2 Should Be Denied.

Topic 2 seeks testimony concerning "Uber's knowledge" of ROSCA and how the statute "applies" to Uber One and Uber Pass. Uber has already provided the nonprivileged information the FTC seeks. *See* Ex. B at 6-7. Uber's Second Supplemental Responses and Objections to FTC's Interrogatory 13 ("Uber's Second Supplemental Response") identify the nonprivileged factual bases for Uber's position regarding ROSCA compliance during the Applicable Time Period, including details relating to features of Uber's advertisements, enrollment flows, and cancellation flows (with Bates cites to Uber's productions). *See id.* Uber's Second Supplemental response also identifies two individuals involved in formulating that belief, Abbey Stauffer and Danielle Sheridan. Uber's Second Supplemental Response therefore provides the nonprivileged factual information underlying "Uber's knowledge of … ROSCA and how it applies to Uber One and Uber Pass" as requested by Topic 2. Uber accordingly offered to designate its Second Supplemental Response as its response to Topic 2. Plaintiffs declined this offer.
The FTC now argues that it seeks the dates when Uber personnel made determinations regarding ROSCA compliance. Uber's Second Supplemental Response already addresses this topic. Interrogatory 13 expressly asked "when any discussions related to that belief occurred." In addition to identifying the factual basis for Uber's position and the personnel involved in formulating it, Uber's Second Supplemental Response explains that, due to the passage of time and the informal nature of some discussions, it is not practicable to identify all dates on which ROSCA-related discussions occurred. Uber's response remains the same here and would remain so in any deposition on the Topic. *See, e.g.*, A. Stauffer 30(b)(1) Tr. (Rough) 155:24-157:4 (testifying that she did not recall specifically when she formed her understanding of ROSCA). Perhaps more importantly, even accepting the FTC's premise that the timing of certain ROSCA-related discussions may bear on Uber's good-faith defense, the FTC does not explain why the timing of unspecified ROSCA-related discussions, as opposed to the factual bases for Uber's position and the identities of relevant individuals involved in those discussions, warrants a separate Rule 30(b)(6) deposition on that Topic.

---

[5] The FTC notes, however, that Defendants have not provided a declaration attesting to any burden associated with producing the requested data. Based on Uber's prior productions, the FTC expects that the vast majority of data requested is stored in a single repository.

Further, to the extent such discussions involved legal advice or legal analysis, they are privileged. And to the extent it seeks additional nonprivileged testimony, it has not identified any concrete factual gap remaining after Uber's Second Supplemental Response. While Rule 30(b)(6) testimony may overlap with written discovery, the FTC has not identified any remaining nonprivileged factual information unavailable from Uber's written responses that would justify the burden and expense of a further corporate deposition on Topic 2. The Court should deny the FTC's request for 30(b)(6) deposition testimony on Topic 2 and permit Uber to designate its Second Supplemental Response as its response to Topic 2.

**B. The FTC Is Not Entitled To Reconsideration of the Court's Order Denying Defendants' Compliance with RFP 61**

The FTC has not met the standard for reconsideration under Local Civil Rule 7-9(b)(3). The Rule requires showing "[a] manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order." "Motions for reconsideration are designed to bring to the Court's attention clear instances of missed arguments, not simply to make the very same points but more loudly." *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, No. 20-CV-04737-RS, 2021 WL 5302525, at *1 (N.D. Cal. Nov. 15, 2021). The FTC has merely re-packaged its losing argument with a set of facts that it could have, but did not, present to the Court on October 2. *See* Dkt. 275. The FTC points to timing as a new material fact, but even with the one-month extension of fact discovery, less than eight weeks remain in fact discovery. This is barely more than the six weeks the Court already found was too little to respond to an RFP the scope of RFP 61. And since October 2, the FTC has served twelve new RFPs and seven new Interrogatories. Permitting a request of RFP 61's scope with less than two months left in fact discovery would still impose a "crushing burden" on Uber. Therefore, because the material facts remain the same, this request is nothing more than a second bite at the apple and warrants denial on that basis alone.

The FTC's core arguments remain the same as before. To the extent the FTC offers anything new here, it claims that in August 2026, it "uncovered" evidence that Uber was inflating its savings claims. This argument fails for two reasons.

First, the FTC says it just learned in August 2026 (weeks before it made its October presentation on the issue to the Court) that Uber included generally available promotions in its savings calculations and representations. But Exhibit 1 in the FTC's own complaint, a common Uber One enrollment flow, tells consumers the $25 average savings figure reflects what Uber One members save "from Uber One and promos." Dkt. 1 at 5; Dkt. 46 at 8; Dkt. 196 at 8. The FTC knew before filing suit in April 2025 that Uber's savings claims included promotions, so it should go without saying that the FTC clearly did delay in serving RFP 61. If the FTC had doubt about what "promos" meant, it could have issued an interrogatory to that effect on April 22, 2025.

Second, Uber's March 9, 2026 production gave the FTC the same information through Uber's non-public documents. In March, Uber produced "documents demonstrating Uber's methodology for calculating savings from Uber One through April 21, 2025." *See* 4th Prod.

Cover Letter. Uber identified these documents by Bates numbers. The document produced at UBER-FTCU1-00002120, in combination with the cover letter, made clear that, until at least April 21, 2025, some of Uber's savings claims included promotions that were available to non-members. *See* UBER-FTCU1-00002120 at -2129. In a row of the table labeled "Potential 'National' Savings (existing membership)", the document plainly states that "When available, we use the transactions of Uber One subscribers whose monthly billings end in the measurement month in the market to estimate the potential savings for Uber One pass per member per month." It then lists the components of this calculation in a bulleted list. The fifth bullet reads "Member Promos." The sixth bullet reads "Eater promos." The seventh bullet reads "Rider promos." Thus, the most reasonable conclusion is that "Eater promos" and "Rider promos" are available to non-members, because there is a separate category called "Member Promos. To the extent the FTC still had any doubt about this after Uber's March 9 production, it could have served the interrogatory it references in March, April, or May. The FTC waited until late July to serve that interrogatory, and until late August to serve RFP 61.

Finally, even if the Court is willing to entertain the FTC's arguments, it should still reach the same conclusion that RFP 61 remains overly burdensome and disproportionate to the needs of the case. *See* Dkt. 281 at 3. Sample size is only part of the burden imposed by RFP 61; the heavier burden is imposed by its 26 sub-parts. Whether the sample is 1% or 10%, Uber would have to compile a vast amount of data with about three and a half weeks of fact discovery remaining. The FTC's footnote speculating that the "vast majority" of Uber's data lives in a single repository is baseless and similarly misses the point. The main challenge here is not only the amount of raw data, but rather assembling it together in a way that responds to all 26 sub-parts of the FTC's request.

Even if the Court grants the FTC leave to seek reconsideration, the Court should at least permit Uber sufficient time to address the FTC's current position before granting the FTC's motion, including time to potentially prepare a declaration.